1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CLAUDIA M. QUINTANA**
City Attorney, SBN 178613
**BY:  FURAH Z. FARUQUI**
Deputy City Attorney, SBN 233083
**CITY OF VALLEJO**, City Hall
555 Santa Clara Street, P.O. Box 3068
Vallejo, CA  94590
Tel:     (707) 648-4545
Fax:     (707) 648-4687

Attorneys for Defendants, CITY OF VALLEJO, ROBERT NICHELINI, CHASE CALHOUN

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| ERIKA GREGORY and<br>LOREN MOLLNER,<br><br>                          Plaintiffs,<br><br>v.<br><br>CITY OF VALLEJO; former VPD CHIEF ROBERT NICHELINI, individually and in his official capacity; VPD OFFICER CHASE CALHOUN, individually; and DOES 1 through 50,<br><br>                          Defendants. | Case No.  2:13-CV-00320-KJM-KJN<br><br><br>**DEFENDANTS' EXPERT WITNESS DISCLOSURE STATEMENTS [FRCP 26]** |

1.     <u>Police Practices Expert</u>

        Defendants hereby disclose the expert witness report of the following, which they intend to call as a witness at trial:

        Jared Zwickey
        1407 Blue Jay Court
        Tracy, CA 95376
        Cellular:  (209) 321-9688

Mr. Zwickey will provide expert testimony regarding police practices in investigation, warrantless entry, use of deadly force in lieu of use of force, supervision, training and discipline of officers, including any and all Vallejo Police Department policies, rules, and/or regulations, regarding investigation, use of force, training, and tactics, relevant to the Plaintiffs' claims and Defendants' defenses as forth in the attached report.

A true and correct copy of the Expert's report as required by FRCP 26 and the court's scheduling order dated July 22, 2013, is attached hereto.

DATED:  April 16, 2014                    Respectfully submitted,


                                          _/s/ Furah Z. Faruqui_
                                          FURAH Z. FARUQUI
                                          Deputy City Attorney
                                          Attorney for Defendant,
                                          CITY OF VALLEJO, ROBERT NICHELINI,
                                          CHASE CALHOUN

*Expert Opinion Report – Erika Gregory and Loren Mollner v. City of Vallejo, et al.*

# OPINION REPORT

Court: United States District Court – Eastern District of California
Case No.: C12-03791 EDL
Case Name: **Erika Gregory and Loren Mollner**
Vs: **City of Vallejo, et al.**
Date: April 16, 2014

A. I, Jared L. Zwickey am an adult over 18 years of age and would be competent to testify if called as a witness in this matter. I have prepared this report on behalf of the defendants in the matter of *Erika Gregory and Loren Mollner v. City of Vallejo, et al.* in the United States District Court, Eastern District of California, in Sacramento, California.

B. The San Joaquin Delta College District in Stockton, California employs me as an Associate Professor, where I teach administration of justice and firearm courses. Prior to July 2011, I was employed as the Director of Police Services and Public Safety Programs. My duties included, but were not limited to, managing the Campus Police Department, the Basic Police Officer Training program at Delta College and the Stanislaus Sheriff's Regional Training Center, the California Department of Corrections-Juvenile Justice Basic Institutions Academy, the Fire Technology program, and the Administration of Justice and Corrections academic programs.

In addition to writing curriculum and teaching college courses for the San Joaquin Community College District, I teach firearms, defensive tactics, criminal law, search and seizure, and use of force in the Basic Police Officer Academy program and for numerous law enforcement agencies, including the California Department of Corrections and members of the United States Military services.

C. The Yosemite Community College District in Modesto, California also employs me as an Administration of Justice adjunct instructor where I teach Administration of Justice courses at Modesto Junior College.

D. I work closely with the California Commission on Peace Officer Standards and Training (POST) as an unpaid consultant to develop Basic Police Officer Academy course curriculum. I currently serve as the use of force subject matter expert representing the Basic Police Officer Academy sponsored programs in the State of California.

E. I hold all of the Commission on Peace Officer Standards and Training Certifications that can be issued to a law enforcement officer in the State of California, which certify my multiple areas of expertise. I have a F.B.I. Firearms Instructor Certificate, and a POST Defensive Tactics Instructor, Impact Weapon Instructor, Basic and Advanced Narcotics & Dangerous Drugs Certificates. I also have been issued certificates for being a POST Test Proctor, Basic Course Academy Instructor of Perishable Skills and Racial Discrimination Profile Instructor.

1

*Expert Opinion Report – Erika Gregory and Loren Mollner v. City of Vallejo, et al.*

F.  I volunteered to serve on numerous POST committees during the past thirty-nine years as a K-9, tactics, use of force, firearms and scenario training expert, and as a subject matter expert for Basic Academy Course training materials.  The POST committees focus on developing program guidelines for basic and in-service law enforcement certification programs.  I also serve on several POST training committees as a subject matter expert and participate in focus training groups to develop in service and basic training programs for the Basic Academy training academies, PC 832 programs and K-12 regional occupational programs.

I am a member of the POST Consortium Advisory Committee, and the Basic Academy subject matter expert evaluation team, to ensure consistency between training specifications and workbook training materials for the Basic Academy Course amongst the forty training academies in the State of California.

I am a member of the International Chiefs of Police Association, California Police Chief's Association, The Professional Executive Research Forum, The Law Enforcement Tactics, Technology, Training Association, The FBI National Academy Associates, The Society of Police Futurists and the Commission on Accreditation of Law Enforcement Agencies (CALEA).

G.  As a retired law enforcement officer I hold a Basic, Intermediate, Advanced, Supervision, Management, Executive, California Command College, Firearms Instructor, Defensive Tactics/Impact and Less Lethal Weapons, Narcotics & Dangerous Drugs, Advanced Narcotics & Dangerous Drugs, Basic Academy Director, and Academy Instructor of Perishable Skills Certificates.  I am also a graduate of the Federal Bureau of Investigation National Academy and the California Command College, and the Force Science Institute as a Human Dynamics Analyst.  I have a Bachelor's Degree in Administration of Justice from Golden Gate University.

H.  I have thirty-eight years of law enforcement experience, and thirty-eight years of training experience as an Administration of Justice Instructor at the Community College level. I have participated in thousands of hours of law enforcement related training programs; including scenario based training involving the identification and analysis of human dynamic principles of perception and action/reaction, during my tenure as a law enforcement officer and trainer. I hold a black-belt rating in three martial arts disciplines, which includes open hands, short and long bladed weapons, and impact weapons.

I.  During the past thirty-eight years I have acted as a law enforcement procedures and use of force expert.   I have reviewed hundreds of internal affairs investigations conducted by numerous California, Connecticut, Alaska, Texas, Washington State, Oregon and Louisiana law enforcement agencies, to determine if the investigations were complete, thorough and met the objectives of a fair and balanced internal affairs investigation (determination of inappropriate conduct, violations of department policy, evaluation of patterns of conduct and failure to discipline).

*Expert Opinion Report – Erika Gregory and Loren Mollner v. City of Vallejo, et al.*

J.   During my twenty-eight years of law enforcement service with the City of Concord, I participated in the internal affairs investigation process involving alleged acts of officer/employee misconduct.  In my capacity as a Patrol and Traffic Sergeant, Special Investigation, Operations and Administrative Lieutenant, Captain of the Operations Division and acting Chief of Police, I routinely reviewed citizen complaints and I investigated alleged acts of misconduct that required imposing progressive discipline in those matters that allegations were sustained.

K.   During my tenure as Chief of Police for the City of Tracy, I conducted and directed internal affairs investigations into alleged acts of misconduct of civilian and city employees.  Based on the sustained findings of the investigations I reviewed or conducted, I administered progressive discipline to police employees, to include, but not limited to letters of reprimand, demotions and terminations.

L.   In my recent position as Director of Police Services at San Joaquin Delta College, I was responsible for the oversight of personnel in the police department, full-time and adjunct employees assigned to the Administration of Justice program and students attending the POST Basic Police Officer and Fire Science Academies.  During the past fifteen years as an employee of the college, I have directed numerous internal affairs investigations into alleged acts of misconduct.  In those incidents where alleged acts of misconduct were sustained, I administered progressive discipline, including, but not limited to written letters of reprimand up to and including termination.  The attached resume contains a more complete listing of my training and qualifications, and is provided for reference of my experience and skills.

M.   I have thirty-eight years of law enforcement experience and thirty-five years training experience as a K-9 trainer, a police procedures instructor, and a use of force, firearms, and a SWAT tactics instructor.   My area of expertise includes but not limited to: recognition of how stress on the human body affects perceptions of critical and rapidly unfolding events; human cognition factors; establishing probable cause for arrest and use of force; laws of arrest and search and seizure; less-lethal alternatives to deadly force (equipment and tactics); modern police administration and supervision, including policies, procedures, and current law enforcement practices; firearms; internal affairs investigations and disciplinary matters; police K-9 administration, training, and tactics; special weapons and tactics administration and training.

N.   I have testified in approximately seventy-four cases over the past thirty-eight years involving, but not limited to, probable cause, K-9 behavior and training, search warrant and arrest warrant entry, use of force, human cognition factors, law enforcement policies and practices, and tactical and investigation procedures. I have reviewed thousands of use of force incidents involving the use of controlling and deadly force during my career as a law enforcement officer and use of force/tactics instructor.  I have testified in state and federal courts for the defense and for plaintiffs.

3

*Expert Opinion Report – Erika Gregory and Loren Mollner v. City of Vallejo, et al.*

O. The City Attorney's Office for the City of Vallejo retained me on April 2, 2014, as a law enforcement expert.  I was asked to review the facts and circumstances of the use of deadly force against the plaintiff's pet dog on May 16, 2012, when Officer Calhoun attempted to make contact with the plaintiffs at their residence at 47 Kentucky Street, located in the City of Vallejo, California.   At the time of completing this report I have reviewed a variety of documents and things to reach an opinion in this matter.

P. The statements made herein are based on my personal knowledge, which is based upon a review of the documents, and things listed on the attachment entitled documents, photographs and things reviewed.  A copy of my Curriculum Vitae is attached.

Q. On April 5, 7, 2014, I received a variety of written, audio, and photographic materials from the City of Vallejo City Attorney's Office to review.

R. Based on the materials reviewed I was requested to provide my opinion as to the policies and practices Officer Calhoun used on May 16, 2012, to protect himself from being attacked by two of the plaintiff's pets, and determine if his actions were consistent with department policy, state and federal statues and case law.

## DOCUMENTS AND THINGS REVIEWED FOR OPINIONS EXPRESSED WITHIN

1. Plaintiffs' Amended Complaint (Violation of Civil Rights)
2. Deposition Testimony of Erika Gregory taken on October 15, 2013
3. Deposition Testimony of Loren Mollner taken on October 15, 2013
4. Deposition Testimony of Chase Calhoun taken on January 7, 2014
5. City of Vallejo's Response To Request For Production of Documents, Set One
6. City of Vallejo's Confidential Supplemental Responses to Request of Production of Documents Pursuant To The Court's Protective Order Dated November 22, 2013
7. City of Vallejo Police Department Radio Traffic
8. City of Vallejo Police Department CAD Log
9. City of Vallejo Police Department CAD Report
10. City of Vallejo Police Department Information Report #126170.1
11. City of Vallejo Police Department Use of Force Policy C-1
12. City of Vallejo Police Department Use of Taser Policy
13. Seven Colored Photographs
14. Wise JK, Yang JJ. Dog and cat ownership, 1991-1998. J Am Vet Med Association 1994; 204:1166-7.
15. Centers for Disease Control, "Dog-Bite-Related Fatalities -- United States, 1995-1996," MMWR 46(21):463-467, 1997
16. Voelker R. "Dog bites recognized as public health problem." JAMA 1997;277:278,280
17. Weiss HB, Friedman DI, Coben JH. "Incidence of dog bite injuries treated in emergency departments." JAMA 1998;279:51-53
18. *Scott v Harris*, 550 U.S. 372 (2007)
19. *Graham v. Connor*, 490 U.S. 386, 394 (1989)

4

*Expert Opinion Report – Erika Gregory and Loren Mollner v. City of Vallejo, et al.*

20.   <u>Scott v. Heinrick</u> 39 F. 3d 912, 914 (9th Cir. 1994), cert. en 1995 U.S. Lexis 4312 (1985)
21.   <u>Tennessee v Garner</u>, 471 U.S. 1, 105 S. Ct 1694, 85 L.Ed.2d 1 (1985)

## THE COMPLAINT FOR DAMAGES

The plaintiffs' allege that on or about May 10, 2012, plaintiffs discovered that five checks had been stolen from their residence and forged totaling approximately $5,000.  Plaintiffs notified the Umpqua Bank of the theft and forged checks and reported the theft to the Vallejo Police Department.  An investigator from the bank discovered that the person who forged the stolen checks was captured on video tape; she signed her name and provided her driver's license upon cashing the checks at a Wells Fargo Bank located in the City of Vallejo.  The investigator reportedly contacted the Vallejo Police Department to report his findings but the police department did not follow-up on the investigative leads.

Plaintiff Gregory called the Vallejo Police Department investigation unit at approximately 11:00 a.m. on May 16, 2012, to check on the status of their investigation of the reported theft and forgery.  Ms. Gregory was informed that she was being transferred to the dispatcher because the investigations unit was unable to handle the theft investigation.  Ms. Gregory said she was transferred back and forth from the investigations unit to the dispatcher and was reportedly told that an officer would follow-up with her, but she was told "I can't guarantee you anything."

On May 16, 2012, at approximately 12:10 p.m., Officer Calhoun was dispatched to the plaintiffs' residence to conduct a follow-up investigation on the plaintiffs' theft investigation.

The plaintiffs' owned three dogs, a 14 year old blind and deaf border collie, an 11 year old Labrador-Catahoula mix breed dog and a 9 month old Labrador puppy.  The plaintiffs' acknowledge that the dogs act as "watchdogs" to alert family members when people enter the property, but they allege their dogs have never bitten or attacked anyone.  The plaintiffs recognize the fact that family members had friends who have entered the yard without incident; delivery and utility employees also would periodically enter the property without any incident with the dogs, including an individual who make weekly deliveries of fresh vegetables onto the front porch.

The plaintiffs allege Officer Calhoun opened the plaintiffs' front picket fence gate and let himself onto the property.  Plaintiff Gregory stated she was working in the residence and did not hear anything that would have alerted her to Officer Calhoun's arrival on her property.  As Officer Calhoun approached the front door of the plaintiffs' residence, two dogs approached the officer.  Officer Calhoun fired two rounds and killed the Labrador-Catahoula mix breed dog fearing that he was going to be attacked and bitten by the dog.

After the shooting, Plaintiff Gregory left her residence and spoke with the Officer.  Officer Calhoun apologized to her for shooting her dog; he stated he wished he didn't have to shoot her dog.

*Expert Opinion Report – Erika Gregory and Loren Mollner v. City of Vallejo, et al.*

Plaintiffs allege that defendant City of Vallejo, Chief of Police Nichelini, and Does 1 through 50 failed to adequately train, supervise, and discipline the police officers of the City of Vallejo with respect to the Fourth Amendment to the United States Constitution, including under what circumstances and on what grounds it is proper to enter private property unannounced, without a warrant, and without exigent circumstances; the proper precautionary measures to take when entering private property where there may be dogs and or children present; and under what circumstances it is proper to use deadly force.

**OPINION NO: 1**

**OFFICER CALHOUN WAS ACTING IN HIS OFFICIAL CAPACITY AS A PEACE OFFICER WHEN HE WAS DISPATCHED TO THE PLAINTIFFS' RESIDENCE TO CONDUCT A BURGLARY AND FORGERY INVESTIGATION.**

**OPINION NO: 2**

**OFFICER CALHOUN WAS WEARING A DEPARTMENT AUTHORIZED UNIFORM AND DRIVING A DISTINCTLY MARKED BLACK AND WHITE PATROL CAR THAT CLEARLY IDENTIFIED HIM AS A PEACE OFFICER.**

**OPINION NO: 3**

**AFTER TAKING STEPS TO DETERMINE IF THERE WERE ANY DOGS LOOSE ON THE PROPERTY, OR THAT PLANTIFFS WERE IN THE VICINITY OF THE FRONT PICKET FENCE GATE, IT WAS APPROPRIATE FOR OFFICER CALHOUN TO ENTER THE PLAINTIFFS' PROPERTY THROUGH AN UNLOCKED GATE TO MAKE CONTACT WITH THE PLAINTIFFS.**

**OPINION NO: 4**

**ANY REASONABLE OFFICER FACED WITH THE SAME OR SIMILAR FACTS AND CIRCUMSTANCES KNOWN TO OFFICER CALHOUN WOULD HAVE PROBABLE CAUSE TO ENTER THE PLAINTIFFS' PROPERTY TO CONDUCT A CRIMINAL INVESTIGATION.**

Officer Calhoun stated that on May 16, 2012, at approximately 12:10 p.m. he was assigned uniform patrol duties when he was dispatched to 47 Kentucky Street, located in the City of Vallejo, to conduct a follow-up investigation on a possible forgery. The details of the assignment involved contacting the reporting party to obtain suspect information from the plaintiffs' bank. Officer Calhoun conducted a records check on the case number that was provided to him, but he said he could not locate the report.

Officer Calhoun arrived at the plaintiffs' residence and parked his patrol unit at or near the front of the residence. He said he left his patrol car and walked up to what he believed was the entrance of the plaintiffs' residence.

*Expert Opinion Report – Erika Gregory and Loren Mollner v. City of Vallejo, et al.*

It appears that there are two entrances to the front door of the plaintiffs' residence, but the one Officer Calhoun chose was through a wooden arbor that is covered by foliage and a swinging picket gate.  The mailbox to the residence is located inside the wooden picket fence line to the right of the gate.  The entire property is surrounded by a waist high picket fence that separates the plaintiffs' property and the sidewalk.

There was no indication to Officer Calhoun that neither he nor any other citizens were restricted from entering the plaintiffs' property other than through the unsecured wooden picket gate.  There is no doorbell to gain the attention of the plaintiffs, there were no warning signs posted notifying the public not to enter the property, nor were there any "No Trespassing" signs posted at the entrance of the plaintiffs' property warning the public not to enter the property and that there are dogs on the premises.  The gate leading onto the property to the front door of the residence is kept unlocked allowing any citizen to enter the property.   Any reasonable officer who approached the gate of the plaintiff's residence as Officer Calhoun did would have noticed that the purpose of leaving the front wooden gate unlocked is to allow the public to pass through the gate, enter the pathway to the front door of the residence to contact the plaintiffs.

Due to the fact that it was hard for Officer Calhoun to see into the plaintiffs' property, he was initially concerned that there may be animals on the premises but there were no obvious signs of a dog being on the premises.  He stated that before he opened the gate, he shook the gate latch and struck the wood gate with his flashlight in hopes of making enough noise to attract the attention of any dogs or people on the premises.  He said that when he didn't get any response from the plaintiffs nor did any animal appear near the gate, he opened the gate and began to walk towards the front door to contact the plaintiffs.

**OPINION NO: 5**

**OFFICER CALHOUN REASONABLY BELIEVED THE PLAINTIFFS' DOGS WERE RAPIDLY RUNNING TOWARDS HIM WITH THE INTENT TO ATTACK HIM. WOUNDS INFLICTED FROM A DOG BITE COULD RESULT IN OFFICER CALHOUN SUFFERING SERIOUS BODILY INJURY.**

**OPINION NO: 6**

**DUE TO THE IMMEDIATE AND CREDIBLE THREAT THAT THE PLAINTIFFS' DOGS POSED TO OFFICER CALHOUN'S SAFETY DEADLY FORCE WAS USED TO STOP THE DOGS' IMPENDING ATTACK.**

**OPINION NO: 7**

**OFFICER CALHOUN'S USE OF DEADLY FORCE TO AVOID BEING BITTEN WAS CONSISTENT WITH LAW ENFORCMENT POLICIES AND PRACTICES, DEPARTMENT POLICY, STATE AND FEDERAL STATUTES AND CASE LAW.**

*Expert Opinion Report – Erika Gregory and Loren Mollner v. City of Vallejo, et al.*

**OPINION NO: 8**

**ANY REASONABLE OFFICER FACED WITH THE SAME OR SIMILAR CIRCUMSTANCES KNOWN TO OFFICER CALHOUN WOULD HAVE USED DEADLY FORCE TO STOP THE ADVANCE OF TWO AGGRESSIVE DOGS FROM ATTACKING AND CAUSING THE OFFICER GREAT BODILY INJURY OR DEATH.**

**OPINION NO: 9**

**LAW ENFORCEMENT OFFICERS ARE TRAINED TO USE DEADLY FORCE TO STOP A CANINE FROM ATTACKING THEM UNDER CIRCUMSTANCES THAT ARE RAPIDLY UNFOLDING AND WHEN LESSER METHODS ARE NOT AVAILABLE OR PRACTICLE DUE TO THE EXIGENCY OF THE MOMENT.**

**OPINION NO: 10**

**LAW ENFORCMENT OFFICERS ARE TRAINED THAT UNTRAINED DOGS CAN BE AGGRESSIVE, UNPREDICTABLE AND CAN CAUSE GREAT BODILY INJURY OR DEATH TO A HUMAN.**

Officer Calhoun said that as he was walking towards the front door, and after traveling approximately half the distance from the gate to the front door, he glanced down to the ground and looked at a blue plastic children's wading pool but he did not see or hear sounds that would lead him to believe children were in the immediate area.  As Officer Calhoun focused on the wading pool, he stated he heard a sound; he looked to his left and saw two dogs running towards him from the left corner of the house.  He said both dogs were charging at him in a full sprint. The dogs were barking and snarling and the dog closest to him was bearing his teeth, his tail was carried straight back and the hackles on the dog's back was standing up as they approached Officer Calhoun.   Although Officer Calhoun is not a dog expert, but based on the dogs' demeanor he reasonably believed that the dogs were not friendly, and that possibly one or both of the rapidly approaching dogs intended to attack him.

 Officer Calhoun stated that the incident unfolded rapidly and he didn't have time to retreat to the gate that he entered the property to avoid being bitten.  He said that within an estimated second the dogs appeared and ran towards him while displaying an aggressive posture, causing him to believe that he was going to be bitten by both dogs.  He said he started to back away five to six feet from the dogs towards the front gate.  He said he drew his department firearm from his holster, because there was not enough time to use alternate methods to prevent the two aggressive dogs from attacking him other than deadly force.  He pointed the muzzle of his pistol at the lead dog and fired two rounds at the dog's upper body.  He said he scanned over to the second dog but noticed that the dog turned around and ran away from him.   After he discharged his firearm, Officer Calhoun retreated through the front gate and radioed the dispatcher that he had just dispatched a dog.

*Expert Opinion Report – Erika Gregory and Loren Mollner v. City of Vallejo, et al.*

**Reaction Time Slows a Trained Response**

Reaction time (Hick's Law) is the time that passes between the moment an observable change in the environment (called a stimulus) occurs and the response to that change. Simple reaction time is the time required for an observer to respond to the presence of a stimulus. For example, in clinical tests where the goal is to determine the average reaction time, a subject might be asked to press a button as soon as a light or sound appears.

The mean response time for college-age individuals in a non-stressful setting is about 160 milliseconds to detect an auditory stimulus, and approximately 190 milliseconds to detect visual stimulus.

Based on the OODA Loop concept (Colonel John Boyd developed the concept of observe, orientate, decide and act concept for military pilots) there are four steps of judgment that an officer must complete when confronted with a critical decision, especially when there is a consideration to use deadly force.
- The first step deals with perceiving, receiving, processing and encoding the sensory information.
- The second step deals with analyzing the perception, and deciding what the information means
- The third step is choosing the correct response and then deciding how to react to the information.
- The last step in the process deals with executing the response accurately and appropriately.

Go/No-Go reaction time tasks require that the subject press a button when one stimulus type appears and withhold a response when another stimulus type appears. For example, the subject may have to press the button when a green light appears and not respond when a blue light appears.  In a law enforcement setting, an officer may be faced with an individual that makes a movement that may or may not pose a credible threat to their safety or to the safety of others.

Choice reaction time tasks require distinct responses for each possible class of stimulus. For example, the subject might be asked to press one button if a red light appears and a different button if a yellow light appears.

In a law enforcement setting, an officer may be faced with multiple opponents who pose a credible threat to his safety or to the safety of others.  The officer will have to quickly evaluate who is the closest threat and determine what action if anything should be made to control the situation.

Discrimination reaction time involves comparing pairs of simultaneously presented visual displays and then pressing one of two buttons according to which display appears brighter, longer, heavier, or greater in magnitude on some dimension of interest.

*Expert Opinion Report – Erika Gregory and Loren Mollner v. City of Vallejo, et al.*

A peace officer may be confronted with an individual who is non-compliant, and assaultive, and the officer must be able to quickly evaluate the individual's actions to determine if their actions are innocent or possibly life threatening.  Whenever an individual makes a quick movement of the hand and arm towards their waistband, the officer has to quickly evaluate the movement, based on the totality of the circumstances.  The officer must determine if the movement is benign or warrants a deadly force response based on what occurred before and during the event.

In the case of several dogs rapidly and aggressively approaching a peace officer, there is very little time that an officer has to react to the treat and determine what the best course of action is appropriate to avoid being injured.  The factor of surprise, the speed of the dogs, the aggressive posture the dogs display and the distance they rapidly cover all enter into the equation of the decision as to what the officer can reasonably due under the circumstances.

Reaction time is related to how fast an individual's nervous system is able to gather, process, and respond to information in the environment.  Signals from the eye pass down the optic nerve into the visual cortex of the brain where they are processed, and a response signal goes from the brain, down the spinal column, and into nerve cells telling the muscles to contract. All of this takes a measurable amount of time.

Mental processing of a visual stimulus is somewhat slower that an audible stimulus.  Reaction time to the stimulus can vary with age, gender, degree of physical fitness, and other variables, such as pre occupation of the mind with additional stimulus such as giving an individual commands to put their hands up, etc.  For this activity, the mean reaction time for young adults not involved in a life or death situation is approximately 0.19 hundreds of a second.

If you add the rapidly unfolding stressful and chaotic events involving two aggressive dogs rapidly approaching a peace officer in what appears an impending attack, the reaction time of the officer will always be far greater than the dogs he/she is trying to control.

**The Objective of Using Force**

To begin to understand the many concepts involved in the use of force, one must first disassociate the strict concepts of offense and defense as the primary justification of use of force techniques. Use of force is often thought of and described in unspecific terms or in sports terminology. Unlike the planned format of certain sports such as baseball and football where offensive and defensive modes are separate, use of force situations are generally not as clearly defined strictly in terms of offense and defense. The application of physical force is more probably like the sport of boxing, in which a participant can:
   • change from offense to defense during a movement, or,
   • perform actions which are simultaneously offensive and defensive.

Therefore, to understand use of force, we must replace offense/defense with the concept of control in our thinking. Control is the ability to command or direct and individual with or without voluntary compliance. One can substitute the idea that the officer will control with the subject's consent, if possible, but force the subject to comply, if necessary.

*Expert Opinion Report – Erika Gregory and Loren Mollner v. City of Vallejo, et al.*

As discussed, officers may use force when they need to establish and maintain control over a subject or an aggressive animal.  Therefore, the officer may use force to:
- to effect an arrest
- overcome resistance to lawful duties and tasks.
- in defense of oneself or others from a person or an animal
- prevent escape

If the officer must make an aggressive or proactive action to seize an individual who does not wish to be seized, the purpose of the seizure is to establish control over the subject, regulating his movements for a legal reason.  If the officer is defending himself or another, control must be established to neutralize the subject or the animals' capability to cause harm, but not necessarily at any cost.

The cost to the individual in terms of injury or deprivation of liberty may not outweigh the need of society to control the individual's actions. The governmental need to control must outweigh the cost to the subject being controlled. Therefore, the amount of force allowed to establish and to maintain control must be reasonable.

## The Reasonableness of Force

The reasonableness inquiry in an excessive force claim is an objective one.  To evaluate the reasonableness of the officer's conduct, the amount of force used must be balanced against the need for that force, with reference to clearly established law at the time of the conduct in question.

The following facts should be considered, but not limited to when gauging reasonableness.

- The severity of the crime
- The nature and extent of the threat posed to Officer Calhoun
- The degree to which the plaintiffs' dogs attempted to attack and bite Officer Calhoun
- The intensity, speed and the level of aggression the dogs displayed

Police officers also have a legal right to use reasonable force to overcome resistance, to affect an arrest, and for protection; the right of self-defense is not lost.

When the level of force applied in any given situation is reasonable, a police officer should not be considered the aggressor.  The officers have a right to stand their ground against any type of aggressor; and they are not required to retreat or desist.

A peace officer who makes or is suddenly attacked by aggressive dogs need not retreat or desist from his/her efforts because of the resistance, or threatened assault of an aggressive animal.   An officer be deemed an aggressor, or lose his right to self-defense by the use of reasonable force to prevent being seriously injured.

11

*Expert Opinion Report – Erika Gregory and Loren Mollner v. City of Vallejo, et al.*

To my knowledge, and based on my thirty-eight years of law enforcement experience there is no requirement for law enforcement officers to use all feasible alternatives to avoid a situation where deadly force can justifiably be used.  There are however, cases that support the assertion that where deadly force is otherwise justified under the Constitution, there is no constitutional duty to use non-injuring alternatives first.

**Peace Officers have to make split-second decisions**

Peace officers are often forced to make split-second decisions that must be reasonable under the circumstances.  It was reasonable for Officer Calhoun to use deadly force when he observed the plaintiffs' dogs rapidly approaching him in an aggressive manner.  Based on the dogs' signs of aggression, Officer Calhoun reasonably believed the dogs posed an immediate and credible threat to his personal safety.

When a higher degree of risk to a peace officer or to the public exists, a greater use of force is justified by a peace officer for his/her self-defense.

Peace officers are vulnerable to potential life-threatening harm when confronting aggressive animals who have the ability to inflict serious bodily injury or death.  The primary goal of using force is to protect the officer and to stop the threatening advance of the dogs; it is not to cause unreasonable pain or to inflict punishment to the animal.

Law enforcement personnel have a variety of force options available to them when dealing with dangerous and aggressive dogs they come in contact with.  On a continuum of increasing levels of force, these options (not in any particular sequence) include officer presence, chemical agents, impact and EDC weapons, and lethal force or weapons.

The level of force that is used depends greatly on the totality of the circumstances.  The level of force used in situations such as this incident depends on the availability of an officer's force options and the amount of time they have to deploy them.  The element of surprise and the quickness and determination of the animals approaching and the distance of the officer to the dogs will often dictate what force option an officer will have time to use.

Each set of circumstances will require peace officers to exercise judgment in the decision of the force to use. Peace officers must be aware of and follow their agency's policies regarding the use of any force option, as Officer Calhoun did in this matter.

In my opinion, Officer Calhoun used only that level of force that was necessary to protect himself from being bitten and severely injured by the plaintiffs' dogs. (See the attached Use of Force Diagram)

From the vantage point of an officer whose personal safety is jeopardized, a rapidly approaching dog who is capable of generating surprise, aggression, and extensive injuries poses a credible threat to the officer's personal safety.  Furthermore, government officials are not required to err on the side of caution.

*Expert Opinion Report – Erika Gregory and Loren Mollner v. City of Vallejo, et al.*

The reasonableness inquiry in an excessive force claim is an objective one.  To evaluate the reasonableness of the officer's conduct, the amount of force used must be balanced against the need for that force, with reference to clearly established law at the time of the conduct in question.

The following facts should be considered, but not limited to when gauging reasonableness.
•        The severity of the crime
•        The nature and extent of the threat posed by the plaintiffs' dogs
•        The degree to which the dogs pose an immediate and credible threat
•        Any attempts by the dogs to continue their attack

When the level of force applied in any given situation is reasonable, a peace officer should not be considered the aggressor.  A peace officer has a right to stand his/her ground against any type of aggressor; and they are not required to retreat or desist.  Peace officers also have a legal right to use reasonable force to overcome resistance, to affect an arrest, and for protection; the right of self-defense is not lost. (Scott v Heinrick 9th Cir 1994)

The objective for the use of force by peace officers in any situation is to ultimately gain or maintain control of the attacking dogs and therefore the situation.

Peace officers are required to use force only when authorized to overcome resistance and gain or maintain control to a lawful process, and to use the type of force that is reasonable under the circumstances.  Further, peace officers should only use the amount and type of force permitted by department policy, state statute and case law.

**Untrained Dogs Can Be Dangerous**

The Centers for Disease Control (CDC) study dog bite incidents in the United States, including the types of dogs most likely to bite. The breeds that the CDC considers highest risk are pit bulls, Rottweilers, German Shepherds, Huskies, Alaskan Malamutes, Doberman Pinschers, Chows, Great Danes, Saint Bernards and Akitas.

Owners of such dogs should be aware that if their dogs attack a person, the attacks will be scrutinized by law enforcement. The reason is that irresponsible behavior with or toward a dog regardless of their breed is known to bite has caused a rising and unacceptable injury and death toll in the United States, which authorities are determined to stem.

The Humane Society of the United States state that there is an 8 out of 10 chance that a biting dog is a male.  Although Pit Bull mixes and Rottweilers are most likely to kill and seriously maim, fatal attacks since 1975 have been attributed to dogs from at least 30 breeds or mixed breeds.

Any trained or untrained dog, treated harshly or trained to fight other animals or attack humans, may bite a person for unknown reasons. Any dog can easily be turned into a dangerous dog. The owner is most often responsible not the breed, and not the dog.

*Expert Opinion Report – Erika Gregory and Loren Mollner v. City of Vallejo, et al.*

An irresponsible owner or dog handler might create a situation that places another person in danger by a dog, without the dog itself being dangerous.

A survey by the national Centers for Disease Control and Prevention in Atlanta ("CDC") concludes that dogs bite nearly 2% of the U.S. population -- more than 4.7 million people annually.   Although the number of dogs in the United States increased by only 2% between 1986 and 1996, the number of dog bite injuries requiring medical treatment rose by 37%.

Almost 800,000 bites per year, one out of every 6 cases are serious enough to require medical attention. Dog bites send nearly 334,000 victims to hospital emergency departments per year (914 per day). The types of injures that could occur range from simple puncture wounds to tissue damage, loss of an appendage, nerve damage, loss of motion and severe infection.  If a peace officer suffers a serious bite injury it would be career ending.

**Motivation of a Dog to Bite**

There are many types of aggression among dogs. Classes of aggression include, but are not limited to the following (Borchelt, P.L. and Voith, V.L. 1982. "Classification of Animal Behavior Problems," Vet. Clinic. North American Small Animal Practitioners. 12:571-585):

- Dominance aggression: aggressive behavior usually directed to family members who take something from the dog, pet it, hold it, pick it up, or disturb it while it is resting.
- Defensive or fear aggression: directed to family or strangers who approach too quickly or too closely when the dog is afraid.
- Protective/territorial aggression: directed to strangers to approach the owner or the home of the owner.
- Predatory aggression: directed to small, quickly moving animals and children, especially where more than one dog is involved.
- Pain-elicited aggression: directed to family or strangers who approach or touch when the dog is in pain or injured.
- Punishment-elicited aggression: directed to family or strangers who hit, kick or verbally assault the dog.
- Redirected aggression: directed to family, strangers and animals that approach or touch the dog when it is aggressive in another context

**Factors That Cause a Dog to Bite**

There is much in the scientific literature of animal behavior that sheds light on the causes of dog attacks. Embedded in the literature, it is interesting to note that a dog owner is directly responsible for the presence or absence of most factors that determine whether a dog will bite.

*Expert Opinion Report – Erika Gregory and Loren Mollner v. City of Vallejo, et al.*

A report by the American Veterinary Medical Association, Task Force on Canine Aggression and Human-Canine Interactions, entitled A Community Approach to Dog Bite Prevention, refers to five factors commonly associated with dog bites:

- Breed and "parents" of the attacking dog: this refers to aggression as a type of behavior that has been bred into certain breeds of dogs, and characteristics of the "sire" and "bitch" that produce an individual dog.
- Socialization of the dog: how the dog has been desensitized to stimuli, especially stimuli produced by children. Poor socialization results in less inhibition to bite and engage in other undesirable behavior.
- Training of the dog to fight other dogs or people: the nature, degree and quality of training. A dog that has been trained to threaten people is an obvious danger, but so is a dog that has been poorly trained or not trained at all.
- Health of the dog: whether the dog was sick or injured. When a dog is sick or injured, or in pain, biting can result for a number of reasons.
- Behavior of the victim: this includes any behavior (i.e., a baby rolling over on a bed), not just provocation (i.e., hitting the dog).

## Signs of Aggressiveness Behavior

Some of the most common signs of aggressive dog behavior that is directed at any person, animal or thing are:

- Growling
- Snarling
- Curling lips
- High Tail Positioning
- Hair standing on end on the upper back in the dominant zone
- Eye Contact & Focus on one individual
- Pacing and or circling
- Saliva Flow (Foaming at the Mouth)
- Ears laid back or positioned forward
- Lunging or running towards an individual
- Snapping
- Blocking an individual's path
- Barking aggressively while advancing
- Biting (even if it does not break the skin)

The plaintiffs stated that the three dogs they owned acted as "watchdogs" to alert the family when people entered the property.  They allege that none of the dogs had ever bitten or otherwise attacked anyone.  The plaintiffs indicate the family regularly had friends visit and enter the yard of their property without incident.  Delivery and utility employees have periodically entered the property without any conflicts with their dogs, including an individual who made weekly deliveries of fresh vegetables to the residence.

15

*Expert Opinion Report – Erika Gregory and Loren Mollner v. City of Vallejo, et al.*

While there are no alleged documented incidents involving the aggressiveness of the plaintiffs' dogs with delivery persons, Officer Calhoun's description of the plaintiffs' dogs approaching him at a rapid pace while barking, growling, tail carriage and raised hackles is consistent with a dog who is in an aggressive posture and is posed to attack.

**OPINION NO: 11**

**THERE IS NO CREDIBLE EVIDENCE THAT THE VALLEJO POLICE DEPARTMENT HAS A POLICY OR PRACTICE THAT ALLOWS DEPARTMENT PERSONNEL TO VIOLATE CITIZENS' PERSONAL AND CONSTITUTIONAL RIGHTS.**

**OPINION NO: 12**

**THERE IS NO CREDIBLE EVIDENCE THAT THE DEFENDANTS OF THE CITY OF VALLEJO, CHIEF NICHELINI AND DOES 1-50 FAILED TO ADEQUATELY TRAIN, SUPERVISE AND DISCIPLINE POLICE OFFICERS FOR IMPROPER CONDUCT.**

Immediately after Officer Calhoun used deadly force to protect himself from being attacked by the plaintiffs' dogs, he asked the dispatcher to dispatch a supervisor and an animal control officer to respond to the scene.

Plaintiff Gregory exited her residence and found that her dog had been shot.  Officer Calhoun spoke to Gregory and he repeatedly told her that he was sorry that he had to shoot her dog because the dog tried to attack him.

The Vallejo Police department assigned Sergeant Sid DeJesus to conduct an administrative investigation into the facts and circumstances surrounding the shooting of the plaintiffs' dog to determine if the use of deadly force was consistent with department policy.  If Officer Calhoun's actions were found appropriate and within department policy, law enforcement practices, state and federal statutes and case law, there is no expectation that the officer would be disciplined.

In my opinion, the use of deadly force by Officer Calhoun is consistent with the City of Vallejo Police Department Use of Force Policy General Order C-1:

     **I.**     **POLICY**

          A. It is the Department policy to accomplish public safety and law enforcement objectives with minimal reliance on the use of force.

          B. Members may use reasonable force as required in the performance of their duties.

          C. Members shall utilize only those force options approved by the Department, in a manner consistent with Department training.

*Expert Opinion Report – Erika Gregory and Loren Mollner v. City of Vallejo, et al.*

## V.      LETHAL FORCE

A. Lethal force may be used only when it is reasonable, as defined herein, and is needed to:
1. Defend the member or other persons from an immediate threat of death or great bodily injury;

2. Apprehend a suspect who is attempting to escape and has, or is reasonably believed to have, committed a violent felony and who presents a continuing and immediate life threatening danger; or,

3. Dispose of dangerous or seriously injured animals in the absence of humane or practical alternatives.

B. Members shall discharge firearms with due regard for the safety of uninvolved persons.

It is my opinion, based on over forty-eight years of experience training a variety of dog breeds, that the plaintiffs' dogs focused their aggression on Officer Calhoun as he walked towards what he believed was the front door of the residence.  There is strong evidence to suggest the plaintiffs' dogs would have bitten Officer Calhoun had he not taken immediate steps to prevent the dogs from attacking him.

The type of injuries that Officer Calhoun could have sustained if the plaintiffs' dog attacked him, range from simple puncture wounds to extensive tissue damage, arterial damage, nerve damage and infection that could be career ending and even life threatening.

It is my opinion that if Officer Calhoun did not shoot the plaintiffs' dog he would have been bitten.  Officer Calhoun's actions were quick and decisive due to the fact that he was suddenly surprised to see the plaintiffs' dog in close proximity of him and rapidly approaching in an aggressive manner.  Officer Calhoun had to make a split second decision to use the most effective level of force to prevent the plaintiffs' dogs from attacking and injuring him.  The use of deadly force under the facts and circumstances of this case is consistent with department policy, law enforcement policies and practices, state and federal statues and case law.

I am prepared to testify to the opinions expressed in this report, in deposition or at trial if called upon to do so.

I understand that discovery is ongoing and I reserve the right to amend my report with additional opinions if I may have I am provided with further documentation for review.  If I am provided with additional materials to review, I reserve the right to amend my report as necessary.

*Expert Opinion Report – Erika Gregory and Loren Mollner v. City of Vallejo, et al.*

**EXHIBITS:**

Use of Force Diagram
Signs of Canine Fear and Aggression
ODDA Loop Diagram

**QUALIFICATIONS:**

See Attached Vitae

**EXPERT TESTIMONY**

See Attached Vitae

**PUBLICATIONS:**

Police officer's Use of Force Reference Guide, 2006
Dog Sport Magazine, 1990-1993

**COMPENSATION:**

| | |
|---|---|
| Case Review | $150 per hour |
| Deposition Fee | $200 per hour |
| Court Testimony | $200 per hour |

*Jared L. Zwickey*

*Expert Opinion Report – Erika Gregory and Loren Mollner v. City of Vallejo, et al.*



*Expert Opinion Report – Erika Gregory and Loren Mollner v. City of Vallejo, et al.*





## AGGRESSIVE ATTACK

This threatening posture is used to chase
another away or, if need be, to attack in order
to protect possessions, pack or self.

*Expert Opinion Report – Erika Gregory and Loren Mollner v. City of Vallejo, et al.*



# JARED L. ZWICKEY

*1407 Blue Jay Court • Tracy, California, 95376 • (209) 835-9159*

## POLICE ACADEMY

1968 Los Medanos Regional Training Facility, Concord, CA

## EDUCATION

DIABLO VALLEY COLLEGE, PLEASANT HILL, CA
*1970, AA Degree, Police Science Major*

GOLDEN GATE UNIVERSITY, SAN FRANCISCO, CA
*1977, BA Degree, Criminal Justice Major*

CALIFORNIA STATE UNIVERSITY, HAYWARD, CA
*1980, 19 Units, Public Administration Major*



POST COMMAND COLLEGE, SAN LUIS OBISPO, CA
*1987, Organizational Leadership Major*

FBI NATIONAL ACADEMY, QUANTICO, VIRGINIA
*1988, Organizational Leadership Major*

UNIVERSITY OF VIRGINIA
*1988, 15 Units, Administration of Justice*

## LAW ENFORCEMENT & TEACHING EXPERIENCE

**CITY OF CONCORD**
*Police Reserve Officer (1965-1967) (2005-2007)(2007-2009)*
*Police Officer          1967-1977*
*Police Corporal         1977*
*Police Sergeant         1977-1982*
*Police Lieutenant       1982-1991*
*Police Captain          1991-1993*

**CITY OF TRACY** - *Police Chief, 1993-1997*

**CITY OF LODI -** *Police Reserve Officer    2005-2007*

**CONTRA COSTA COMMUNITY COLLEGE DISTRICT-***Defensive Tactics Instructor, 1974-1993*

**COUNTY OF STANISLAUS** – *Stanislaus County Sheriff - Reserve Sheriff Deputy, 2007-2009*

**YOSEMITE COMMUNITY COLLEGE DISTRICT** - *Administration of Justice Instructor*

**LOS MEDANOS COMMUNITY COLLEGE DISTRICT** - *Administration of Justice Instructor*

**SAN JOAQUIN COUNTY DELTA COLLEGE –** *DIRECTOR OF PUBLIC SAFETY/ADMINISTRATION OF JUSTICE TRAINING PROGRAMS/ASSOCIATE PROFESSOR/POLICE CHIEF- 1997TO 2011– Administration of Justice Associate Professor2011-2013*

1

## POLICE TRAINING

1967- Civil Defense Emergency Course
1969 - Weaponless Defense Instructor Course
1970 - K-9 Training Course
1971 - CHP Motorcycle Training School
1972 - Federal Narcotics & Dangerous Drugs
1973 - Polygraph Examiner Course
1973 - FBI Firearms Instructor Course
1973 - Executive Development Course
1974 - Police Self Defense Institute
1975 - Techniques of Teaching
1975 - Sergeant Supervisory Training
1976 - FBI Basic SWAT Training
1977 - FBI Firearms Instructor Course
1978 - Baxter School of Lie Detection
1978 - Traffic Program Management Institute
1979 - Police Dog Handlers Course
1980 - Police Management Course
1981 - Police Dog Training
1981 - Supervising Traffic Control
1982 - Scent Detection Training
1982 - Basic Traffic Accident Investigation
1982 - K-9 Training in Europe, Canada
1983 - K-9 Training in Europe
1983 - Side Handle Baton Instructors Course
1986 - Records Management Training
1986 - Property Management Training
1986 - Middle Management Training
1987 - Critical Incident Management/Tactics
1987 - California Command College
1988 - Earthquake Preparedness
1988 - FBI National Academy
1989 - Police Facility Design & Construction
1990 - Vice/Narcotics Commander's Course
1995 - Executive Development Course
1995 - OJJDP Gang/Drug Policy Training
1995 - Non Lethal Weapons - Instructor
1997 - POST Monthly Video Training
1998 - POST Monthly Video Training
1998 - POST Basic Academy-Director
1998 - POST Firearms Training Seminar
1998 - POST 1998 Legal Update
1999 - POST 1999 Legal Update
1999 - POST Monthly Video Training
1999 - POST Suicide By Cop - V
1999 - POST Viol in a Workplace -V
2000 - POST Domestic Violence,
POST- Preliminary Investigation Course -V
2000 - POST Instructor Symposium
2000 - POST Monthly Video Training
2001 - POST Verbal Judo Techniques
2001 - POST Positional Asphyxiation-V

2001 - POST Unmarked Vehicle Ops – V
2001 - POST CDL Falsifications-V
2001 - POST Building Search Techniques-V
2001 - POST Jail/Courtroom Searches-V
2001 - POST Domestic Violence-V
2002 - POST Instructor Symposium - LA
2002 - POST Legal Update- V
2002 - POST Voluntary Instructor Update
2003 - POST Anti-reproductive Crimes-V
2003 - POST Case Law Update-V
2003 - POST Vehicle Theft -V
2003 - POST PC 832 Workshops
2003 - POST Recognizing Terrorism-V
2003 - POST Public Safety Dispatcher-V
2003 - POST Achieving Training-V
2003 - Crowd Management-V
2003 - Civil Disobedience-V
2003 - POST Leadership & Supervision-V
2003 - POST 832 Arrest/Control/Firearms
2003 - POST Use of Chemical Agents (D)
2004 - POST Basic IA Investigations
2004 - POST Case Legal Update (D)
2004 - POST Racial Profiling Trainer
2004 - Pistol Qualification (832pc)
2005 - POST Warrant Service/Bld Search (D)
2005 - POST Preliminary Investigations (D)
2005 - POST Use of Force (D)
2005 - Gang Members (D)
2005 - Illegal Street Racing & Sideshow (D)
2005 - Domestic Violence Update (D)
2005 - Firearms Seizure and Disposition (D)
2005 - Case Law Today - April - June (D)
2005 - Pistol/Long Rifle Qualification
2006 - Legal Update (D)
2006 - Case Law Today (D)
2006 - Terrorism - Suicide Bombers (D)
2006 - Case Law Today (D)
2006 - Custodial and Courtroom Security (D)
2006 - Instructor Development Training
2006 - Electronic & Projectile Weapons
2006 - Shock Knife Instructor Certification
2007 - Legal Update
2007 - NIMS & SIMS Mandated Training
2008 - LEGAL UPDATE
2008 - Firearms Training DSS Qualification
2008 - Driver Training Update
2009 - Perishable Skills Training
2009 – Diagnostic Training for Firearms
2009 - NIMS/SIMS Levels of Training
2009 – Human Dynamics/Behavioral Science
2009 – Firearms Scenario Training

2

**POLICE TRAINING**

2009 – X26 Taser Recertification Training
2009 – Pistol, M-4, LT-Shotgun Qualification
2010 – Legal Update & Pistol Qualification
2011 – Legal Update & Pistol Qualification
2012 – TECLOSE - Intermediate Search &
      Seizure –Houston Texas
2012 – DCPD Firearms Qualifications
2012 – Legal Update
2013 – Legal Update
2013 – Firearms Qualifications/Use of force
2013 – Best Practices of Good Training
2013 – Learners First: Facilitation Skills for
      Learner-Centered Instruction
2013 – Target Your Teaching
2013 – POST - Mental Health Update
2013 – Idaho POST Excited Delirium
      Instructor's Course
2014 – Stress Management
2014- Firearms Qualification

## POST CERTIFICATES:

BASIC, INTERMEDIATE, ADVANCED, SUPERVISION, MANAGEMENT, EXECUTIVE, COMMAND COLLEGE. FIREARMS, DEFENSIVE TACTICS, IMPACT WEAPONS, LESS LETHAL WEAPONS, NARCOTICS & DANGEROUS DRUGS, ADVANCED NARCOTICS & DANGEROUS DRUGS, ACADEMY DIRECTOR, RACIAL PROFILING, ACADEMY INSTRUCTOR OF PERISHABLE SKILLS.

## FIELDS OF EXPERTISE

| | |
|---|---|
| Arrest and Control Techniques | Detentions, Stop & Frisk, Laws of Arrest |
| Defensive Tactics/Field Tactics | Less than Lethal Weapons |
| High and Low Risk Stop Techniques | K-9 Training, Tactics, Program Management |
| SWAT Tactics & Management | Tactical Use of Firearms |
| Critical Scene Management | Law Enforcement Policies and Practices |
| Use of Force/Executive Protection | Property/Evidence Management |
| Impact and Dangerous Weapons | Criminal and Administrative Investigations |
| Riot and Crowd Control | Search Warrants & Consent Searches |
| Tactical Communications | Narcotic Dog Detection, Training |
| Transportation of Prisoners | Law Enforcement Policies and Procedures |
| Restraint Devices | Supervision and Leadership |
| Dealing with the Emotionally Disturbed | Response to Critical Incidents |
| Narcotics and Dangerous Drugs | Traffic Management/Accident Investigation |

## INSTRUCTOR/CONSULTANT EXPERIENCE

CHIEF ZWICKEY HAS BEEN AN INSTRUCTOR IN THE LAW ENFORCEMENT COMMUNITY SINCE 1967. HE HAS INSTRUCTED AT LOS MEDANOS COLLEGE IN PITTSBURG, CA, FROM 1974 TO PRESENT, OHLONE COLLEGE, CALIFORNIA STATE UNIVERSITY LONG BEACH, INSTITUTE OF TECHNOLOGY, MODESTO JR. COLLEGE AND DELTA COLLEGE. CHIEF ZWICKEY PROVIDED K-9 OFFICER SURVIVAL TRAINING TO OFFICERS FROM NUMEROUS LAW ENFORCEMENT AGENCIES AT THE CALIFORNIA INSTITUTE AT SAN LUIS OBISPO. HE IS ALSO A SUBJECT MATTER EXPERT CONSULTANT TO THE COMMISSION ON CALIFORNIA PEACE OFFICER AND TRAINING. HE HAS CONDUCTED TRAINING FOR THE F.B.I., MEMBERS OF THE UNITED STATES ARMED SERVICES AND THE FOLLOWING LAW ENFORCEMENT/GOVERNMENT AGENCIES:

| | |
|---|---|
| FREMONT POLICE DEPARTMENT | RICHMOND POLICE DEPARTMENT |
| UNIVERSITY OF CALIFORNIA POLICE | VACAVILLE POLICE DEPARTMENT |
| BERKELEY POLICE DEPARTMENT | HAYWARD POLICE DEPARTMENT |
| GLENDALE POLICE DEPARTMENT | SAN LEANDRO POLICE DEPARTMENT |
| HUMBOLDT COUNTY SHERIFF'S DEPT. | CONTRA COSTA SHERIFF'S DEPT. |
| LOS ANGELES SHERIFF'S DEPARTMENT | NAPA POLICE DEPARTMENT |
| CSTI FOR OFFICER SURVIVAL | NAPA COUNTY SHERIFF'S DEPT. |
| LOS ANGELES POLICE DEPARTMENT | LODI POLICE DEPARTMENT |
| SAN DIEGO POLICE DEPARTMENT | ANTIOCH POLICE DEPARTMENT |
| EL MONTE POLICE DEPARTMENT | POMONA POLICE DEPARTMENT |

4

| ROSEVILLE POLICE DEPARTMENT | EL MONTE POLICE DEPARTMENT |
|---|---|
| MODESTO POLICE DEPARTMENT | SUSD POLICE DEPARTMENT |
| SAN FRANCISCO POLICE DEPARTMENT | FEDERAL BUREAU OF INVESTIGATION |

## COURT CERTIFICATION AS AN EXPERT WITNESS

| | |
|---|---|
| **MILLER V COUNTY OF BUTTE** -USE OF FORCE, LE PRACTICES (JANUARY 2009) | **ADAMS V STATE OF CALIFORNIA** -USE OF FORCE, LE POLICIES/PRACTICES (JANUARY 2009) |
| **MINOR V STATE OF CALIFORNIA** -USE OF FORCE, LE POLICY/PRACTICES (APRIL 2009) | **BEECHAM V CITY OF WEST SACRAMENTO** - USE OF FORCE, PROBABLE CAUSE, LE POLICIES & PRACTICES (APRIL 2009) |
| **BARRERA V CITY OF OXNARD** –PROBABLE CAUSE DEADLY FORCE, LE POLICIES/PRACTICES (AUGUST 2009) | **FRIETAS V CITY OF PLEASANT HILL** – PROBABLE CAUSE SUSPECT IDENTIFICATION, LE POLICIES / PRACTICES (APRIL 2009) |
| **SAUCER V CITY OF OAKLAND** –PROBABLE CAUSE LE POLICIES/PRACTICES (JUNE 2010) | **MEDINA V CITY OF MENLO PARK** –PROBABLE CAUSE SUSPECT IDENTIFICATION, LE POLICIES/PRACTICES (AUGUST 2009) |
| **JACKSON  V CITY OF PITTSBURG** –USE OF FORCE, LE POLICIES & PRACTICES (JULY 2010) | **MANESS  V MUNICIPALITY OF ANCHORAGE, AK** –USE OF FORCE, LE POLICIES & PRACTICES (NOV 2010) |
| **HERBOLD V CITY OF RHONERT PARK** –USE OF FORCE, LE POLICIES & PRACTICES (JANUARY 2011) | **SANDRA FEE  V STATE OF CALIFORNIA** – PROBABLE CAUSE LE POLICIES/PRACTICES (MAY  2010) |
| **SEALS V LAKE COUNTY,  CA** – USE OF FORCE, LE POLICIES & PRACTICES (June 2011) | **BEECHAM V CITY OF WEST SACRAMENTO** - USE OF FORCE, PROBABLE CAUSE, LE POLICIES & PRACTICES (APRIL 2009) |
| **ADAMS V STATE OF CALIFORNIA** -USE OF FORCE, LE POLICIES/PRACTICES (JANUARY 2009) | **GUITEIRREZ V SACRAMENTO COUNTY, CA** POLICIES & PRACTICES (MARCH 2011) |
| **BECKWAY V LAKE COUNTY  CA** –USE OF FORCE, LE POLICIES & PRACTICES (Jan 2011) | **TUATA  V CITY OF ANCHORAGE, AK** –USE OF FORCE, LE POLICIES & PRACTICES (MARCH 2011) |
| **VALIAVICHARSKA V CELAYA/BENNETT**–USE OF FORCE, LE POLICIES & PRACTICES (Jan 2011) | **MONDELL V CITY OF SIMI VALLEY**–USE OF FORCE, LE POLICIES & PRACTICES (April 2012) |
| **PINASCO V STATE OF CALIFORNIA**-USE OF FORCE, LE POLICIES & PRACTICES (January 2011) | **MILLER V COUNTY OF BUTTE** -USE OF FORCE, LE PRACTICES (JANUARY 2009) |
| **ADAMS V CA /STATE PARKS** –USE OF FORCE, LE POLICIES & PRACTICES (MAY 2011) | **FRIETAS V CITY OF PLEASANT HILL** – PROBABLE CAUSE SUSPECT IDENTIFICATION, LE POLICIES / PRACTICES (APRIL  2009) |
| **MINOR V STATE OF CALIFORNIA** -USE OF FORCE, LE POLICY/PRACTICES (APRIL 2009) | **MEDINA V CITY OF MENLO PARK** –PROBABLE CAUSE SUSPECT IDENTIFICATION, LE POLICIES/PRACTICES (AUGUST 2009) |
| **BARRERA V CITY OF OXNARD** –PROBABLE CAUSE DEADLY FORCE, LE POLICIES/PRACTICES (AUGUST 2009) | **RUTHA CARROLL V HARRIS COUNTY** – USE OF FORCE, LE POLICIES & PRACTICES (March 2013) |

**SAUCER V CITY OF OAKLAND** –PROBABLE
CAUSE LE POLICIES/PRACTICES (JUNE 2010)

**JACKSON  V CITY OF PITTSBURG** –USE OF
FORCE, LE POLICIES & PRACTICES (JULY 2010)

## DEPOSITIONS PROVIDED

**ADAMS V. STATE OF CALIFORNIA** – USE OF FORCE, LAW ENFORCEMENT POLICIES AND PROCEDURES
**BECKWAY V. LAKE COUNTY** – USE OF FORCE, POLICIES AND PRACTICES
**BEECHAM V. CITY OF WEST SACRAMENTO** - PROBABLE CAUSE, DISPLAY OF FORCE, HIGH RISK STOPS
**BELL V. CITY OF WOODLAND** – WRONGFUL TERMINATION, SEXUAL HARRASSMENT
**BLUEFORD V CITY OF OAKLAND** – USE OF FORCE, POLICE PRACTICES
**FEE V. CALIFORNIA HIGHWAY PATROL** - ARREST/TRANSPORTATION PROCEDURES
**FLORES V UNION PACIFIC RAILROAD -** HIRING STANDARDS, ACADEMIC PERFORMANCE
**GUITERREZ V. SACRAMENTO COUNTY-** POLICY AND PRACTICES
**MILLER V. BUTTE COUNTY -** USE OF FORCE, POLICY AND PRACTICES
**PINASCO V. STATE OF CALIFORNIA** – USE OF FORCE, POLICY AND PRACTICES
**POSEY V.  CITY OF OAKLAND** - POLICY AND PROCEDURES, PROBABLE CAUSE, USE OF FORCE
**RUTHA CARROLL V. HARRIS COUNTY, TX** – LAW ENFORCEMENT POLICIES AND PROCEDURES, USE OF FORCE
**SEALS V. COUNTY OF LAKE** – USE OF FORCE LE POLICY AND PRACTICES
**SKALLERUD V. CITY OF PINOLE** - USE OF FORCE, LE POLICY AND PRACTICES
**WEAVER V. CITY OF SANTA CLARA** – USE OF FORCE, LE POLICY AND PRACTICES, K-9 USE
**TUATA V CITY OF ANCHORAGE, AK** - USE OF FORCE, POLICY AND PRACTICES

7