# EXHIBIT

# A

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

---oOo---

ERIKA GREGORY and LOREN MOLLNER,

        Plaintiffs,

    -vs-                     NO.2:13-CV-00320-KJM-KJN

CITY OF VALLEJO; former
VPD CHIEF ROBERT NICHELINI,
individually and in his official
capacity; VPD OFFICER CHASE
CALHOUN, individually; and
DOES 1 through 50,

        Defendants.
_____/

DEPOSITION OF CHASE CALHOUN

Taken before GAYLE I. COWAN, CSR
State of California
CSR No. 7004
January 7, 2014

DIABLO VALLEY REPORTING SERVICES
Certified Shorthand Reporters
2121 North California Blvd.   Suite 210
Walnut Creek, California 94596
(925) 930-7388

1       A.  Cal State East Bay in Hayward.

2       Q.  Uh-huh.

3           What year did you obtain that bachelor's?

4       A.  2009, I believe.

5       Q.  And what area was the bachelor's in?

6       A.  Criminal justice.

7       Q.  And in 2009 had you -- where did your work with --

8   as a Vallejo P.D. police cadet come in?  Were you attending

9   Cal State East Bay at that time?

10      A.  Yes.

11      Q.  Do you recall what years you worked as a V.P.D.

12  police cadet?

13      A.  I believe I started in 2007.

14      Q.  Was that a paid position?

15      A.  Yes.

16      Q.  And what are the general duties of a police cadet?

17      A.  It's part-time; they go to school while they're

18  working for the City.  There's different assignments that

19  they do; they're not sworn police officers, but while working

20  there I worked with the traffic division, I also worked,

21  like, Mare Island-type security patrol, assignments like

22  that, and while also they -- they do train, like, bimonthly

23  training in law enforcement-related things, subjects.

24      Q.  Did this have any sort of credit towards your

25  degree?

1          A.   No credit towards my college degree, no.

2          Q.   Did you ever attend police academy?

3          A.   Yes, I did.

4          Q.   And where did you attend?

5          A.   The Alameda County Sheriff's Department police

6    academy.

7          Q.   What year did you attend the academy?

8          A.   2009 into 2010.

9          Q.   Was that a six-month program?

10         A.   Approximately; might have been a little bit longer.

11         Q.   Had you gotten a job offer from the Alameda County

12   Sheriff's Department at the time you started at the police

13   academy?

14         A.   No.  I started the police academy as Vallejo police

15   training.

16         Q.   Is that different than a police cadet?

17         A.   Just because I'm going to the academy full time,

18   I mean, not doing the cadet duties, so a little bit, but not

19   really.

20         Q.   Okay.

21         How did it come about that you started at Alameda

22   County Sheriff's Department, rather than V.P.D.?

23         A.   The City of Vallejo was bankrupt and didn't have

24   the money to hire me.

25         THE REPORTER:  I'm sorry.  Can you speak up, please.

1      THE WITNESS:  The City of Vallejo was bankrupt and

2  didn't have the money to hire me.

3      THE REPORTER:  Thank you.

4      MR. CASPER:  Q.  Did you live in Vallejo at the time?

5      A.  No.

6      Q.  How did it come about that you first started as

7  a police cadet at V.P.D.?  Did you have a point of contact

8  there?

9      A.  No.  I was attending administration of justice

10  classes at Diablo Valley Community College, and somebody

11  from the Vallejo Police Department came in to recruit or was

12  talking about the program; that's how I first heard about it

13  and applied.

14      Q.  Did you start at the Alameda County Sheriff's

15  Department immediately after you finished the Alameda County

16  police academy?

17      A.  Yes.  I was sworn in the same day.

18      Q.  So you got an offer at some point during the police

19  academy?

20      A.  Yes.

21      Q.  And you testified you worked as a sheriff's deputy

22  for approximately two years?

23      A.  It was less than two years.  I'm not exactly sure.

24  It was maybe a little over a year and a half, but less than

25  two, from March of -- March of 2010 until October 31st of

1    2011; maybe about a year and a half.

2           Q.  And why did you leave Alameda County Sheriff's

3    Department?

4           A.  Because there was an opening with Vallejo.

5           Q.  Was there a reason that -- did you prefer to work

6    at Vallejo, versus the Alameda County Sheriff's Department?

7           A.  Well, I guess, yes.

8           Q.  Why is that?

9           A.  I didn't enjoy working in the Oakland jail.

10          Q.  Was that your primary assignment when you worked

11   as a sheriff's dep-- sheriff's deputy?

12          A.  Yes.

13          Q.  Is that a typical kind of, you know, entry-level

14   position for the sheriff's department there?

15          A.  Yes.

16          Q.  Is that the Santa Rita jail?

17          A.  No.  It's the Glenn Dyer detention facility in

18   Oakland.

19          Q.  Okay.

20          Did you have any sort of patrol assignments when you

21   were with the sheriff's department?

22          A.  No.

23          Q.  Were you a-- assigned to the Glenn Dyer detention

24   facility the whole time?

25          A.  Yes, other than overtime assignments.

```
 1          Q.   When you started at V.P.D. in -- you said it was
 2   in October of 2011?  Is that right?
 3          A.   Yes.
 4          Q.   What was your first position at V.P.D.?
 5          A.   Patrol.
 6          Q.   Was there any sort of -- did you have a field
 7   training officer when you started at V.P.D.?
 8          A.   Yes.
 9          Q.   And how long did that field training period last?
10          A.   The field training program, at least when I went
11   through, was approximately five months, and that included a
12   couple weeks of orientation.
13          Q.   Was the orientation on the job, or was it in a
14   classroom?
15          A.   Both.
16          Q.   And that was when you first got hired?
17          A.   Yes.
18          Q.   Do they give you that orientation before you're on
19   patrol, or is it at the same time?
20          A.   Before.  It -- the orientation was about two weeks,
21   and then you start the field training program.
22          Q.   Who were your field training officers at V.P.D.?
23          A.   My primary field training officer was Corporal --
24   or now Sergeant Postolaki.
25          Q.   I'm sorry.  His name again, or her name?
```

1          A.  Yes.

2          Q.  Did you have a primary shift that you worked at

3    V.P.D.?

4          A.  While on training or after training?

5          Q.  Well, why don't we start during training.  Did you

6    work one shift or several different shifts?

7          A.  Several different shifts.

8          Q.  Okay.

9          And was that including day, swing, and graveyard?

10         A.  Yes.  Well -- yes, all three of them.  Or all four

11   of them.  Three.

12         Q.  Approximately what time -- when did you finish the

13   field training program, if you recall?

14         A.  About five months after I started.

15         Q.  Okay.

16         Would it be fair to say maybe around March or April of

17   2012?

18         A.  Yes.

19         Q.  And once you had finished the field training

20   program, did you work with a partner?  Or were you -- when

21   you -- were you on a patrol assignment after that?

22         A.  Yes.

23         Q.  How did you -- what was your assignment in patrol?

24   Did you have a squad car?

25         A.  Yes.

1    going to patrol.

2         Q.  I'm sorry.  A day or a week?

3         A.  A week.

4         Q.  A week.

5         And what sort of things does crime suppression cover?

6         A.  A lot.  So they don't have -- they do, I guess,

7    narcotics-type enforcement, major crimes, on-call detectives.

8    It was kind of all-encompassing at that time, but they no

9    longer exist.

10        Q.  Did you ever work for or work with a SWAT unit?

11        A.  No.

12        Q.  Or any sort of gang task force?

13        A.  No.

14        Q.  Did you ever receive any commendations from V.P.D.?

15        A.  Yes.

16        Q.  And what were those commendations for?

17        A.  They call them -- I don't know -- letter --

18    "letters of accommodation" or "positive" -- they slang call

19    them "atta boys."  They're letters of accommodation,

20    basically, and I had over a dozen of them.  I can't remember

21    what they're all for, but things that are above and beyond

22    your normal duty.

23        Q.  Did you receive an atta-boy commendation relating

24    to this incident, the -- when I say "this incident," I'm

25    referring to the May 16th, 2012, shooting of the dog.

1        Q.   It was -- was that before or after the J.T.O.?

2        A.   After.

3        Q.   And generally, what did you learn at the Alameda

4   County Sheriff's Department in terms of how to deal -- or

5   when you encountered a dog that's perhaps aggressive?

6        MS. FARUQUI:  Well, just one second.

7        So you're asking for what the training -- what exactly

8   is the question?

9        I'm confused a little bit.

10        MR. CASPER:  Q.  What you learned in your training at

11   Alameda County Sheriff's Department regarding dogs.

12        You testified that you did receive some training as it

13   relates to dogs.

14        A.   Obviously, because it's been a while, I can't

15   tell you specifically what exactly was said in the class or

16   specifically what the training encompassed, but they talked

17   about, you know, signs of aggressive animals compared to

18   nonaggressive animals and, obviously, different ways to deal

19   with them and different levels of force that can be used to

20   deal with them.

21        Q.   What were some of the signs of aggression that you

22   recall from that training?

23        A.   Again, I could tell you specific signs of

24   aggressive dogs, but I can't tell whether it was from that

25   training, other training, or personal experience out in the

1    field.

2            Q.  Okay.

3            A.  It's been a while.

4            Q.  When you say "other training," was some of that

5    other training at V.P.D.?

6            A.  Specifically towards dogs, I -- you know, I don't

7    remember.

8            Q.  Okay.

9            Do you recall receiving any training at V.P.D. as it

10   relates to dogs?

11           A.  Not formal training, that I can think of, other

12   than, like, the F.T.O. program.

13           Q.  It did co-- you did cover dog encounters in your

14   F.T.O. program, though?

15           A.  Yes.

16           Q.  I understand that you can't necessarily parse out

17   where you have your understanding of what an aggressive dog

18   is, whether that was from Alameda, from other law enforcement

19   experiences or personal experiences, but what is your

20   understanding of what an aggressive dog -- or what are the

21   signs?

22           A.  Things like a -- a straightened tail, as opposed

23   to a wagging tail; raised hair, like, on the scruff of their

24   neck or their back; snarling and growling, dogs that are

25   showing their teeth; those type of signs would indicate an

1   aggressive dog.

2          Q.  Do you have any sense -- I mean, those are some

3   pretty specific signs, like a straight tail or that -- was it

4   the hair standing up, you said?

5          A.  Uh-huh.

6          Q.  Do you recall where that information came to you,

7   or how you obtained that information?

8          A.  I believe some of it came from the training at the

9   Alameda County Sheriff's Department, but, again, it's been

10  so long, I couldn't tell you exactly.

11         Q.  In your training at either Alameda County Sheriff's

12  Department or any -- at any point did you receive training on

13  when it was appropriate to enter private property?

14         MS. FARUQUI:  I'm just going to object to the word

15  "appropriate."

16         MR. CASPER:  Q.  When it is -- well, do you understand

17  the question?

18         A.  Not really.

19         Q.  Okay.

20         And that's something I should have covered.

21         You may hear your attorney occasionally object.

22  If you understand the question, you should answer it, unless

23  you're instructed not to answer, as you have previously been.

24  Otherwise, let me know, and I'll ask you a different

25  question.

1       Q.  So you were working an overtime day shift.

2           When did that shift start on May 16th?

3           A.  I believe 7:00 a.m.

4       Q.  And do you recall what you did that day, prior to

5   responding to 47 Kentucky Street?

6           A.  No.

7       Q.  Were you in a marked squad car?

8           A.  Yes.

9       Q.  What did you typically do on a shift?  Did you --

10  were you responding to dispatch calls?  Or did you -- how was

11  your day-to-day work in that time?

12          A.  We responded to dispatch calls, yes.  Or you can

13  do, I guess, proactive police work if you want to or have

14  the time, but usually the majority of your time is spent

15  responding to dispatch calls.

16          Q.  Do you recall receiving a dispatch call as it

17  relates to this case?

18          A.  Yes.

19          Q.  Okay.

20          MR. CASPER:  Before we get into the substance of that,

21  why don't we mark as Exhibit 3 what's been produced as the

22  CAD log.

23

24          (Exhibit 3 was marked for identification.)

25  ///

1       A.   In -- in investigations.

2       Q.   Okay.

3            Was she a uniformed police officer?

4       A.   No.

5       Q.   Was she a sworn officer?

6       A.   No.

7       Q.   Would that entry be before or after your first

8  interaction involving this case?

9       A.   Before.

10      Q.   Okay.

11           When were you first contacted regarding this case?

12           Or let me rephrase that.

13      A.   According to this, twelve-O-- 12:08, but I -- yeah,

14  looks like 12:08 is when I was dispatched to the call.

15      Q.   Okay.

16           And that is the line that says "units recommended";

17  is that right?

18      A.   No.  I don't know what that is, because that shows

19  a bunch of -- a bunch of people.  So I think that ha-- and

20  I don't know, but -- would be the answer, I don't know, but

21  I think that has more to do with dispatch.

22      Q.   Okay.

23      A.   Maybe who they could dispa-- I don't know.  Maybe

24  who they could dispatch the call.

25           None of them responded to the call initially or -- it

1          Q.   So because you're responding to this call, you're

2     unavailable to be dispatched to another call?

3          A.   Correct.

4          Q.   Okay.

5          Until you somehow check back there and change that?

6          A.   Exactly.

7          Q.   Okay.

8          Who do you recall contacting you as it relates to this

9     May 16th incident?

10         A.   You're going to have to clarify.  I'm not sure what

11    you mean.

12         Q.   How were you -- well, I'll change the question.

13         How were you contacted first as it relates to this

14    May 16th call to 47 Kentucky Street?

15         A.   As far as the call for service?

16         Q.   Yeah.

17         A.   It's just -- just like this, there's a call for

18    service in the computer, so either you're dispatched over

19    the air or you request to be sent the call.  And I don't

20    recall exactly how it came about, but either way it was a

21    call for service -- it's hard to explain without seeing it,

22    but, basically, I have a computer in my car, and it lists

23    all the calls for service.  Right?  For the whole city.  And

24    it designates by area where they're at, so it will show that

25    you have X, Y, Z calls in your area or just this call in your

1    area.  So either you can ask to be sent that call or dispatch

2    can actually dispatch you to that call, but either way it's a

3    call for service that's pending and it needs to be dealt with

4    or responded to, so...

5          Q.  Okay.

6          Do you recall if you responded that you could respond

7    to that call?  Or were you specifically assigned to that

8    call?

9          A.  I don't -- I don't recall.

10         Q.  Okay.

11         A.  But either way, it was in my area, so it was

12   something that I had to deal with.

13         Q.  Was it all over the computer, or did you also have

14   radio contact with dispatch relating to this?

15         A.  I don't remember.  At some point there's radio

16   contact, so I just don't know when it started.

17         Q.  Okay.

18         And what do you recall being notified about regarding

19   this call?

20         A.  Just this.  This is the only thing it had in here,

21   from what I recall, was that the -- the part at the top,

22   R.P., which is reporting party, filed, and it lists a case

23   number, "and has suspect information provided to her by the

24   bank," "R.P. would like to speak to an officer to provide

25   suspect information to."

1          A.   Alls I knew is what was down here, "R.P. filed,"

2     case number, "and has suspect information provided to her

3     by the bank," "R.P. would like to speak with an officer to

4     provide suspect information."

5          Q.   Had you responded to a similar type call, where

6     someone had creat-- that there wasn't a police report but

7     there was an existing file number for a crime and you were

8     just doing kind of follow-up work?

9          A.   I don't know.  Probably, but I don't know exactly.

10         Q.   Was there any other information imparted to you

11    regarding what your response to this residence was?

12         A.   No.

13         Q.   Okay.

14         Did you understand that it was not a crime in

15    progress, meaning that there wasn't, like, a -- an active

16    larceny going on at the time?

17         A.   I'm sorry.  I don't understand, or it's not very

18    clear.

19         Q.   Okay.

20         A.   So...

21         Q.   Well, did you understand that you weren't

22    responding to --

23         A.   What would be considered, like, a hot or

24    in-progress crime?  Was somebody breaking into the house

25    right this second?

1         Did you respond -- once you got this call, did you

2    respond directly to 47 Kentucky Street?

3         A.  Yes.

4         Q.  Did you respond with -- were you by yourself in

5    your squad car?

6         A.  I was by myself.

7         Q.  Do you recall:  Were you in your car when you first

8    were dispatched to the property?

9         A.  I believe so, yes.

10        Q.  Do you recall where in the city you were?

11        A.  No.

12        Q.  When you responded to 47 Kentucky Street, did you

13   take any measures such as, you know, putting on the sirens or

14   lights?

15        A.  No.

16        Q.  Okay.

17        Did you in fact arrive at that destination?

18        A.  Yes.

19        Q.  What did you do when you arrived?

20        A.  Do you want me to do a narrative of the whole

21   instance, or --

22        Q.  No.  I guess I prefer to just break it up.

23        Did you park your car somewhere?

24        A.  Yes.

25        Q.  Do you recall where you parked the car?

1          A.  Not exactly, but in front of the residence.

2          Q.  Do you recall -- do you have kind of a mental

3   picture of the property?

4          A.  A little vague, but yes.

5          Q.  Okay.

6          Did you park on the same side of the street as the

7   residence or across the street?

8          A.  I don't remember.

9          Q.  Let's see.

10         What did you do once you parked the car?  Did you walk

11  towards the property?

12         A.  Yeah, I got out of the car and walked -- walked up

13  to the front of the property, or the front gate, I guess.

14         Q.  Okay.

15         I'd like to show you what's been previously marked as

16  Exhibit 11 to Erika Gregory's deposition.

17         MR. CASPER:  Should we mark it again?

18         MS. FARUQUI:  Might as well.

19         MR. CASPER:  Okay.

20         MS. FARUQUI:  Or -- I mean, it's up to you.

21         MR. CASPER:  Yeah.

22         MS. FARUQUI:  What do you think?

23         MR. CASPER:  We'll mark it again --

24         MS. FARUQUI:  Okay.

25         MR. CASPER:  -- as Exhibit 4 to Calhoun's deposition.

1   the same side, but right in front of the house and get out,

2   it's not -- nothing's going on right now, nobody's going to

3   try to hurt me.  You know, it's what you call my -- you know,

4   it's low-level type crime.

5        But as I responded to this call, we still have

6   officer-safety things that we have to worry about, and when

7   I saw this yard specifically, the one thing that I was

8   concerned about is dogs.  Because even though I'm not

9   responding to a high-level type call, I still have to be safe

10  and go home in the same condition I left at the end of the

11  day.  And what I noticed about this yard is that it was

12  surrounded by this gate, all the way around the yard, or what

13  looks like all the way around the yard, with a lot of

14  foliage, and it was hard to see in there.

15       So you can't notify the residents that you're there.

16  There's a gate, there's no doorbell at the gate, there's no

17  intercom at the gate; you gotta get to the front door to

18  notify them.

19       But yes, I was concerned -- and I think that's what

20  you were trying to get to -- about the fact that there may be

21  dogs.

22       Q.  I'm going to show you what we've previously marked

23  as Exhibit 19 to Erika Gregory's deposition.  We'll mark it

24  as Exhibit 5 to your depo.

25  ///

1     Q.   Okay.

2          But in this situation, when you couldn't actually see

3     into the property and you had some concerns about dogs,

4     did it not make sense for you to take the time to call the

5     reporting party and just to ensure that there were no

6     dangerous animals on the property?

7          A.   We don't --

8          MS. FARUQUI:  Objection.  Argumentative.

9          MR. CASPER:  Q.  If you understand, you can answer.

10         A.   Just like we have to go up and knock on doors

11    commonly, we deal with situations where we have to go through

12    gates or into, you know, yards that aren't very accessible.

13         So I took precautions to make sure that there wasn't

14    dogs, I peaked my head in there and looked around the best

15    I could.  I didn't see any dogs in the front yard, and

16    although there is a lot of foliage, I could see at least

17    some of the front yard.

18         And then, which is a common habit, even if I'm

19    responding to a hot call, I'll take it a step further and

20    shake the gate or hit the gate with my flashlight, to make

21    sure that there's no dogs that are startled or are going to

22    be startled when I enter the property.

23         Q.   And that was actually my next question.

24         Did you in fact do any of those precautions of -- of

25    shaking the gate or hitting it with your flashlight?

1        Q.  Are you married?

2        A.  No.  Well, separated.

3        Q.  Okay.

4            Did you ever have any conversations with anyone at

5   V.P.D. prior to coming to this deposition today about what

6   this deposition was all about?

7        A.  No.

8        Q.  Before we get through the gate at 47 Kentucky

9   Street, what were you wearing that day?

10       A.  Full police uniform.

11       Q.  And did you have a -- I don't know what the correct

12  term is, but a utility belt of some sort?

13       A.  Yes.

14       Q.  Okay.

15           And what did you have with you that day?

16       A.  On the utility belt?

17       Q.  Yeah.

18       A.  Oh, handcuffs, a gun and holster, TASER, pepper

19  spray, a baton, and their holders, magazines in a magazine

20  pouch, and I believe that was it.

21       Q.  And in terms of communication devices?

22       A.  Oh, I'm sorry.

23           And a radio and radio holder.

24       Q.  Okay.

25           Was the radio up at your -- the chest level?

1        Q.   Okay.

2             The pepper spray, how was that holstered?  Were there

3        any levels of protection for the pepper spray?

4        A.   It was a leather case with a single snap.

5        Q.   After you shook the gate, tapped it without a

6        response, did you enter the gate?

7        A.   Yes.

8        Q.   Like, enter through the gate?

9        A.   (Nods head.)

10       Q.   And what did you -- what do you recall doing after

11       entering the gate?

12       A.   Walked towards the front door.

13       Q.   Okay.

14            Could you see the front door after walking through the

15       gate?

16       A.   I don't recall exactly how it was set up, but I --

17       I can remember a pathway that led to what looked like a

18       porch, so I assumed that the front door was there. You might

19       be able to see it, actually; it might have been straight

20       ahead.  I can't really tell from this picture.

21       Q.   Okay.

22            MR. CASPER:  Why don't we mark as Exhibit 6 what has

23       been previously marked as Exhibit 12 to Gregory's deposition.

24

25            (Exhibit 6 was marked for identification.)

1   picket fence?

2        A.  No, I don't recall.

3        Q.  Okay.

4        What do you recall next, after your walking towards

5   the house, towards the front door?

6        A.  Do you want me to --

7        Q.  Yeah.

8        A.  -- just explain it all, or sort of nail that down

9   a little bit more?

10        Q.  Well, why don't you explain it all, and if I have

11   any questions to break it up, I'll stop you.

12        A.  I entered the yard, and I was walking towards the

13   front door.  I got what, from what I remember, was about

14   half-ways there, and I remember for whatever reason glancing

15   down at that kids' pool.

16        And then all of a sudden I heard a sound and looked

17   up and to my left, and that's when I saw two -- two dogs

18   charging around the corner of the house at a -- at a full

19   sprint.

20        Q.  Do you recall from what direction the dogs were

21   approaching you?

22        A.  If I'm looking directly at the house, like these

23   pictures, they were coming from my left, around the left

24   corner of the house, which would be the -- I guess the

25   northeast corner of the house.

1      Were they barking?

2      A.  Yes.

3      Q.  What other thing did you observe with regard to the

4 dogs approaching you?

5      A.  Again, within the split second, you know, dogs

6 being at a full sprint and closing the gap, I noticed that

7 they were barking, snarling.  And I think my -- my attention

8 was directed to the one that was a little bit in front,

9 obviously, because it was a little bit in front.  Its teeth

10 were showing, I noticed that hair raised on the back of its

11 neck and that straight tail.  It was immediate to me that

12 they weren't -- they didn't appear to be friendly, and it

13 appeared that they were -- the reason they were running in

14 that full sprint is because they were going to attack me.

15      Q.  When you say a straight tail, was -- what do you

16 mean by that?  It was straight up?  Straight down?

17      A.  Straight, like straight back.

18      So dogs, from, I guess, my personal experience maybe

19 and some of the training -- if a dog's playing, usually their

20 tails wag; if a dog's upset, angry, or aggressive, usually

21 those tails are dead straight.  And a lot of times, if you

22 talk to people, that's -- that's a big sign of aggression,

23 is that there's a big difference between a dog with a wagging

24 tail that's barking and a dog that's got his tail straight

25 and hair raised and things like that.

1          Q.  And you observed that its tail was straight and its

2     hair was standing up on its neck?  Was that right?

3          A.  Back, or back of the neck, or -- yeah.

4          Again, all of this is happening within a split second.

5          Q.  Okay.

6          Are you sure that you observed those traits of the dog

7     at the time?

8          A.  In that split second, yes.

9          Q.  Okay.

10         What did you do after observing these animals

11    approaching you?

12         A.  Again -- and I have to preface it with this all

13    happened within a matter of maybe a second, and some of it

14    I didn't realize until after the fact.

15         But within that matter of second, I realized that

16    I was going to be attacked by not one, but two dogs, and

17    I drew my firearm and fired two -- two rounds or two bullets

18    just in time to prevent the first dog from attacking me.

19         At that time I scanned over to the second dog, who

20    after firing the shots turned around and ran away.  I backed

21    out of the yard and closed the gate.

22         Now, after the fact, when I was kind of able to look

23    at everything, I realized that I had backed up probably five

24    or six feet trying to get out of the yard, but in that -- you

25    know, that second or two of everything happening, I didn't

1    even realize I was retreating; I barely had enough time to

2    draw my firearm and fire those two rounds before being

3    attacked.

4        Q.   Why was that significant to you, that you ended up

5    finding out that you withdrew five or six feet?

6        A.   Just because it happened so fast, I didn't even

7    realize I was moving backwards while -- while drawing my

8    firearm and doing all of that at one time.

9        Q.   Did you ever tell an investigator that you had

10   backed up after seeing the animals?

11       A.   I don't recall.

12       Q.   Okay.

13       Is there a reason why you didn't retreat to the gate

14   that you came from when you saw these animals?

15       A.   I didn't have enough time.

16       Q.   Is there a reason why you didn't kind of hop that

17   short picket fence that was to your right?

18       A.   Again -- and I know it's hard to kind of gather

19   sitting here, but in a situation like that, where you

20   literally have a second to react, I mean, you think about --

21   if you really think about it, you have a second to not only

22   look at these dogs and realize what's happening, because

23   you realize you're even going to be -- again, I'm way down

24   here, kind of calm and not realizing anything's going on.

25   Obviously, if I would have thought there was two aggressive

1  dogs in the yard, I would have been able to do a lot of

2  things differently, but --

3     Q.  But that wasn't --

4     A.  -- all of a sudden you're faced with an attack of

5  two dogs, and you're trying to determine -- first of all,

6  you realize they're aggressive and you're in trouble, and

7  you have literally barely enough time to draw my firearm,

8  draw my firearm and pull off the rounds.  I mean, as quickly

9  as it happened, I'm surprised that I was able -- even able to

10  get my firearm out of the holster fast enough and fire those

11  rounds, let alone being able to -- I mean, if you waste the

12  time to try to turn around and run or try to jump over things

13  and do stuff like that, you know, there's just not enough

14  time to do that.

15     In some instances with dogs, you may have an

16  aggressive dog but not one that's charging you at full-on

17  attack, and you have a little bit more time to use other

18  levels of force or other means of retreat and things like

19  that.  There just wasn't enough time in that situation,

20  unfortunately.

21     Q.  Is there a reason why you didn't deploy your pepper

22  spray?

23     A.  One, pepper spray is not always effective; and,

24  two, there just wasn't -- there wasn't enough time to try to

25  start with a lower means of force and work your way up.

1    those two shots?

2           A.   Well, as I was backing up -- again, I was backing

3    up at the time all this was happening -- scanned to the

4    second dog to see if they were still a threat to me, and the

5    second dog kind of stopped and either backed up or turned

6    around or whatever.  I was able to retreat back to the fence,

7    get behind the gate, and close the gate.

8           Q.   And then what did you do?

9           A.   I radioed that I had to dispatch or shoot a dog

10   and requested a supervisor and Animal Control to respond to

11   my scene.

12          Q.   Okay.

13          I just wanted to play you the dispatch tape.  It's

14   about -- I just want to play the beginning portion and wanted

15   your clarification.

16          MR. CASPER:  If -- Counsel, we can waive reporting on

17   the actual recording, if that's okay?

18          MS. FARUQUI:  Yes.  Sure.

19

20          (Mr. Casper plays recording.)

21

22          MR. CASPER:  Q.  Officer, was that you in the

23   beginning?

24          A.   I believe so, yes.

25          Q.   Okay.

# EXHIBIT

# B









# EXHIBIT

# C

1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF CALIFORNIA

3                      ---oOo---

4

ERIKA GREGORY and LOREN           )
5    MOLLNER,                          )
                                       )
6                   Plaintiffs,        )
                                       )
7              vs.                     )  No.
                                       )  2:13-CV-00320-KJM-
8    CITY OF VALLEJO; former VPD       )  KJN
     CHIEF ROBERT NICHELINI,           )
9    individually and in his           )
     official capacity; VPD            )
10   OFFICER CHASE CALHOUN,            )
     individually; and DOES 1          )
11   through 50,                       )
                                       )
12                  Defendants.        )
     ─────────────────────────────────)
13

14                      ---oOo---

15

16

17              **DEPOSITION OF**

18              **ERIKA GREGORY**

19         Tuesday, October 15, 2013

20

21

22

23
     REPORTED BY:  JOHN P. SQUIRES, CMR, CCRR
24               CSR No. 2001

25

                                              1

```
1    A.        General number.  I looked it up online.

2    Q.        So what did the woman or secretary of the

3    investigations unit tell you when you called her?

4    A.        So I said "I'm calling because I need to

5    know who has been assigned."

6              And she kind of laughed and said, "Well,

7    nobody."

8              And I said "Well, what do you mean?"

9              She said "We don't investigate fraud or

10   identity theft in Vallejo, we only investigate

11   murders."

12   Q.        Then what did you do then?

13   A.        I said "Well, then I don't know what I'm

14   supposed to do here because I have a bank who is

15   saying they can't investigate my case without your

16   cooperation and so I need to know who is going to be

17   working with me on this in Vallejo PD."

18             And she said "Let me send you down to" --

19   well, first she said "The reason that we can't

20   investigate these kinds of things is that we don't

21   have enough detectives."  I think she said "We have

22   four detectives."  I think that's what she said.  And

23   she said "But let me send you down to dispatch,"

24   which given the conversation I had just had, I didn't

25   understand why she would do that.
```

28

1          I don't know how dispatch works.  Do they

2    dispatch detectives?

3          So she sent me down to dispatch.  Dispatch

4    picked up and I said "Hi.  I've been sent down here

5    by the detective division."

6          And she said "Well, why are you calling us?"

7          And I said "I don't know either.  Because

8    somebody sent me down here."

9          And she said "Well, let me send you back

10   up."

11         So she patched me back up to the same person

12   that I had spoken to before.  You know, I said "You

13   guys are passing me back and forth."

14         And she said "Well, I don't know, I can try

15   and force a message through to dispatch, but I can't

16   guarantee you anything."

17   Q.      Okay.  And so this was a dispatch woman that

18   you were speaking to?

19   A.      No.  It was the secretary in the detective

20   unit sent me to dispatch.  Dispatch couldn't figure

21   out why I was on their line, sent me back up to the

22   secretary I had talked to, and she said "Well, I can

23   try and force a message through to dispatch, but I

24   can't guarantee you anything."

25         Honestly, I didn't know what that meant.

                                                  29

```
 1   once we get the photographs I did not take.  But so
 2   far these are all ones that I took myself.  And I can
 3   tell you the date after the deposition.
 4              MS. FARUQUI:  Okay, great.
 5              THE WITNESS:  So this is, as I said, the
 6   house has -- it's a corner house.  So this here is
 7   the Trinity Street side, okay, where my left hand is,
 8   okay.  The right-hand side of the photograph is
 9   Trinity Street.  And this is a path leading up to the
10   patio that you saw in the previous photographs from
11   our lower yard.
12              MS. FARUQUI:  Q.  Okay.
13   A.        Okay?  Leading up alongside the wraparound
14   porch.
15              And if you were to continue on this path,
16   you would get to the patio you saw before and the
17   gate you saw that leads to the Kentucky Street side
18   of the property.
19              MS. FARUQUI:  Let's go ahead and mark this
20   then as next in order.
21              (Exhibit 15 marked)
22              THE WITNESS:  So this one is the same
23   looking from the Kentucky Street side at that gate
24   we've been talking about leading into the patio.  So
25   it's just a different angle on that same gate.
```

                                                        48

```
 1    A.        I hit the floor.

 2    Q.        Okay.

 3    A.        I hit the floor.  I laid down on the floor.

 4    You know, I honestly can't remember if I started

 5    crawling around to the front of the house first or if

 6    I called my husband first.  I think I might have

 7    called him first.  And, you know, I was shaking and I

 8    couldn't dial correctly, so I couldn't get him -- you

 9    know, I couldn't get him to answer.

10              And then I crawled around through my office,

11    around to the front door, and I cracked the front

12    door open to see if I could see anything, and

13    somebody started yelling at me to stay in my house.

14    Q.        Were you the only one at home?

15    A.        Um-hmm.  Yes.

16    Q.        So looking at Exhibit 10 -- I always want to

17    say 16 -- you said you were looking the other way,

18    and by "the other way" you mean not looking at the

19    window?

20    A.        I was not looking out the window that was

21    facing the direction I heard the shots come from,

22    that's correct.

23    Q.        Okay.  So you didn't actually see what

24    happened when the shots were fired?

25    A.        No.
```

                                                            55

1    Q.       Okay.  So your only -- the only thing

2    that -- sorry.  Let me rephrase this.

3            The first time you knew that shots were

4    fired is when you heard the actual shots?

5    A.       That's correct.

6    Q.       All right.  And then you're potentially on

7    the floor crawling around or trying to call your

8    husband and you make it to the front door and someone

9    tells you to stay inside?

10   A.       (Nodding head).

11   Q.       Then what did you do?

12           MR. CASPER:  You have to answer.

13           THE WITNESS:  Sorry.  Yes.  Somebody started

14   yelling at me "Stay in the house, stay in the house,

15   stay in the house, stay in the house."  So I did.

16   But I didn't know who that person was.  So I didn't

17   know who was out there or what was going on.  What

18   did I do?  I tried a couple of times to open the

19   door.  I was in pretty much of a panic.  I look back

20   on it now and I wonder why was I opening the front

21   door.  But, you know, your instinct in a situation

22   like that is to get out.

23           MS. FARUQUI:  Q.  How long did you stay

24   inside --

25   A.       It was probably just a few minutes.

56

1          And then whoever it was outside said "Okay,

2   you can come out now."

3   Q.          Did you?

4   A.          I did.

5          And there was a police officer standing in

6   my yard, kind of shaking his head, looking down at

7   his feet, saying "I'm sorry, ma'am, I'm so sorry I

8   had to do that."  And he didn't tell me what he had

9   to do.  I had no idea what he was talking about.

10  Q.          So at that point you did not know what had

11  occurred; he just apologized to you?

12  A.          No.  He said "I am so sorry, ma'am, I'm so

13  sorry I had to do that."  I'll never forget him

14  saying those words, "I'm sorry, I had to do that."

15          And I, you know, just was looking at him

16  trying to figure out what he was talking about.  And

17  then I realized from the way he was standing and he

18  had kind of looked over a little bit that there was

19  something going on around the bush here that you

20  can't see.

21  Q.          You're looking at Exhibit 10 again?

22  A.          I'm looking at Exhibit 10.  But this is a

23  foliated area.  Maybe there is a better picture.

24  Yes.  This is a better picture.

25  Q.          And that's Exhibit 3?

                                                    57

# EXHIBIT

# D

```
 1                UNITED STATES DISTRICT COURT

 2               EASTERN DISTRICT OF CALIFORNIA

 3                       ---oOo---

 4
      ERIKA GREGORY and LOREN          )
 5    MOLLNER,                         )
                                       )
 6                   Plaintiffs,       )
                                       )
 7           vs.                       )   No.
                                       )   2:13-CV-00320-KJM-
 8    CITY OF VALLEJO; former VPD      )   KJN
      CHIEF ROBERT NICHELINI,          )
 9    individually and in his          )
      official capacity; VPD           )
10    OFFICER CHASE CALHOUN,           )
      individually; and DOES 1         )
11    through 50,                      )
                                       )
12                   Defendants.       )
      _____)

13

14                       ---oOo---

15

16

17                   DEPOSITION OF

18                   LOREN MOLLNER

19            Tuesday, October 15, 2013

20

21

22

23
      REPORTED BY:  JOHN P. SQUIRES, CMR, CCRR
24                  CSR No. 2001

25

                                                    1
```

1   test you for cholesterol and blood pressure and

2   things like that and I couldn't really sit down and

3   talk to him about the hives.  I got frustrated and

4   went home and did research and I treated myself.

5   Q.       Okay.  All right.  So let's get to the

6   subject incident, which you were sitting in here when

7   we talked about the date this morning as May 16,

8   2012.  Does that date ring a bell to you as well?

9   A.       Yes.

10  Q.       Please tell me what you did that day before

11  you got a call from your wife.

12  A.       I got up early and went to work.  I got to

13  work by 6:30 in the morning.  I took the bus that day

14  from Vallejo, bus to BART and BART to the office.

15  Q.       In the city?

16  A.       In Oakland, federal building.

17  Q.       All right.  And then what happened?

18           At some point you got a call from your wife.

19  A.       Right.

20  Q.       Do you recall what time?

21  A.       Probably around twelve o'clock.

22  Q.       Okay.

23  A.       She was hysterical:  "The dog has been shot,

24  come home."

25           So I took BART, took the bus, got on my cell

15