*Gregory/Mollner vs. City of Vallejo, et al*

*2:13-cv-00320-KJM-KJN*

# EXHIBIT 1

**to Declaration of Nick Casper**

**in Support of Opposition to Defendants'**

**Motion for Summary Judgment**

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF CALIFORNIA

3                   ---oOo---

4

ERIKA GREGORY and LOREN              )
5   MOLLNER,                          )
                                      )
6              Plaintiffs,            )
                                      )
7          vs.                        )   No.
                                      )   2:13-CV-00320-KJM-
8   CITY OF VALLEJO; former VPD       )   KJN
    CHIEF ROBERT NICHELINI,           )
9   individually and in his          )
    official capacity; VPD           )
10  OFFICER CHASE CALHOUN,            )
    individually; and DOES 1         )
11  through 50,                       )
                                      )
12             Defendants.            )
    _____)

13

14                  ---oOo---

15

16

17            **DEPOSITION OF**

18            **ERIKA GREGORY**

19      Tuesday, October 15, 2013

20

21

22

23

24  REPORTED BY:  JOHN P. SQUIRES, CMR, CCRR
                  CSR No. 2001

25

                                          1

1    Q.        Do you own this home?

2    A.        No.  We rent.

3    Q.        And who lives at this home with you?

4    A.        My husband, Loren Mollner, and our two

5    children, Jack and Lucy Mollner.

6    Q.        Can you tell me their ages, please.

7    A.        Jack is eight and Lucy is six.

8    Q.        Do you have any other children?

9    A.        No.  My husband has grown children, but we

10   don't as a family have children, except for these

11   two.

12   Q.        I will ask him about that then in his

13   deposition.

14             Where did you live prior to the Mill Valley

15   address?

16   A.        47 Kentucky Street, Vallejo 94590.

17   Q.        And did you own that home?

18   A.        Yes.

19   Q.        When did you purchase the home?

20   A.        I think it was maybe 2002 or 2003.

21   Q.        Okay.  And we'll get to this, but is it your

22   contention that you were forced to move from 47

23   Kentucky as a result of the incident?

24   A.        Yes.  We didn't feel like -- we didn't feel

25   like we could keep our kids there anymore.

                                                        10

1  sent you when we first started communicating, I sent

2  you kind of an abbreviated version.

3  Q.      Wait a minute.

4  A.      Oh, I can't -- sorry.

5  Q.      I don't want to know anything that you

6  talked about with your attorney because that's going

7  to intrude on the attorney-client privilege and I'm

8  not entitled to know that.

9  A.      Okay.

10         MR. CASPER:  I probably could abbreviate

11  this.

12         I did discuss this and I don't believe we

13  have anything in addition other than there is a

14  narrative statement that I had not provided I can

15  provide to you.

16         MS. FARUQUI:  That would be great.  That's

17  fine.  So I will take your attorney's representation

18  on that and we can get going here.

19  Q.      Can you tell me what your current

20  residential address is, please.

21  A.      99 Laverne Avenue, Mill Valley, California

22  94941.

23  Q.      And how long have you lived at Laverne

24  Avenue?

25  A.      Since July, 2012.

                                                    9

1   Q.      Do you own this home?

2   A.      No.  We rent.

3   Q.      And who lives at this home with you?

4   A.      My husband, Loren Mollner, and our two

5   children, Jack and Lucy Mollner.

6   Q.      Can you tell me their ages, please.

7   A.      Jack is eight and Lucy is six.

8   Q.      Do you have any other children?

9   A.      No.  My husband has grown children, but we

10  don't as a family have children, except for these

11  two.

12  Q.      I will ask him about that then in his

13  deposition.

14          Where did you live prior to the Mill Valley

15  address?

16  A.      47 Kentucky Street, Vallejo 94590.

17  Q.      And did you own that home?

18  A.      Yes.

19  Q.      When did you purchase the home?

20  A.      I think it was maybe 2002 or 2003.

21  Q.      Okay.  And we'll get to this, but is it your

22  contention that you were forced to move from 47

23  Kentucky as a result of the incident?

24  A.      Yes.  We didn't feel like -- we didn't feel

25  like we could keep our kids there anymore.

                                                    10

1    Q.        And when did you make that decision?

2    A.        Within about a month of the incident.

3    Q.        And is there a reason you chose Mill Valley?

4    A.        That's where I grew up and I still have

5    family there.

6    Q.        We'll touch on that more later.

7    A.        Okay.

8    Q.        Are you presently employed?

9    A.        Yes.

10   Q.        And by whom?

11             Are you self-employed?

12   A.        I own a company with a partner.

13             MS. FARUQUI:  Off the record for a second.

14             (Off the record)

15             MS. FARUQUI:  Go back on.

16   Q.        So you're saying that you own a company?

17   A.        Yes.

18   Q.        What is the name of the company?

19   A.        Called Collective Invention.

20   Q.        What type of business is it?

21   A.        It's a strategic planning and consulting

22   business.

23   Q.        And you are the owner?

24   A.        Yes.

25   Q.        How many employees do you have?

11

1    A.        We have seven employees.

2    Q.        And what are their positions?

3    A.        We have one person who is the head of

4    research.  She is my partner.

5              We have a business manager.

6              We have another researcher.

7              We have a business development person.

8              We have two engagement managers, program

9    managers.

10             I feel like I'm missing somebody.  I don't

11   know how many that was.

12   Q.        I think that was five.

13   A.        Then we have a couple people who work half

14   time or part time with us, consultants.

15   Q.        You don't have a coowner or anything?

16   A.        I do.  Her name is Fiona Hovenden, F-i-o-n-a

17   H-o-v-e-n-d-e-n.

18   Q.        What is the address of this business?

19   A.        So the mailing address -- it's at the --

20   okay.  It's care of The Hub, H-u-b, a shared work

21   space, 901 Mission Street, San Francisco, Suite 205,

22   and I'm blanking on the zip code right now.

23   Q.        How long have you owned this business?

24   A.        Since 2005.

25   Q.        And since owning -- well, let me ask it this

                                                        12

1   way:   Did the business start in 2005?

2   A.        Yes.

3   Q.        So it wasn't owned previously by anybody?

4   A.        No.   I started the business.

5   Q.        And just to be clear, you are not making a

6   wage-loss claim as a result of this lawsuit, is that

7   correct?

8   A.        Yeah.   It feels insignificant to me.   Number

9   one, I don't keep super-clear records of my hours and

10  so it would be sort of hard for us to go back and

11  figure it out.   And it just doesn't feel like it's

12  the main point.

13  Q.        Then I'm going to skip through these other

14  questions that I usually ask when someone is making a

15  wage-loss claim.

16          MR. CASPER:   I could say we're not making a

17  wage-loss claim.   If that ever changes, we'll provide

18  you documents and we can reopen her deposition.

19          MS. FARUQUI:   Great.   All right.

20  Q.        I need some background on your education.

21          Did you graduate from high school?

22  A.        I did.

23  Q.        Where from?

24  A.        Tamalpais High School in Mill Valley.

25  Q.        How do you spell that?

13

```
 1              (Recess 10:20 a.m. to 10:21 a.m.)
 2          MR. CASPER:  Back on the record.
 3          After discussing this issue with my client,
 4     we've decided, although originally Ms. Gregory felt
 5     the weight gain was tied in with her emotional
 6     distress, she's not going to be asserting that there
 7     was weight gain as a result of this incident.
 8          MS. FARUQUI:  Q.  Okay.  So now I'm going to
 9     get to the subject incident, which I will represent
10     to you was May 16th, 2012.  Does that seem accurate
11     to you?
12     A.       Yes.
13     Q.       All right.  Can you tell me what you did
14     that day upon waking up?
15     A.       So my five-year-old was -- I took my
16     five-year-old to nursery school.
17              I took my then seven-year-old to grade
18     school.
19              And I was working at home and waiting for my
20     nanny to bring my daughter home from preschool.
21     Q.       When did you take your kids to school, what
22     time in the morning?
23     A.       Nine o'clock.  Is that right?  I think
24     schools start here at 9:00.  I believe that's right.
25     8:55 or something.
```

                                                         21

1    PD's intervention.

2    Q.        So this fraud intervention, was this your

3    company's checkbook?

4    A.        No.  It was a personal checkbook that was

5    stolen from our house.

6    Q.        And do you know how many checks were stolen?

7    A.        I think it ended up being six or seven.  I

8    would have to double-check that.

9              And the total amount ended up being close to

10   $5,000 that was stolen from the account.

11   Q.        How did you first learn that checks were

12   missing?

13   A.        How did I first learn?  Because our bank

14   account was overdrawn.  I was traveling for work and

15   I learned that the bank account was overdrawn and it

16   shouldn't have been.  And then I went in and

17   downloaded all of the copies of the -- scanned copies

18   of the checks and saw that somebody had been signing

19   my name on checks.

20   Q.        So how much before -- what time period

21   before the incident did you learn about these stolen

22   checks?

23   A.        I think that -- this was a Wednesday.  I

24   think it probably was a week before.  And I think I

25   probably pieced all this together on a Tuesday or a

23

```
1    Wednesday.  No.  Might have even been like Thursday
2    or Friday of the prior week.  And then I went into my
3    bank on a Friday and I filed a claim with Vallejo PD
4    that day.
5    Q.       On the Friday before the Wednesday?
6    A.       Yes.  So if Wednesday was the 16th, it would
7    have been the 11th, Friday the 11th.
8    Q.       And then what -- let's back up for a second.
9             So you learned your bank account was
10   overdrawn.  Then did you contact your bank?
11   A.       I did.
12   Q.       What happened next in terms of the
13   interaction with the bank?
14   A.       I went to the bank.  I went to the bank.  I
15   asked them -- or the bank manager, who I know, what
16   the procedure was.  She told me that she thought that
17   it was unlikely that we were going to get reimbursed.
18            So I called my husband.  My husband used to
19   be employed by that bank, was a vice president at
20   Umpqua Bank, and he called the CEO's office and said
21   "We're concerned about this, somebody is obviously
22   fraudulently using our bank account," and the CEO's
23   office assigned a bank investigator to our case, and
24   her name is Christina -- I'm blanking on her name
25   right now, but I believe it's in my -- somewhere.  I
```

                                                        24

1    can look it up.

2            And so then I -- she instructed me to file

3    the police report, which I did online because I

4    couldn't get anybody at Vallejo PD to pick up the

5    phone when I called.

6            She then told us that it was the bank's

7    policy to prosecute to the fullest extent of the law

8    even for small amounts.  Where the larger banks don't

9    do that, they do because it's been their experience

10   that if people steal once, they go to the next bank

11   and they go to the next bank.  So she said, "Just so

12   you know, it's going to be our policy to reimburse

13   you if you comply with us completely, and what we're

14   going to need from you is help getting Vallejo PD to

15   be responsive because there's only so much we can do

16   from Portland, Oregon, and we're going to need your

17   help identifying this person if you can help us do

18   that."

19           And so we agreed to help.

20   Q.      So was your bank contacting VPD?

21   A.      Yeah.  The investigator was.

22   Q.      So why don't you tell me about your first

23   interaction then with VPD with respect to this case.

24   A.      So aside from getting the confirmation of my

25   online claim --

                                                        25

1  Q.      So you're calling it a claim, but is it --

2  A.      I don't know.  What's it called?  Police

3  report.

4  Q.      You went on the website and gave some facts

5  and created a police report and submitted it?

6  A.      Yes.

7  Q.      And that was on Friday, the 11th?

8  A.      Yes.

9  Q.      What happened after that?

10  A.      So then on -- so I talked to our

11  investigator probably the Monday and Tuesday before

12  that.  You know, this is my best recollection now.

13  Q.      Yes.

14  A.      And she said "I've got calls in to Vallejo

15  PD but they're not returning my phone calls."

16         So that Wednesday morning when I was at home

17  I called her and said "Well, what do you think is

18  going on?"

19         At that point it looked like it was about

20  $3,000.  It ended up being more than that later.  But

21  that's a lot of money for us and I was concerned that

22  we weren't going to be able to make our mortgage

23  payment.

24         And I said "What do you think the bank can

25  tell us?"

26

1        And she said "You need to get Vallejo PD

2 involved because we believe that there's evidence at

3 a Wells Fargo Bank of some transactions involving

4 your checks, but we can't get that surveillance tape

5 without the police getting involved."  So she said

6 "You have to call Vallejo PD," which I did, at

7 probably around eleven o'clock in the morning.  I

8 called the investigations department and tried to

9 explain to the woman -- what I said to her is "I

10 filed a police report, I'd like to know what

11 investigator has been assigned to our case."

12 Q.      Do you know who you spoke with?

13 A.      I didn't at the time know.  She didn't

14 identify herself.  I now understand that she was the

15 secretary in that department.  I don't know her name.

16 Q.      So when you filled out the police report

17 online, did you ever get a response?

18 A.      No.  I believe I got, you know, a thing

19 saying that your police report has been received.

20 Q.      Like a confirmation?

21 A.      Yes.

22        I would have to double-check that, but I

23 believe that's right.

24 Q.      How did you get the number for the

25 investigations unit?  Was it a general number?

27

1   A.        General number.  I looked it up online.

2   Q.        So what did the woman or secretary of the

3   investigations unit tell you when you called her?

4   A.        So I said "I'm calling because I need to

5   know who has been assigned."

6             And she kind of laughed and said, "Well,

7   nobody."

8             And I said "Well, what do you mean?"

9             She said "We don't investigate fraud or

10  identity theft in Vallejo, we only investigate

11  murders."

12  Q.        Then what did you do then?

13  A.        I said "Well, then I don't know what I'm

14  supposed to do here because I have a bank who is

15  saying they can't investigate my case without your

16  cooperation and so I need to know who is going to be

17  working with me on this in Vallejo PD."

18            And she said "Let me send you down to" --

19  well, first she said "The reason that we can't

20  investigate these kinds of things is that we don't

21  have enough detectives."  I think she said "We have

22  four detectives."  I think that's what she said.  And

23  she said "But let me send you down to dispatch,"

24  which given the conversation I had just had, I didn't

25  understand why she would do that.

28

1          I don't know how dispatch works.  Do they

2  dispatch detectives?

3          So she sent me down to dispatch.  Dispatch

4  picked up and I said "Hi.  I've been sent down here

5  by the detective division."

6          And she said "Well, why are you calling us?"

7          And I said "I don't know either.  Because

8  somebody sent me down here."

9          And she said "Well, let me send you back

10  up."

11          So she patched me back up to the same person

12  that I had spoken to before.  You know, I said "You

13  guys are passing me back and forth."

14          And she said "Well, I don't know, I can try

15  and force a message through to dispatch, but I can't

16  guarantee you anything."

17  Q.      Okay.  And so this was a dispatch woman that

18  you were speaking to?

19  A.      No.  It was the secretary in the detective

20  unit sent me to dispatch.  Dispatch couldn't figure

21  out why I was on their line, sent me back up to the

22  secretary I had talked to, and she said "Well, I can

23  try and force a message through to dispatch, but I

24  can't guarantee you anything."

25          Honestly, I didn't know what that meant.

29

1    Right?  You know when you're in the phone thing where

2    you're being sent around from person to person.  I

3    didn't have any idea what she was getting at.

4           So then she said "Goodbye."

5    Q.      Let me just back up.  When you were put

6    through to dispatch before you were sent back to

7    investigations, who did you speak to at dispatch?

8    A.      Whoever picked up the phone.

9    Q.      Do you remember if it was male or female?

10   A.      It was a female.

11   Q.      Basically, you called investigations and

12   then were sent over to dispatch and after dispatch

13   you were sent back to investigations, where the

14   secretary told you she will try to get a message

15   through but she can't guarantee you anything?

16   A.      Right.

17          I think in that call she said "Well, maybe

18   they could have a uniformed officer talk to you,"

19   which didn't make any sense to me.  I had already

20   filed a police report.  I didn't need to file a

21   police report.

22          So that's when she said "Well, let me try

23   and force a message through to dispatch, I can't

24   guarantee you anything."

25          So honestly I didn't have any idea what any

                                                    30

1  of that meant.

2  Q.        So after you got off the phone, then what

3  happened?  So this is around what, 11:15 or something

4  like that?  So what happened then?

5          Do you need to take a break?

6          MR. CASPER:  Erika, do you want a moment or

7  do you want to keep going?

8          THE WITNESS:  I want to get it done.

9          MS. FARUQUI:  Let's go off the record for a

10  second.

11          (Off the record)

12          MS. FARUQUI:  Q.  So tell me what happened

13  next after you got off the phone with investigations.

14  A.        I was at my computer in my office -- just

15  one second.  I don't want to stop.  Just hold on a

16  minute.

17          I was at my computer in my home office, with

18  my back to the window, waiting for my nanny to bring

19  Lucy home from preschool and I was going through my

20  bank statements and there were shots in my backyard.

21  There were shots in the backyard or big sounds, okay.

22  I didn't know what was going on.  And I thought

23  somebody was trying to kill me because I was in a

24  room that was exposed, there were windows on two

25  sides, and I thought somebody was trying to shoot me.

31

DOUCETTE & ASSOCIATES   707.554.9970

```
 1    order, which will be Exhibit 2.

 2              (Exhibit 2 marked)

 3              MS. FARUQUI:  Q.  Can you tell me what this

 4    photograph is depicting?

 5    A.         It's the Trinity Street -- no.  Sorry --

 6    Kentucky Street side of our house, which is at the

 7    corner of Kentucky and Trinity in Vallejo, and it's

 8    looking at the house from the Kentucky Street side.

 9              And the gate is to the right of where this

10    photograph ends.

11    Q.         So is this your gate?

12    A.         It's our picket fence, yes.

13    Q.         Did you have that built yourself?

14    A.         It was there when we bought the house.  My

15    husband repaired pieces of it, but it was there when

16    we bought the house.

17    Q.         Did you take this photograph?

18    A.         I don't remember.

19    Q.         Okay.

20    A.         I might have.

21    Q.         Okay.  But if it wasn't you, do you know who

22    took it?

23              MR. CASPER:  I think I took it.

24              MS. FARUQUI:  All right.  Do you know when?

25              MR. CASPER:  I could find out.  It's listed
```

33

1    digitally on the camera.

2          THE WITNESS:  It probably wouldn't have been

3    until the fall because -- yeah, it wouldn't have been

4    until the fall.

5          And also it looks like it's pretty overgrown

6    and it wouldn't have been this overgrown while we

7    were still living there.

8          MS. FARUQUI:  Next I'm going to have another

9    photograph marked next in order.

10          (Exhibit 3 marked)

11          MS. FARUQUI:  Q.  I have just handed you

12    what has been marked as Exhibit 3.

13          Can you tell me what this photograph is

14    depicting?

15    A.          This is the gate that I said was to the

16    right of where the last photograph ended.  This is

17    the gate that's the entryway into our patio and it's

18    as seen from the patio looking out to the street.

19    Q.          So if I'm coming to your home -- or your

20    prior home, then do I need to enter this gate in

21    order to ring the doorbell or contact you?

22    A.          There is a gate here and then there is a

23    gate on the other side.  So there are two entrances

24    into the patio.  So you could come in through this

25    gate or through the other.

                                                    34

1      And there was kind of a cowbell -- I don't

2   know if you can see it in this photograph.  But

3   people would generally kind of ring that bell or

4   shake the gate or call out and then, you know, come

5   into our yard.

6   Q.      And then the cowbell, you can hear that from

7   inside your home?

8   A.      Um-hmm.

9           MR. CASPER:  Answer yes or no.

10          THE WITNESS:  Yes.  Sorry.  Yes, yes.

11          MS. FARUQUI:  Q.  Just to be clear, this

12  entrance is on which street?

13  A.      This entrance is on the Kentucky Street

14  side.

15          There is another entrance on the Trinity

16  Street side.

17  Q.      So there are two entrances to get to your

18  home?

19  A.      Correct.

20  Q.      But essentially in order to contact you if

21  you're on the street or anything like that, you need

22  to go to one of these different gates?

23  A.      Correct.

24  Q.      And you can't just go up to the front door?

25  A.      You can't just go up to the front door.

                                                    35

```
 1              But we had, you know, things that make noise
 2      so that I was never surprised by people coming in
 3      from the outside.
 4      Q.        Okay.  So would you call this a front yard
 5      or a backyard?
 6      A.        It's the front patio.
 7                But this is not the entrance that anybody
 8      would typically go in.  There are mailboxes out
 9      there.  The mailman delivers mail to that side of the
10      house.
11                But, generally speaking, people would have
12      come around through the main entrance on the Trinity
13      Street side.
14      Q.        So in your mind this is a back entrance?
15      A.        Side entrance, yes.
16      Q.        Okay.
17      A.        But, yeah, the house looks out onto this
18      patio, so this is the front.
19      Q.        Now, how far from this gate is your front
20      door located?
21      A.        I'm sure that my husband has measured that.
22                I would say it's 20 feet.
23                There's a wraparound porch that you have to
24      step onto before you get to the front door.  So you
25      cross this patio, you go up a couple steps onto a
```

                                                        36

DOUCETTE & ASSOCIATES   707.554.9970

1   wraparound porch, and then you get to the front door.

2   Q.        And do you know if the other entrance -- how

3   far the other entrance gate is to your front door?

4   A.        Probably equidistant.

5            MS. FARUQUI:  I want to mark another

6   photograph.

7            (Exhibit 4 marked)

8            MS. FARUQUI:  Q.  That's been marked as

9   Exhibit 4.

10           Can you tell me what this photograph is?

11  A.        This is a close-up of that same gate.

12  Q.        Is the cowbell or anything visible from this

13  photograph, Exhibit 4?

14  A.        No.  But we had moved out by the time this

15  photograph was taken, so it's entirely possible all

16  that stuff was gone.

17  Q.        Where would it have been on the photograph?

18  A.        It would have been hanging from one of the

19  pickets on here.  It was like a brass ring.

20  Q.        So the cowbell would have been hanging from

21  one of these pickets?

22  A.        Um-hmm.

23  Q.        Do you happen to have a photograph of the

24  cowbell?

25  A.        No.

                                              37

1    first of all, there's a lot of foliage there.  It was

2    not quite as overgrown as this.

3            Also, there was a child's wading pool here

4    at the bottom of these stairs and there were a lot of

5    kids' toys all over the patio, including a dollhouse.

6    I just want to point out there was a bunch of kids'

7    stuff here at the bottom of these stairs.

8    Q.        So basically the way that your home -- or

9    prior home is depicted in Exhibit 3 is not the way

10   that it was on the day of the incident?

11   A.        Not exactly, no.

12   Q.        Okay.

13   A.        So anybody coming in this gate would have

14   seen first of all a bunch of dogs' toys and kids'

15   toys out here on the patio.

16   Q.        What about the fencing?

17   A.        The fencing was there.

18   Q.        And the gates?

19   A.        Yes.  The fencing and the gates were all as

20   you see them.

21            I just wanted to point out --

22   Q.        Thank you for clarifying that.

23            You also said there was a cowbell, which

24   isn't depicted in these photographs, correct?

25   A.        Correct.

                                                          41

1    Q.        Looking at Exhibit 7, this is another

2    close-up of the same gate facing Kentucky Street from

3    your front door out, correct?

4    A.        Sorry.  This is 7?

5    Q.        Yes.

6    A.        Yes.  This is the same thing.

7              MS. FARUQUI:  I'm going to mark another

8    photograph now.

9              (Exhibit 8 marked)

10             MS. FARUQUI:  Q.  All right.  Now we're

11   looking at Exhibit 8.  Please describe the

12   orientation of this photograph from the photographs

13   we were just looking at.

14   A.        So if I were standing in Exhibit 7 with my

15   back to the gate, I would be looking straight onto

16   the porch that's shown in Exhibit 8.

17   Q.        Okay.  So essentially this is -- is this

18   your front door?

19   A.        Those two steps that you see in Exhibit 8

20   leading up to this wraparound porch, the window that

21   you're looking at there is the window that I had my

22   back to when the shots were fired.

23             And if you were to go up these two steps and

24   turn right, you would get to our front door.

25   Q.        All right.  So the window that's depicted in

                                                          42

1    Exhibit --

2    A.        8.

3    Q.        -- 8 is where your office is?

4    A.        Correct.

5            MS. FARUQUI:  Off the record.

6            (Off the record)

7            MS. FARUQUI:  Q.  If you can circle the

8    window on Exhibit 8 for me using this red pen and

9    then underneath it write "office window."

10   A.        Yeah.  So there are two.  My husband has

11   just pointed out there are two -- there are actually

12   two windows, one of which is hidden by this maple

13   tree.

14   Q.        Okay.  I can see it.  Yes.

15           MR. CASPER:  I don't think that pen is going

16   to show up.

17           THE WITNESS:  We need a Sharpie.

18           (Off the record)

19           MS. FARUQUI:  We're going back on the

20   record.

21   Q.        Now, can you describe the way that your

22   office is set up?

23   A.        Yes.  So at the time that this happened this

24   room, which used to be a bedroom, had, you know, an

25   office setup so that I was looking the other

                                                  43

1    direction, with my back to this window, sitting at a

2    big -- what do you call it -- rolltop desk, and

3    office supplies and office shelves and so forth.

4           Is this answering your question?

5    Q.      So was the desk against the window?

6    A.      The desk was on the wall on the opposite

7    side of the room from the window.

8    Q.      Okay.

9    A.      With the chair looking -- you know, facing

10   the opposite side.  So I had my back to the window.

11   Q.      Right.

12          So when you would look from your desk

13   forward, your back is to the window, so you can't see

14   out the window unless you turn around?

15   A.      There is another window which you can't see

16   in this photograph to the left.

17   Q.      Okay.

18   A.      Which I could see.  I liked that because,

19   generally speaking, people would come in through that

20   gate, so my kids would come and go through that gate,

21   for instance, and we parked on that side.  So I could

22   see everything that would come and go through that

23   window.

24          And I have a turn-around chair.  So if I

25   heard anything coming the other direction, I could

                                                        44

1   turn around and look out this window as well.

2   Q.        Okay.  But you would have to turn around to

3   do that?

4   A.        Yes.

5   Q.        Okay.

6   A.        Um-hmm.

7            MS. FARUQUI:  I'll mark another photograph.

8            (Exhibit 9 marked)

9            MS. FARUQUI:  Q.  Now we're going to look at

10  Exhibit 9, which appears to be almost a similar view

11  but more of a close-up.

12  A.        Um-hmm.

13  Q.        Is that correct?

14  A.        That's correct.

15           (Exhibit 10 marked)

16           MS. FARUQUI:  Q.  This is Exhibit 10.

17  A.        Yes.

18  Q.        And this shows the other window?

19  A.        Yes.  Same thing, but it's a close-up and it

20  shows that there are two windows.

21           (Exhibit 11 marked)

22           MS. FARUQUI:  Q.  Next is Exhibit 11.

23  Please tell me what this photograph shows.

24  A.        This is the outside looking into the patio

25  of that same gate we've been talking about from the

                                                         45

1    Kentucky Street side.

2    Q.        So this is just basically from the street

3    view in?

4    A.        Correct.

5             (Exhibit 12 marked)

6             MS. FARUQUI:   Q.   Next is Exhibit 11.

7    Please tell me what this photograph is depicting.

8    A.        I have 12.

9    Q.        Sorry.  12.

10   A.        This is depicting the same entryway from

11   standing it looks like directly outside the gate

12   looking down the stairs that lead into the patio.  So

13   this is what someone would see if they were coming in

14   this gate into the property.  Right?  So if I were

15   standing outside the gate looking in, this is what I

16   would see before I opened the gate, except there was

17   a big child's wading pool and a bunch of toys and dog

18   toys all over the place.

19   Q.        So this is outside the gate, right?

20   A.        Remember I showed you before there was an

21   area that's blocked off where we grew flowers and

22   vegetables.  That's what this separate little

23   blocked-off garden is.  It's all part of the same

24   house.

25   Q.        So the gate would be out here somewhere?

                                                        46

1    MS. FARUQUI:  Let's just mark this since we

2   just talked about it.  So what you just described is

3   going to be marked as Exhibit 16.

4        (Exhibit 16 marked)

5        MR. CASPER:  Some of these have different

6   angles but they may not be relevant to the claim.

7        MS. FARUQUI:  No.  I only want to discuss

8   relevant photographs to the claim.

9        THE WITNESS:  Okay.

10       MS. FARUQUI:  If you're going to talk about

11  a photograph, let's mark it before talking about it.

12       THE WITNESS:  I think all of these are

13  pretty much the same.

14       Okay.  Here's one.

15       (Exhibit 17 marked)

16       THE WITNESS:  Exhibit 17 is looking over the

17  picket fence into the yard and it shows the

18  fencing -- I don't know what that's called -- the

19  wire fencing that my husband had placed to keep the

20  dogs from jumping out of the yard.

21       MS. FARUQUI:  Q.  Okay.  So were your dogs

22  usually in this area?

23  A.      Yes.

24  Q.      What would you call this area?

25  A.      I would call it the hillside leading up to

49

1   would often get ahead of us and make it kind of hard

2   to even get into this gate, so people would come

3   around to the other gate.  Just for whatever that's

4   worth.

5   Q.      Okay.  You probably should just keep those

6   nearby in case we need to ask questions.

7          You did a great job explaining the

8   orientation of your home.

9          Let's go back to so you were saying that you

10  were in your office and you were facing away from the

11  windows.  Let's put one of those in front of us.

12  A.      Okay.  Here we go.

13  Q.      So we're going to look at Exhibit 16.

14  A.      This is 10.

15  Q.      Sorry.  10.

16         So you were in your office with your back to

17  the windows.

18  A.      Yes.  In Exhibit 10 we're looking at two

19  windows for my home office.  I had my back to the

20  left-hand window.  But I was looking out the other

21  way, waiting for my daughter to come home.  After I

22  got off the phone, I was working at my computer and

23  then there were shots in my backyard.

24  Q.      So what did you do?  You heard shots.  What

25  happened then?

54

1   A.        I hit the floor.

2   Q.        Okay.

3   A.        I hit the floor.  I laid down on the floor.

4   You know, I honestly can't remember if I started

5   crawling around to the front of the house first or if

6   I called my husband first.  I think I might have

7   called him first.  And, you know, I was shaking and I

8   couldn't dial correctly, so I couldn't get him -- you

9   know, I couldn't get him to answer.

10          And then I crawled around through my office,

11  around to the front door, and I cracked the front

12  door open to see if I could see anything, and

13  somebody started yelling at me to stay in my house.

14  Q.        Were you the only one at home?

15  A.        Um-hmm.  Yes.

16  Q.        So looking at Exhibit 10 -- I always want to

17  say 16 -- you said you were looking the other way,

18  and by "the other way" you mean not looking at the

19  window?

20  A.        I was not looking out the window that was

21  facing the direction I heard the shots come from,

22  that's correct.

23  Q.        Okay.  So you didn't actually see what

24  happened when the shots were fired?

25  A.        No.

                                                    55

1    Q.        Okay.  So your only -- the only thing

2    that -- sorry.  Let me rephrase this.

3            The first time you knew that shots were

4    fired is when you heard the actual shots?

5    A.        That's correct.

6    Q.        All right.  And then you're potentially on

7    the floor crawling around or trying to call your

8    husband and you make it to the front door and someone

9    tells you to stay inside?

10   A.        (Nodding head).

11   Q.        Then what did you do?

12            MR. CASPER:  You have to answer.

13            THE WITNESS:  Sorry.  Yes.  Somebody started

14   yelling at me "Stay in the house, stay in the house,

15   stay in the house, stay in the house."  So I did.

16   But I didn't know who that person was.  So I didn't

17   know who was out there or what was going on.  What

18   did I do?  I tried a couple of times to open the

19   door.  I was in pretty much of a panic.  I look back

20   on it now and I wonder why was I opening the front

21   door.  But, you know, your instinct in a situation

22   like that is to get out.

23            MS. FARUQUI:  Q.  How long did you stay

24   inside --

25   A.        It was probably just a few minutes.

56

1   A.        3.

2   Q.        Okay.

3   A.        So where he was standing, he was -- I was at

4   the front door, so I couldn't see around to this

5   corner.  But where he was standing, he seemed to be

6   looking toward this way, towards the patio that's

7   shown in Exhibit 3, near the bottom of the step, by

8   the gate.

9             So I went around -- or, you know, looked

10  around the corner and I saw that my dog was lying in

11  a pool of blood by the kids' wading pool.

12  Q.        And you mean Bella?

13  A.        Belle, yeah.

14  Q.        Belle.  Okay.

15            Back up for a second.  At the time you had

16  three dogs?

17  A.        We did.

18  Q.        Tell me about the other dogs.

19  A.        Flicka was 13 or 14 years old, I guess, and

20  she was sick and we thought she was going to be

21  dying.

22            Belle was 11 years old and we had her -- we

23  had had them both since they were puppies.

24            Because we thought one of the dogs was

25  dying, we got a puppy for the kids for Christmas.  So

                                                    58

1   we had an eleven-month-old puppy in the house.  She

2   was with me.  Her name is Holly.

3   Q.      So the puppy stayed inside the home, right?

4   A.      The puppy was in the house with me.

5           The two dogs were sleeping on the patio, you

6   know, sunny and they sleep in the sun.  Sometimes

7   they sleep under a tree.

8   Q.      And just to be clear, how did you know where

9   the dogs were at the time of the incident if you

10  weren't outside?

11  A.      Because they weren't inside.

12  Q.      No.  I understand that.

13  A.      Sorry.

14  Q.      How did you know their exact location --

15  A.      I didn't know their exact location.

16  Q.      Okay.

17  A.      I just know that commonly when I was home

18  during the day I would leave the dogs out on the

19  patio because it's fenced in and they were old and

20  they liked to lay out in the sun and I felt better

21  having dogs out there to bark at people that came to

22  the gate.

23  Q.      So Belle and Flicka, did they get along?

24  A.      Yes.

25  Q.      Were they guard dogs?

                                                        59

1   A.        I mean they were guard dogs because they

2   would bark if people came to the gate.  But they

3   weren't, you know, like attack dogs, no.  But they

4   barked when people came.

5   Q.        How long had you had the dogs?

6   A.        We had Belle since she was nine weeks old

7   maybe.  So more than 10 years, almost 11 years.

8             Flicka we had -- we probably got Flicka in

9   1999.  I don't know.  I can't do math that fast.  12,

10  13 years.

11  Q.        And then in the time that you had had both

12  of these dogs had -- well, with respect to Belle, had

13  Belle ever bitten any other human?

14  A.        No.

15  Q.        Had Belle been involved in any altercations

16  with other dogs?

17  A.        No.

18  Q.        Okay.

19            MR. CASPER:  Did you get the photographs on

20  the dogs that I produced?  It was on that same disc

21  as the property.

22            MS. FARUQUI:  Yes, I think I did.

23            MR. CASPER:  Okay.  I was just checking.

24            MS. FARUQUI:  Q.  All right.  So at this

25  point you're outside and you're talking to who you

                                                    60

1   came.   So we told our kids what had happened and that

2   somebody had made a terrible, terrible mistake.

3           You know, I don't know how much more you

4   want me to say.

5   Q.      So did the acting police chief never show up

6   then?

7   A.      No.   They called later to say there must

8   have been a misunderstanding, that they were not

9   planning to have anybody come to the house.

10  Q.      All right.   So tell me about -- I know

11  you're making an emotional distress claim.   Are you

12  making a physical injury claim as a result of this

13  incident?

14  A.      No.

15  Q.      So you're making an emotional distress

16  claim.

17  A.      Um-hmm.   Yes.

18  Q.      Please describe for me your claim.

19  A.      You mean describe what feels wrong?

20  Q.      Yes.

21  A.      Yes.   Okay.   So I don't feel like this is

22  over for our family now.   It's been over a year.

23          I can say that it was a long time before I

24  could sleep through a night.

25          It was a long time before I could either,

                                                        70

1    you know, be with clients or focus on any of my work.

2    I do most of the business development work for my

3    company.

4         Any loud noise -- still, you know, I watch a

5    TV show, any loud noise.

6         Looking at the photographs, answering the

7    questions, getting ready for this deposition or the

8    interrogatories.  You know, I myself was really

9    surprised a few weeks ago when we filled out the

10   interrogatories that it just -- you know, this whole

11   thing is still -- I go through my days, I don't think

12   about it every day, but it's -- you know, I don't

13   know -- I don't know what words -- I don't know what

14   I'm supposed to say, honestly.

15   Q.      Let me ask you this:  The injury that you're

16   attributing to the incident is emotional distress,

17   but number one it's insomnia and -- tell me about the

18   insomnia.  Let's talk about that first.

19   A.       Okay.  For months I was awake every few

20   hours, okay, my heart pounding.

21         It was very distressing to pick up and move

22   from Vallejo under these circumstances, you know, to

23   yank our kids out of the home that they were in.

24         But honestly I felt like we were in an

25   unsafe place that to me was never going to be okay,

71

1   you know, I was never going to walk outside and feel

2   like the kids were okay.

3        I have felt a kind of sadness about this

4   that I just don't seem to be able to shake.  I'm sad

5   about the way people with responsibility handled it.

6   I can't get the picture of a guy in a uniform

7   standing outside my house without ever identifying

8   himself as a police officer...

9        You know, the feeling of being invaded like

10  you are not safe anywhere if you're not safe in your

11  own home.  That the police have apparently the

12  capacity to walk onto your property and start

13  shooting just because they feel nervous about your

14  dog.  It's pretty hard to feel a sense of safety

15  after something like that happens.

16  Q.      Was Officer Calhoun wearing a uniform?

17  A.      He was, yes.

18  Q.      So as a result of your insomnia and anxiety

19  you sought treatment, right?

20  A.      I did.  I went a couple of times.  And then

21  we got involved in moving and I stopped going.

22  Q.      Who did you treat with?

23  A.      Mary Spence, here in Vallejo.

24  Q.      And did she prescribe you any medication?

25  A.      She did not.  Wait.  Oh, no.  I think it

72

DOUCETTE & ASSOCIATES   707.554.9970

1    was -- no.   I don't think Mary Spence was an M.D.

2    either.

3    Q.        So the Celexa and the --

4    A.        Gabapentin.

5    Q.        Who did you get that from?

6    A.        The Celexa from Teresa Caron, who I

7    mentioned to you earlier, the M.D., and then I told

8    you on a break I have to look up the name of the

9    psychiatrist who prescribed the gabapentin.

10             MS. FARUQUI:  So, Nick, we're going to need

11   to get these records, so we're going to need to get a

12   psych authorization signed from you and your client.

13             MR. CASPER:  We can work with you.

14             MS. FARUQUI:  Okay.  Good.

15   Q.        So do you remember if any of your treating

16   physicians for your anxiety told you you could not

17   work or anything like that?

18   A.        No.

19   Q.        Okay.

20   A.        But what they said to me is that I was

21   showing signs of really extreme stress.

22   Q.        You said that as a result of deciding to

23   move you only had a couple appointments with Dr.

24   Spence?

25   A.        I did.

73

```
 1                    CERTIFICATE OF REPORTER

 2          I, JOHN P. SQUIRES, a Certified Shorthand

 3     Reporter, hereby certify that the witness in the

 4     foregoing deposition, ERIKA GREGORY, was duly sworn

 5     by me; that the testimony of said witness was taken

 6     down in shorthand by me at the time and place herein

 7     stated; that the testimony of said witness was

 8     thereafter reduced to typewriting, by computer, under

 9     my direction and supervision.

10          I further certify that I am not of counsel

11     or attorney for any of the parties to said cause, nor

12     in any way interested in the outcome of this cause

13     and I am not related to any of the parties thereto.

14          I declare under penalty of perjury that the

15     foregoing is true and correct.  I have hereunto set

16     my hand on October 22, 2013.

17

18          _____
            John P. Squires, CSR No. 2001

19

20

21

22

23

24

25

                                                    96
```