*Gregory/Mollner vs. City of Vallejo, et al*

*2:13-cv-00320-KJM-KJN*

# EXHIBIT 2

**to Declaration of Nick Casper**

**in Support of Opposition to Defendants' Motion for Summary Judgment**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

---oOo---

| | |
|---|---|
| ERIKA GREGORY and LOREN MOLLNER,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF VALLEJO; former VPD CHIEF ROBERT NICHELINI, individually and in his official capacity; VPD OFFICER CHASE CALHOUN, individually; and DOES 1 through 50,<br><br>Defendants. | No. 2:13-CV-00320-KJM-KJN |

---oOo---

**DEPOSITION OF**

**LOREN MOLLNER**

Tuesday, October 15, 2013

REPORTED BY: JOHN P. SQUIRES, CMR, CCRR
CSR No. 2001

of the deponent.

THE WITNESS: Okay.

MS. FARUQUI: Q. Have you ever seen Exhibit 24 before?

A. Yes, I believe so.

Q. Okay.

A. No. I don't know. Doesn't look familiar.

Q. All right. As I asked your wife this morning, do you have any documents to add in terms of request numbers 1 through 5, any documents that you've not already produced in this litigation?

A. No.

MS. FARUQUI: Is that accurate, Nick?

MR. CASPER: Yes, I believe that's correct.

MS. FARUQUI: Q. All right. And I asked your wife this morning about your current residential address and prior addresses. Have you lived with her at each of those locations?

A. Yes.

Q. What year did you two marry?

A. 2001.

Q. And were you married before that?

A. Yes.

Q. To who?

A. Mary Mollner.

Q. And what year did you and Ms. Mollner get married?

A. 1971.

MS. GREGORY: Sorry to laugh.

MS. FARUQUI: Q. What year did you get divorced?

A. Approximately 1998.

Q. And do you have any children with Ms. Mollner?

A. Yes.

Q. What are their names and ages?

A. Maura is 41, Megan is 38, and Mark is 36.

Q. And how do you spell Maura?

A. M-a-u-r-a.

Q. All right. And none of those children live with you, is that correct?

A. Correct.

Q. And with Ms. Gregory you share two children, is that correct?

A. Yes.

Q. And that would be Jack and --

A. His name is Joseph.

Q. Joseph.

A. We call him Jack.

Q. Okay.

A. And Lucia.

Q. All right. Are you presently employed?

A. Yes.

Q. Who is your employer?

A. Department of Homeland Security, U.S. Coast Guard.

Q. And what exactly is your position with the Department of Homeland Security for the U.S. Coast Guard?

A. I'm a real property accountability specialist.

Q. And how long have you worked there?

A. Since January, 2011.

Q. And where were you working before that?

A. U.S. Department of Agriculture.

Q. In what capacity?

A. Home loan specialist.

Q. And are you making a wage-loss claim in this litigation?

A. A small one, but -- I don't think so. I'm sorry.

MR. CASPER: Same as Ms. Gregory. We will not be making a wage-loss claim. If that ever changes, we will provide documents, then you'll be able to redepose Mr. Mollner.

never saw him. I saw him once maybe.

Q. Are you making a claim for physical injuries as a result of the incident?

A. No.

Q. Are you making a claim for emotional injuries as a result of the incident?

A. Yes.

Q. And can you tell me what your injuries are with respect to emotional?

A. Fits of anger and depression and hopelessness and watching my kids not be able to function properly.

And every time this gets brought up -- just doesn't seem to go away, it's like a scab, okay? And you saw -- this morning we watched what happened with Erika when you mentioned it, and it will happen a few times a month either to the kids or to my wife or to myself and it brings it all back, the scab gets picked off and it bleeds all over again. This was a member of our family we lost.

Q. Did you seek treatment by a physician for any of these ailments?

A. I did.

Q. And who was that with?

A. I don't recall his name. It was a Kaiser --

the psychiatric place.

Q. In your interrogatory answers you state you treated at Kaiser Permanente Department of Psychology. There's no doctor listed. We're going to need to get those.

All right. How many times did you see this doctor?

A. I saw him one time.

Q. Right after the incident?

A. Yes, the next day. I took the kids and myself and we went, got treatment right away.

Q. Were you ever treated by any other psychiatric evaluator after the incident?

A. No.

Q. Do you have any plans to see a psychiatrist?

A. Yes.

Q. When?

A. Well, it just came to our attention this morning that my son is having issues, so we're going as a family as soon as we can make an appointment.

Q. Well, what about you personally?

A. I will go with the family. It's a family deal, we're all going.

You also talked about physical ailments and you jogged my memory. I had hives. I had hives for

eight or nine months and I thought it was the water in Mill Valley, I thought it was mildew in the air conditioning or in the heating system, but I went to the doctor in Vallejo and I started reading up on hives and what causes them and it's a symptom of posttraumatic stress disorder.

Now the hives are gone and I was treated -- I like to read the internet and treat myself. I don't have that much faith in some of the medical professionals. So I was treating myself with hydrocortisone for these hives. They were every place in my body where heat is generated. They're gone now because I think it's because a little time has gone by.

But I attribute the hives now to the incident. So there were some physical things.

Q. When did the hives start?

A. They probably started in June or July of 2012.

Q. When did you move again?

A. We moved July 4th, 2012.

Q. And so from what you just said, did you not see a doctor for hives or you did?

A. I tried to. I went to the doctor. But, you know, they wanted to do just a bunch of lab tests and

test you for cholesterol and blood pressure and things like that and I couldn't really sit down and talk to him about the hives. I got frustrated and went home and did research and I treated myself.

Q. Okay. All right. So let's get to the subject incident, which you were sitting in here when we talked about the date this morning as May 16, 2012. Does that date ring a bell to you as well?

A. Yes.

Q. Please tell me what you did that day before you got a call from your wife.

A. I got up early and went to work. I got to work by 6:30 in the morning. I took the bus that day from Vallejo, bus to BART and BART to the office.

Q. In the city?

A. In Oakland, federal building.

Q. All right. And then what happened?

At some point you got a call from your wife.

A. Right.

Q. Do you recall what time?

A. Probably around twelve o'clock.

Q. Okay.

A. She was hysterical: "The dog has been shot, come home."

So I took BART, took the bus, got on my cell

everything is overgrown. That might make some difference.

MS. FARUQUI: Q. Did you sell your home in 2012?

A. No. We moved out quickly.

Q. Okay.

A. Okay?

Q. So are you still the owner?

A. Yes.

Q. Oh, okay. All right. So it's currently unoccupied?

A. No. It's rented.

Q. It's rented?

A. Um-hmm.

Q. To who?

A. A family.

Q. And when did they start renting from you?

A. In September of 2013.

Q. '12?

A. '13.

MR. CASPER: A month ago?

THE WITNESS: Yes.

MS. GREGORY: Am I allowed to say anything?

THE WITNESS: No.

On Exhibit 11, to answer your question, you

 Q. And then you rented it to someone else?
A. In September.
Q. Of 2012?
A. Of 2012.
Q. Until?
A. It's still rented.
Q. Do you know those people's names?
A. It's on my phone and I don't -- I quit a long time ago trying to memorize everything because I'm just -- it's Carlos and Johanna.
Q. What about a last name?
A. They have two different last names.
Q. All right. Basically if I ask for it, you can provide that to your attorney?
A. Absolutely.
Q. Now going to 47, from what you said, you left in July of -- July 4th, 2012?
A. Correct.
Q. Then you rented 47 to a Coast Guard family?
A. It was a commander and he's a psychiatrist -- psychologist for the Coast Guard and his name was Jose Gomez.
Q. And that was in September of 2012?
A. That was September, 2012.
Q. And when did they break their lease?

patch of lawn was Erika's fancy lawn for her to have picnics and read stories to the kids. And you can see in this picture it's overgrown, which says to me this house is vacant, it's not being maintained, the landscaping is not being maintained. I just wanted to point that out because I think that might be important.

Q. Okay.

A. And then also the -- let me get another picture.

Is that the top or the bottom?

On Exhibit 17 it is a good close-up of the wire that's on the top. And the wire is done horizontally because a small dog will run up to a fence and then try to jump. But if you put the wire horizontally, they get to the fence and look up and go, oh my gosh, I can't go over that fence. And this was done to keep the puppy in. So this wire was put here recently, very soon before the incident, because we got a Christmas puppy to replace Flicka, who was one of the attack dogs, supposedly, according to the police report, who was on her last legs and going to expire and have to be put down, so we got a Christmas puppy, and the Christmas puppy's brother lived two houses up the street, so the puppy would climb the

fence and try to go see her brother. So that's when the wire was put up. The wire wasn't put up for Belle, the wire wasn't put up for Flicka, the wire was put up for the puppy to keep in. So I wanted to make that perfectly clear.

That's all.

Q. Okay. Then I would like you to look -- actually, before we do that, do you remember providing some information to your attorney about interrogatory responses?

A. Yes.

Q. All right. I know that we talked to your wife this morning about witnesses that she had listed. You had listed a couple extra ones that I just want to ask you about. I think I know who this is now. You have listed Maura, which is your --

A. My oldest daughter.

Q. And then Mark Mollner.

A. My son.

Q. And Megan and Jason Boyer.

A. That's my middle daughter and her husband.

Q. And who is Teresa Pangelina?

A. She is a coworker.

Q. At the Coast Guard?

A. Yes.

CERTIFICATE OF REPORTER

I, JOHN P. SQUIRES, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition, LOREN MOLLNER, was duly sworn by me; that the testimony of said witness was taken down in shorthand by me at the time and place herein stated; that the testimony of said witness was thereafter reduced to typewriting, by computer, under my direction and supervision.

I further certify that I am not of counsel or attorney for any of the parties to said cause, nor in any way interested in the outcome of this cause and I am not related to any of the parties thereto.

I declare under penalty of perjury that the foregoing is true and correct. I have hereunto set my hand on October 22, 2013.

John P. Squires, CSR No. 2001