*Gregory/Mollner vs. City of Vallejo, et al*

*2:13-cv-00320-KJM-KJN*

# EXHIBIT 4

### to Declaration of Nick Casper

### in Support of Opposition to Defendants'

### Motion for Summary Judgment

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

---oOo---

ERIKA GREGORY and LOREN MOLLNER,

        Plaintiffs,

   -vs-                  NO.2:13-CV-00320-KJM-KJN

CITY OF VALLEJO; former
VPD CHIEF ROBERT NICHELINI,
individually and in his official
capacity; VPD OFFICER CHASE
CALHOUN, individually; and
DOES 1 through 50,

        Defendants.

_____/

DEPOSITION OF CHASE CALHOUN

Taken before GAYLE I. COWAN, CSR
State of California
CSR No. 7004
January 7, 2014

DIABLO VALLEY REPORTING SERVICES
Certified Shorthand Reporters
2121 North California Blvd.  Suite 210
Walnut Creek, California 94596
(925) 930-7388

1    Q.   And who is your current employer?

2    A.   I'm currently not employed.

3    Q.   Who was your last employer?

4    A.   The Vallejo Police Department.

5    Q.   When did your employment with -- I'm just going

6    to refer to them as "V.P.D."

7         Is that okay?

8    A.   Yeah.

9    Q.   When did your employment with V.P.D. end?

10   A.   December of 2013.

11   Q.   Last month?

12   A.   Yes.

13   Q.   Was that in the beginning or the end of the month?

14   A.   Beginning.

15   Q.   And what were the circumstances of your departure

16   from V.P.D.?

17        MS. FARUQUI:   I'm going to object to that.  He's not

18   going to be answering any questions as to his departure or

19   the circumstances.  That's a violation of privacy, as well

20   as it's a personnel matter and it's privileged information.

21        MR. CASPER:   Okay.

22   Q.   Did it involve your conduct while in the course and

23   scope of your work?

24        MS. FARUQUI:   Same objections.

25        And he's not answering any questions today.

```
1          MR. CASPER:  Well, we have a protective order in this
2   case, and we have asked for any and all incidents of, you
3   know -- I believe we asked for any complaints against Officer
4   Calhoun, for which the City responded that there were none.
5          MS. FARUQUI:  Right.
6          MR. CASPER:  Hold on.
7          MS. FARUQUI:  I mean, if you want to meet and confer
8   on this issue, we can, but the discovery that we gave you is
9   accurate.  I can represent to you that.
10          And we gave you any document related to force in the
11  last five years and complied with your other requests.
12          MR. CASPER:  Okay.
13          MS. FARUQUI:  I'm just not going to have him answer
14  questions as to his departure.
15          MR. CASPER:  Well, did it involve a complaint of
16  excessive force?
17          MS. FARUQUI:  You can answer that, if you want.
18          THE WITNESS:  No.
19          MR. CASPER:  Okay.
20          For purposes of this, you know, we may meet and
21  confer, and, you know, I just reserve the right to reopen
22  Officer Calhoun's deposition, depending on the outcome of
23  our meet-and-confer process or if the Court's involved in
24  any way.
25          MS. FARUQUI:  Right.  Of course.
```

1          I saw pit bulls, yes.

2          Q.  Okay.

3          Was that a common occurrence, to encounter a pit bull?

4          A.  I don't know.  Dogs and pit bulls and everything

5    is kind of common; it's not necessarily pit bulls more than

6    something else, but yes, I would see pit bulls occasionally.

7          Q.  Did you ever have any specific assignment that

8    related to Animal Control at V.P.D.?

9          A.  No.

10         Q.  I'd like to turn your attention to May 16th, 2012.

11    Do you recall what your -- did you work that day?

12         A.  Yes.

13         Q.  And do you recall which shift you worked?

14         A.  I was working overtime, on day shift.

15         Q.  What does that mean, you were working overtime on

16    day shift?

17         A.  That wasn't my regular assigned shift.

18         Q.  Okay.

19         Had you worked the previous shift?

20         A.  Like, the night before?

21         Q.  Yeah.

22         A.  I don't believe so.

23         Q.  Is it possible?

24         A.  In this situation, I don't believe so.

25         Q.  What makes you say that?

```
 1        A.   Just because, if I recall correctly, I worked

 2   the full -- I worked the full overtime shift; if I was --

 3   if I worked the night before, it would have only been for a

 4   couple hours, and I believe I worked a full shift, so I don't

 5   think I worked the night before.

 6        Q.   Okay.

 7             And was that overtime based on the number of hours you

 8   had worked that week?

 9        A.   No.

10        Q.   How was the overtime -- why was it overtime work?

11        A.   Because there -- there wasn't enough people to

12   work the shift, so they have to hire the overtime, which is

13   generally filled voluntarily, so I probably volunteered to

14   work that shift.

15        MS. FARUQUI:   Is your question why is it considered

16   overtime?

17        MR. CASPER:   Yeah.   Thank you.

18        Q.   Why is it considered overtime?   Is it just because

19   you weren't assigned to that specific shift, or do you have

20   to exceed a certain number of hours per week for it to be

21   counted as overtime?

22        A.   Just what I just described to you.

23        Q.   So if it's not your shift and you volunteer for it,

24   it's overtime?

25        A.   It's an extra shift, so it was above my regular
```

1    40 hours for the week.

2         Q.  And did you get time and a half for that work?

3         A.  Yes.

4         Q.  In May of 2012, approximately how much overtime

5    were you working on a -- say, on a per-week basis?

6         A.  I have no idea.

7         Q.  Did your overtime fluctuate throughout your time

8    at V.P.D.?

9         A.  Yes.

10        Q.  Were there periods where you worked a lot of

11   overtime, compared to other officers?

12        A.  I guess that would depend what other officers

13   you're comparing it to.

14        Q.  Well, were you working more or -- during that

15   period of time, more or less than ten overtime hours a week?

16        A.  I don't know.  I'd have to look, but ten -- ten

17   hours would be one shift, so, I mean, if you work one shift,

18   you're working ten hours a week.  I just don't remember

19   exactly.

20        Q.  Do you recall during that time frame if you were --

21   if there were pay periods where you had no overtime shifts?

22        A.  I don't know.  Sorry.

23        MS. FARUQUI:  It might be easier just to make a

24   document request.  So we can get that information for you.

25        MR. CASPER:  Thank you.

1    Q.   So you were working an overtime day shift.

2    When did that shift start on May 16th?

3    A.   I believe 7:00 a.m.

4    Q.   And do you recall what you did that day, prior to

5    responding to 47 Kentucky Street?

6    A.   No.

7    Q.   Were you in a marked squad car?

8    A.   Yes.

9    Q.   What did you typically do on a shift?  Did you --

10   were you responding to dispatch calls?  Or did you -- how was

11   your day-to-day work in that time?

12   A.   We responded to dispatch calls, yes.  Or you can

13   do, I guess, proactive police work if you want to or have

14   the time, but usually the majority of your time is spent

15   responding to dispatch calls.

16   Q.   Do you recall receiving a dispatch call as it

17   relates to this case?

18   A.   Yes.

19   Q.   Okay.

20   MR. CASPER:  Before we get into the substance of that,

21   why don't we mark as Exhibit 3 what's been produced as the

22   CAD log.

23

24   (Exhibit 3 was marked for identification.)

25   ///

1       A.   In -- in investigations.

2       Q.   Okay.

3            Was she a uniformed police officer?

4       A.   No.

5       Q.   Was she a sworn officer?

6       A.   No.

7       Q.   Would that entry be before or after your first

8  interaction involving this case?

9       A.   Before.

10      Q.   Okay.

11           When were you first contacted regarding this case?

12           Or let me rephrase that.

13      A.   According to this, twelve-O-- 12:08, but I -- yeah,

14  looks like 12:08 is when I was dispatched to the call.

15      Q.   Okay.

16           And that is the line that says "units recommended";

17  is that right?

18      A.   No.  I don't know what that is, because that shows

19  a bunch of -- a bunch of people.  So I think that ha-- and

20  I don't know, but -- would be the answer, I don't know, but

21  I think that has more to do with dispatch.

22      Q.   Okay.

23      A.   Maybe who they could dispa-- I don't know.  Maybe

24  who they could dispatch the call.

25           None of them responded to the call initially or -- it

1   would be down a couple lines, where it says stat

2   P.D./2-Paul-6 -- which is who I was working that day --

3   dispatched.

4        Q.  Okay.

5        A.  Or "D.I."

6        Then when it goes to -- looks like 2:11, 2-Paul-6

7   U.A., that's probably when I arrived there.

8        Q.  Okay.

9        A.  Or when I clicked the "I got the call" or something

10  else.

11       Q.  Okay.

12       Stat PD/2-Paul-6, 2P6 --

13       A.  Yeah.

14       Q.  -- was that an identification specific to you?

15       A.  Yes.

16       Q.  Was that always your identification when you worked

17  at V.P.D.?

18       A.  No.

19       Q.  Was it --

20       A.  Two represents the shift, so it was the squad two,

21  "P" is for patrol, and then six would be the -- the beat

22  assignment, the area that I was assigned to work.

23       Q.  Okay.

24       A.  And so if you were assigned to work beat five on

25  that same shift, it's 2-Paul-5.  So you see somewhere else on

1      Q.  So because you're responding to this call, you're

2  unavailable to be dispatched to another call?

3      A.  Correct.

4      Q.  Okay.

5      Until you somehow check back there and change that?

6      A.  Exactly.

7      Q.  Okay.

8      Who do you recall contacting you as it relates to this

9  May 16th incident?

10      A.  You're going to have to clarify.  I'm not sure what

11  you mean.

12      Q.  How were you -- well, I'll change the question.

13      How were you contacted first as it relates to this

14  May 16th call to 47 Kentucky Street?

15      A.  As far as the call for service?

16      Q.  Yeah.

17      A.  It's just -- just like this, there's a call for

18  service in the computer, so either you're dispatched over

19  the air or you request to be sent the call.  And I don't

20  recall exactly how it came about, but either way it was a

21  call for service -- it's hard to explain without seeing it,

22  but, basically, I have a computer in my car, and it lists

23  all the calls for service.  Right?  For the whole city.  And

24  it designates by area where they're at, so it will show that

25  you have X, Y, Z calls in your area or just this call in your

1   area.  So either you can ask to be sent that call or dispatch

2   can actually dispatch you to that call, but either way it's a

3   call for service that's pending and it needs to be dealt with

4   or responded to, so...

5           Q.  Okay.

6           Do you recall if you responded that you could respond

7   to that call?  Or were you specifically assigned to that

8   call?

9           A.  I don't -- I don't recall.

10          Q.  Okay.

11          A.  But either way, it was in my area, so it was

12  something that I had to deal with.

13          Q.  Was it all over the computer, or did you also have

14  radio contact with dispatch relating to this?

15          A.  I don't remember.  At some point there's radio

16  contact, so I just don't know when it started.

17          Q.  Okay.

18          And what do you recall being notified about regarding

19  this call?

20          A.  Just this.  This is the only thing it had in here,

21  from what I recall, was that the -- the part at the top,

22  R.P., which is reporting party, filed, and it lists a case

23  number, "and has suspect information provided to her by the

24  bank," "R.P. would like to speak to an officer to provide

25  suspect information to."

1      Q.   Okay.

2           Did that indicate to you that this was a -- already an

3  open file with V.P.D.?

4      A.   Yes.

5      Q.   Had you ever had any interaction or involvement

6  with that specific file prior to May 16th, 2012?

7      A.   Not prior to, but as I got the call, I looked up

8  that case number in R.-- it's called a "net R.M.S. system,"

9  which is like a report-writing system, the way we generate

10  these reports.

11     Q.   Okay.

12     A.   Part of having these on the computer is you can go

13  back and look them up fairly easily.

14     Q.   Okay.

15     A.   So I tried to look up this case number into this

16  program, and when I looked it up -- I can't remember exactly,

17  but it appeared that there was no real police report, which

18  made me believe that the -- I guess the reporting party in

19  this case, or whoever the victim in the initial crime was,

20  didn't report the crime through an officer, they did either

21  an online police report or telephone or over-the-counter

22  police report, because it was very vague, if any, information

23  in there.

24          A lot of times that's done for some, you know, petty

25  theft crimes, where there's no suspect information; people

1      Q.   Okay.

2      A.   Or see it again.

3      Q.   Regarding these, you know, theft crimes, identity

4   theft crimes, whatever it may be, where reporting parties

5   fill out an online police report, what was the practice of

6   V.P.D. to follow up on those?  Were those always created into

7   an actual police report at some point?

8      A.   No.

9      Q.   Okay.

10      Who determined whether to do any follow-up work on

11   those inquiries?

12      A.   Unfortunately, due to Vallejo's -- especially the

13   police department's budget and horrible staffing levels,

14   there was no one following up on any of that.  So there's

15   only a few detectives that basically only do violent crimes,

16   and it's up to cases like this, which, you know, I would

17   consider very serious, identity theft cases and things like

18   that, if it's going to be dealt with, especially to the

19   point where if there's suspect information, making an arrest

20   or requesting a warrant, it's all -- has to be done by the

21   patrol officer, or else it's not going to go anywhere.

22      Q.   Okay.

23      And in this case, was it your understanding that the

24   reporting party had contacted V.P.D. to provide further

25   information on her -- on her prior report?

1          A.  Alls I knew is what was down here, "R.P. filed,"

2     case number, "and has suspect information provided to her

3     by the bank," "R.P. would like to speak with an officer to

4     provide suspect information."

5          Q.  Had you responded to a similar type call, where

6     someone had creat-- that there wasn't a police report but

7     there was an existing file number for a crime and you were

8     just doing kind of follow-up work?

9          A.  I don't know.  Probably, but I don't know exactly.

10         Q.  Was there any other information imparted to you

11    regarding what your response to this residence was?

12         A.  No.

13         Q.  Okay.

14         Did you understand that it was not a crime in

15    progress, meaning that there wasn't, like, a -- an active

16    larceny going on at the time?

17         A.  I'm sorry.  I don't understand, or it's not very

18    clear.

19         Q.  Okay.

20         A.  So...

21         Q.  Well, did you understand that you weren't

22    responding to --

23         A.  What would be considered, like, a hot or

24    in-progress crime?  Was somebody breaking into the house

25    right this second?

1    Q.  Correct.

2    A.  Yes.

3    Q.  Okay.

4    Was it your understanding that it involved some sort

5    of fraud or, you know, theft from a bank account and that you

6    were following up on that call?

7    A.  Yes.

8    Q.  Were you ever notified of whether the reporting

9    party was expecting an officer from V.P.D. to contact her at

10   her property?

11   A.  No.

12   Q.  Did you ever take any steps to ensure whether the

13   reporting party was aware that a V.P.D. officer was coming

14   to her property?

15   A.  No.  Usually when people call the police to report

16   a crime, they expect us to respond.

17   Q.  But did you know one way or another whether whoever

18   she contacted at V.P.D. said, "We're going to send someone

19   right now"?

20   A.  Like I said, it doesn't really work that way.

21   I mean, we get -- we get the calls for service, and then we

22   respond to them.  Like you said, there's different levels of

23   response, but we still respond, nonetheless.

24   Q.  What would this level of response be?  Was it a

25   specific category that you guys used internally?

```
1          Did you respond -- once you got this call, did you
2   respond directly to 47 Kentucky Street?
3          A.  Yes.
4          Q.  Did you respond with -- were you by yourself in
5   your squad car?
6          A.  I was by myself.
7          Q.  Do you recall:  Were you in your car when you first
8   were dispatched to the property?
9          A.  I believe so, yes.
10         Q.  Do you recall where in the city you were?
11         A.  No.
12         Q.  When you responded to 47 Kentucky Street, did you
13  take any measures such as, you know, putting on the sirens or
14  lights?
15         A.  No.
16         Q.  Okay.
17         Did you in fact arrive at that destination?
18         A.  Yes.
19         Q.  What did you do when you arrived?
20         A.  Do you want me to do a narrative of the whole
21  instance, or --
22         Q.  No.  I guess I prefer to just break it up.
23         Did you park your car somewhere?
24         A.  Yes.
25         Q.  Do you recall where you parked the car?
```

1    A.  Not exactly, but in front of the residence.

2    Q.  Do you recall -- do you have kind of a mental

3  picture of the property?

4    A.  A little vague, but yes.

5    Q.  Okay.

6    Did you park on the same side of the street as the

7  residence or across the street?

8    A.  I don't remember.

9    Q.  Let's see.

10    What did you do once you parked the car?  Did you walk

11  towards the property?

12    A.  Yeah, I got out of the car and walked -- walked up

13  to the front of the property, or the front gate, I guess.

14    Q.  Okay.

15    I'd like to show you what's been previously marked as

16  Exhibit 11 to Erika Gregory's deposition.

17    MR. CASPER:  Should we mark it again?

18    MS. FARUQUI:  Might as well.

19    MR. CASPER:  Okay.

20    MS. FARUQUI:  Or -- I mean, it's up to you.

21    MR. CASPER:  Yeah.

22    MS. FARUQUI:  What do you think?

23    MR. CASPER:  We'll mark it again --

24    MS. FARUQUI:  Okay.

25    MR. CASPER:  -- as Exhibit 4 to Calhoun's deposition.

1   the same side, but right in front of the house and get out,

2   it's not -- nothing's going on right now, nobody's going to

3   try to hurt me.  You know, it's what you call my -- you know,

4   it's low-level type crime.

5       But as I responded to this call, we still have

6   officer-safety things that we have to worry about, and when

7   I saw this yard specifically, the one thing that I was

8   concerned about is dogs.  Because even though I'm not

9   responding to a high-level type call, I still have to be safe

10  and go home in the same condition I left at the end of the

11  day.  And what I noticed about this yard is that it was

12  surrounded by this gate, all the way around the yard, or what

13  looks like all the way around the yard, with a lot of

14  foliage, and it was hard to see in there.

15      So you can't notify the residents that you're there.

16  There's a gate, there's no doorbell at the gate, there's no

17  intercom at the gate; you gotta get to the front door to

18  notify them.

19      But yes, I was concerned -- and I think that's what

20  you were trying to get to -- about the fact that there may be

21  dogs.

22      Q.  I'm going to show you what we've previously marked

23  as Exhibit 19 to Erika Gregory's deposition.  We'll mark it

24  as Exhibit 5 to your depo.

25  ///

1          (Exhibit 5 was marked for identification.)

2

3          MR. CASPER:  Q.  And, Officer Calhoun, does this -- do

4     you recognize this fence as being part of 47 Kentucky Street?

5          A.  No, I don't recognize it, but it looks to be that

6     way, yes.

7          Q.  Okay.

8          When you walked up to the property, did you observe

9     what you see in Exhibit 5, had kind of chicken wire that

10    extends up above the -- the picket fence?

11         A.  No, I did not see that.

12         Q.  Did you walk directly to the gate, or did you

13    walk along the property line to kind of assess the property

14    before --

15         A.  I don't remember, but I think I -- I may have just

16    walked directly to the gate.  Like I said, I think I just

17    pulled up in front of the house.

18         Q.  Did you take any -- did you -- you noticed that

19    there was some kind of overgrown foliage; correct?

20         A.  Yes.

21         Q.  And that it was difficult to look into the

22    property?  Is that right?

23         A.  Yes.

24         Q.  Did you ever observe any children's toys on the

25    property?

1    A.   Yes, I did.

2    Q.   Did you observe any dog toys on the property?

3    A.   No.

4    Q.   What children's toys do you recall observing?

5    A.   I just remember looking in, for whatever reason,

6  and seeing a -- like, a kids' pool, a little plastic kiddie

7  pool.

8    Q.   Okay.

9    A.   Sitting down in front of the house right there.

10    Q.   Is there a reason why -- and you had -- prior to

11  entering the property you had some concerns about, you know,

12  general officer-safety issues, including the presence of

13  dogs; correct?

14    A.   Mostly just dogs, because of the yard.

15    Q.   Okay.

16    And that was because you couldn't actually see into

17  the yard in -- in its entirety?

18    A.   Yes.

19    Q.   Is there a reason why you didn't call the reporting

20  party directly to inform the reporting party of your arrival?

21    A.   We don't generally do that.

22    Q.   Why is that?

23    A.   Because we respond to calls all day long, and calls

24  like this, we go up and knock on the door; that's kind of how

25  it works.

1       Q.  Okay.

2       But in this situation, when you couldn't actually see

3  into the property and you had some concerns about dogs,

4  did it not make sense for you to take the time to call the

5  reporting party and just to ensure that there were no

6  dangerous animals on the property?

7       A.  We don't --

8       MS. FARUQUI:  Objection.  Argumentative.

9       MR. CASPER:  Q.  If you understand, you can answer.

10      A.  Just like we have to go up and knock on doors

11  commonly, we deal with situations where we have to go through

12  gates or into, you know, yards that aren't very accessible.

13      So I took precautions to make sure that there wasn't

14  dogs, I peaked my head in there and looked around the best

15  I could.  I didn't see any dogs in the front yard, and

16  although there is a lot of foliage, I could see at least

17  some of the front yard.

18      And then, which is a common habit, even if I'm

19  responding to a hot call, I'll take it a step further and

20  shake the gate or hit the gate with my flashlight, to make

21  sure that there's no dogs that are startled or are going to

22  be startled when I enter the property.

23      Q.  And that was actually my next question.

24      Did you in fact do any of those precautions of -- of

25  shaking the gate or hitting it with your flashlight?

1     A.  Yes, I did.

2     Q.  Okay.

3         And what did you do, specifically, at 47 Kentucky

4  Street?

5     A.  Both.

6     Q.  Okay.

7         Shaking the gate, is that in a -- a gentle way or in

8  a way just to ensure that noise is being made?

9     A.  Enough to ensure that enough noise is being made

10 that if there were dogs in close proximity, they would be

11 alerted.  Dogs have very good -- usually have very good

12 hearing and will kind of come running up quickly once they

13 hear something.

14    Q.  And nothing responded?

15    A.  Nothing.

16    Q.  Did you strike the gate with your flashlight?

17    A.  I believe so, yes.  Not hard, I mean, you don't

18 want to damage somebody's property, but, you know, tapped it

19 enough where I made a knocking noise, which would be louder

20 than me knocking with my knuckles, because I don't want to

21 hurt my -- hurt my knuckles knocking too hard.  So that's why

22 I use my flashlight.

23    Q.  Did you ever verbally call out, announcing your

24 presence?

25    A.  No.

1        Q.   Did you say anything at anytime arriving, prior to

2   encountering the dogs?  Like, "Hello?"  "V.P.D."?  Anything

3   like that?

4        A.   No, I didn't.

5        Q.   Did you observe any bells or, you know, like, a --

6   a cattle bell that was on the gate?

7        A.   No.

8        Q.   After you shook the gate and, you know, tapped it

9   with your flashlight to make some noise, what did you do

10  then?

11       A.   Well, I began to enter the property.

12       And I hate to keep doing this to you, but I've got to

13  go use the restroom again.

14       Q.   I promise you, I'm not following you, but I've got

15  to do the same.

16       So why don't we take five minutes.

17

18       (Recess taken.)

19

20       MR. CASPER:  Back on the record.

21       Q.   Officer Calhoun, I may jump around a little bit,

22  so I apologize, but before I forget, other than your attorney

23  or attorneys, have you spoken to anyone about the substance

24  of this deposition?

25       A.   No.

1          A.   No.

2          Q.   Would the holster for the firearm -- what level

3    was it?

4          A.   It was a Level 3 holster; it was what they call

5    the -- the triple-- triple-threat holster, which requires the

6    release of two snaps and then rocking the firearm forward --

7    or backwards before pulling it out of the holster.

8          Q.   And those represent the three levels of protection?

9          A.   (Nods head.)

10         Q.   Is that to prevent a suspect from taking the

11   firearm from you?

12         A.   That's why I carried it, yes.

13         Q.   Okay.

14         Did other officers have Level 2 holsters, as far as

15   you know?

16         A.   I couldn't speak specifically to other officers'

17   equipment, but I don't think there was a policy that dictated

18   it had to be that exact holster.  I think people may have

19   been able to carry some other holster, but I'm not sure.

20         Q.   Was there a reason that you carried a Level 3,

21   versus a Level 2?

22         A.   It was issued to me, and I did feel it was the

23   safest holster.

24         Q.   Is there a reason that you didn't call out, you

25   know, and announce your presence at the gate?

1        A.   We just generally don't do that.   So if you're

2   responding to somebody's house, just like this or a cold

3   burglar report, we don't walk up to somebody's house yelling

4   and hooting and hollering and screaming and stuff, so we just

5   walk up and knock on the door.

6        Q.   But you would agree that a cold burglary call is

7   different than this call; correct?

8        A.   Not much, no.

9        Q.   In a cold burglary call, isn't it possible that you

10   would encounter a burglar?

11        A.   Not in the cold call.   That would be somebody

12   that, like, came home, already walked through their house

13   and they know no one's there and they just want us to respond

14   and take the police report and collect the evidence, that

15   kind of thing.

16        Q.   I see.

17        Sorry.   I didn't pick up on the cold versus hot --

18        A.   Yeah.

19        Q.   -- characterizations.

20        Did you do anything prior to entering the gate, in

21   terms of, you know, taking your firearm out of the holster?

22        A.   No.

23        Q.   Did you take any precautions of getting the pepper

24   spray at the ready?

25        A.   No.

1          MR. CASPER:  Q.  And, Officer Calhoun, does that

2     generally look like what you saw as you walked through the

3     gate on March 16th, 2012?

4          A.  I don't know.  I don't recall exactly, but

5     generally, yes.

6          Q.  Would the kiddie pool that you observed have been

7     depicted in this photograph, you know -- or was the location

8     of the kiddie pool depicted in this photograph?

9          A.  I don't know.  I don't remember.

10         Q.  Okay.

11         Approximately how far did you walk prior -- as you

12    walked -- sorry.  Scratch that.

13         As you walked, did you take any other measures to

14    announce your presence on the property?

15         A.  No.

16         Q.  Okay.

17         Did you, you know, bang on the fence or anything to

18    once again try to determine if there were any dogs on the

19    premises?

20         A.  After I already walked in past the fence?

21         Q.  Correct.

22         A.  No.

23         Q.  Do you recall looking at Exhibit 6 as you entered

24    a -- another small side fence on your right-hand side,

25    another -- it was kind of a continuation of the white

1   picket fence?

2       A.  No, I don't recall.

3       Q.  Okay.

4       What do you recall next, after your walking towards

5   the house, towards the front door?

6       A.  Do you want me to --

7       Q.  Yeah.

8       A.  -- just explain it all, or sort of nail that down

9   a little bit more?

10       Q.  Well, why don't you explain it all, and if I have

11   any questions to break it up, I'll stop you.

12       A.  I entered the yard, and I was walking towards the

13   front door.  I got what, from what I remember, was about

14   half-ways there, and I remember for whatever reason glancing

15   down at that kids' pool.

16       And then all of a sudden I heard a sound and looked

17   up and to my left, and that's when I saw two -- two dogs

18   charging around the corner of the house at a -- at a full

19   sprint.

20       Q.  Do you recall from what direction the dogs were

21   approaching you?

22       A.  If I'm looking directly at the house, like these

23   pictures, they were coming from my left, around the left

24   corner of the house, which would be the -- I guess the

25   northeast corner of the house.

1          Q.  Okay.

2          And approximately how far were you from the gate when

3    you noticed that there were these dogs approaching you?

4          A.  I don't remember exactly, but like I said, about

5    half-ways into the yard.  I never measured.

6          Q.  What kind of dogs were they?  What do you recall

7    in that regard?

8          A.  I have no idea.  I'm not a dog expert, so...

9          MR. CASPER:  Why don't we mark as Exhibit 7 a

10   photograph that we've produced to Defendants.  I don't have

11   a Bates stamp on it.

12

13         (Discussion off the record.)

14         (Exhibit 7 was marked for identification.)

15

16         MR. CASPER:  Q.  And, Officer Calhoun, does that

17   appear to be the dogs that you noticed approaching you?

18         A.  Yes.

19         Q.  Okay.

20         Do you recall:  Were they both approaching you kind of

21   side by side, or was one in front of the other?

22         A.  They were close, but I think one was just in front

23   of the other.

24         Q.  Okay.

25         Which one?

1          As we're looking at Exhibit 7, we see a -- kind of a

2    black-and-tan one on the left and a white-and-black one on

3    the right.

4          Do you recall which one was in front of the other?

5      A.  I believe it was the black-and-tan one.

6      Q.  And did you -- you don't know what breed these

7    animals are?

8      A.  No, I don't.

9      Q.  Okay.

10         Did you recognize either of them as a pit bull?

11     A.  Are you talking about now, or in that split second

12   that I saw them from the time this happened?

13     Q.  In that split second.

14     A.  No, I didn't.

15     Q.  And how about now?

16     A.  Well, again, not a dog expert, but no, I don't

17   think so.

18     Q.  When they were -- you said they were approaching

19   you at a full sprint --

20     A.  Yes.

21     Q.  -- is that correct?

22     A.  Yes.  Yes.

23     Q.  And that was from -- as you were facing the house,

24   from the left side --

25     A.  Yes.

1              Were they barking?

2              A.  Yes.

3              Q.  What other thing did you observe with regard to the

4      dogs approaching you?

5              A.  Again, within the split second, you know, dogs

6      being at a full sprint and closing the gap, I noticed that

7      they were barking, snarling.  And I think my -- my attention

8      was directed to the one that was a little bit in front,

9      obviously, because it was a little bit in front.  Its teeth

10     were showing, I noticed that hair raised on the back of its

11     neck and that straight tail.  It was immediate to me that

12     they weren't -- they didn't appear to be friendly, and it

13     appeared that they were -- the reason they were running in

14     that full sprint is because they were going to attack me.

15             Q.  When you say a straight tail, was -- what do you

16     mean by that?  It was straight up?  Straight down?

17             A.  Straight, like straight back.

18             So dogs, from, I guess, my personal experience maybe

19     and some of the training -- if a dog's playing, usually their

20     tails wag; if a dog's upset, angry, or aggressive, usually

21     those tails are dead straight.  And a lot of times, if you

22     talk to people, that's -- that's a big sign of aggression,

23     is that there's a big difference between a dog with a wagging

24     tail that's barking and a dog that's got his tail straight

25     and hair raised and things like that.

1          Q.  And you observed that its tail was straight and its

2    hair was standing up on its neck?  Was that right?

3          A.  Back, or back of the neck, or -- yeah.

4          Again, all of this is happening within a split second.

5          Q.  Okay.

6          Are you sure that you observed those traits of the dog

7    at the time?

8          A.  In that split second, yes.

9          Q.  Okay.

10         What did you do after observing these animals

11   approaching you?

12         A.  Again -- and I have to preface it with this all

13   happened within a matter of maybe a second, and some of it

14   I didn't realize until after the fact.

15         But within that matter of second, I realized that

16   I was going to be attacked by not one, but two dogs, and

17   I drew my firearm and fired two -- two rounds or two bullets

18   just in time to prevent the first dog from attacking me.

19         At that time I scanned over to the second dog, who

20   after firing the shots turned around and ran away.  I backed

21   out of the yard and closed the gate.

22         Now, after the fact, when I was kind of able to look

23   at everything, I realized that I had backed up probably five

24   or six feet trying to get out of the yard, but in that -- you

25   know, that second or two of everything happening, I didn't

1    even realize I was retreating; I barely had enough time to

2    draw my firearm and fire those two rounds before being

3    attacked.

4         Q.  Why was that significant to you, that you ended up

5    finding out that you withdrew five or six feet?

6         A.  Just because it happened so fast, I didn't even

7    realize I was moving backwards while -- while drawing my

8    firearm and doing all of that at one time.

9         Q.  Did you ever tell an investigator that you had

10   backed up after seeing the animals?

11        A.  I don't recall.

12        Q.  Okay.

13        Is there a reason why you didn't retreat to the gate

14   that you came from when you saw these animals?

15        A.  I didn't have enough time.

16        Q.  Is there a reason why you didn't kind of hop that

17   short picket fence that was to your right?

18        A.  Again -- and I know it's hard to kind of gather

19   sitting here, but in a situation like that, where you

20   literally have a second to react, I mean, you think about --

21   if you really think about it, you have a second to not only

22   look at these dogs and realize what's happening, because

23   you realize you're even going to be -- again, I'm way down

24   here, kind of calm and not realizing anything's going on.

25   Obviously, if I would have thought there was two aggressive

1   dogs in the yard, I would have been able to do a lot of

2   things differently, but --

3        Q.  But that wasn't --

4        A.  -- all of a sudden you're faced with an attack of

5   two dogs, and you're trying to determine -- first of all,

6   you realize they're aggressive and you're in trouble, and

7   you have literally barely enough time to draw my firearm,

8   draw my firearm and pull off the rounds.  I mean, as quickly

9   as it happened, I'm surprised that I was able -- even able to

10  get my firearm out of the holster fast enough and fire those

11  rounds, let alone being able to -- I mean, if you waste the

12  time to try to turn around and run or try to jump over things

13  and do stuff like that, you know, there's just not enough

14  time to do that.

15        In some instances with dogs, you may have an

16  aggressive dog but not one that's charging you at full-on

17  attack, and you have a little bit more time to use other

18  levels of force or other means of retreat and things like

19  that.  There just wasn't enough time in that situation,

20  unfortunately.

21        Q.  Is there a reason why you didn't deploy your pepper

22  spray?

23        A.  One, pepper spray is not always effective; and,

24  two, there just wasn't -- there wasn't enough time to try to

25  start with a lower means of force and work your way up.

1         A.   Again, it's kind of a guess, because I don't --

2    you know, I'm not sitting in the yard, I can't look and give

3    you a fair guess, but, you know, maybe about 30 or less.

4    Probably less, but I don't even -- I'm not sure.

5         Q.   How far away was the black-and-tan dog when you

6    shot it?

7         A.   I would say at that time probably almost

8    point-blank range, because it was, if not leaping to bite me,

9    getting ready to.

10        Q.   And did it in fact -- you weren't bitten on

11   May 16th, were you?

12        A.   No.

13        Q.   Okay.

14        Had you ever observed dogs approaching in that manner

15   and then kind of pulling up and barking?

16        A.   Not that aggressively, no.

17        Q.   You've mentioned that you have training relating

18   to dogs and then also personal experience.

19        What are you referring to when you say that, with the

20   personal experience?

21        A.   Just personal experience around dogs.  I've been

22   raised around dogs and been around dogs my whole life.

23        And one other thing I will tell you, and I have seen

24   firsthand dog attacks via -- although I've never been a

25   canine handler, but in canine training or with demonstrations

1    with canines, and I would say that, you know, the speed at

2    which they were charging and the aggression which they were

3    charging would be something similar to, like, a canine being

4    released on someone and that sprint, where they're jumping

5    up -- a sprint and then jumping to, you know, bite or attack

6    somebody, similar aggression speed.

7            Q.  You shot the dog at almost point-blank range.

8            Had it jumped at that point?

9            A.  I -- again, you're talking split second.  I mean,

10   I recall more -- you know, I'm surprised I recall as much

11   as I do, but I couldn't tell you if it jumped or not or was

12   starting to jump, or what.

13           MR. CASPER:  I'll mark two photographs that have

14   previously been produced by the City.  We'll mark them

15   subsequently as 8 and 9.

16           Why don't we do 8, 9, 10.

17

18           (Exhibits 8, 9, and 10 were marked for
             identification.)
19
             (Discussion off the record.)
20

21           MR. CASPER:  Q.  And, Officer Calhoun, do you

22   recognize these photos of the scene on May 16th, 2012, after

23   the shooting?

24           A.  Yes.

25           Q.  Did you ever move the dog after it was shot?

1       A.  No.

2           Q.  Was that -- in looking at Exhibit 8, on the top,

3   was that the position of the dog at the time that you shot

4   it?

5       A.  Yes.

6           Q.  Okay.

7           Would you mind marking with an "X" the location where

8   you were at the time you fired those rounds?

9           A.  At the time I fired?

10          Q.  Yeah.

11          A.  Again, and I'm -- you know, I know you understand

12  this, but I don't remember, you know, exactly where I'm

13  standing, it's all kind of a guess, just based on where the

14  dog came to rest and where I remember being when I saw them.

15          But, you know, the best I can guess is right in front

16  of the dog.

17          Q.  Okay.

18          And it's your testimony that -- that you had retreated

19  from the kiddie pool that's in front there to about where

20  you've marked that "X" at the time you fired the shots?

21          A.  Yeah.

22          And looking where the -- the children's pool is,

23  I was -- I think I was even farther than half-ways in the

24  yard, it looks like.  I may have been closer almost to the

25  porch, where the kiddie pool is.

1      Q.   Were you concerned about the presence of children
2  at the time you fired your firearm?
3      A.   Again, this all took place in -- in about a
4  second, but based on the direction I was firing, which was
5  down towards the dog, or down towards the ground, I wasn't
6  concerned that there were any children, you know, on the
7  ground underneath the dog, so no.  I mean, we deal with
8  backdrops and we're responsible for where our bullets
9  ultimately end up, but the ground is probably about the
10  safest backdrop you could have when having to discharge your
11  firearm somewhere like that.
12      Q.   And that includes a stone walkway?  There's no risk
13  of ricochet?
14      A.   I mean, there's a million what-ifs, but, I mean,
15  yeah, if you're going to have to shoot your firearm, firing
16  towards the ground is about as safe as it could possibly get.
17      Q.   Is that the same for soil or a stone walkway?
18      A.   I mean, yeah.  It ultimately would be nice if
19  there was, you know, a 100-foot sand berm behind them, but
20  in a split-second situation, it's -- you know, having to fire
21  towards the ground is going to be safer than anything else.
22      Q.   How many rounds did you fire?
23      A.   Two.
24      Q.   And looking at Exhibit 10, it appears one went into
25  the dog's snout; is that correct?

1        A.   Yes.

2        Q.   Do you know where the second round went, or the

3  first round?

4        A.   I believe the -- the back of the dog's throat,

5  inside its mouth.

6        Q.   Okay.

7        Do you recall which was shot first?

8        A.   There's no way to -- I mean, again, you're

9  talking -- all this stuff happened in one second.  There's no

10  way to tell -- I did not see which round struck where first.

11  It was -- from a second or two seeing the dogs to boom, boom,

12  was, you know, that -- how long that took, you know, a second

13  or two.  I don't know which round struck where first.

14        Q.   And it's your belief that the other round that's

15  not depicted in Exhibit 10 went through the dog's mouth?

16        A.   I believe so, yes.

17        Q.   Approximately how much time had elapsed between the

18  time that you first observed the dogs to the time that you

19  fired the two shots?

20        A.   A second or two.

21        Q.   How long does it take you to take your firearm out

22  of the holster?

23        A.   Apparently less than a second or two if you really

24  need to.

25        Q.   What's the first thing you did after you fired

1        I asked for the sergeant, so basically "Sam to

2    2-Paul-6," which I'm trying to get his attention.  When he

3    says, "Go ahead," I asked for him to respond to my call

4    because I had to dispatch a dog.

5        And then I told dispatch to start Animal Control.

6        Q.  Okay.

7        In any point in that recording did you indicate that

8    you had shot a dog?

9        A.  I said I dispatched a dog, which means I had to

10   kill a dog.

11       Q.  Okay.

12       A.  Is the word they would use for it, so -- that's not

13   used for anything else.

14

15       (Mr. Casper plays recording.)

16

17       MR. CASPER:  Q.  And I believe the rest of the

18   recording is them attempting to get an Animal Control

19   officer.

20       Were you on the scene when an Animal Control officer

21   responded to the scene?

22       A.  Yes.

23       Q.  Okay.

24       Skipping around again -- I apologize -- you had some

25   concerns that you couldn't see into the property prior to

1    entering the gate, and your primary concern was the presence

2    of dogs; correct?

3         A.  Yes.

4         Q.  Did you have your hand kind of closer to the

5    holster in anticipation of potentially encountering dogs?

6         A.  No.

7         Q.  Okay.

8         A.  This -- like I said, this is one of the -- when

9    I first got there and I first walked to the gate, I was

10   concerned, but after I checked, I looked, I listened --

11   right? -- I don't hear any dogs barking.  I'm looking around;

12   I don't see anything, you know, at least that I saw in my

13   vision, that made me think there was dogs in there, other

14   than the gate.  And it's not like a six-foot fence; it's a

15   small picket fence.  I didn't see the wiring.

16        But by the time I entered the gate, I felt confident

17   that there wasn't any, so I wasn't on, like, a high alert or

18   something like that.  Like I said, in other situations I may

19   have been where, you know, I'm more ready or not, but at that

20   point I didn't believe there was any dogs, so I wasn't --

21   didn't have my hand on my gun or anything out or -- I was

22   just walking to the front door to knock on someone's door.

23        Q.  Did you not announce your presence as part of

24   your practice because of calls that are hot, where you're

25   basically alerting someone on the property that the police

1          Q.   We previously marked the police report that you

2     prepared as Exhibit 2.

3          If you look in the narrative portion, or report

4     narrative, on page three and page four, if you would just

5     take a moment to read that narrative, Officer Calhoun.

6          A.   Okay.

7          Q.   Is there anything in that narrative portion that

8     you feel is inaccurate?

9          A.   No.

10          Q.   You feel that -- or it's accurate that you tried to

11     back out of the yard but both dogs closed the distance almost

12     immediately?

13          A.   Like I said, when I first entered the property

14     and I noticed the dogs, I was at about next to that pool, so

15     I was literally looking down inside of it when I heard and

16     saw the dogs.  So I backed from where that pool is to where

17     I shot the dog, which it looks from the picture like about

18     five or six feet.  So yes, I did attempt to retreat.  I may

19     not have realized I was retreating at the -- in that second

20     that it was happening, but I did attempt to retreat.

21          Q.   And it's your testimony that you were able to back

22     up that five or six feet, retrieve your firearm, and fire the

23     two shots within about a second?

24          A.   Or two, yes.  Well, and you gotta realize that I'm

25     backing as I'm drawing the firearm, and as I'm firing the two

90

1   shots and then after I'm firing the two shots, I mean, the
2   dog -- just the speed in which it was sprinting, it may have
3   came forward a little bit as it fell to the ground.   But yes.

4       Q.  I'm sorry.

5       How long did you say you remained at the scene, if you
6   recall?

7       A.  I didn't.

8       Q.  Okay.

9       A.  I'm not sure.

10      Q.  Did you -- did anyone advise you from V.P.D. that
11  you should speak with a lawyer regarding this?

12      A.  No.

13      Q.  Okay.

14      Were you aware that there would be an investigation
15  into the use of deadly force in this case?

16      A.  There is -- to a point, yes.

17      Q.  Were you ever interviewed as part of the internal
18  affairs investigation into this case?

19      A.  No, I don't believe so.

20      Q.  Do you believe that there was an internal affairs
21  investigation into this case?

22      A.  I was aware that there was an internal affairs
23  investigation, yes.

24      Q.  But you weren't interviewed during that process?

25      A.  No.

1       Does that look familiar to you?

2       A.  No.

3       Q.  Okay.

4       You had previously testified that when you first saw

5  the dogs, that they were approaching from this direction;

6  is that correct?

7       A.  I -- I don't know.  I -- I didn't walk around the

8  whole house, and I'm not familiar with this picture or --

9  or where it's at, so...

10      Q.  But is it -- you had stated that you saw them

11  approaching from that corner of the house; is that right?

12      A.  The northeast corner, yes.

13      Q.  Okay.

14      Did you actually see them round the corner, like, come

15  into view, or when -- had they already --

16      A.  As they had came around the corner into view is

17  when I first saw them, yes.

18      Q.  Did you hear any barking before you saw them?

19      A.  Like I said, this whole thing happened -- I mean,

20  we're talking, you know, a second or two from the time

21  I initially saw them to the time this all happened, so it

22  happened very quickly, and, you know, I don't recall.

23      Q.  Beyond you being informed by -- who was it?  It was

24  Sid DeJesus -- was it Sid DeJesus that told you that the use

25  of force was justified in this case?

```
1    STATE OF CALIFORNIA      )
                              ) ss.
2    COUNTY OF ALAMEDA        )

3

4         I, GAYLE I. COWAN, a Certified Shorthand Reporter

5    in the State of California, do hereby certify:

6         That CHASE CALHOUN, in the foregoing deposition

7    named, was present and by me sworn as a witness in the

8    above-entitled action at the time and place therein

9    specified;

10        That said deposition was taken before me at said

11   time and place, and was taken down in shorthand by me, a

12   Certified Shorthand Reporter of the State of California, and

13   was thereafter transcribed into typewriting, and that the

14   foregoing transcript constitutes a full, true, and correct

15   report of said deposition and of the proceedings which took

16   place;

17        That I am a disinterested person to the said action.

18        IN WITNESS WHEREOF, I have hereunder subscribed my

19   hand this 16th day of January, 2014.

20

21

22

23

24   _____
     GAYLE I. COWAN, CSR NO. 7004
25   State of California
```

100

DEPOSITION OF CHASE CALHOUN - January 7, 2014