1  Nick Casper (SBN 244637)
2  **CASPER, MEADOWS, SCHWARTZ & COOK**
   A Professional Corporation
   California Plaza
3  2121 North California Blvd., Suite 1020
4  Walnut Creek, California  94596
   Telephone:     (925) 947-1147
5  Facsimile:     (925) 947-1131

6

7  Attorneys for Plaintiffs
   ERIKA GREGORY and LOREN MOLLNER
8

9

10              UNITED STATES DISTRICT COURT

11            EASTERN DISTRICT OF CALIFORNIA

12

13

14  ERIKA GREGROY and LOREN MOLLNER,     Case No.  2:13-CV-00320-KJM-KJN

15              Plaintiffs,

16  vs.                                  **PLAINTIFFS' MEMORANDUM IN
                                         OPPOSITION TO DEFENDANTS'
17  CITY OF VALLEJO; former VPD Chief    MOTION FOR SUMMARY JUDGMENT**
    ROBERT NICHELINI, individually and in
18  His official capacity; VPD Officer CHASE   **JUDGE:     Hon. Kimberly J. Mueller**
    CALHOUN, individually; and DOES 1         **DATE:      August 22, 2014**
19  Through 50,                               **TIME:       10:00 a.m.**
                                              **CRTRM:    3, 15th Floor**
20              Defendants.
                                         **TRIAL DATE:  November 17, 2014**
21

22

23

24

25

26

27

28

**CASPER, MEADOWS,
SCHWARTZ & COOK**
2121 N. California Blvd.,
Suite 1020
Walnut Creek, CA  94596
TEL: (925) 947-1147
FAX (925) 947-1131

*Gregory, et al. vs. City of Vallejo, et al.*     Case No. 2:13-CV-00320-KJM-KJN

# TABLE OF CONTENTS

INTRODUCTION AND SUMMARY OF OPPOSITION .................................................1

FACTUAL BACKGROUND ..............................................................................................1

   I. PLAINTIFFS AND THEIR DOG, BELLE..................................................1

   II. PLAINTIFFS DISCOVER MISSING FUNDS .................................................3

   III. VPD OFFICER CALHOUN EVENTUALLY RESPONDS TO
      DISPATCH ................................................................................................4

   IV. CALHOUN ARRIVES AT THE PROPERTY AND ENTERS THE
       YARD, DESPITE HIS CONCERN ABOUT THE PRESENCE OF DOGS......6

   V. CALHOUN SHOOTS AND KILLS BELLE ...................................................8

   VI. CALHOUN'S TERMINATION ......................................................................9

     A. Calhoun's Credibility ...................................................................10

     B. Calhoun's Delay in Response to Calls for Service During the Relevant
       Time Period...................................................................................10

LEGAL ARGUMENT.........................................................................................................12

   I. CALHOUN VIOLATED PLAINTIFFS' FOURTH AMENDMENT
      RIGHTS AND IS NOT PROTECTED BY QUALIFIED IMMUNITY ..........12

     A. Legal Standard for an Excessive Force Claim Under § 1983 .....................12

     B. Genuine Disputes of Material Fact Exist as Whether Calhoun Used
      Excessive Force...................................................................................13

       1. Calhoun's Credibility is Paramount, and Seriously in Question ..........13

       2. There Exists Independent Evidence That Also Casts Doubt on
         Calhoun's Account of the Shooting ......................................................15

       3. Calhoun's Pre-Entry Actions Are in Dispute ......................................17

       4. Calhoun's Whereabouts Leadings Up to the Incident, and His State
         of Mind, Are in Dispute .......................................................................17

     C. THE CONSTITUTIONAL RIGHT WAS CLEARLY ESTABLISHED
      AT THE TIME OF THE SHOOTING.............................................................18

CASPER, MEADOWS,
SCHWARTZ & COOK
2121 N. California Blvd.,
Suite 1020
Walnut Creek, CA  94596
TEL: (925) 947-1147
FAX (925) 947-1131

*Gregory, et al. vs. City of Vallejo, et al.*     Case No. 2:13-CV-00320-KJM-KJN                    Page i
PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT

1

II.  PLAINTIFFS' STATE LAW CLAIMS SURVIVE ..........................................19

2

A.  TRESPASS TO CHATTELS/CONVERSATION.......................................19

3

B.  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.................19

4

C.  CAL.CIV.CODE § 52.1 ............................................................................20

5

CONCLUSION..............................................................................................................20

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CASPER, MEADOWS,
SCHWARTZ & COOK
2121 N. California Blvd.,
Suite 1020
Walnut Creek, CA  94596
TEL: (925) 947-1147
FAX (925) 947-1131

# TABLE OF AUTHORITIES

**Cases**                                                                                        **Page(s)**

*Arden v. Kastell*
(9th Cir. 2014) 553 Fed.Appx. 697 .................................................................... 14

*Brown v. Muhlenberg Twp.*
(3d Cir. 2001) 269 F.3d 205 ............................................................................ 13

*Church of Scientology v. Armstrong*
(1991) 232 Cal.App.3d 1060 ........................................................................... 19

*Drummond ex rel. Drummond v. City of Anaheim*
(9th Cir. 2003) 343 F.3d 1052 ..................................................................... 12, 13

*Entrepreneur Media, Inc. v. Smith*
(9th Cir. 2002) 279 F.3d 1135 ........................................................................ 14

*Fuller v. Vines*
(9th Cir. 1994) 36 F.3d 65 .............................................................................. 13

*Graham v. Connor*
(1989) 490 U.S. 386 .................................................................................. 12, 13

*His and Her Corp. v. Shake-N-Go Fashion, Inc.*
(9th Cir., May 12, 2014) 2014 WL 1877082 ..................................................... 14

*Kay v. County of Cook, Illinois*
(N.D. Ill., Aug. 29, 2006) 2006 WL 2509721 ................................................... 16

*Knapps v. City of Oakland*
(N.D. Cal. 2009) 647 F.Supp.2d 1129 ............................................................. 20

*Kosakoff v. City of San Diego*
(9th Cir. 2011) 460 Fed.Appx. 652 .................................................................. 12

*Nelson v. City of Davis*
(9th Cir.2009) 571 F.3d 924 ............................................................................ 13

*Pearson v. Callahan*
(2009) 555 U.S. 236 ....................................................................................... 12

*Perez v. City of Placerville*
(E.D. Cal., Sept. 9, 2008) 2008 WL 4279386 .................................................. 20

*Robinson v. Solano County*
(9th Cir. 2002) F.3d 1007. ............................................................................. 13

CASPER, MEADOWS,
SCHWARTZ & COOK
2121 N. California Blvd.,
Suite 1020
Walnut Creek, CA  94596
TEL: (925) 947-1147
FAX (925) 947-1131

*San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*
  (9th Cir. 2005) 402 F.3d 962 ............................................................. 12, 13, 17, 19

*Santos v. Gates*
  (9th Cir. 2002) 287 F.3d 846 ............................................................. 13

*Saucier v. Katz,*
  (2001) 533 U.S. 194 ............................................................................. 12, 19

*Smith v. City of Hemet*
  (9th Cir. 2005) 394 F.3d 689 ............................................................. 13

*Sneade v. Rojas*
  (D. Mass., Mar. 10, 2014) 2014 WL 949635 ................................... 13

*Taylor v. City of Chicago*
  (N.D. Ill., Nov. 23, 2010) 2010 WL 4877797 ................................... 16

*Thurston v. City of North Las Vegas Police Dept.*
  (9th Cir. 2014) 552 Fed.Appx. 640 ................................................... 15

*Viilo v. Eyre*
  (7th Cir. 2008) 547 F.3d 707 ............................................................. 19

*Warboys v. Proulx*
  (D. Conn. 2004) 303 F.Supp.2d 211 ................................................. 13, 17

*Wood v. Kitsap County*
  (W.D. Wash., May 3, 2007) 2007 WL 1306548................................ 16

**Statutes**

42 U.S.C. § 1983 ................................................................................ 1, 12, 20

Cal. Civ. Code § 52.1 .......................................................................... 20

**Other Authorities**

Fourth Amendment ......................................................................... *passim*

CASPER, MEADOWS,
SCHWARTZ & COOK
2121 N. California Blvd.,
Suite 1020
Walnut Creek, CA  94596
TEL: (925) 947-1147
FAX (925) 947-1131

## INTRODUCTION AND SUMMARY OF OPPOSITION

Plaintiffs Erika Gregory and Loren Mollner ("collectively, Plaintiffs") have brought a 42 U.S.C. § 1983 action for the fatal shooting of their eleven-year-old family dog, Belle, by Chase Calhoun ("Calhoun"), a former Vallejo Police Department ("VPD") officer.  In their Motion for Summary Judgment, Defendants attempt to paint a compelling picture that Calhoun had no choice but to shoot and kill Belle because he knew Belle was "getting ready" to attack.

Not only are there a number of facts in Calhoun's account that are in genuine dispute, but Calhoun is a witness with dubious credibility, a distinction of great significance because he was the sole eyewitness to the shooting and there are no independent facts to corroborate his self-serving story.  When the shooting occurred on May 16, 2012, Calhoun was in the midst of a long course of misconduct that resulted in seven sustained findings of violations of VPD policy, and ultimately his termination in December 2013 after little more than two years as a VPD Officer.  The facts and circumstances of his transgressions cast serious doubt on the veracity of his account.

Plaintiffs oppose Defendants' Motion on the grounds that numerous questions of fact exist on whether Calhoun violated Plaintiffs' Fourth Amendment rights under the clearly established law at the time, thus he is not entitled to qualified immunity.  There are also genuine factual disputes on Plaintiffs' claims brought under state law.[1]

## FACTUAL BACKGROUND

### I.    PLAINTIFFS AND THEIR DOG, BELLE

Plaintiffs are a married couple with two children under the age of ten.  Deposition of Erika Gregory ("Gregory Depo"), Ex 1 to Declaration of Nick Casper in Support of Plaintiffs' Opposition ("Casper Decl") at 10:3-7; Deposition of Loren Mollner ("Mollner Depo"), Ex 2 to Casper Decl at 6:15-21, 7:18-25). Gregory operates her own consulting business in San Francisco with seven employees, and Mollner is employed by the U.S. Coast Guard under the U.S. Department of Homeland Security as a real property specialist.  Gregory Depo at 11:8-

---

[1] Plaintiffs do not oppose granting summary judgment on their *Monell* claims against Defendant City of Vallejo, or their claim against Calhoun for trespass.

CASPER, MEADOWS,
SCHWARTZ & COOK
2121 N. California Blvd.,
Suite 1020
Walnut Creek, CA  94596
TEL: (925) 947-1147
FAX (925) 947-1131

*Gregory, et al. vs. City of Vallejo, et al.*      Case No. 2:13-CV-00320-KJM-KJN      Page 1
PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

13:4; Mollner Depo at 8:2-11.  Plaintiffs own a home at 47 Kentucky Street in Vallejo, where they lived from 2002 until July 2012.  Gregory Depo at 9:19-25, 10:14-20; Mollner Depo at 27:3-9, 30:16-18.

At the time of the incident, Plaintiffs owned three dogs: fourteen-year-old Flicka, eleven-year-old Belle, and Holly, a puppy.  Gregory Depo at 58:15-59:2.  Plaintiffs had owned both Belle and Flicka since they were puppies, having gotten Belle when she was approximately nine weeks old.  Gregory Depo at 58:22-23, 60:5-10.  Belle was a Labrador-Catahoula-mix who weighed approximately 70 pounds, and Flicka was a blind and deaf Border Collie-mix who weighed approximately 40 pounds.  Declaration of Erika Gregory in Support of Plaintiffs' Opposition ("Gregory Decl") ¶ 2; Ex 3 to Casper Decl [Photo of Belle and Flicka].  During the more than ten years that Plaintiffs owned Belle, she had never bitten a person or been involved in any altercations with other dogs.  Gregory Depo at 60:11-17. Belle and Flicka also got along with each other.  *Id.* at 59:23-24.

Elizabeth Coudright ("Coudright") was Plaintiffs' tenant at 47 Kentucky Street, living in the unit below their home from July 15, 2009 until July 15, 2012.  Declaration of Elizabeth Coudright in Support of Plaintiffs' Opposition ("Coudright Decl") ¶ 1.  When Coudright first viewed the unit in 2009 after telling Mollner that she was comfortable with dogs, she saw two dogs, Belle and Flicka, come bounding to the gate, barking and wagging their tails. *Id.* at ¶ 2. She entered the property by herself and did not feel threatened by their presence.  *Id.*

Coudright's apartment was directly below Plaintiffs' home and they shared common space behind their completely fenced property for three years.  *Id.* at ¶ 3.  She interacted with Belle every day, and when the family would go out of town, Coudright would dog sit for the family.  *Id.*  She had friends come to visit and they were able to enter the property without any issues from Belle or Flicka.  *Id.* at ¶ 4. Coudright found Belle to be a friendly, playful lovable dog.  *Id.*

Plaintiffs and Coudright had a bi-monthly delivery of fresh vegetables to the house that would be left on the porch, and there was never a complaint or request to lock up the dogs.  *Id.* at ¶ 5.  Coudright also observed Belle as being very good with the family's children, as Belle

CASPER, MEADOWS,
SCHWARTZ & COOK
2121 N. California Blvd.,
Suite 1020
Walnut Creek, CA  94596
TEL: (925) 947-1147
FAX (925) 947-1131

*Gregory, et al. vs. City of Vallejo, et al.*      Case No. 2:13-CV-00320-KJM-KJN                    Page 2
PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT

1   had been with Plaintiffs prior to the arrival of children. *Id.* at ¶ 6. Belle tolerated the kids as

2   they rolled over her and tugged at her ears, and even when they would accidently hurt her while

3   roughhousing. *Id.* Coudright states that Belle and Flicka sometimes barked and occasionally

4   ran toward visitors to eagerly greet them. *Id.* at ¶ 7. The property is on a slope, and when the

5   dogs were at the bottom of the property and they heard the bells on the top gate jingle, they

6   came running to the top of the property. *Id.* Belle and Flicka listened to commands, and were

7   well behaved and socialized. *Id.* Coudright had never seen either Belle or Flicka attack, bite,

8   or show any aggression to any of the many visitors to the property in the three years that she

9   lived at 47 Kentucky Street. *Id.* at ¶ 8.

10         Jan Gregory ("J. Gregory") is Erika's mother, has owned dogs for over fifty years, and

11   knew Belle since she was a puppy. Declaration of Jan Gregory in Support of Plaintiffs'

12   Opposition ("J. Gregory Decl") ¶¶ 1-3. Over eleven years, J. Gregory saw Belle in a variety of

13   contexts: in Belle's own home – both at large gatherings when she didn't know all the guests

14   and when J. Gregory was the sole visitor – and in J. Gregory's home. *Id.* at ¶ 4. In all of these

15   circumstances, J. Gregory saw Belle as relaxed and at ease with both people and other dogs,

16   composed and amiable. *Id.*

17         When she visited her daughter's home, Belle always came to the gate and greeted J.

18   Gregory enthusiastically, approaching in a friendly fashion. *Id.* at ¶ 5. On a couple of

19   occasions when J. Gregory was present, Belle barked briefly at a UPS driver, as many dogs

20   would, but subsided quickly. *Id.* The delivery driver came through the gate easily and

21   confidently to deliver parcels, showing no sign of feeling threatened. *Id.* J. Gregory and

22   Plaintiffs' family walked their dogs at the Point Isabel off-lead dog play area. *Id.* at ¶ 6. Belle

23   behaved just as one would want a dog to do: she ran, swam, greeted other dogs, and showed no

24   fear or aggression toward people or dogs at the site. *Id.* J. Gregory found Belle to be a sweet,

25   well-mannered and even-tempered dog. *Id.* at ¶ 7.

26   **II.    PLAINTIFFS DISCOVER MISSING FUNDS**

27         On Thursday or Friday, May 10 or 11, 2012, Gregory was traveling for work and

28   learned that her personal bank account had been overdrawn when there should have been

CASPER, MEADOWS,
SCHWARTZ & COOK
2121 N. California Blvd.,
Suite 1020
Walnut Creek, CA  94596
TEL: (925) 947-1147
FAX (925) 947-1131

*Gregory, et al. vs. City of Vallejo, et al.*   Case No. 2:13-CV-00320-KJM-KJN          Page 3
PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT

sufficient funds.  Gregory Depo at 23:11-24:7.  After looking at copies of deposited checks online, Gregory discovered that someone had stolen six or seven checks from her personal checkbook and fraudulently written and signed these checks in an amount totaling approximately $5,000.  *Id.* at 23:2-19.  Gregory contacted her bank (Umpqua Bank) to report the theft, and an assigned bank investigator instructed her to file a report with VPD to increase the chances of bank reimbursement.   *Id.* at 24:9-25:19.  On May 11, 2012, Gregory called VPD, but no one picked up the line, so she submitted an online report through VPD's website. *Id.* at 25:2-5, 25:22-26:8.  Gregory never received a response from VPD to her online report, other than an electronic confirmation at the time of submission.  *Id.* at 27:16-21.  Early the following week, Gregory again spoke with the bank investigator, who told Gregory that she had also called VPD, but had not received a response. *Id.* at 25:20-21, 26:10-15.

On Wednesday, May 16, 2012, Gregory was working from home and called the bank investigator, who told her she needed to call VPD again to initiate an investigation into the theft.   *Id.* at 21:8-20, 26:16-27:6.   At approximately 11:00 a.m., Gregory called the Investigations Unit at VPD to find out the status of her report, and a female VPD employee indicated that nothing had been done because VPD did not have enough detectives to investigate crimes other than murders.   *Id.* at 27:6-28:22; Deposition of Chase Calhoun ("Calhoun Depo"), Ex 4 to Casper Decl at 44:3-21.  The VPD employee transferred Gregory to dispatch, and a dispatcher determined that Gregory needed to speak with Investigations, transferring her back to the first VPD employee with whom Gregory spoke.  Gregory Depo at 28:22-29:13, 30:5-16.  The Investigations Unit employee then told Gregory that she "can try and force a message through to dispatch, but I can't guarantee you anything" and said goodbye. *Id.* at 29:14-30:4.  Gregory did not know what "forcing a message through dispatch" meant.  *Id.* at 29:22-30:3.

### III.   VPD OFFICER CALHOUN EVENTUALLY RESPONDS TO DISPATCH

Calhoun started his shift on May 16, 2012 at 7:00 a.m. Calhoun Depo at 34:1-3.  The shift was not his regularly-assigned shift, and was an extra overtime shift for Calhoun. Calhoun Depo at 31:10-33:1. Calhoun was by himself and not working with a partner that shift.

CASPER, MEADOWS,
SCHWARTZ & COOK
2121 N. California Blvd.,
Suite 1020
Walnut Creek, CA  94596
TEL: (925) 947-1147
FAX (925) 947-1131

*Gregory, et al. vs. City of Vallejo, et al.*   Case No. 2:13-CV-00320-KJM-KJN      Page 4
PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1  *Id.* at 48:1-6.

2      At 10:59 a.m. on May 16, 2012, VPD Investigations Clerk/Secretary Stephanie

3  Boursaw ("Boursaw") initiated a call for service out to 47 Kentucky Street, listing Erika

4  Gregory as the reporting party, and listing her phone number.  Ex 5 to Casper Decl [CAD Log].

5  The CAD entry lists as the patrol unit to respond as "PD/2P6," which was an identification

6  referring to Calhoun's patrol unit.  *Id.*; Calhoun Depo at 37:12-15.   According to Calhoun, "2"

7  represents the shift, "P" is for "patrol", and "6" was "the beat assignment, the area that [he] was

8  assigned to work."  *Id.* at 37:20-22.   Calhoun states that the calls for service would appear in

9  the computer in the patrol cars.  *Id.* at 39:13-40:4. One minute later, at 11:00 a.m., Boursaw

10  listed that the reporting party had filed a report, including a report number, and indicated that

11  the reporting party [Gregory] "has suspect information provided to her by the bank" and

12  "would like to speak to an officer to provide suspect information."  Ex 5 to Casper Decl.

13      At 11:17 a.m., seventeen minutes after the initial call for service to "PD/2P6", dispatch

14  recommended several other VPD patrol units to respond.  *Id.*  At 12:05 p.m., the call for service

15  "timed out."  *Id.*  At 12:08 p.m., the call for service to 47 Kentucky Street was renewed, with

16  "PD/2P6" and other units recommended, at which time Calhoun finally picked up the call for

17  service.  *Id.*; Calhoun Depo at 36:13-14.  Calhoun does not recall if he ultimately asked to be

18  sent to the call or was directly dispatched to the call, but "either way, it was in my area, so it

19  was something I had to deal with."  Calhoun Depo at 40:1-12.  He recalls that he was in his car

20  when he was dispatched to 47 Kentucky Street, but does not recall where in the city he was at

21  the time.  *Id.* at 48:7-11.

22      Calhoun looked up the report number through the computer system in his patrol car and

23  determined that a police officer had not made a report on the incident yet, but was aware that a

24  prior report had been made by the reporting party, such as through VPD's online system.  *Id.* at

25  40:18-41:23. Calhoun had not had any involvement with Gregory's theft report prior to the call

26  for service.  *Id.* at 41:5-10.  Calhoun was aware that he was not responding to a crime in

27  progress, and that he was following up on a prior report involving a theft from a bank account.

28  *Id.* at 45:14-46:7.  He did not confirm that Gregory was expecting VPD to send an officer to

CASPER, MEADOWS,
SCHWARTZ & COOK
2121 N. California Blvd.,
Suite 1020
Walnut Creek, CA 94596
TEL: (925) 947-1147
FAX (925) 947-1131

1  her property to take a report, but states, "[u]sually when people call the police to report a crime,

2  they expect us to respond."  *Id.* at 46:12-16.

3  **IV.  CALHOUN ARRIVES AT THE PROPERTY AND ENTERS THE YARD,**
   **DESPITE HIS CONCERN ABOUT THE PRESENCE OF DOGS**

4       Plaintiffs' home was situated on the corners of Kentucky and Trinity Streets, and was

5  surrounded by a low white picket fence.  Gregory Depo at 33:2-12.; Ex 6 to Casper Decl

6  [photograph of Plaintiffs' fence line from Kentucky Street].  The property had two entrances,

7  with the front patio and yard accessed through a wooden gate on Kentucky Street.  Gregory

8  Depo at 34:11-18, 42:1-6, 45:22-46:4; Ex 7 to Casper Decl [photograph of gate taken from

9  Plaintiffs' property looking out toward Kentucky Street]; Ex 8 to Casper Decl [photograph of

10  gate from Kentucky Street looking into Plaintiffs' property]. The gate led to a short cobbled

11  path, opening up to the front patio.  Gregory Depo at 46:9-18; Ex 9 to Casper Decl [photograph

12  looking from gate into Plaintiffs' property].  Continuing straight led to Plaintiffs' front yard and

13  house, with the front door located on the wrap-around porch approximately twenty feet from

14  the gate.  Gregory Depo 36:17-37:1, 42:10-24; Ex 10 to Casper Decl [photograph of Plaintiffs'

15  front yard and house].  At the time of the incident, there was a cowbell that hung from the gate

16  that, when shaken, Gregory and others could hear from inside her home.  Gregory Depo at

17  35:1-10, 41:23-25; Coudright Decl ¶ 7.

18       On May 16, 2012, there was objective indicia of the presence of dogs on the property:

19  there were children's and dog toys in the front patio, and there was wire fencing extending

20  along the wooden fence line to keep the puppy, Holly, from jumping out.  Gregory Depo at

21  41:3-15, 49:16-20; Mollner Depo at 32:12-33:5; Ex 11 to Casper Decl [photograph of wire

22  fencing attached to picket fence].

23       Calhoun parked his patrol car near Plaintiffs' property and approached the gate.

24  Calhoun Depo at 48:23-49:13.  When Calhoun saw Plaintiffs' property, his primary concern

25  was the presence of dogs.  Calhoun Depo at 82:24-83:3.  He states:

26       But as a I responded to this call, we still have officer-safety things that we have to
        worry about, and when I saw this yard specifically, **the one thing I was**
27      **concerned about is dogs**.  Because even though I'm not responding to a high-
        level type call, I still have to be safe and go home in the same condition I left at
28      the end of the day.  And what I noticed about this yard is that it was surrounded

CASPER, MEADOWS,
SCHWARTZ & COOK
2121 N. California Blvd.,
Suite 1020
Walnut Creek, CA  94596
TEL: (925) 947-1147
FAX (925) 947-1131

by this gate [fence], all the way around the yard . . . with a lot of foliage, and it was hard to see in there.

So you can't notify the residents that you're there.  There's a gate, there's no doorbell at the gate, there's no intercom at the gate; you gotta get to the front door to notify them.

But yes, I was concerned . . . about the fact that there may be dogs.

Calhoun Depo at 51:5-21.

Calhoun walked up to the gate and peered inside the yard, observing children's toys, such as a wading pool; he does not recall seeing dog toys, but maintains that he was concerned about the presence of dogs.  *Id.* at 52:12-53:18.   He did not call out his presence at the gate, nor did he call the reporting party despite having her phone number to inform Gregory of his arrival because "[w]e don't generally do that . . . we respond to calls all day long, and calls like this, we go up and knock on the door; that's kind of how it works."  *Id.* at 53:19-25, 55:23-56:4, 62:24-63:5.   He says "we don't walk up to somebody's house yelling and hooting and hollering and screaming and stuff, so we just walk up and knock on the door."  *Id.* at 63:3-5.  Calhoun did not observe a cattle bell attached to the gate.  *Id.* at 56:5-7.

Calhoun states that he shook the gate and tapped the gate with his flashlight, per his habit when entering properties where dogs might be startled.  *Id.* at 54:10-55:1.   Calhoun was ultimately "confident" that there were no dogs on the premises partly because there was a small picket fence and "I didn't see wiring."   Calhoun Depo at 83:8-22. He then entered Plaintiffs' property.  Calhoun Depo at 56:8-11.  Calhoun did not take any further measures to determine whether there were dogs on the property after entering through the gate.  Calhoun Depo at 65:13-22.

At the time Calhoun entered the yard, Gregory was working at her computer in her home office, waiting for the nanny to drop off five-year-old Lucy from preschool.  Gregory Depo at 21:15-20, 31:17-20, 54:18-23; Ex 10 to Casper Decl.  Belle and Flicka were outside, and the puppy was inside the home with Gregory.  *Id.* at 59:3-22.  Gregory was sitting at her desk, with her back to the window that faced the wraparound porch and front yard.  *Id.* at 42:19-44:10.  Gregory typically heard when people walked through the gate when she was in her office.  *Id.* at 35:1-8, 36:1-3; Gregory Decl ¶ 3.  When Gregory was home during the day,

CASPER, MEADOWS,
SCHWARTZ & COOK
2121 N. California Blvd.,
Suite 1020
Walnut Creek, CA  94596
TEL: (925) 947-1147
FAX (925) 947-1131

1    she would typically leave the dogs in the fenced-in yard because they liked to lie in the sun,

2    and they alerted Gregory to when people were at the gate by barking.  *Id.* at 59:17-22.

3        Gregory never heard any sounds from the direction of the gate when Calhoun arrived;

4    the first thing alerting Gregory to Calhoun's presence on her property was the sound of

5    gunshots.  Gregory Decl ¶ 4.

6    ## V.       CALHOUN SHOOTS AND KILLS BELLE

7        According to Calhoun, when he was approximately halfway toward the house, he saw

8    two dogs charging at him at a full sprint from the left side of the house.  Calhoun Depo at

9    66:16-19.  Belle, the black-and-tan one, was slightly ahead of Flicka.  Calhoun Depo at 67:9-

10   68:5; Ex 3 to Casper Decl.  Calhoun states that the dogs were barking as they approached.

11   Calhoun Depo at 70:1-2.

12       Within "a second or two," Calhoun states the following occurred: he recognized that

13   the dogs "didn't appear to be friendly"; he noticed the dogs snarling; he observed that the hairs

14   on their backs were raised and that their tails were straight; determined that the dogs "were

15   going to attack me"; retreated five or six feet toward the gate; and fired two shots, killing the

16   lead dog, Belle.  *Id.* at 70:3-72:3, 79:17-20, 89:21-90:3, 96:18-22.  Calhoun did not recognize

17   either dog as being a pit bull.  *Id.* at 68:10-14.  Calhoun states he did not have time to retreat

18   through the gate or otherwise from the yard, but he was "surprised that I was able to . . . get my

19   firearm out of the holster fast enough and fire those rounds . . ."  *Id.* at 72:13-73:20.  The

20   holster he was using on that date was a "Level 3" holster, which requires the release of two

21   snaps and rocking the gun forward to release it – the "triple threat" holster."  *Id*. at 62:2-7.  The

22   other dog, Flicka, ran away after he shot Belle. *Id.* at 71:19-20.

23       He says that he shot Belle at "point-blank range" because it was "getting ready to" leap

24   up and bite him.  *Id.* at 75:5-9.  He does not recall if the dog had "jumped or . . . was starting to

25   jump."  *Id*. at 76:10-12.  Calhoun fired two shots, striking her in the snout, and through the

26   mouth and throat.  *Id.* at 78:22-79:5; Ex 12 to Casper Decl [photograph of Belle post-shooting].

27   Calhoun believes he was further than the kiddie pool in the yard when he started retreating

28   back toward the gate, shooting Belle at approximately at her final point of rest.  Calhoun Depo

CASPER, MEADOWS,
SCHWARTZ & COOK
2121 N. California Blvd.,
Suite 1020
Walnut Creek, CA  94596
TEL: (925) 947-1147
FAX (925) 947-1131

1    at 76:21-77:25, 89:13-20; Ex 13 to Casper Decl [photograph of Belle's point of rest]; Ex 14 to

2    Casper Decl [photograph of closer view of Belle's point of rest].  He was not concerned about

3    the presence of children because he was firing his gun toward the ground.  Calhoun Depo at

4    78:1-11. Gregory heard the shots from nearby in the home office and "hit the floor" because

5    she thought "somebody was trying to shoot me."  Gregory Depo at 31:17-25, 54:9-55:1.

6          Calhoun was not bitten by either dog.  Calhoun Depo at 75:10-12.  Calhoun was the

7    only eye witness to the shooting.  Gregory Depo at 55:20-56:5.

8          In the wake of the incident, Plaintiffs have experienced severe emotional distress.

9    Gregory Depo at 70:15-72:15, 72:18-73:9; Mollner Depo at 12:5-15:4.  After approximately

10   eight years of living at 47 Kentucky Street, Plaintiffs and their two children moved out of their

11   home and out of Vallejo in July 2012 as a result of the trauma from the incident.  Gregory

12   Depo at 10:14-11:2; Mollner Depo at 30:16-18.

13         **VI.    CALHOUN'S TERMINATION**

14         On December 2, 2013, Chase Calhoun was terminated from VPD.  Ex 15 to Casper

15   Decl [Notice of Discipline].[2]    The termination was the result of an Internal Affairs

16   Investigation ("IA"), conducted by Lieutenant Sid Dejesus ("Lt. DeJesus") into Calhoun's

17   misconduct ranging from March 2012 until August 2013, during which time Calhoun was

18   having sexual contacts with a woman, ██████████████, while Calhoun was on his

19   patrol shifts, in remote locations, and frequently in his patrol vehicle.  Ex 16 to Casper Decl

20   [VPD Internal Affairs Investigation Report No. 2013-03].  ████ ended the relationship and

21   notified VPD of Calhoun's wrongdoing in August 2013 after she discovered that not only had

22   Calhoun been married to another woman since September 2012, of which ████ was unaware,

23   but that Calhoun was also seeing another woman during this timeframe, ████  *Id.* at pp. 1,

24   11, 18.   The IA charged Calhoun with seven violations of department policy; all seven charges

25   were sustained by three superior officers, including Chief Kreins.  *Id.* at pp. 2, 4-6.

26

27   ───────────────────────────
     [2] The decision to terminate Calhoun was made by now-former VPD Chief Kreins, who was a party to this lawsuit
28   and subsequently dismissed.  Chief Kreins succeeded Defendant Chief Nichelini, who was the Chief of Police at
     the time of the incident.

CASPER, MEADOWS,
SCHWARTZ & COOK
2121 N. California Blvd.,
Suite 1020
Walnut Creek, CA  94596
TEL: (925) 947-1147
FAX (925) 947-1131

1   Chief Kreins, in his Notice of Discipline, states, "The nature and extent of you (sic)

2   misconduct is shocking, which misconduct clearly was unbecoming and brought into disrepute

3   the Department and its other personnel.   Your actions demonstrate serious, repeated and

4   perplexing failures in judgment that make you unfit to be a police officer."  Ex 15 to Casper

5   Decl at p. 2.  The IA report reveals two issues of particular relevance to this case:

### A.    Calhoun's Credibility

7   Lt. DeJesus interviewed Calhoun, and Calhoun confirmed he began a sexual

8   relationship with ███ in March 2012.  Ex 16 to Casper Decl at p. 16.  Lt. DeJesus remarked

9   in the IA Report that "Officer Calhoun appeared to me to have selective memory loss in

10  relation to the frequency of his sexual contacts with ████████, and specific dates

11  related to the same."  *Id.* at p. 16.  Lt. DeJesus stated that "Officer Calhoun would attempt to

12  minimize the time that it would take for him to complete these sexual acts by describing the

13  duration of time as lasting only 10 to 15 minutes at a time."  *Id.* at p. 17.  Calhoun did confirm

14  that he would take ███ to Mare Island for these encounters.  *Id.*  Lt. DeJesus states that

15  Calhoun appeared "to minimize the amount of times he and ███ would actually have sexual

16  intercourse while in a police car on Mare Island . . ."  *Id.*  Calhoun only admitted to taking

17  ███ to the Mare Island Training Facility ("MITC") after Lt. DeJesus confronted him with a

18  photograph of the location.  *Id.* at pp. 10, 17-18.  When asked about having sex with ███ at

19  another remote location (VPD Traffic Office), Calhoun responded, "I've got to be honest, I

20  can't recall having sex there."  *Id.* at p. 19.  Calhoun denied missing Calls for Service, despite

21  the statement of Sergeant B. Clark ("Sgt. Clark") that it was an ongoing problem for Calhoun.

22  *Id.* at pp. 14, 18.

23  Calhoun confirmed that he started a sexual relationship with ███ after pulling her

24  over for a traffic violation, but stated he only saw her while off-duty, despite his pattern of

25  behavior with ███.  *Id.* at p. 19-20.  This could not be corroborated because ███ would not

26  return Lt. DeJesus's calls.  *Id.* at p. 20.

### B.    Calhoun's Delay in Response to Calls for Service During the Relevant Time Period.

28  From April 2012 through February 2013, ███ lived at ███ Santa Clara Street.  *Id.* at

CASPER, MEADOWS,
SCHWARTZ & COOK
2121 N. California Blvd.,
Suite 1020
Walnut Creek, CA  94596
TEL: (925) 947-1147
FAX (925) 947-1131

p. 9.  From March 2, 2012 through January 9, 2013, Calhoun worked frequently as a solo beat officer assigned to "Beat 6," which Lt. DeJesus found of significance because Beat 6 is in close proximity to ███ house on Santa Clara Street.  *Id.* at p. 3.  *Calhoun was working as a solo beat officer assigned to "Beat 6" on May 16, 2012 when he shot and killed Belle.* Calhoun Depo at 37:20-22, 48:1-6.   During the time ███ lived on Santa Clara Street, she and Calhoun had sexual intercourse while he was on duty once or twice a week.  Ex 16 to  Casper Decl at p. 9.   During this timeframe, the IA revealed that Calhoun took ███ to remote locations to have sex while on his shift, including to a recycling center on Mare Island and to MITC.  *Id.*  at pp. 9-10.

Lt. DeJesus interviewed Sgt. Clark as part of the IA.  *Id.* at p. 14.  The IA states, "Sergeant Clark spoke of Officer Calhoun having 'routinely' missed 'Calls for Service,' and how dispatch would need to 'advise a second time' at which point Officer Calhoun would then answer for his designated CFS."  *Id.* at p. 14.

In Lt. DeJesus's findings of a violation of Availability of Duty (VPD General Order B-1, III, B1.4), he states:

> During the course of the investigation, I was able to confirm the actual locations where Officer Calhoun would drive ███████ for the purpose of having sexual intercourse.  These locations were established to be in remote areas concealed from the general public where Officer Calhoun could assure himself of the privacy he would need to complete these sexual encounters.  The location on Mare Island near Alco Recycling, which is located on the furthest North-West corner of the Island, the PG&E substation in Glen Clove, and Gilcrest, would necessarily take Officer Calhoun out of service for extended periods and very likely resulted in missed or delayed responses to Calls for Service as confirmed by Sergeant B. Clark.

> Officer Calhoun would not advise Communications of his duty status changes which occurred each time he allowed ███████ into his police car which also took him out of service by his own action.

*Id.* at p. 21.

In Lt. DeJesus's findings of a violation of Duty Responsibilities (VPD General Order B-1, III, B1.14), he states:

> By virtue of Officer Calhoun taking himself out of service without lawful and/or reasonable justification, he was not in a position to respond expeditiously to calls for service either directed to him by Communications, or calls from other uniformed officers who may have needed assistance or backup, or from citizens

CASPER, MEADOWS, SCHWARTZ & COOK
2121 N. California Blvd.,
Suite 1020
Walnut Creek, CA  94596
TEL: (925) 947-1147
FAX (925) 947-1131

of this City.  By virtue of him having an unauthorized civilian inside his police car, he was no longer in a position to respond and/or perform his duties in a prompt or safe manner.

*Id.* at p. 22

## LEGAL ARGUMENT

### I.   CALHOUN VIOLATED PLAINTIFFS' FOURTH AMENDMENT RIGHTS AND IS NOT PROTECTED BY QUALIFIED IMMUNITY.

Defendants incorrectly argue they are protected by qualified immunity.  The issue of qualified immunity involves analysis of whether the plaintiff has shown a deprivation of a clearly established constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201, 205 (2001), *abrogated by Pearson v. Callahan* (2009) 555 U.S. 236 (providing courts with discretion to address either prong in determining the immunity issue).   As stated in *Drummond ex rel. Drummond v. City of Anaheim* (9th Cir. 2003) 343 F.3d 1052, 1056:

> In order to decide whether state officers are entitled to qualified immunity, *Saucier* . . . instructs that we must first determine whether, "[t]aken in the light most favorable to the party asserting the injury ... the facts alleged show [that] the officer's conduct violated a constitutional right.' '[I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established ... in light of the specific context of the case' such that 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'

When assessing qualified immunity, courts must presume facts in favor of the plaintiff. *Kosakoff v. City of San Diego* (9th Cir. 2011) 460 Fed.Appx. 652, 654-55.

As explained below, Calhoun violated clearly established constitutional rights.

### A.   Legal Standard for an Excessive Force Claim Under § 1983.

"Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor* (1989) 490 U.S. 386, 396.  "Reasonableness is the touchstone of any seizure under the Fourth Amendment . . . We look to the totality of the circumstances to determine whether the destruction of property was reasonably necessary to effectuate the performance of the law enforcement officer's duties." *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose* (9th Cir. 2005) 402 F.3d 962, 975.

"[T]he destruction of property by state officials poses as much of a threat, if not more,

CASPER, MEADOWS, SCHWARTZ & COOK
2121 N. California Blvd., Suite 1020
Walnut Creek, CA 94596
TEL: (925) 947-1147
FAX (925) 947-1131

1   to people's right to be 'secure . . . in their effects' as does the physical taking of them." *Fuller v.*

2   *Vines* (9th Cir. 1994) 36 F.3d 65, 68, *overruled on other grounds, Robinson v. Solano County*

3   (9th Cir. 2002) F.3d 1007.   "The killing of [a] dog is a destruction recognized as a seizure

4   under the Fourth Amendment.   *Id.*   The killing of a citizen's dog while in the performance of a

5   law enforcement officer's duty amounts to a "severe" intrusion. *San Jose Charter of Hells*

6   *Angels Motorcycle Club, supra,* 402 F.3d at 975; *See also Brown v. Muhlenberg Twp.* (3d Cir.

7   2001) 269 F.3d 205, 210-211, calling the destruction of a pet an "extreme intrusion."

8       The balancing required by *Graham* "nearly always requires a jury to sift through

9   disputed factual contentions," to draw inferences, and to make credibility assessments such that

10  summary judgment should be granted "sparingly."   *Santos v. Gates* (9th Cir. 2002) 287 F.3d

11  846, 853; *accord, Nelson v. City of Davis* (9th Cir.2009) 571 F.3d 924, 927; *Drummond, supra,*

12  343 F.3d at 1056; *Smith v. City of Hemet* (9th Cir. 2005) 394 F.3d 689, 701. Moreover, "[t]o

13  the extent that there is a difference between the parties, [courts are to] look to the version most

14  favorable to the plaintiff." *Smith, supra,* 394 F.3d at 693; *Sneade v. Rojas* (D. Mass., Mar. 10,

15  2014) 2014 WL 949635 at * 5 ["[G]iven that there is a chance, however slight, that a jury could

16  find that under these circumstances Officer Rojas's shooting of [plaintiffs' dog] was unlawful, I

17  am denying summary judgment with respect to Plaintiffs' Section 1983 claim against him."]

18      **B.   Genuine Disputes of Material Fact Exist as to Whether Calhoun Used**
        **Excessive Force.**

19      The crux of this inquiry is whether Calhoun had an objectively reasonable belief that he

20  was required to shoot and kill Belle in the interests of officer safety, which has been recognized

21  in certain circumstances to justify such an extraordinary use of force.   *See Warboys v. Proulx*

22  (D. Conn. 2004) 303 F.Supp.2d 211 [officers were justified in killing 90- to 100-pound Pit

23  Bull].   Here, there are myriad genuine disputes of material fact that preclude the granting of

24  summary judgment.

25      **1.   Calhoun's Credibility is Paramount, and Seriously in Question.**

26      Calhoun was the sole eyewitness to the shooting and to the events preceding it.   In order

27  for Defendants to prevail, Calhoun's account that he feared that he was "going to be attacked"

28  must be credible.   As a preliminary matter, such cases are ill-suited for a determination by a

CASPER, MEADOWS,
SCHWARTZ & COOK
2121 N. California Blvd.,
Suite 1020
Walnut Creek, CA  94596
TEL: (925) 947-1147
FAX (925) 947-1131

1    court without other corroborating evidence, of which there is none in this case.

2        As stated in, Gonzalez v. City of Anaheim (9th Cir. 2014) 747 F.3d 789, 794-95:

3        Deadly force cases pose a particularly difficult problem . . . because the officer
         defendant is often the only surviving eyewitness. . . We must . . . examine
4        "circumstantial evidence that, if believed, would tend to discredit the police
         officer's story." (citation) We have held that summary judgment should be granted
5        sparingly in excessive force cases. *Glenn v. Washington County*, 673 F.3d 864,
         871 (9th Cir.2011). This principle applies with particular force where the only
6        witness other than the officers was killed during the encounter.

7        "In resolving summary judgment motions, a court must not weigh the evidence, make

8    credibility determinations, or draw inferences from the facts adverse to the non-moving party."

9    *His and Her Corp. v. Shake-N-Go Fashion, Inc.* (9th Cir., May 12, 2014) 2014 WL 1877082 at

10   *1, *citing Anderson v. Liberty Lobby, Inc.*, (1986) 477 U.S. 242, 255; *See also Entrepreneur*

11   *Media, Inc. v. Smith* (9th Cir. 2002) 279 F.3d 1135, 1149 ["[O]f course, it is for the trier-of-

12   fact, not the court deciding whether to grant summary judgment, to determine issues of

13   credibility."]; *Arden v. Kastell* (9th Cir. 2014) 553 Fed.Appx. 697, 698 ["But on summary

14   judgment judges cannot decide credibility."]

15       Here, there is no independent evidence that Belle was about to attack Calhoun: Calhoun

16   was not bitten or otherwise touched by the dogs, and Belle had no history of aggression. The

17   reasonableness of Calhoun's decision to kill Belle turns in large part on the credibility of his

18   story.  His account that, within "one or two seconds," he recognized the intent of the dogs to

19   attack – including noticing the raised hair on their backs – retreated five or six feet,

20   unholstered a Level-3 holster, and fired two shots into Belle right before she was going to leap,

21   is a debatable sequence of events that must be evaluated by a jury.

22       Furthermore, Calhoun's credibility is seriously in question in light of his enduring

23   course of misconduct while a VPD Officer.   First, Calhoun's misdeeds which resulted in seven

24   sustained findings of department policy violations and his ultimate termination  – having sexual

25   intercourse at remote locations distant from his patrol beat, while on duty, in uniform and in his

26   patrol car – in and of themselves bear on his credibility. Calhoun's decision to have sexual

27   encounters while on duty instead of fulfilling his duties as a police officer necessarily involved

28   acts of dishonesty, as Calhoun concealed his activities and whereabouts from dispatch, his

CASPER, MEADOWS,
SCHWARTZ & COOK
2121 N. California Blvd.,
Suite 1020
Walnut Creek, CA  94596
TEL: (925) 947-1147
FAX (925) 947-1131

*Gregory, et al. vs. City of Vallejo, et al.*     Case No. 2:13-CV-00320-KJM-KJN          Page 14
PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT

fellow officers, and from his supervisors. The only reason his misconduct came to light was ███ notification to VPD; officers interviewed in the IA purportedly had no idea of Calhoun's clandestine activities. In other words, from at least March 2012 until August 2013, he routinely held himself out to be doing what he was obligated to do (patrol his beat), when in fact, he was not.

Second, there is ample evidence that Calhoun was dishonest during the IA, even in the face of overwhelming evidence of his wrongdoing. In his interview of Calhoun, Lt. DeJesus found him "to have selective memory loss" related to pivotal pieces of information of his contacts with ███. He also found that Calhoun "would attempt to minimize" the length of time of his contacts with ███ to an unbelievable degree. He admitted to taking ███ to locations only after being confronted with photographs. He responded he couldn't "recall having sex" at other locations – done again, a difficult assertion to believe. Calhoun denied missing Calls for Service, despite Sgt. Clark's statement that it was an ongoing problem for Calhoun.

In short, Calhoun was a VPD Officer for a mere two years, and was terminated based on conduct that was, in the words of former Chief Kreins, "shocking" and demonstrated "serious, repeated and perplexing failures in judgment." His credibility is dubious, and his account of events must be weighed by a trier of fact.

> **2.**    **There Exists Independent Evidence that Also Casts Doubt on Calhoun's Account of the Shooting.**

Aside from Calhoun's disputed credibility as the sole witness to Belle's shooting, there exists other evidence that calls into question his version of events.

First, there is abundant evidence of Belle's temperament for peacefulness, and courts have found such evidence in police dog shooting cases relevant to the inquiry of reasonableness of the use of force. As stated in *Thurston v. City of North Las Vegas Police Dept.* (9th Cir. 2014) 552 Fed.Appx. 640, 642:

> [T]here is a genuine issue of fact as to whether the dogs attacked. The district court relied on the lack of evidence directly contradicting the officers' testimony that the dogs attacked. But this ignores the summary judgment standard that requires the court to view the evidence in the light most favorable to Thurston and

CASPER, MEADOWS,
SCHWARTZ & COOK
2121 N. California Blvd.,
Suite 1020
Walnut Creek, CA  94596
TEL: (925) 947-1147
FAX (925) 947-1131

draw all reasonable inferences in her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Here, although Thurston did not witness the alleged attack herself, she did testify that her dogs were not aggressive and that she had observed her dogs sitting by the back patio door looking happy and "wiggling their tails" just prior to her being escorted out of the house. Viewing the evidence in Thurston's favor, a jury could infer that if her dogs were "wiggling their tails" non-aggressively right before the alleged attack, then perhaps they did not attack at all.

*See also Kay v. County of Cook, Illinois* (N.D. Ill., Aug. 29, 2006) 2006 WL 2509721 at *3, finding summary judgment inappropriate ["Kay further presented evidence that his brown dog attended obedience training, that there is no history that his dogs have bitten anyone, and that there were no complaints from neighbors or animal control about his dogs."]; *Taylor v. City of Chicago* (N.D. Ill., Nov. 23, 2010) 2010 WL 4877797 at * 3, denying summary judgment ["[P]laintiffs have pled facts that would overcome an argument that Brick posed an imminent danger. They have alleged that Brick had no biting history, is a social dog, and had completed advanced and intermediate professional obedience classes."]

Here, Gregory states that Belle had never bitten any person or dog. Coudright, who lived on the premises for three years until July 2012, states in her declaration that, although Belle would sometimes bark and run toward visitors (as many dogs do), Belle had never shown signs of aggression, including toward the numerous visitors and people making deliveries to the property. J. Gregory knew Belle since she was a puppy (over eleven years), and also states in her declaration that during her countless encounters with Belle, she was a playful, peaceful dog that never exhibited aggressive signs toward people, including toward UPS drivers who entered Plaintiffs' property.

Other relevant evidence to the reasonableness of Calhoun's actions is the advanced age of Belle (eleven years). *Wood v. Kitsap County* (W.D. Wash., May 3, 2007) 2007 WL 1306548 at * 9 [citing the fact the dog was eleven years old and in poor health as a relevant factor for weighing the officers' claims of aggression]. Belle's age also lends credence to the evidence of her temperament, as there was a long period in which she exhibited a lack of aggression, in contrast to a young dog with a small sample size of behaviors. Belle was also not a Pit Bull, a breed that is typically flagged as an aggressive breed, and a fact which Calhoun recognized

CASPER, MEADOWS, SCHWARTZ & COOK
2121 N. California Blvd.,
Suite 1020
Walnut Creek, CA  94596
TEL: (925) 947-1147
FAX (925) 947-1131

*Gregory, et al. vs. City of Vallejo, et al.*     Case No. 2:13-CV-00320-KJM-KJN           Page 16
PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

1   during his brief encounter. *Warboys, supra,* 303 F.Supp at n. 13 [relying, in part, on the dog's

2   Pit Bull breed in determining the reasonableness of the shooting].

3                    **3.        Calhoun's Pre-Entry Actions Are in Dispute.**

4          Calhoun's purported actions in entering the property are also disputed, which may have

5   contributed to the ultimate unconstitutional shooting.  Formulating a plan to enter property

6   when law enforcement is aware of the presence of dogs is a factor cited by courts in

7   determining the reasonableness of a dog shooting case. *San Jose Charter of Hells Angels*

8   *Motorcycle Club, supra,* 402 F.3d 962 at 976.

9          While the facts here are distinct from those in *San Jose Charter of Hells Angels*

10  *Motorcycle Club*, in which the entry team had a week of planning prior to entry, Calhoun

11  concedes that when viewing Plaintiffs' property with its fenced-in yard, his primary concern

12  was the presence of dogs. Calhoun then came up with a plan: he shook the gate and knocked it

13  with his flashlight prior to entering the premises.

14         There are factual disputes as to this account.  Calhoun states he never saw wiring on the

15  fence, which contributed to his confidence that there were no dogs, yet there was wiring on the

16  picket fence at the time. Calhoun states that he did not see a bell on the gate, but there is

17  evidence that there was, in fact, a bell on the gate to alert Plaintiffs to visitors.  Gregory did not

18  hear Calhoun at the gate, despite working nearby in her home office.

19         In addition to whether Calhoun actually took those precautions prior to entering, there

20  are disputes as to the reasonableness of his entry plan.  Calhoun concedes that he did not

21  announce his presence at the gate or call the reporting party simply because officers "don't

22  generally do that."  The reasonableness of this practice is questionable under the circumstances,

23  particularly since Calhoun was concerned about the presence of dogs, had difficulty seeing into

24  the property due to foliage, and knew he was there to take a report and not to address a crime-

25  in-progress.

26                    **4.        Calhoun's Whereabouts Leading Up to the Incident, and His State
                                  of Mind, Are in Dispute.**

27         As previously set forth, May 16, 2012 was approximately two months after Calhoun

28  began taking ███ to remote locations for sexual intercourse while on duty.  Three of the

**CASPER, MEADOWS,
SCHWARTZ & COOK**
2121 N. California Blvd.,
Suite 1020
Walnut Creek, CA  94596
TEL: (925) 947-1147
FAX (925) 947-1131

*Gregory, et al. vs. City of Vallejo, et al.*     Case No. 2:13-CV-00320-KJM-KJN          Page 17
PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT

1   sustained findings in the IA was for Calhoun's violations of "Availability for Duty," "Duty

2   Responsibilities" and "Idling on Duty" based on Calhoun taking ▮▮▮ to remote areas of Mare

3   Island during his shifts, thus being unavailable for calls for service. Calhoun's habit of dilatory

4   responses to calls for service was corroborated by Sgt. Clark.

5        Here, there is evidence that Calhoun was unavailable for the original call for service by

6   Gregory.   The initial dispatch at 10:59 a.m. was directed to "PD/2P6," which was an

7   identification referring to Calhoun's patrol unit. The CAD log reflects this fact, and Calhoun

8   corroborates this by stating, "either way, it was in my area, so it was something I had to deal

9   with." The CAD log also reflects that Calhoun responded to dispatch at 12:08 p.m. – a lapse of

10  an hour and nine minutes from the original call for service in his beat.[3]

11       Calhoun's whereabouts for this period of time are relevant to his state of mind during

12  the incident, and may shed light on his response to unfolding circumstances.  For example, if

13  Calhoun was somewhere where he was not supposed to be – a possibility in light of the date of

14  the incident relative to Calhoun's wrongdoing, the fact he was working the same Beat 6 where

15  ▮▮▮▮ lived, and the apparent lag in response – there is a plausible inference that he may have

16  been rushing to the call in a hurried, frantic state.  There is also an inference that his mind was

17  focused on avoiding detection from dispatch, other officers, or supervisors, and not on

18  confronting the call for service with a calm and collected demeanor.  Such evidence would

19  explain his response to what otherwise may have been mundane circumstances – an eleven-

20  year-old family dog running toward him – which ultimately bears on the reasonableness of the

21  use of force.

22       **C.     The Constitutional Right Was Clearly Established at the Time of the
                  Shooting.**

23       As there exists multiple genuine disputes of material fact on the issue of Calhoun

24  violating Plaintiffs' Fourth Amendment rights in killing Belle, the next step under the qualified

---

[3] The deposition of Calhoun on January 7, 2014 was taken prior to the production of his termination records, and defense counsel instructed Calhoun not to answer any questions related to his termination.  Calhoun Depo at 9:5-10:25.  Plaintiffs intend to re-depose Calhoun on relevant issues relating to his termination, as well as to clarify his whereabouts prior to the incident, and will be bringing a Motion to Compel Further Deposition Testimony in response to Defendants' refusal to produce Calhoun due to the close of discovery.  The relevance in the apparent lag time in response to the initial call for service was unknown to Plaintiffs' counsel at the time of deposition.

CASPER, MEADOWS,
SCHWARTZ & COOK
2121 N. California Blvd.,
Suite 1020
Walnut Creek, CA  94596
TEL: (925) 947-1147
FAX (925) 947-1131

*Gregory, et al. vs. City of Vallejo, et al.*     Case No. 2:13-CV-00320-KJM-KJN          Page 18
PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT

1    immunity inquiry under the framework of *Saucier, supra,* 533 U.S. at 201 is determining
2    whether the right is clearly established.

3        Here, on May 16, 2012, it was well-settled that an officer could not kill a citizen's dog,
4    on his or her property, if it is not reasonable under the totality of the circumstances. *San Jose*
5    *Charter of Hells Angels Motorcycle Club, supra, 402* F.3d at 977-978 ["These cases should
6    have alerted any reasonable officer that the Fourth Amendment forbids the killing of a person's
7    dog, or the destruction of a person's property, when that destruction is unnecessary . . ."]; *Viilo*
8    *v. Eyre* (7th Cir. 2008) 547 F.3d 707, 710 ["[I]n a case decided after the events at issue here,
9    the Ninth Circuit held that it was clearly established *in 1998* that an officer cannot kill a
10   person's pet unnecessarily." (emphasis in original)]; *Criscuolo, supra,* 540 Fed.Appx. at 564.

11       Since there exist genuine disputes of fact as to the reasonableness of Calhoun's actions,
12   and the right of Plaintiffs to be free from the unreasonable killing of their dog on their property
13   was clearly established at the time of the incident, Calhoun is not entitled to qualified
14   immunity.

15   **II.    PLAINTIFFS' STATE LAW CLAIMS SURVIVE**

16       **A.    TRESPASS TO CHATTELS/CONVERSION**

17       Defendants rely upon the state privilege of self-defense in arguing against Calhoun's
18   violation of Plaintiffs' possessory rights under trespass to chattels and conversion. *Church of*
19   *Scientology v. Armstrong* (1991) 232 Cal.App.3d 1060.

20       Since there are genuine disputes as to whether Calhoun was, in fact, acting in self-
21   defense, or whether the killing was unreasonable under the circumstances, summary judgment
22   should not be granted as to these causes of action.

23       **B.    INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

24       Defendants state that Plaintiffs cannot prove "outrageous conduct" because Calhoun
25   acted in self-defense.  As previously noted, this issue is subject to significant factual disputes.
26   Defendants also aver that a cause of action for intentional infliction of emotional distress
27   cannot lie because Calhoun did not intend to cause "severe or extreme emotional distress,"
28   particularly since it occurred outside Plaintiffs' presence.  Contrary to this assertion, intentional

**CASPER, MEADOWS,**
**SCHWARTZ & COOK**
2121 N. California Blvd.,
Suite 1020
Walnut Creek, CA  94596
TEL: (925) 947-1147
FAX (925) 947-1131

*Gregory, et al. vs. City of Vallejo, et al.*     Case No. 2:13-CV-00320-KJM-KJN          Page 19
PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT

1    infliction may be shown if a defendant possessed "knowledge that emotional distress was

2    substantially certain to result from the defendant's conduct.  In other words . . . if the defendant

3    knows there is a high probability that emotional distress will result and then acts with a

4    deliberate disregard of that probability." *Perez v. City of Placerville* (E.D. Cal., Sept. 9, 2008)

5    2008 WL 4279386 at * 9.

6    　　　　　Here, the facts can support a finding that Calhoun acted with a deliberate disregard of

7    the probability that his actions would cause emotional distress: he arrived late to the call for

8    service for unknown reasons; he entered the property without taking adequate precautions

9    despite his concern about the presence of dogs; and he shot and killed Plaintiffs' family dog

10   that had been a loving and peaceful dog in the preceding eleven years of its life.

11   **C.    CAL. CIV. CODE § 52.1**

12   　　　　　As stated in *Knapps v. City of Oakland* (N.D. Cal. 2009) 647 F.Supp.2d 1129, 1168:

13   　　　　The elements of a section 52.1 excessive force claim are essentially identical to
       those of a § 1983 excessive force claim (citations) Thus, where a plaintiff's claims

14   　　　　under the federal and state constitutions are co-extensive, the discussion of a
       plaintiff's federal constitutional claim resolves both the federal and state

15   　　　　constitutional claims.
       . . .

16   　　　　[T]he force used in the August 10, 2004 incident was unnecessary, unreasonable,
       and excessive. Accordingly, the individual defendants are not entitled to

17   　　　　immunity under section 820.2, and are therefore liable under section 52.1.

18   　　　　　Thus, the resolution of Plaintiffs' § 1983 claim for excessive force is coextensive with

19   their cause of action under § 52.1.  Defendants' argument that Plaintiffs have not alleged any

20   facts of any acts that amount to "threats, violence, or intimidation" that caused the

21   constitutional violation is erroneous: Calhoun's unreasonable and extreme use of deadly force

22   was a flagrant act of violence that serves as the basis of Plaintiffs' constitutional violation.

23   　　　　　　　　　　　　　　　　　　**CONCLUSION**

24   　　　　　For the foregoing reasons, the Court should deny Defendants' motion.

25   Dated: August 8, 2014                              _____*/s/* - "Nick Casper"_____

26   　　　　　　　　　　　　　　　　　　　　　　　Nick Casper
       　　　　　　　　　　　　　　　　　　　　　　**Casper, Meadows, Schwartz & Cook**

27   　　　　　　　　　　　　　　　　　　　　　　Attorneys for Plaintiffs ERIKA GREGORY and
       　　　　　　　　　　　　　　　　　　　　　　LOREN MOLLNER

28

CASPER, MEADOWS,
SCHWARTZ & COOK
2121 N. California Blvd.,
Suite 1020
Walnut Creek, CA  94596
TEL: (925) 947-1147
FAX (925) 947-1131

*Gregory, et al. vs. City of Vallejo, et al.*     Case No. 2:13-CV-00320-KJM-KJN
PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT