*Gregory/Mollner vs. City of Vallejo, et al*

*2:13-cv-00320-KJM-KJN*

# EXHIBIT 16

to Declaration of Nick Casper

in Support of Opposition to Defendants'

Motion for Summary Judgment

## INTERNAL AFFAIRS INVESTIGATION
### IA # 2013-03

# Vallejo Police Department
## Internal Investigation Report

| INCIDENT TYPE: | DATE REPORTED: | DATE OF INCIDENT: | FILE NUMBER: |
|---|---|---|---|
| Standards of Conduct | August 20, 2013 | 03/2012- 07/31/2013 | IA 2013-03 |

| EMPLOYEE: | DIVISION OR ASSIGNMENT: | WORK LOCATION: |
|---|---|---|
| Officer Chase Calhoun, #624 | Field Operations- Patrol | Vallejo Police Department |

| COMPLAINANT: Vallejo Police Department | ADDRESS: 111 Amador Street | |
|---|---|---|
| CITY: Vallejo | STATE: CA | ZIP CODE: 94590 |
| PHONE NUMBER: 707-649-3570 | CONTACT: Lieutenant S. DeJesus, #507 | |

**SUMMARY OF COMPLAINT:**

On August 20, 2013, Lieutenant K. Park, on-duty Watch Commander, received a phone call from ▮▮▮▮▮▮▮▮, who reported that she had developed a sexual relationship with Officer Chase Calhoun, Badge #624, in March of 2012, and that this relationship involved them having sexual intercourse on multiple occasions in a patrol vehicle. ▮▮▮▮▮▮ stated that Officer Calhoun would routinely pick her up while he was on-duty in a police vehicle, and that they would drive to areas on Mare Island and have sexual intercourse.

On August 20, 2013, I was directed by the Chief of Police to initiate an internal administrative investigation into ▮▮▮▮▮▮▮'s allegations against Officer Calhoun, and the following is a report upon my investigation and my findings which are based upon recorded interviews with ▮▮▮▮▮▮▮, assorted witnesses, and Officer Chase Calhoun.

| DIVISION ASSIGNED:<br>Vallejo Police Department,<br>Internal Affairs Unit | DATE ASSIGNED:<br><br>August 20, 2013 | DATE COMPLETED:<br><br>November 1, 2013 |
|---|---|---|
| INVESTIGATOR:<br><br>Lieutenant S. DeJesus, #507 | SUPERVISORS REVIEW:<br>Chief J. Kreins<br>Captain J. O'Connell<br>Lt. S. DeJesus | |

## INTERNAL AFFAIRS INVESTIGATION
### IA # 2013-03

| VIOLATIONS (S) | REVIEWER'S FINDINGS | REVIEWER'S FINDINGS | REVIEWER'S FINDINGS |
|---|---|---|---|
| VPD General Order Section: B-1, I-B | Sustained | Sustained | Sustained |
| VPD General Order Section: B-1, III, B1.4 | Sustained | Sustained | Sustained |
| VPD General Order Section: B-1, III, B1.14 | Sustained | Sustained | Sustained |
| VPD General Order Section: B-1,III, B1.21 | Sustained | Sustained | Sustained |
| VPD General Order Section: B-1, III, B1.35 | Sustained | Sustained | Sustained |
| VPD General Order Section: H-2, F.4 | Sustained | Sustained | Sustained |
| VPD General Order Section: H-8, 1.B | Sustained | Sustained | Sustained |
| VPD General Order Section: J-6, III, B | Sustained | Sustained | Sustained |
| | SIGNED and DATED 11/6/13 | SIGNED and DATED 11/6/13 | SIGNED and DATED 11/06/13 |
| | Chief Joseph Kreins | Captain J. O'Connell | Lieutenant S. DeJesus |

**DISPOSITION:**

Charges sustained.  Notice of proposed discipline to be issued.

**SIGNATURE:**

**DATE:** 11/7/2013

INTERNAL AFFAIRS INVESTIGATION
IA # 2013-03

## Background Summary

On August 20, 2013, I conducted an audit of the 2012 and 2013 Patrol rosters which reflected Officer Calhoun's work status. My findings are as follows:

- March 02, 2012 through January 09. 2013: Officer Calhoun was working as a solo beat officer 51 times, and was signed on as 6P6 74% of the time. The significance of this figure is that beat 6 is geographically located near ▮▮▮▮ Santa Clara, residence of ▮▮▮▮▮▮▮▮▮ from March 2012 through February 1, 2013

- March 02, 2012 through January 09, 2013: Officer Calhoun was signed on as an "Adam Unit" (two officers per vehicle) and, during that same period, was assigned to transport (11) times, which would have placed him in a solo officer status

- March 02, 2012 through January 09, 2013: Officer Calhoun was signed on as an "Adam Unit" and, during that same period, his partner was assigned to transport (8) times which would have placed him in a solo officer status

- January 18, 2013 through August 18, 2013: Officer Calhoun was working as a solo beat officer (23) times, and was signed on as 4P2 65% of that time. The significance of this figure is that beat 2 is geographically located near ▮▮▮▮ Fulton, the residence of ▮▮▮▮▮▮▮▮ from February 1, 2013 to present day

- January 18, 2013 through August 18, 2013: Officer Calhoun was signed on as an "Adam Unit" and, during that same period, was assigned to transport (10) times which would have placed him in a solo officer status

- January 18, 2013 through August 18, 2013: Officer Calhoun was signed on as an "Adam Unit" and, during that same period, his partner was assigned to transport (9) times which would have placed him in a solo officer status

On August 21, 2013, I downloaded approximately 45 text messages from the iPhone owned by ▮▮▮▮▮▮▮▮▮▮▮▮▮. These text messages were between her, Officer Calhoun, and Officer Calhoun's wife, ▮▮▮▮▮▮.

On August 30, 2013, I arranged to drive ▮▮▮▮▮▮▮▮ around the area of Alco, MITC (Mare Island Training Center), Gilcrest (VPD Traffic Office), and areas around Glen Cove, (subdivision located in East Vallejo) for the purpose of her confirming specific locations where she and Officer Calhoun would have had sexual intercourse while inside a police car. ▮▮▮▮▮▮▮▮ was able to confirm the area just south of Alco (Mare Island) where they had sexual intercourse, MITC where they did not, Gilcrest where they did, and was unable to locate the other area in Glen Cove, which she described as a wooded area surrounded by trees, where they also had sexual intercourse. This contact was documented via VIEVU.

### INTERNAL AFFAIRS INVESTIGATION
### IA # 2013-03

# Officer Chase Calhoun Complaint/Authorities

The focus of this investigation is Officer Chase Calhoun's "On-Duty" conduct alleged by ████████████ from March of 2012, through August, 2013, and whether that conduct was in violation of the following Vallejo Police Department Policies/General Orders:

- **VPD General Order B-1, I-B: Standards of Conduct (Conduct Unbecoming):**

  > Members and employees shall conduct their private and professional lives in such a manner as to avoid bringing disrepute upon themselves, the Department, the City of Vallejo and the police service. The absence of a specific rule commanding or forbidding a particular act does not preclude administrative action where an individual's behavior violates this provision.

- **VPD General Order B-1, III, B1.4: Standards of Conduct (Availability for Duty):**

  > Personnel shall not conceal themselves from the public, nor fail to answer any call directed to them, except to accomplish a police purpose. Uniformed personnel in field assignments shall inform the Communications Section of location and duty status changes.

- **VPD General Order B-1, III, B1.14: Standards of Conduct (Duty Responsibilities):**

  > Although periodically relieved of duty, members are at all times subject to recall. They shall respond expeditiously to calls for service directed to them, lawful orders of competent authorities and requests for assistance from citizens, and shall perform their duties promptly.

- **VPD General Order B-1, III, B1.21: Standards of Conduct (Idling on Duty):**

  > Personnel shall not sleep on-duty, nor shall they, except at meals and during breaks, engage in personal activity not directly related to the performance of duty. Any exception requires the specific authorization of the pertinent Bureau Commander.

**INTERNAL AFFAIRS INVESTIGATION**
**IA # 2013-03**

- **VPD General Order B-1, III, B1.35:  Standards of Conduct**
  **(Obedience to Laws, Regulations, and Orders):**

    Members and employees shall obey all laws and ordinances, and all General Orders and special orders of the Department. They shall perform their duties as required or directed by law, Department policy, Department training guidelines or order of a superior officer or other proper authority. While assigned by the Department to another jurisdiction, members and employees are additionally subject to the rules and orders of that jurisdiction.

- **VPD General Order H-2, F.4: Department Property and Equipment:**
  **(Policy):**

    The use of Department property and equipment is strictly reserved for law enforcement purposes. Personnel are required to utilize Department property and equipment in the manner for which it is intended.

    **(Using Vehicle for other than Police Purpose)**

    Personnel shall transport citizens in Department vehicles only when necessary to accomplish a police purpose.

- **VPD General Order H-8, 1.B: Uniforms, Equipment and Appearance:**
  **(Uniform Attire in Public View)**

    Members and employees shall, while on-duty and absent orders to the contrary, be attired and equipped in the manner set forth in this Order, and shall present a conservative, professional appearance. Absent a supervisor's authorization, uniformed members shall wear all required uniform items while in public view.

- **VPD General Order J-6, III, B: Ride-Along Program**

    III.   PROCEDURES

        A. The ride-along program is intended to be instructive and public relations-oriented.  A Watch Commander or other competent authority shall approve host personnel and screen participants.

        B. Individuals expressing an interest in the ride-along program shall be referred to the Watch Commander of the shift on which they wish to participate.

## INTERNAL AFFAIRS INVESTIGATION
### IA # 2013-03

1. The Watch Commander shall schedule an appropriate member or employee to host the approved ride-along applicant.

2. Ride-along applicants must sign a Waiver of Liability form before participating in the program. The host member or employee shall complete the form and have it signed before the ride-along tour begins.

3. The host member or employee shall submit the signed waiver form, together with other authorization documents, if applicable, to the Professional Standards Division, via the Duty Status mailbox.

# **Investigation**

On Tuesday, August 20, 2013, I was directed by Chief of Police Joseph Kreins to initiate an Internal Affairs Investigation into the allegations of inappropriate conduct while on-duty by Officer Chase Calhoun, Badge #624. ████████████████ reported that she had been having a sexual relationship with Officer Calhoun while he was in uniform, on-duty, and most times while inside a police vehicle. ████████████ reported these sexual encounters occurred at remote locations in Vallejo, Mare Island, near Alco Recycling, and in the Glen Cove area of East Vallejo.

**During the initial stages of this investigation, I retrieved the following information which is contained in Binder 1 of 2:**

- Attachment 1    2012/2013 Patrol Rosters which reflect Officer Calhoun's Duty Assignments: March 2012 - January 09, 2013
  * Adam Unit (Two officer car) Transport, and Solo Status *

- Attachment 2    2012/2013 Patrol Rosters which reflect Officer Calhoun's Duty Assignments: March 2012 - January 10, 2013
  * Adam Unit (Two officer car) or Vacation *

- Attachment 3    2013 Patrol Rosters which reflect Officer Calhoun's Duty Assignments: January 2013 - August 17, 2013
  *Adam Unit (Two officer Car) or Vacation *

- Attachment 4    2013 Patrol Rosters which reflect Officer Calhoun's Duty Assignments: January 2013 - August 18, 2013
  * Adam Unit (Two officer Car), Transport, and Solo status*

# INTERNAL AFFAIRS INVESTIGATION
## IA # 2013-03

- **Attachment 5**     Email memo from Lt. K. Park to Captain L. Horton 08/20/2013 @ 10:45 AM; Potential problem, Officer Misconduct: Memo detailing allegations of misconduct

- **Attachment 6**     Email directive from Chief of Police Joseph Kreins to Lt. DeJesus; Collection of Officer Calhoun's duty weapon, ID card, and Badge; 08/21/2013 @ 7:30 PM

- **Attachment 7**     Notification of Administrative Leave Form issued to Officer Calhoun by Captain O'Connell

- **Attachment 8**     CAD report DMV printout with Photo for ▮▮▮▮▮▮▮▮ CDL: ▮▮▮▮▮▮; 08/20/2013 @12:00 PM

- **Attachment 9**     Police Officer Photo Lineup (Caucasian Officers to include Officer Calhoun) shown to ▮▮▮▮▮▮

- **Attachment 10**     Police Officer Photo Lineup (Asian Officers to include Officer Tolentino) shown to ▮▮▮▮▮▮

- **Attachment 11**     Single color photo of Officer Calhoun

- **Attachment 12**     Vallejo Police Department Administrative Memorandum Witness Officer Notification of interview, Officer R. Tolentino 08/21/2013

- **Attachment 13**     DMV color photo of ▮▮▮▮▮▮▮▮, positive ID by Tolentino, 08/21/2013

- **Attachment 14**     Vallejo Police Department Police Officer Interview Form POBAR, list of allegations, and Lybarger Admonishment Officer Calhoun, 08/30/2013

- **Attachment 15**     Email from Lt. DeJesus to IA Administrative Assistant Craige Flater: List of associated wave files related to Case investigation (List attached) 09/02/2013 @ 3:46 PM

- **Attachment 16**     Email from Lt. DeJesus to IA Administrative Assistant Craige Flater: Request to create CD from VIEVU interview Of Officer Calhoun, 09/02/2013 @ 4:46 PM

- **Attachment 17**     Digital Interviews (CD)

## INTERNAL AFFAIRS INVESTIGATION
### IA # 2013-03

- Attachment 18    Eight color photographs of Alco Mare Island, MITC
  Mare Island Training Center, Gilcrest, Glen Cove Marina
  (Still images captured from VIEVU)

- Attachment 19    Applicable General Orders under review:

  o  B-1, I-B: Standards of Conduct, (Conduct
     Unbecoming)
  o  B-1, III, B1.4: Availability for Duty
  o  B-1, III, B1.14: Performance of Duty
  o  B-1, III, B1.21: Idling on Duty
  o  B-1, III, B1.35: Obedience to Laws and Regulations
  o  H-2, F.4: Using Vehicle for other than Police Purpose
  o  H-8, 1.B: Uniform Attire in Public View
  o  J-6, III, B: Ride-Along Program

**Binder 2 of 2 contains digital interview transcripts as follows:**

Transcript 1    **Audio file name:  DW_A0403**
               **Phone contact:** ▐███████████

Transcript 2    **Audio file name:  DW_A0404**
               **Interview of:** ▐████████████  [Audio 1]

Transcript 3    **Audio file name:  DW_A0405**
               **Interview of:**  Officer Ritzie Tolentino

Transcript 4    **Audio file name:  DW_A0406**
               **Admin. leave notification:**  Officer Chase Calhoun [Audio 1]

Transcript 5    **Audio file name:  DW_A0407**
               **Admin. leave notification:**  Officer Chase Calhoun  [Audio 2]

Transcript 6    **Audio file name:  DW_A0408**
               **Interview of:** ▐████████████  [Audio 2]

Transcript 7    **Audio file name:  DW_A0409**
               **Phone message for:** ▐███████████

Transcript 8    **Audio file name:  DW_A0410**
               **Phone conversation with:** ▐██████████████████

Transcript 9    **Audio file name:  DW_A0411**
               **Phone interview of:** ▐████████████

## INTERNAL AFFAIRS INVESTIGATION
## IA # 2013-03

Transcript 10      **Audio file name:** DW_A0413
**Phone message for:** ▮▮▮▮▮▮

Transcript 11      **Audio file name:** DW_A0414
**Phone interview of:** ▮▮▮▮▮▮

Transcript 12      **Audio file name:** DW_A0415
**Phone interview of:** Officer Kyle Wylie

Transcript 13      **Audio file name:** DW_A0416
**Phone interview of:** Sergeant Brett Clark

Transcript 14      **Audio file name:** DW_A0417
**Phone conversation with:** ▮▮▮▮▮▮

Transcript 15      **Audio file name:** DW_A0422
**Interview of:** Officer Chase Calhoun

### Interview of Witness Sarah Elmossalamy

On August 21, 2013 @ 0900 hrs, I met with and personally interviewed ▮▮▮▮ ▮▮▮▮ in the Professional Standards Office of the Vallejo Police Department. This interview was digitally recorded and contained in file on CD as Attachment #17 (Binder 1). The following is a summary of my interview with ▮▮▮▮ on the above stated date, in addition to a second personal interview which I conducted the following day, August 22, 2013.  All recorded statements confirm the documented allegations which she shared with Lt. K. Park in a phone call on August 20, 2013, which he documented in an email that is identified as Attachment #5 (Binder 1).

▮▮▮▮ confirmed that she met Officer Chase Calhoun in March of 2012 while living at ▮▮ Santa Clara Street.  She stated that Officer Calhoun and a second officer, described as being "Filipino" (later identified as Officer Ritzie Tolentino), responded to a CFS (call for service) in relation to a "possible reckless Go-Cart".

▮▮▮▮ stated that Officer Calhoun approached her and some of her friends who were watching the police contact, and remembered him saying that she did not look like she was from Vallejo. ▮▮▮▮ said that Officer Calhoun asked for her phone number, which she gave him, and indicated that is when their relationship effectively began.

▮▮▮▮ confirmed that from April, 2012 through February, 2013, while she lived at ▮▮ Santa Clara Street, she and Officer Calhoun engaged in sexual intercourse once or twice a week while he was on-duty, in uniform, and in most cases inside his assigned Vallejo Police vehicle, next to "Alco Recycling" on Mare Island. She also confirmed there were at least two occasions where he came to her home, while on-duty, in uniform, and had sexual intercourse with her in her bedroom. ▮▮▮▮

**INTERNAL AFFAIRS INVESTIGATION**
**IA # 2013-03**

stated Officer Calhoun would prefer to either pick her up in his police car, or have her drive out to Mare Island in her own personal vehicle, then get in his police car where he would then drive to a remote area just south of "Alco" where they would engage in sexual intercourse.

I asked ██████████ to describe how they would have sexual intercourse while inside a police vehicle considering the confined space which existed. She began by describing the interior of our police vehicles, explaining the configuration of the console, placement of the two guns which were between the seats, then described how the MDT (Mobile Data Terminal) had the ability to speak or read each of the messages would come across the screen. ██████████ stated that "Chase would recline his seat", "remove his snaps" (keepers), drop his pants, and she would climb over the center console, mount him and they would engage in full-on sexual intercourse. ██ ██████ stated at first they were using condoms, but because she was using birth control, they stopped, and he would ejaculate inside her. ██████████ confirmed that on occasion, she would orally copulate Officer Calhoun, and that he would ejaculate in her mouth, or sometimes on her pants.

██████████ confirmed that on one occasion, Officer Calhoun picked her up in his police car and drove to a building on Mare Island, later determined to be MITC (Mare Island Training Center). They went into the building to have sexual intercourse but, because another officer then arrived, she was forced to hide inside a broom closet until that officer left. ██████████ confirmed once the other officer departed, they also left and she could not recall where else they went.

██████████ stated that for a brief period, they broke off the relationship between July and August of 2012, because of Officer Calhoun not being "attentive enough", but they resumed the relationship during the "riots at city hall". ██████████ stated that she "texted" Officer Calhoun out of concern for his safety, and that is when they began to communicate again.

██████████ said that on September 7, 2012, she left for Ethiopia, and returned on November 29th; on December 4th, she called Officer Calhoun, who was on-duty, very early in the morning. She stated that he complained of being tired, so she brought him some coffee and met him behind "Alco" and they again visited without having sexual intercourse.

██████████ said the next time they had sexual intercourse was on December 14, 2012. Officer Calhoun drove in a marked police vehicle to her house while on-duty and in uniform and had sexual intercourse with her in her bedroom. She then confirmed the next sexual encounter she had inside his police car was on December 20th, at "Alco" on Mare Island, where she performed "oral sex" on him. In January of 2013, she, along with some of her roommates, decided to relocate due to the increased level of violence in the area of ████ Santa Clara Street. She indicated that ultimately she, along with her roommates, moved to ████ Fulton Ave. in Glen Cove, but because of a vehicle accident she was involved in on January 29, 2013, in which she sustained serious injuries, she moved in with her mother, who resides in Martinez, CA. ██████████ stated she

**INTERNAL AFFAIRS INVESTIGATION**
**IA # 2013-03**

continued living in Martinez for six months, and kept in touch with Officer Calhoun via phone, text, or she would come to the ▬▬▬ Fulton Ave. address once a month to pick up and drop off school assignments.

▬▬▬▬▬▬▬ stated each time she would come to Vallejo, she and "Chase" would meet and have sexual intercourse in what she described as a remote area of "Glen Cove" in a "wooded area". ▬▬▬▬▬▬▬ stated Officer Calhoun would pick her up in his police car, while he was on-duty and in uniform, and drive her to the above described area where they would have sexual intercourse in the same form and fashion as when on Mare Island. ▬▬▬▬▬▬▬ stated she moved back to the Fulton Ave. address in June of 2013, and from then until July 31st, she and Officer Calhoun had sexual intercourse at least two more times in the same area. She also spoke about Officer Calhoun having picked her up in a police car, while on-duty, and in uniform, and they would drive to the "Glen Cove Marina" and just talk. She confirmed they never had sex at this location, and would always drive to the "wooded area" which she described as "remote" in order to have sexual relations.

▬▬▬▬▬▬▬ also spoke about being driven to a "brown building," a "building of authority" on top of a hill, which I later determined to be "Gilcrest", the Vallejo Police Department Traffic Office (452 Gilcrest Ave.). ▬▬▬▬▬▬▬ stated that Officer Calhoun would back his police car in on the side of the building where it was dark, and they would talk. She did not speak about having sexual intercourse at this location.

On August 7, 2013, @ 11:00 pm, ▬▬▬▬▬▬▬ said she received a text message which contained a wedding photo of "Chase" and his wife ▬▬▬▬▬▬▬. She said the text confirmed that "Chase" was married, but that he never spoke of being married, nor had he ever worn a wedding ring. ▬▬▬▬▬▬▬ confirmed that she and ▬▬▬▬ connected over the phone, and developed a relationship based upon both of them feeling they were deceived by "Chase". ▬▬▬▬▬▬▬ said it was then that she found out that "Chase" was seeing another woman whom ▬▬▬ identified as ▬▬▬, a Filipino female". She stated that she attempted to call ▬▬▬ to warn her about "Chase", but received a less than welcoming response from ▬▬▬.

▬▬▬▬▬▬▬ stated that she confronted "Chase" about this issue and his response was that something was wrong with him, which is ultimately why she felt compelled to report this to the Vallejo Police Department, hoping that the Department could get him the psychological help he needed.

The last time ▬▬▬▬▬▬▬ said that she saw and/or spoke with Officer Calhoun was when he met her for lunch in Brentwood, CA where she works. She stated that "Chase" was asking her not to report this to the police department, and that he would get the therapy he needed. She remained concerned for him and his on-the-job "partners". When she discovered on August 18th that "Chase" had not taken any affirmative steps toward getting some help, she realized she would have to come forward.

## INTERNAL AFFAIRS INVESTIGATION
## IA # 2013-03

On August 30, 2013, I arranged to drive ████████████ around Mare Island, MITC (Mare Island Training Center), and the areas in Glen Cove where she claims to have been taken by Officer Calhoun. This contact was documented on VIEVU, and digital photos were printed and are in the file as Attachment #18 (Binder 1). ████████████ was able to confirm the area just south of "Alco" where they would park, MITC, where she was taken and required to hide inside a broom closet, and the Glen Cove Marina where she and Officer Calhoun would go and talk. ████████████ was unable to locate the "remote, wooded area" where they would go, saying that each time it was always dark and she could not recall how to get there. That area was later confirmed to be a PG&E power plant by Officer Calhoun.

For further details, please refer to Transcripts #2 & #6 (Binder 2).

### <u>Interview of Witness Officer R. Tolentino, Badge #625</u>

On August 21, 2013 @ 1530 Hrs, I met with Officer R. Tolentino, Badge #625, in the Professional Standards office of the Vallejo Police Department. This interview was digitally recorded and is contained in the file on CD as Attachment #17 (Binder 1). The following is a summary of my interview with Officer Tolentino who confirmed that he understood he was being interviewed as a witness officer and not as a subject of the investigation. Officer Tolentino also understood that he would be compelled to answer all questions related to this matter truthfully. The following is a summary of this interview:

I began by showing Officer Tolentino a photograph of ████████████, asking him if he recognized the person depicted in the photograph. Officer Tolentino stated that he could not identify the person by name, but recognized her as a woman he and Officer Calhoun met in the area of Tennessee and Santa Clara Street while covering Lieutenant K. Park on a traffic stop at that location.

Officer Tolentino stated that he and Officer Calhoun were an "Adam Unit" (Two Man Car), and the traffic stop was in relation to a 23103 CVC (Reckless Motorcycle). Officer Tolentino said that Lt. Park left the area prior to the contact he and Officer Calhoun had with ████████████.

Officer Tolentino stated what he remembered was ████████████ walking up to their patrol vehicle acting very friendly and she began speaking with Officer Calhoun. Officer Tolentino stated he was in the passenger seat and was contacted by some of ██ ████████████ friends, and that he was uncertain as to what was said between Officer Calhoun and ████████████. Officer Tolentino stated that he knew that ██ ████ gave Officer Calhoun her phone number, but he was uncertain if Officer Calhoun gave her his phone number. He claims to have only seen ████████████ twice, once at the traffic stop in March, and then again outside of Touro University during a school-sponsored function in December of 2012. Officer Tolentino stated that he was uncertain as to how he and Officer Calhoun were made aware of the function

**INTERNAL AFFAIRS INVESTIGATION**
**IA # 2013-03**

which could have been relayed through text messages from ███████████ to Officer Calhoun.

Officer Tolentino confirmed that three weeks after having met ███████████, he knew that she and Officer Calhoun were exchanging "multiple text messages" which Officer Calhoun admitted were from ███████████. Officer Tolentino said he did not know what the contents of the text messages were, nor was he aware they had established a relationship beyond that of texting. Officer Tolentino stated that he and Officer Calhoun were not very close, and he did not prefer to ride with him because he did not like his style of policing.

Officer Tolentino stated that he and Officer Calhoun worked the same patrol shifts which consisted of them working on Squad 6, from March 2012 - September 2012. He then said both he and Officer Calhoun were switched to Squad 4, from September 2012 to December of 2012.  For further details, please refer to Transcript #3 (Binder 2) of the actual interview.

### Phone Interview of Witness ███████████

On August 22, 2013, I contacted ███████████, estranged wife of Officer Chase Calhoun, via phone and arranged to meet with her at my office on Saturday, August 24, 2013. ███████████ indicated she was traumatized by this entire event, and confirmed having knowledge of her husband (Officer Calhoun) being involved with at least "two other girls". This conversation was digitally recorded and is on CD as Attachment #17 (Binder 1).

Ms. Calhoun stated she spoke with ███████████ and also knew of an "Asian" female identified only as ███████████ stated she was at work and not in a position to talk with me, but would be willing to discuss these issues with me on the 24th.

On Friday, August 23, 2013, I received a phone call from ███████████ who informed me that, on the advice of her physician, she would not be meeting me for the interview, and would rather put all of this behind her. ███████████ also stated that what I wanted to discuss was personal and should be kept between herself and Officer Calhoun.

On October 18, 2013, I received another phone call from ███████████ who requested that I meet with her as she was now ready to discuss issues with me and felt as if she "was in a better place".

I met with ███████████ at ███ Ida Drive in Concord, CA, where she was currently living. ███████████ was unable to provide detailed information about Officer Calhoun's relationships with ███████████ and ███████████ was hoping that I could provide her with legal advice related to her safety and her growing concern for the psychological health of Officer Calhoun about whom she seemed to be unsettled.

## INTERNAL AFFAIRS INVESTIGATION
## IA # 2013-03

This interview did not yield anything of significance in relation to this administrative investigation. For further details, please refer to Transcript #7 (Binder 2).

### Phone Interview of Witness Officer Kyle Wylie, Badge # 570

On August 28, 2013, I conducted a phone interview with Officer Wylie which was digitally recorded and is on CD as Attachment #17 (Binder 1). Officer Wylie confirmed that he understood he was being interviewed as a witness officer and not the subject of this investigation. Officer Wylie also understood that he would be compelled to answer all questions related to this matter truthfully. The following is a summary of this interview:

Officer Wylie confirmed that he worked with Officer Calhoun as an "Adam Unit" (two man car) in 2012/2013. Officer Wylie stated he had no knowledge of ███████████, or of Officer Calhoun being involved in any type of inappropriate or unprofessional conduct with her.

No further statements were obtained, please refer to Transcript #12 (Binder 2) for further detail.

### Phone Interview of Witness Officer Sergeant B. Clark, Badge #436

On August 29, 2013, I conducted a phone interview with Sergeant B. Clark which was digitally recorded and is on CD as Attachment #17 (Binder 1). Sergeant Clark confirmed that he understood he was being interviewed as a witness officer and not the subject of this investigation.   Sergeant Clark also understood that he would be compelled to answer all questions related to this matter truthfully. The following is a summary of this interview:

Sergeant Clark stated that Officer Calhoun was assigned to "Beat 2" (East side of Vallejo, area adjacent to Glen Cove and 1259 Fulton Ave). Sergeant Clark further stated that Officer Calhoun was primarily a "solo beat officer" and, because of his "rookie status", he was not permitted to have "ride-alongs".

Sergeant Clark spoke of Officer Calhoun having "routinely" missed "Calls for Service", and how dispatch would need to "advise a second time" at which point Officer Calhoun would then answer up for his designated CFS. Sergeant Cark stated he suspected this to be "Rookie Mistakes", and was not overly concerned about this as a performance issue.

Sergeant Clark confirmed that he had no knowledge of ███████████ never saw Officer Calhoun with a citizen ride-along, never saw Officer Calhoun on Mare Island, and was not aware of him being involved in a relationship while on-duty.

**INTERNAL AFFAIRS INVESTIGATION**
**IA # 2013-03**

No further statements were obtained, please refer to Transcript #13 (Binder 2) for further detail.

### Phone Interview of Witness ████████████

On August 27, 2013, I spoke with ████████████ via phone, and this contact was digitally recorded and on CD as Attachment #17 (Binder 1). I asked ████████ if she was friends with ████████████; she confirmed that she was, and they were at one time roommates in Vallejo. ████████ stated that she had recently received a "text message" from ████████, and when asked if she was told what to say while speaking with me, she confirmed that she was not.

I asked ████████ if she knew Officer Calhoun, and she stated that she did not know him personally, but confirmed that Officer Calhoun would come over to their house at ████ Santa Clara Street, Vallejo, CA, and that he would always come around 2:00 am, and stay with ████ in her bedroom. ████████ stated that she knew he was on-duty because he was always in uniform, and they would stay in the room and, based upon the noise, she suspected they were having sexual intercourse.

████████ began talking about how each of the roommates would be upset when Officer Calhoun would come to the house because he would always park his police car in their driveway which nobody thought was "cool"; in addition, each time he would drive by the house, he would shine his spotlight then "text ████ asking her if she thought that was cool."

████████ did not have an independent recollection of Officer Calhoun driving by in his police car and picking up ████████████, but stated ████ would frequently leave in the middle of the night and return a few hours later speaking about having been with Officer Calhoun.

No further statements were obtained, please refer to Transcript #9 (Binder 2) for further details.

### Phone Interview of Witness ████████████

On August 27, 2013, I spoke with ████████████ via phone, and this contact was digitally recorded and is on CD as Attachment #17 (Binder 1). I asked ████████ if she was friends with ████████████, she confirmed that she was, and they were at one time roommates in Vallejo.

████████ confirmed much of the above information provided by ████████, but was reluctant to provide any further details.

No further statements were obtained, please refer to Transcript #11 (Binder 2) for further details.

**INTERNAL AFFAIRS INVESTIGATION**
**IA # 2013-03**

## Interview of Subject Officer Chase Calhoun, Badge #624

On Friday August 30, 2013, I personally interviewed Officer Chase Calhoun in the Professional Standards Unit of the Vallejo Police Department. Officer Calhoun was represented by his Attorney, David Mastagni Jr.  This interview was digitally recorded and videotaped via Vievu and is on CD as Attachment #17 (Binder 1). The following is a summary of my recorded interview with Officer Calhoun:

I asked Officer Calhoun to confirm being ordered to my office for the purpose of this administrative interview, which order he acknowledged. Officer Calhoun requested copies of all audio and video files associated with this interview which I agreed to provide in accordance with POBAR (Police Officer Procedural Bill of Rights).

Officer Calhoun was advised of his POBAR rights, and was also given a Lybarger admonition which he stated he understood; I then asked him to initial each advisement which is in file as Attachment #14 (Binder 1). He was advised of each potential General Order violation under review, and ordered to respond to each question in a truthful manner or be subjected to potential violations of untruthfulness. Officer Calhoun again confirmed that he understood.

I asked Officer Calhoun if he was familiar with ██████████████, and he confirmed that he was, whom he identified by the photograph I provided. I asked Officer Calhoun when he met ██████████████, and he stated March of 2012. Officer Calhoun spoke about having covered Lt. Park on a traffic stop of a "Go-Cart", and that he was riding with Officer Tolentino as an "Adam Unit". Officer Calhoun confirmed that he and Officer Tolentino assisted with the CHP 180 (Impound Report) for the tow truck. He confirmed that he was working Squad #6, weekend swings, from 1430-0300 hrs.

Officer Calhoun stated that ████████ and her friends came up to the police car and began asking questions in relation to what was going on. Officer Calhoun confirmed that he exchanged phone numbers with ████████, and that she, along with her friends, lived at the corner house at Santa Clara @ Tennessee Street (████ Santa Clara Street).

Officer Calhoun stated approximately one week after meeting ████████ in March of 2012, they initiated a sexual relationship. He confirmed that he was not married until September of 2012 to his wife, ██████████████████.

I asked Officer Calhoun to describe his relationship with ██████████████,  For the record, it should be noted that Officer Calhoun appeared to me to have selective memory loss in relation to the frequency of his sexual contacts with ██████████████, and specific dates related to same. Throughout the interview, Officer Calhoun would apologize for not having complete or accurate recall based upon the self-described traumatic series of events surrounding his life over the previous few weeks prior to this interview.

Officer Calhoun described the relationship he had with ██████████████ as "friends with benefits", and that it was purely a sexual relationship and they were not really dating.

## INTERNAL AFFAIRS INVESTIGATION
### IA # 2013-03

Officer Calhoun stated that he did not tell ███ he was engaged, or preparing to get married, but instead told her that he wanted to "hang out".

I asked Officer Calhoun if he had ever gone to ███ house located at ███ Santa Clara Street, to have sexual intercourse while on-duty and in uniform. He confirmed that he had gone to her house and had sexual intercourse while on-duty, and stated he "slept with her". Officer Calhoun would attempt to minimize the time that it would take for him to complete these sexual acts by describing the duration of time as lasting only 10 to 15 minutes at a time.

I asked Officer Calhoun where else he routinely met ███, and he stated he would pick her up in his police car and drive her to Mare Island, where he would drive towards the North-West corner of "Alco Metal Scrap" and park on the side of the building. I showed Officer Calhoun photos of "Alco" and the area around same and he confirmed that was the area he and ███ would go to have sexual intercourse while inside his police vehicle. Officer Calhoun wanted to point out that he and ███ would not always have "sex", and that sometimes he would pick her up and they would "just talk". He also confirmed that ███ would also perform "oral sex" on him while inside his police car in the same general area of "Alco". Officer Calhoun stated they initially were using condoms, but because of ███ being on the pill, they stopped. Officer Calhoun confirmed he would on most occasions ejaculate inside her vagina or in her mouth if she was performing oral sex.

I asked Officer Calhoun to describe how he and ███ would complete the actual sex act while inside a police vehicle considering the confined space which existed. Officer Calhoun stated he had "penis-vaginal" sex one time while on Mare Island and, while seated in the driver's seat, ███ would "mount" and "face" him, and they would have sex until he ejaculated.

As a result of Officer Calhoun appearing to minimize the amount of times he and ███ would actually have sexual intercourse while in a police car on Mare Island, I asked him why ███ reported having had sexual intercourse with him while inside a police car at least two times a week. Officer Calhoun stated the only logical explanation he could provide was that ███ was "mad and upset".

Officer Calhoun began apologizing for "going off topic," stating he realized that he "messed up", but that ███ was "motivated to destroy his career". He stated that ███ was mad that he did not want to continue with the relationship. Officer Calhoun again attempted to confirm that he had oral sex a couple of times in the police car, and sexual intercourse once.  Officer Calhoun also stated that ███ would meet him on Mare Island sometimes, driving her own car. She would park, then get into his police vehicle and they would park in the same area as described and have sexual intercourse.

I asked Officer Calhoun if there was any other location to which he may have taken ███ to have sex while inside his police car, and he stated the first time he picked ███ up at her house, he gave her a tour of Mare Island, but they did not have sexual intercourse. Officer Calhoun made no mention of having taken her to MITC

**INTERNAL AFFAIRS INVESTIGATION**
**IA # 2013-03**

(Mare Island Training Center), and when I showed him a photograph of same, only then did he admit to having brought her to that location one time. Officer Calhoun stated that, while at MITC with ███, she was forced to hide in a broom closet in the back bathroom because another unidentified officer had shown up.  Officer Calhoun was unable or unwilling to provide me with the name of that officer saying he could not recall who it was. Officer Calhoun could not remember the date of that incident, but confirmed they did not have sexual intercourse.

I asked Officer Calhoun if he ever had ███ sign a "Ride-Along Waiver" form, or if he ever had obtained a supervisor's permission to have a "Ride-Along," and he confirmed that he had not done so on both counts, and that was something he took upon himself.

I asked Officer Calhoun, while he was having sexual intercourse with ███ both at her house and while on Mare Island, how was he handling his CFS (Calls for Service) while on-duty. Officer Calhoun said he could not remember, but that he "never blew off his calls", and that he regularly took his "Code 7's" (Lunch Breaks) and breaks during periods when he would not have any CFS.  Officer Calhoun stated that he always went to his calls.

I asked Officer Calhoun if he worked "indirectly" with Sergeant Clark, as he confirmed that his immediate Supervisor was Sergeant Whitney, and that Sergeant Clark worked the "on-coming shift, graveyard". I asked Officer Calhoun if he ever recalled Sergeant Clark speaking to him about routinely missing the initial broadcast of CFS, and dispatch having to send out a "tone" or to re-broadcast the call until he answered up. Officer Calhoun stated that he could not remember if Sergeant Clark spoke to him, but that it was possible he did. Officer Calhoun repeated several times that he was having a difficult time, "lots of issues" in his life, going through a hard time".

I asked Officer Calhoun to confirm how many times he had gone to ███ home at ███ Santa Clara Street, and had sex with her while on-duty; he confirmed that he had sex with her "a couple of times" while on-duty.  I asked if it would consist of him texting ███ and asking her if anyone was home before he would come over, and he stated that he could not remember. I asked Officer Calhoun if he was concerned if anyone was home whenever he would come to visit, and he stated that he was because he did not want anyone to see him there on-duty and in uniform. I asked if he retained any of those text messages and he stated that he did not, because he was getting married and did not want to retain them for obvious reasons.

I asked Officer Calhoun if he continued seeing ███ after getting married in September of 2012. Officer Calhoun confirmed that he had, and that ███ went to Ethiopia in September, and didn't return until the end of November, 2012. Officer Calhoun confirmed that upon her return, they resumed their relationship and continued having sexual intercourse inside his police car while on Mare Island.

Officer Calhoun again spoke about only having sexual intercourse inside a police car once, a few times while in "Glen Cove", but "it wasn't a bunch of times".

## INTERNAL AFFAIRS INVESTIGATION
### IA # 2013-03

Officer Calhoun confirmed that, in January of 2013, he and Officer Tolentino met ███ on Mare Island for a Touro University "Gala". He confirmed having received a text message from ███ who invited him over. Once he and Officer Tolentino arrived, they "hung out" for a short period, and because they were on-duty, they did not stay long.

I showed Officer Calhoun a photograph of Gilcrest, Vallejo PD Traffic Office, less than a mile from ███ Fulton Ave., home of ███ after February 1, 2013. I asked Officer Calhoun the significance of the photo, and he stated at first that he was unsure, and that it didn't mean anything. I asked Officer Calhoun if he had ever brought ███ up to Gilcrest and he confirmed that he had picked her up at ███ Fulton Ave., then drove her there. Officer Calhoun stated "I've got to be honest, I can't recall having sex there". I asked Officer Calhoun whether, once ███ moved to ███ Fulton Ave., had he ever had sexual intercourse with her at that location while in uniform and on-duty. He stated that he had sex with her once while on-duty at this house.

Officer Calhoun stated that while in Glen Cove, he would drive ███ to the PG&E power plant where they had sexual intercourse twice while he was on-duty and in a police car. He described the area as being between North and South Regatta, which is the "Wooded area" ███ was unable to locate.

I asked Officer Calhoun how he would deal with his CFS while in such a remote location. Officer Calhoun provided me with the same response, saying that he "would never blow off calls", and that he would be out of service no more than 30 minutes. Officer Calhoun confirmed that he would also drive ███ to the Glen Cove Marina where they would park and just talk, but they never had sex at that location. This was also confirmed by ███ who recognized the area when driven there on August 30, 2013.

I asked Officer Calhoun when the last time was that he saw ███ while on-duty, and again he stated that he could not recall, that his life was a mess, and that he would have to refer to his text messages.

Officer Calhoun stated that he met ███ two to three weeks prior to this interview while off-duty in Brentwood, CA, where she works. He stated they had lunch at BJ's where they spoke about life's issues, and he apologized. He was hoping to convince her not to speak to the Chief of Police as she told him she would, and he asked her to not destroy his career. Officer Calhoun stated that ███ threatened him by saying she was going to get him fired.

Officer Calhoun again started talking about his life being a complete mess, but he was not going to let ███ control his life by holding this over his head. He stated he terminated their relationship, and he has not seen her since.

I asked Officer Calhoun about his relationship with ███, whom he currently is seeing. I asked how he met ███, and Officer Calhoun stated that he pulled her over for a traffic violation in the area of the Target Center on Turner Parkway. He stated that he did not issue her a citation, but asked her for her phone number and that

**INTERNAL AFFAIRS INVESTIGATION**
**IA # 2013-03**

is how their relationship began. Officer Calhoun stated ▇▇▇▇ was a resident of Vallejo, and she lived at the Ascot Street Apartments. He stated that he never picked ▇▇▇▇ up in his police car, nor had sex with her while on-duty, or while in his police car. He claimed he dated her only while off-duty, and that she has since moved to Fresno, CA.

I asked Officer Calhoun if he was ever concerned about the consequences of his actions. He stated that he was, and could not understand why he allowed himself to do what he did. Officer Calhoun stated that he understood all the problems associated with his choices.

The nature of Officer Calhoun's relationship with ▇▇▇▇ could not be confirmed, because ▇▇▇▇ refused to return any of my phone calls.

For further details of this interview, please refer to Transcript #15 (Binder 2)

## Conclusions and Findings

The purpose of this investigation was to determine whether Officer Chase Calhoun's alleged on-duty conduct with ▇▇▇▇ between March of 2012 and August of 2013, violated Vallejo Police Department General Orders, as follows:

- **VPD General Order B-1, I-B: Standards of Conduct (Conduct Unbecoming)**

*Members and Employees shall conduct their private and professional lives in such a manner as to avoid bringing disrepute upon themselves, the department, the City of Vallejo and the Police Service. The absence of a specific rule commanding or forbidding a particular act does not preclude administrative action where an individual's behavior violates this provision.*

**During this investigation, it was determined that Officer Chase Calhoun was in violation of the above listed VPD General Order.**

During the course of this investigation, ▇▇▇▇ alleged to have had multiple consensual sexual encounters with Officer Chase Calhoun while he was on-duty, in uniform, while inside a VPD patrol vehicle. These allegations were corroborated by Officer Calhoun through his own admissions, which uncontrovertibly establish that this employee had sexual intercourse with ▇▇▇▇ while he was on-duty, in police uniform, while in a VPD patrol vehicle. This conduct brought Officer Calhoun, this Department and the City of Vallejo into disrepute.

As a result of the evidence developed in this investigation, this allegation is found to be **Sustained**.

## INTERNAL AFFAIRS INVESTIGATION
## IA # 2013-03

- ### VPD General Order  B-1, III, B1.4: Availability for Duty

*Personnel shall not conceal themselves from the public, nor fail to answer any call directed to them, except to accomplish a police purpose. Uniformed personnel in field assignments shall inform the Communications Section of location and duty status changes.*

**During this investigation, it was determined that Officer Chase Calhoun was in violation of the above listed VPD General Order.**

During the course of this investigation, I was able to confirm the actual locations where Officer Calhoun would drive ▉▉▉▉▉▉▉ for the purpose of having sexual intercourse. These locations were established to be in remote areas concealed from the general public where Officer Calhoun could assure himself of the privacy he would need to complete these sexual encounters. The location on Mare Island near Alco Recycling, which is located on the furthest North-West corner of the Island, the PG&E substation in Glen Cove, and Gilcrest, would necessarily take Officer Calhoun out of service for extended periods and very likely resulted in missed or delayed responses to Calls for Service as confirmed by Sergeant B. Clark.

Officer Calhoun would not advise Communications of his duty status changes which occurred each time he allowed ▉▉▉▉▉▉▉ into his police car which also took him out of service by his own action.

As a result of the evidence developed in this investigation, this allegation is found to be **Sustained**.

- ### VPD General Order  B-1, III, B1.14:  Duty Responsibilities

*Although periodically relieved of duty, members are at all times subject to recall. They shall respond expeditiously to calls for service directed to them, lawful orders of competent authorities and request for assistance from citizens, and shall perform their duties promptly. The administrative delegation of duties to various units of the department does not relieve members and employees from taking action outside the scope of their normal assignments when necessary.*

**During this investigation, it was determined that Officer Chase Calhoun was in violation of the above listed VPD General Order.**

By virtue of Officer Calhoun taking himself out of service without lawful and/or reasonable justification, he was not in a position to respond expeditiously to calls for service either directed to him by Communications, or calls from other uniformed officers who may have needed assistance or backup, or from citizens of this City. By virtue of him having an unauthorized civilian inside his police car, he was no longer in a position to respond and/or perform his duties in a prompt or safe manner.

As a result of the evidence developed in this investigation, this allegation is found to be **Sustained**.

## INTERNAL AFFAIRS INVESTIGATION
### IA # 2013-03

- ### <u>VPD General Order B-1, III, B1.21: Idling on Duty</u>

*Personnel shall not sleep on duty, nor shall they except at meals and during breaks, engage in personal activity not directly related to the performance of duty. Any exception requires the specific authorization of the pertinent Bureau Commander.*

**During this investigation, it was determined that Officer Chase Calhoun was in violation of the above listed VPD General Order.**

The sexual activity Officer Calhoun purposely and willingly engaged in while on-duty and in police uniform was purely personal activity wholly unrelated to the performance of his duty. Although uniformed officers are entitled to one 45 minute meal break, and two 10 minute breaks, such break/meal times in no way justify or excuse Officer Calhoun's repeated sexual escapades while on-duty.

As a result of the evidence developed in this investigation, this allegation is found to be **Sustained.**

- ### <u>VPD General Order B-1, III, B1. 35: Obedience to Laws, Regulations and Orders</u>

*Members and employees shall obey all laws and ordinances, and all General Order and Special Orders of the Department. They shall perform their duties as required or directed by law, department policy, department training guidelines or order of a superior officer or other proper authority. While assigned by the department to another jurisdiction, members and employees are additionally subject to the rules and orders of that jurisdiction.*

**During this investigation, it was determined that Officer Chase Calhoun was in violation of the above listed VPD General Order.**

This investigation establishes that Officer Calhoun intentionally, repeatedly and flagrantly violated all orders listed in this administrative case investigation.

As a result of the evidence developed in this investigation, this allegation is found to be **Sustained.**

- ### <u>VPD General Order H-2, F.4: Using Vehicle for other than Police Purpose</u>

*Personnel shall transport citizens in department vehicles only when necessary to accomplish a police purpose.*

**During this investigation, it was determined that Officer Chase Calhoun was in violation of the above listed VPD General Order.**

Officer Calhoun on multiple occasions transported ▮▮▮▮▮▮▮▮▮▮ in a police vehicle for the sole purpose of conducting his sexual escapades. ▮▮▮▮▮▮▮▮ was not involved in any official police action, investigation, or identified as a victim in relation to a crime.  By repeatedly transporting this civilian to remote areas and then parking

**INTERNAL AFFAIRS INVESTIGATION**
**IA # 2013-03**

there, Officer Calhoun endangered her, displaying little regard for her physical safety. As a result of the evidence developed in this investigation, this allegation is found to be **Sustained**.

- **VPD General Order H-8, 1.B: Uniform Attire in Public View**

*Members and employees shall, while on-duty and absent orders to the contrary, be attired and equipped in the manner set forth in this order, and shall present a conservative, professional appearance. Absent a supervisor's authorization, uniformed members shall wear all required uniform items while in public view.*

**During this investigation, it was determined that Officer Chase Calhoun was in violation of the above listed VPD General Order.**

Officer Calhoun was in violation of this order each time he elected to remove his duty belt and disrobe for the purpose of having sexual relations. Although Officer Calhoun would select remote areas thought to be out of public view, during late hours, this created only the illusion of privacy in his mind. Alco Recycling is a large public business located on Mare Island. The P&E power plant is located in a residential neighborhood in Glen Cove with a driveway off a public street which could have been accessed by any number of people. Gilcrest, located at 452 Gilcrest Ave., sits in a residential neighborhood on a public street with less than 50 feet of separation from the home located just north of the location. Officer Calhoun was on-duty but in flagrant violation of this order while partially undressed and engaged in sexual relations.

As a result of the evidence developed in this investigation, this allegation is found to be **Sustained**.

- **VPD General Order J-6, III, B: Ride-Along Program**

*Individuals expressing an interest in the ride-along program shall be referred to the Watch Commander of the shift on which they wish to participate.*

1. *The Watch commander shall schedule an appropriate member or employee to host the approved ride-along applicant*

2. *Ride-along applicants must sign a waiver of liability from before participating in the program. The host member or employee shall complete the form and have it signed before the ride along tour begins.*

3. *The host member or employee shall submit the signed waiver form together with other authorization documents. If applicable to the Professional Standards Division via the duty status mailbox.*

**During this investigation, it was determined that Officer Chase Calhoun was in violation of the above listed VPD General Order.**

Officer Calhoun violated this order on multiple occasions by repeatedly and purposely failing to obtain all the necessary authorizations by the on-duty Watch Commander who is the appointing authority for the Ride-Along program. Officer Calhoun failed to obtain a Ride-Along waiver and have ████████████ relieve this department and the City of

## INTERNAL AFFAIRS INVESTIGATION
### IA # 2013-03

Vallejo from any degree of liability should an accident, officer involved shooting, or tragic event have occurred resulting in her injury or death while she was an unauthorized passenger in a police vehicle. Officer Calhoun by his own admission failed to complete a single Ride-Along waiver form for all the times ███████████ was a passenger in his assigned police vehicle.

As a result of the evidence developed in this investigation, this allegation is found to be **Sustained.**