**CLAUDIA M. QUINTANA**
City Attorney, SBN 178613
**By:     FURAH Z. FARUQUI**
Deputy City Attorney, SBN 233083
**CITY OF VALLEJO**, City Hall
555 Santa Clara Street, P.O. Box 3068
Vallejo, CA  94590
Tel:     (707) 648-4545
Fax:     (707) 648-4687

Attorneys for Defendants, CITY OF VALLEJO, ROBERT NICHELINI, CHASE CALHOUN

NICK CASPER
Attorney at Law, SBN 244637
**CASPER, MEADOWS, SCHWARTZ & COOK**
A Professional Corporation
2121 North California Blvd., Suite 1020
Walnut Creek, California  94596
Tel:  (925) 947-1147
Fax:   (925) 947-1131

Attorneys for Plaintiffs ERIKA GREGORY and LOREN MOLLNER

## UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| ERIKA GREGORY and LOREN MOLLNER, <br><br>          Plaintiffs, <br><br> vs. <br><br> CITY OF VALLEJO; former VPD CHIEF ROBERT NICHELINI, individually and in his official capacity; VPD OFFICER CHASE CALHOUN, individually; and DOES 1 through 50, <br><br>          Defendants. | CASE NO.: 2:13-CV-00320-KJM-KJN <br><br> **JOINT PRETRIAL CONFERENCE STATEMENT** <br><br><br> **JUDGE:      Hon. Kimberly J. Mueller** <br> **DATE:       January 8, 2015** <br> **TIME:       3:00 p.m.** <br> **CRTRM:    3, 15th Floor** <br><br> **TRIAL DATE: January 26, 2015** |

          Pursuant to the court's minute order dated November 5, 2014, the parties submit the following updated Joint Pretrial Conference Statement.

**(1)    Jurisdiction – Venue**

Plaintiffs have brought a 42 U.S.C. § 1983 action, with related state law claims, for the fatal shooting of their dog by Chase Calhoun, a Vallejo Police Department ("VPD") Officer at the time, in Vallejo, California on May 16, 2012.

The Complaint seeks remedies pursuant to Title 42, United States Code §§ 1983 and 1988.  Jurisdiction is conferred upon the United States District Court by Title 28, United States Code §§ 1331 and 1343. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

The actions giving rise to Defendants' liability, as alleged in this Complaint, occurred in the City of Vallejo, County of Solano, California, thus venue is proper in this Court  pursuant to 28 U.S.C. § 1391(b), and Local Rule 120(d).

**(2) Jury Trial**

Both parties have demanded a jury trial of all the issues in this matter.

**(3)    Undisputed Facts**

| | |
|---|---|
| 1. | In 2007, Officer Chase Calhoun was hired as a police cadet (a non-sworn employee) by VPD. |
| 2. | Officer Chase Calhoun's police cadet duties consisted of working with the traffic division, providing security at Mare Island and other adjunct locations. |
| 3. | Officer Chase Calhoun attended the Alameda County Sheriff's Department Police Academy from 2009-2010. |
| 4. | After completing the academy, Officer Chase Calhoun was employed by the Alameda County Sheriff's Department as a Sheriff's Deputy. |
| 5. | In 2011, Officer Chase Calhoun departed Alameda County and joined VPD. |
| 6. | After Officer Chase Calhoun completed the field training program, he was assigned to Patrol. |
| 7. | Plaintiffs Erika Gregory and Loren Mollner are a married couple with two children under the age of ten. |
| 8. | Gregory operates her own consulting business in San Francisco with seven employees, and Mollner is employed by the U.S. Coast Guard under the U.S. Department of Homeland Security as a real property specialist. |
| 9. | Plaintiffs own a home at 47 Kentucky Street in Vallejo, where they lived from 2002 until July 2012. |
| 10. | At the time of the incident, Plaintiffs owned three dogs: fourteen-year-old Flicka, eleven-year-old Belle, and Holly, a puppy. |

| | |
|---|---|
| 11. | Belle was a Labrador-Catahoula-mix that weighed approximately 70 pounds, and Flicka was a blind and deaf Border Collie-mix that weighed approximately 40 pounds. |
| 12. | Plaintiffs had owned both Belle and Flicka since they were puppies, having gotten Belle when she was approximately nine weeks old. |
| 13. | After Officer Chase Calhoun completed the field training program, he was assigned to Patrol. |
| 14. | On Thursday or Friday, May 10 or 11, 2012, Gregory was traveling for work and learned that her personal bank account had been overdrawn when there should have been sufficient funds. After looking at copies of deposited checks online, Gregory discovered that someone had stolen six or seven checks from her personal checkbook and fraudulently written and signed these checks in an amount totaling approximately $5,000. |
| 15. | Gregory contacted her bank (Umpqua Bank) to report the theft, and an assigned bank investigator instructed her to file a report with VPD to increase the chances of bank reimbursement. |
| 16. | On May 16, 2012, Officer Chase Calhoun was on duty starting at 7 a.m. |
| 17. | During Officer Chase Calhoun's patrol assignment, he received several commendations. |
| 18. | Calhoun was by himself and not working with a partner that shift. |
| 19. | That day, Officer Chase Calhoun's attire consisted of a full police uniform, a utility belt, handcuffs, a gun and holster, a Taser, pepper spray, a baton, magazines in a magazine pouch, and radio. |
| 20. | The shift was not Calhoun's regularly-assigned shift, and was an extra overtime shift for Calhoun. |
| 21. | Calhoun recalls that he was in his car when he was dispatched to 47 Kentucky Street, but does not recall where in the city he was at the time. |
| 22. | Officer Chase Calhoun was informed by dispatch that Plaintiffs wanted to "speak with an officer to provide suspect information." |
| 23. | Calhoun looked up the report number through the computer system in his patrol car and determined that a police officer had not made a report on the incident yet, but was aware that a prior report had been made by the reporting party, such as through VPD's online system. |
| 24. | Calhoun had not had any involvement with Gregory's theft report prior to the call for service. |
| 25. | Calhoun was aware that he was not responding to a crime in progress, and that he was following up on a prior report involving a theft from a bank account. |
| 26. | He did not confirm that Gregory was expecting VPD to send an officer to her property to take a report, but states, "[u]sually when people call the police to report a crime, they expect us to respond." |
| 27. | Upon arrival to the property, Officer Chase Calhoun parked his patrol car in front of the residence. |
| 28. | Upon arrival to 47 Kentucky Street, Officer Chase Calhoun walked up to the front of the property. |
| 29. | Officer Chase Calhoun noticed that the property was a corner lot and the entire front yard of the home was surrounded by a low white fence with an unlocked gate. |

| | |
|---|---|
| 30. | Plaintiffs' home was situated on the corners of Kentucky and Trinity Streets, and was surrounded by a low white picket fence. |
| 31. | The property had two entrances, with the front patio and yard accessed through a wooden gate on Kentucky Street. |
| 32. | The gate led to a short cobbled path, opening up to the front patio. Continuing straight led to Plaintiffs' front yard and house, with the front door located on the wrap-around porch approximately twenty feet from the gate. |
| 33. | Plaintiffs "regularly had friends visit and enter the yard". |
| 34. | "Delivery and utility employees would periodically enter Plaintiffs' property," including an individual who made weekly deliveries of fresh vegetables onto the front porch. |
| 35. | Officer Chase Calhoun entered the yard and started walking towards the front door. |
| 36. | Calhoun states the following occurred: he recognized that the dogs "didn't appear to be friendly"; he noticed the dogs snarling; he observed that the hairs on their backs were raised and that their tails were straight; determined that the dogs "were going to attack me"; retreated five or six feet toward the gate; and fired two shots, killing the lead dog, Belle. |
| 37. | The holster Calhoun was using on that date was a "Level 3" holster, which requires the release of two snaps and rocking the gun forward to release it – the "triple threat" holster." |
| 38. | Calhoun fired two shots, striking her in the snout, and through the mouth and throat. |
| 39. | The other dog, Flicka, ran away after he shot Belle. |
| 40. | Calhoun says that he shot Belle at "point-blank range" because it was "getting ready to" leap up and bite him. |
| 41. | Calhoun does not recall if the dog had "jumped or . . . was starting to jump." |
| 42. | Calhoun was not bitten by either dog. |
| 43. | Officer Chase Calhoun immediately radioed dispatch to report the incident and requested that Animal Control respond to the scene. |
| 44. | After hearing the gun fire, Ms. Gregory rushed out of her home. |
| 45. | Officer Chase Calhoun apologized for fatally wounding Belle. |
| 46. | Officer Chase Calhoun is the only eyewitness to the event. |
| 47. | At the time Calhoun entered the yard, Gregory was working at her computer in her home office. |
| 48. | Gregory was sitting at her desk, with her back to the window that faced the wraparound porch and front yard. |
| 49. | Although Ms. Gregory was at home, she was not an eyewitness to the shooting. |

**(4)     Disputed Facts**

| | |
|---|---|
| 1. | During the more than ten years that Plaintiffs owned Belle, she had never bitten a person or been involved in any altercations with other dogs. Belle and Flicka also got along with each other. |
| 2. | Elizabeth Coudright ("Coudright") was Plaintiffs' tenant at 47 Kentucky Street, living in the unit below their home from July 15, 2009 until July 15, 2012. |

| 3. | When Coudright first viewed the unit in 2009 after telling Mollner that she was comfortable with dogs, she saw two dogs, Belle and Flicka, come bounding to the gate, barking and wagging their tails. She entered the property by herself and did not feel threatened by their presence. |
|---|---|
| 4. | Coudright's apartment was directly below Plaintiffs' home and they shared common space behind their completely fenced property for three years. She interacted with Belle every day, and when the family would go out of town, Coudright would dog sit for the family. |
| 5. | Coudright had friends come to visit and they were able to enter the property without any issues from Belle or Flicka. Coudright found Belle to be a friendly, playful lovable dog. |
| 6. | Plaintiffs and Coudright had a bi-monthly delivery of fresh vegetables to the house that would be left on the porch, and there was never a complaint or request to lock up the dogs. |
| 7. | Coudright also observed Belle as being very good with the family's children, as Belle had been with Plaintiffs prior to the arrival of children. Belle tolerated the kids as they rolled over her and tugged at her ears, and even when they would accidently hurt her while roughhousing. |
| 8. | Coudright states that Belle and Flicka sometimes barked and occasionally ran toward visitors to eagerly greet them. The property is on a slope, and when the dogs were at the bottom of the property and they heard the bells on the top gate jingle, they came running to the top of the property. Belle and Flicka listened to commands, and were well behaved and socialized. |
| 9. | Coudright had never seen either Belle or Flicka attack, bite, or show any aggression to any of the many visitors to the property in the three years that she lived at 47 Kentucky Street. *Id.* at 8. |
| 10. | Jan Gregory ("J. Gregory") is Erika's mother, has owned dogs for over fifty years, and knew Belle since she was a puppy/ |
| 11. | Over eleven years, J. Gregory saw Belle in a variety of contexts: in Belle's own home – both at large gatherings when she didn't know all the guests and when J. Gregory was the sole visitor – and in J. Gregory's home. In all of these circumstances, J. Gregory saw Belle as relaxed and at ease with both people and other dogs, composed and amiable. |
| 12. | When J. Gregory visited her daughter's home, Belle always came to the gate and greeted J. Gregory enthusiastically, approaching in a friendly fashion. On a couple of occasions when J. Gregory was present, Belle barked briefly at a UPS driver, as many dogs would, but subsided quickly. The delivery driver came through the gate easily and confidently to deliver parcels, showing no sign of feeling threatened. |
| 13. | J. Gregory and Plaintiffs' family walked their dogs at the Point Isabel off-lead dog play area. Belle behaved just as one would want a dog to do: she ran, swam, greeted other dogs, and showed no fear or aggression toward people or dogs at the site. J. Gregory found Belle to be a sweet, well-mannered and even-tempered dog. |
| 14. | On the morning of May 16, 2012, Plaintiff Erika Gregory had called VPD dispatch to request that an officer investigate an alleged check fraud. |

| | |
|---|---|
| 15. | At 10:59 a.m. on May 16, 2012, VPD Investigations Clerk/Secretary Stephanie Boursaw ("Boursaw") initiated a call for service out to 47 Kentucky Street, listing Erika Gregory as the reporting party, and listing her phone number. |
| 16. | The CAD entry lists as the patrol unit to respond as "PD/2P6," which was an identification referring to Calhoun's patrol unit. According to Calhoun, "2" represents the shift, "P" is for "patrol", and "6" was "the beat assignment, the area that I was assigned to work." |
| 17. | Calhoun states that the calls for service would appear in the computer in the patrol cars. |
| 18. | One minute later, at 11:00 a.m., Boursaw listed that the reporting party had filed a report, including a report number, and indicated that the reporting party [Gregory] "has suspect information provided to her by the bank" and "would like to speak to an officer to provide suspect information." |
| 19. | At 11:17 a.m., seventeen minutes after the initial call for service to "PD/2P6", dispatch recommended several other VPD patrol units to respond. |
| 20. | At 12:05 p.m., the call for service "timed out. |
| 21. | At 12:08 p.m., the call for service to 47 Kentucky Street was renewed, with "PD/2P6" and other units recommended, at which time Calhoun finally picked up the call for service. |
| 22. | During Officer Chase Calhoun's tenure at the Sheriff's Department, he received in-depth training on how to act when encountering a domestic animal, including defensive tactics. |
| 23. | This training taught Officer Chase Calhoun to identify the differences between an aggressive dog and a non-aggressive dog. |
| 24. | Officer Chase Calhoun learned that an aggressive dog exhibits one or more of the following attributes: "a straightened tail, as opposed to a wagging tail, raised hair, snarling and growling, and showing its teeth." |
| 25. | When Calhoun saw Plaintiffs' property, his primary concern was the presence of dogs due to the fenced-in yard, and the difficulty of seeing into the property due to foliage. |
| 26. | At the time of the incident, there was a cowbell that hung from the gate that, when shaken, Gregory and others could hear from inside her home. |
| 27. | Calhoun did not observe a cattle bell attached to the gate. |
| 28. | The gate of 47 Kentucky Street had neither a doorbell nor an intercom. |
| 29. | In order to notify the residents of one's presence, one has to enter through the gate and approach the front door. |
| 30. | On May 16, 2012, there was objective indicia of the presence of dogs on the property: there were children's and dog toys in the front patio, and there was wire fencing extending along the wooden fence line to keep the puppy, Holly, from jumping out. |
| 31. | Calhoun walked up to the gate and peered inside the yard, observing children's toys, such as a wading pool; he does not recall seeing dog toys, but maintains that he was concerned about the presence of dogs. |

| 32. | Calhoun did not call out his presence at the gate, nor did he call the reporting party to inform Gregory of his arrival because "[w]e don't generally do that . . . we respond to calls all day long, and calls like this, we go up and knock on the door; that's kind of how it works." He says "we don't walk up to somebody's house yelling and hooting and hollering and screaming and stuff, so we just walk up and knock on the door." |
|---|---|
| 33. | Before entering the gate, Officer Chase Calhoun took safety precautions to ensure that there were no dogs. |
| 34. | Officer Chase Calhoun peaked his head over the top of the gate. |
| 35. | Officer Chase Calhoun observed foliage in the front yard, but no activity from either a person or an animal. |
| 36. 37. | Officer Chase Calhoun shook the gate and "hit the gate" with a flashlight to ensure that he did not startle any dogs as he entered the property. |
| 38. | Officer Chase Calhoun heard no response after taking the above safety precautions. |
| 39. | Calhoun was ultimately "confident" that there were no dogs on the premises partly because there was a small picket fence and "I didn't see wiring." |
| 40. | Calhoun did not take any further measures to determine whether there were dogs on the property after entering through the gate. |
| 41. | Gregory never heard any sounds from the direction of the gate when Calhoun arrived; the first thing alerting Gregory to Calhoun's presence on her property was the sound of gunshots. |
| 42. | According to Calhoun, when he was approximately halfway toward the house, he saw two dogs charging at him at a full sprint from the left side of the house. Belle, the black-and-tan one, was slightly ahead of Flicka. |
| 43. | Calhoun states that the dogs were barking as they approached. |
| 44. | Officer Chase Calhoun's attention was directed to the lead dog, Belle, a mixed- breed dog that weighed approximately 70 pounds. It was "barking and snarling", showing its teeth, had "raised hair", and exhibited a "straight tail." |
| 45. | Based on his experience, Officer Chase Calhoun recognized that the "dogs did not appear to be friendly", and it "appeared that they were running in full sprint because they were going to attack [him]." |
| 46. | Within that second, Officer Chase Calhoun realized that he was "going to be attacked by two dogs." |
| 47. | Within "a second or two," Calhoun states the following occurred: he recognized that the dogs "didn't appear to be friendly"; he noticed the dogs snarling; he observed that the hairs on their backs were raised and that their tails were straight; determined that the dogs "were going to attack me"; retreated five or six feet toward the gate; and fired two shots, killing the lead dog, Belle. |
| 48. | Officer Chase Calhoun backed away five or six feet so that he could get out of the yard, but the dogs continued to charge at him. |
| 49. | Calhoun did not recognize either dog as a pit bull. |
| 50. | Calhoun states he did not have time to retreat through the gate or otherwise from the yard, but he was "surprised that I was able to . . . get my firearm out of the holster fast enough and fire those rounds . . ." |

| | |
|---|---|
| 51. | Calhoun believes he was further than the kiddie pool in the yard when he started retreating back toward the gate, shooting Belle at approximately at her final point of rest. |
| 52. | Officer Chase Calhoun drew his firearm and fired two rounds just in time to prevent the first dog from attacking him. |
| 53. | Officer Chase Calhoun "barely had enough time to get shots out" to prevent an attack on him. |
| 54. | In the wake of the incident, Plaintiffs have experienced severe emotional distress |
| 55. | After approximately eight years of living at 47 Kentucky Street, Plaintiffs and their two children moved out of their home and out of Vallejo in July 2012 as a result of the trauma from the incident. |
| 56. | On December 2, 2013, Calhoun was terminated from VPD. |
| 57. | The termination was the result of an Internal Affairs Investigation ("IA"), conducted by Lieutenant Sid Dejesus ("Lt. DeJesus") into Calhoun's misconduct ranging from March 2012 until August 2013, during which time Calhoun was having sexual contacts with a woman, "Jane Roe," while Calhoun was on his patrol shifts, in remote locations, and frequently in his patrol vehicle. |
| 58. | Jane Roe ended relationship and notified VPD of Calhoun's wrongdoing in August 2013 after she discovered that not only had Calhoun been married to another woman since September 2012, of which Jane Roe was unaware, but that Calhoun was also seeing another woman during this timeframe. |
| 59. | The IA charged Calhoun with seven violations of department policy; all seven charges were sustained by three superior officers, including Chief Kreins. |
| 60. | Chief Kreins, in his Notice of Discipline, states, "The nature and extent of you (sic) misconduct is shocking, which misconduct clearly was unbecoming and brought into disrepute the Department and its other personnel.  Your actions demonstrate serious, repeated and perplexing failures in judgment that make you unfit to be a police officer." |
| 61. | Lt. DeJesus interviewed Calhoun, and Calhoun confirmed he began a sexual relationship with Jane Roe in March 2012. |
| 62. | Lt. DeJesus remarked in the IA Report that "Officer Calhoun appeared to me to have selective memory loss in relation to the frequency of his sexual contacts with Jane Roe and specific dates related to the same." |
| 63. | Lt. DeJesus stated that "Officer Calhoun would attempt to minimize the time that it would take for him to complete these sexual acts by describing the duration of time as lasting only 10 to 15 minutes at a time." |
| 64. | Calhoun did confirm that he would take Jane Roe to Mare Island for these encounters. |
| 65. | Lt. DeJesus states that Calhoun appeared "to minimize the amount of times he and Jane Roe would actually have sexual intercourse while in a police car on Mare Island . . ." |
| 66. | Calhoun only admitted to taking Jane Roe to the Mare Island Training Facility ("MITC") after Lt. DeJesus confronted him with a photograph of the location. |
| 67. | When asked about having sex with Jane Roe at another remote location (VPD Traffic Office), Calhoun responded, "I've got to be honest, I can't recall having sex there." |

| | |
|---|---|
| 68. | Calhoun denied missing Calls for Service, despite the statement of Sergeant B. Clark ("Sgt. Clark") that it was an ongoing problem for Calhoun. |
| 69. | Calhoun confirmed that he started a sexual relationship with another woman after pulling her over for a traffic violation, but stated he only saw her while off-duty, despite his pattern of behavior with Jane Roe. |
| 70. | DeJesus could not be corroborate Calhoun's story because the woman would not return Lt. DeJesus's calls. |
| 71. | From April 2012 through February 2013, Jane Roe lived at 1225 Santa Clara Street. |
| 72. | From March 2, 2012 through January 9, 2013, Calhoun worked frequently as a solo beat officer assigned to "Beat 6," which Lt. DeJesus found of significance because Beat 6 is in close proximity to Jane Roe's house on Santa Clara Street. |
| 73. | Calhoun was working as a solo beat officer assigned to "Beat 6" on May 16, 2012 when he shot and killed Belle. |
| 74. | During the time Jane Roe lived on Santa Clara Street, she and Calhoun had sexual intercourse while he was on duty once or twice a week. |
| 75. | During this timeframe, the IA revealed that Calhoun took Jane Roe to remote locations to have sex while on his shift, including to a recycling center on Mare Island and to MITC. |
| 76. | Lt. DeJesus interviewed Sgt. Clark as part of the IA. |
| 77. | The IA states, "Sergeant Clark spoke of Officer Calhoun having 'routinely' missed 'Calls for Service,' and how dispatch would need to 'advise a second time' at which point Officer Calhoun would then answer for his designated CFS." |
| 78. | In Lt. DeJesus's findings of a violation of Availability of Duty (VPD General Order B-1, III, B1.4), he states:<br><br>"During the course of the investigation, I was able to confirm the actual locations where Officer Calhoun would drive [Jane Roe] for the purpose of having sexual intercourse.  These locations were established to be in remote areas concealed from the general public where Officer Calhoun could assure himself of the privacy he would need to complete these sexual encounters.  The location on Mare Island near Alco Recycling, which is located on the furthest North-West corner of the Island, the PG&E substation in Glen Clove, and Gilcrest, would necessarily take Officer Calhoun out of service for extended periods and very likely resulted in missed or delayed responses to Calls for Service as confirmed by Sergeant B. Clark.<br><br>Officer Calhoun would not advise Communications of his duty status changes which occurred each time he allowed [Jane Roe] into his police care which also took him out of service by his own action." |
| 79. | In Lt. DeJesus's findings of a violation of Duty Responsibilities (VPD General Order B-1, III, B1.14), he states:<br><br>By virtue of Officer Calhoun taking himself out of service without lawful and/or reasonable justification, he was not in a position to respond expeditiously to calls for service either directed to him by Communications, or calls from other uniformed officers who may have needed assistance or backup, or from citizens of this City.  By |

virtue of him having an unauthorized civilian inside his police car, he was no longer in a position to respond and/or perform his duties in a prompt or safe manner.

**(5) Disputed Evidentiary Issues**

Defendants will file the following motions in limine in conjunction with this statement:

- Defendants' Motion In Limine No. 1 Re: Excluding Evidence Of Other Complaints And Incidents
- Defendants' Motion In Limine No. 2 Re: Excluding Evidence And Testimony Inconsistent With The Court's Prior Rulings
- Defendants' Motion In Limine No. 3 Re: Excluding Evidence Of Potential Indemnification
- Defendants' Motion In Limine No. 4 To Exclude Any Evidence Related To Calhoun's Termination From The Vallejo Police Department
- Defendants' Motion In Limine No. 5 To Exclude Any Photographs Of Plaintiffs' Deceased Dog Belle

Plaintiffs do not intend to file any motions in limine, but will be opposing those cited by Defendants.

**(6)     Relief Sought**

Plaintiffs seek special, general, and punitive damages, reasonable attorney's fees pursuant to 42 U.S.C. § 1988 and California Civil Code §§ 52 and 52.1, and for costs of suit.

Defendants seek Plaintiffs to take nothing and be awarded for costs of defending the lawsuit.

**(7)     Points of Law**

The primary legal dispute is whether Chase Calhoun's shooting and killing of Plaintiffs' dog was a reasonable seizure under the Fourth Amendment. *Graham v. Connor* (1989) 490 U.S. 386, 396; *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose* (9th Cir. 2005) 402 F.3d 962, 975.

**(8)     Abandoned Issues**

Plaintiffs are not pursuing their claims under *Monell v. Dept. of Social Services of the City of New York, et al.* (1978) 436 U.S. 658 (Second Cause of Action), Trespass (Third Cause of Action), or Trespass to Chattels (Fourth Cause of Action).

**(9)     Discovery Documents**

Plaintiffs expect all witnesses that provided discovery responses and deposition responses to be present at trial.  Thus, all deposition testimony or written discovery responses will be used for impeachment purposes.

Defendants expect all witnesses that provided discovery responses and deposition responses to be present at trial.  Thus, all deposition testimony or written discovery responses will be used for impeachment purposes.

**(10)     Further Discovery or Motions**

Plaintiffs have brought a motion to compel further deposition testimony from Chase Calhoun. It is under submission.

All designated experts have been deposed.

**(11)     Stipulations**

*The following stipulations are offered:*

- During the course of the incident of May 16, 2012, Chase Calhoun was acting under color of law.

- Anything that a custodian of records would be called to establish on the parties' exhibit lists are authentic business or public records.  This does not mean that any document is now admissible; however custodian of records will not have to be called at trial merely to authenticate documents.

- The parties stipulate to exclude any evidence or reference to any draft reports prepared by the parties' retained experts, and further agree not to suggest or infer that any such draft reports were submitted to counsel for "editorial assistance" prior to the Federal Rule of Civil Procedure 26 disclosures of expert witnesses.

- The parties stipulate to exclude any evidence or reference to any media articles, media publications, or media broadcasts concerning the subject incident.

- The parties stipulate to exclude evidence concerning, or make reference to, the parties' prior settlement negotiations, if any, in the instant matter.

- The parties stipulate to exclude all non-party non-expert witnesses from the

courtroom and to instruct all witnesses to refrain from discussing the case with other witnesses.

- • The parties stipulate to refrain from making requests for new discovery or stipulations, and from making or discussing trial motions, in front of the jury.
- • The parties stipulate to the use of agreed CACI Jury Instructions in regards to Plaintiffs' State law claims.
- • The parties stipulate not to display any exhibits prior to securing prior permission from the court or a stipulation from opposing counsel.

**(12)    Amendments – Dismissals**

Plaintiffs dismiss former Chief Nichelini as part of their abandonment of their *Monell* claims.

**(13)    Settlement Negotiations**

Defendants have offered $100,000 to settle this case. Plaintiffs' last formal demand was for $420,000, inclusive of attorney's fees.

**(14)    Agreed Statements**

The parties do not believe the case would be suitable for a presentation of an Agreed Statement of Facts.

**(15)    Separate Trial of Issues**

None at this time.

**(16)    Impartial Experts**

The parties do not anticipate an appointment of impartial experts by the court, or limitation on the number of expert witnesses, at this time.

**(17)    Attorneys' Fees**

Plaintiffs seek attorneys' fees pursuant to 42 U.S.C. § 1988 and California Civil Code §§ 52 and 52.1, and anticipate doing so in conformity with the procedures set forth under Local Rule 293 and Fed. R. Civ. P. 54.

**(18)    Trial Protective Order**

None at this time.

**(19)    Miscellaneous**

None at this time.

**(20)    Joint Statement of the Case**

*The following statement is offered, pending the Court's summary judgment ruling:*

This lawsuit arises out of the alleged wrongful shooting of Plaintiffs Erika Gregory and Loren Mollner's dog.

The Defendants are Chase Calhoun, a former Vallejo Police Officer, and City of Vallejo.

The incident that gave rise to this litigation occurred during the day of May 16, 2012 at Plaintiffs' home in Vallejo.  Plaintiffs allege that Defendants violated their Fourth Amendment rights under the U.S. Constitution for an alleged wrongful shooting of their dog under California law.

Defendants deny Plaintiffs' allegations and allege that their conduct was lawful.

Dated:  December 30, 2014                    /s/ - *Furah Z. Faruqui*
                                           Furah Z. Faruqui
                                           Deputy City Attorney
                                           Attorneys for Defendants
                                           CITY OF VALLEJO, ROBERT NICHELINI
                                           and CHASE CALHOUN

Dated: December 30, 2014                    /s/ - *Nick Casper*
                                           Nick Casper
                                           **CASPER, MEADOWS, SCHWARTZ & COOK**
                                           Attorneys for Plaintiffs ERIKA GREGORY
                                           and LOREN MOLLNER