**CLAUDIA M. QUINTANA**
City Attorney, SBN 178613
**BY:  FURAH Z. FARUQUI**
Deputy City Attorney, SBN 233083
**CITY OF VALLEJO**, City Hall
555 Santa Clara Street, P.O. Box 3068
Vallejo, CA  94590
Tel:     (707) 648-4545
Fax:     (707) 648-4687

Attorneys for Defendants, CITY OF VALLEJO, ROBERT NICHELINI, CHASE CALHOUN

## UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| ERIKA GREGORY and LOREN MOLLNER,<br><br>                    Plaintiffs,<br><br>          v.<br><br>CITY OF VALLEJO; former VPD CHIEF ROBERT NICHELINI, individually and in his official capacity; VPD OFFICER CHASE CALHOUN, individually; and DOES 1 through 50,<br><br>                    Defendants. | Case No.  2:13-CV-00320-KJM-KJN<br><br>**DEFENDANTS' TRIAL BRIEF**<br><br>**JUDGE:**       **Hon. Kimberly J. Mueller**<br>**CRTRM:**      **3, 15th Floor**<br><br>**TRIAL DATE:  January 26, 2015** |

Defendants CITY OF VALLEJO and CHASE CALHOUN submit the following Trial Brief:

### A.     Introduction:

Defendant Police Officer Chase Calhoun fatally wounded Plaintiffs' dog while acting in self-defense. The incident occurred in the front yard of Plaintiffs' residence, where the Officer had been dispatched to respond to Plaintiff Erika Gregory's request for investigation of a

nonviolent crime. Plaintiffs Erika Gregory and Loren Mollner initiated this lawsuit against Defendants City of Vallejo, Police Chief Robert Nichelini and Officer Chase Calhoun. Plaintiffs allege federal claims for violation of civil rights under 42 U.S.C. §1983 and various claims under state law. Plaintiffs' suit is premised on the fatal shooting of Plaintiffs' dog Belle when she charged at Officer Calhoun after he entered Plaintiffs' front yard. The undisputed evidence establishes that: Plaintiffs invited Officer Calhoun to their residence, Plaintiffs' dogs rushed at Officer Calhoun, Officer Calhoun fired his weapon at the lead dog Belle in self-defense, and Officer Calhoun was the only eyewitness to the event.

Specifically, Officer Calhoun acted in a manner that did not violate any rights held by Plaintiffs under the United States Constitution. First, Officer Calhoun's shooting of Plaintiffs' dog Belle did not violate the Fourth Amendment because it was in self-defense.  Second, even if Officer Calhoun's acts did amount to constitutional violations, he is qualifiedly immune from liability.  Third, Plaintiffs conversion claim is meritless, as Officer Calhoun shot Belle in self-defense.  Fourth, Plaintiffs intentional infliction of emotional distress claim is unsupported by the evidence.  Lastly, Plaintiffs cannot prevail on a California Civil Code §52.1 because they have not provided any evidence of threats, intimidation, or coercion.

Although the City acknowledges that the fatal injury of Plaintiffs' pet was tragic, under these circumstances, Defendants are not legally liable.  In sum, Officer Calhoun did not violate the constitutional rights of either Plaintiff, and thus, all Defendants are entitled to judgment as a matter of law.

**B.**   **Statement of Facts:**

**1.**   **VALLEJO POLICE OFFICER CHASE CALHOUN**

In 2007, Officer Calhoun was hired as a police cadet (a non-sworn employee) by VPD. His duties consisted of working with the traffic division, providing security at Mare Island and other adjunct locations.

Subsequently, Officer Calhoun attended the Alameda County Sheriff's Department Police Academy from 2009-2010.  Thereafter, he was employed by the Alameda County Sheriff's Department as a Sheriff's Deputy.  During his tenure at the Sheriff's Department, he

received in-depth training on how to act when encountering a domestic animal, including defensive tactics.  This training taught him to identify the differences between an aggressive dog and a non-aggressive dog.  For example, Officer Calhoun learned that an aggressive dog exhibits one or more of the following attributes: "a straightened tail, as opposed to a wagging tail, raised hair, snarling and growling, and showing its teeth."

In 2011, he departed Alameda County and joined VPD.  Upon arrival, he began an intensive field training program.  After completion, he was assigned to Patrol.  During his assignment, he received several commendations.

### 2.    THE INCIDENT

On May 16, 2012, Officer Calhoun came on duty at 7 a.m.  His attire consisted of a full police uniform, a utility belt, handcuffs, a gun and holster, a Taser, pepper spray, a baton, magazines in a magazine pouch, and radio.

#### a.    Plaintiff Erika Gregory asks for investigation

At noon, he was dispatched to 47 Kentucky Street to investigate a bank fraud.  Earlier that day, Plaintiff Erika Gregory had called VPD dispatch to request that an officer investigate an alleged check fraud.  Accordingly, Officer Calhoun was informed that the homeowners wanted to "speak with an officer to provide suspect information."  Upon arrival to the property, Officer Calhoun parked his patrol car in front of the residence.  Thereafter, he walked up to the front of the property.  He noticed that the property was a corner lot and the entire front yard of the home was surrounded by a low white fence with an unlocked gate.

The gate had neither a doorbell nor an intercom.  A visitor seeking to make contact with a resident has to enter through the gate and approach the front door.  Plaintiffs "regularly had friends visit and enter the yard".  Strangers also visited, for example, "delivery and utility employees would periodically enter the property," including an individual who made weekly deliveries of fresh vegetables onto the front porch.

Before entering, Officer Calhoun took safety precautions to ensure that there were no dogs present.  First, he peeked his head over the top of the gate.  He observed foliage in the front yard, but no activity from either a person or an animal.  Second, he shook the gate and "hit the

gate" with a flashlight to ensure that he did not startle any dogs as he entered the property. He heard no response.

### b.     Officer Calhoun's Entry into the Property

After taking the above safety precautions, Officer Calhoun entered the yard and started walking towards the front door. As he was halfway to the front door, he suddenly "heard a sound" and observed "two dogs charging around the left corner of the house at a full sprint." Officer Calhoun's attention was directed to the front dog, a mixed-breed dog weighing approximately 70 pounds. It was "barking and snarling", showing its teeth, had "raised hair", and exhibited a "straight tail." Based on his experience, Officer Calhoun recognized that the "dogs did not appear to be friendly", and it "appeared that they were running in full sprint because they were going to attack [him]."

Within a second, he realized that he was "going to be attacked by two dogs." He quickly backed away five or six feet so that he could get out of the yard, but the dogs continued to charge at him. Officer Calhoun drew his firearm and fired two rounds at the lead dog, just in time to prevent an attack on him. At that time, he scanned over to the second dog and noticed it had retreated after the gun fire. At this time, Calhoun exited the yard and closed the gate. Officer Calhoun "barely had enough time to get shots out" to prevent an attack on him.

He immediately radioed dispatch to report the incident and requested that Animal Control respond to the scene.

After hearing the gun fire, Ms. Gregory rushed out of her home. Officer Calhoun apologized for fatally wounding Belle.

Officer Calhoun is the only eyewitness to the event. Although Ms. Gregory was at home, she did not witness the shooting.

### C.     Remaining Claims:

#### 1.     GENERAL ALLEGATIONS

This complaint "seeks damages for the violation of Plaintiffs Erika Gregory and Loren Mollners' rights protected by the Fourth Amendment to the United States Constitution under 42 U.S.C. §1983." Plaintiffs also seek damages under California law. "The actions and failures to

act [as alleged in the First Amended Complaint] were committed by Vallejo Police Department personnel acting under color of law within the course and scope of their employment with the City of Vallejo." (First Amended Complaint, 1: 20-23.)

    **2.**    **42 U.S.C. §1983**

        a.   <u>Officer Calhoun</u>:

           1.   Calhoun engaged in the following actions "the failure to take reasonable precautionary measures when entering private property unannounced where dogs and/or children are present; and the unreasonable and excessive use of force in the shooting death of Plaintiffs' dog."

           2.   Calhoun acted with "malice and oppression" and "with the intent to harm Plaintiffs" or was "despicable and carried out with a conscious disregard of Plaintiffs' rights or safety" (*Id.*, ¶34.)

    **3.**    **TRESPASS**

Calhoun "intentionally entered Plaintiff's property and dwelling", 47 Kentucky Street, "without a warrant, without exigent circumstances, and without Plaintiff's permission." (*Id.*, ¶45.)

    **4.**    **CONVERSION**

On May 16, 2012, while at Plaintiffs' property, "Officer Calhoun intentionally fired at least two rounds at Belle from his police-issued handgun…striking her twice in the head and killing her." Plaintiffs "did not consent to the wrongful shooting death of their dog Belle by Officer Calhoun" or to the "substantial interference with their personal property." (*Id.*, ¶¶49, 50, 55.)

    **5.**    **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

Officer Calhoun "engaged in outrageous conduct intended to cause Plaintiffs emotional distress or acted with reckless disregard of the probability that Plaintiffs would suffer emotional distress, knowing that Plaintiffs were present when each Defendant committed the outrageous conduct alleged." (*Id.*, ¶58.)

### 6. CALIFORNIA CIVIL CODE §§52, 52.1[1]

Officer Calhoun used "threats, coercion, and intimidation" and "interfered with and threatened to interfere with Plaintiffs' rights guaranteed by the Fourth Amendment.  (*Id*., ¶64.)

**D.** **Points of Law:**

### 1. OFFICER CALHOUN DID NOT VIOLATE PLAINTIFFS' FOURTH AMENDMENT RIGHTS AGAINST UNREASONABLE SEARCH AND SEIZURE

42 U.S.C. §1983 "imposes two essential proof requirements upon a claimant: (1) that a person acting under color of state law committed the conduct, at issue, and (2) that the conduct deprived the claimant of some right, privilege, or immunity protected by the Constitution or laws of the United States." (*Leer v. Murphy* (9th Cir. 1988) 844 F.2d 628, 632-633.)

#### a. Officer Calhoun's Shooting of Plaintiffs' Dog did not Violate the Fourth Amendment as it was in Self-Defense

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." A "seizure" of property occurs whenever "there is some meaningful interference with an individual's possessory interests in that property." (*Soldal v. Cook County, Ill.* (1992) 506 U.S. 56, 61.)  The destruction of property, including the killing of a dog, is considered "meaningful interference" and qualifies as a seizure under the Fourth Amendment.  (*Fuller v. Vines* (9th Cir. 1994) 36 F.3d 65, 68, *overruled on other grounds, Robinson v. Solano County* (9th Cir. 2002) 278 F.3d 1007, 1011.)

To succeed on a Fourth Amendment claim for unlawful seizure, Plaintiffs must not only show that a seizure occurred, but also that the seizure was unreasonable.  (*Brower v. County of Inyo* (1989) 489 U.S. 593, 599.)  A court must consider the totality of the circumstances and balance "the  nature of the quality and quantity of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake" to determine whether the force used to effect a particular seizure was reasonably necessary.  (*Graham v. Connor* (1989) 490 U.S. 386, 396, internal quotations and citations omitted.) "The calculus of

---

[1] Defendants assume that Plaintiffs are making a claim for the Bane Act only.

reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation."  (*Id*. at 396-97.)

Fourth Amendment claims are reviewed for objective reasonableness because the subjective intent of the Defendant is irrelevant.  (*Brower*, *supra*, at 599.)

The "primary governmental interest to be considered in a Fourth Amendment claim based on the shooting of a dog is the safety of the officer."  (*San Jose Charter of the Hells Angels Motorcycle Club v. City of San Jose* (9th Cir. 2005) 402 F.3d 962, 977 (governmental interest of safety may provide "sound justification" for officer's conduct in shooting dog).  Where danger is unexpected and imminent, or dogs are allowed to run free, unleashed, uncontrolled, and unsupervised, the balance tips in favor of the governmental interest. (*Id.)*  "The balance of these interests depend on whether an objectively reasonable officer… in the position of [the officer] could conclude that the [Plaintiffs'] dog posed an imminent threat." (*Id*. at 207.)

On the other hand, "the private Fourth Amendment possessory interests are obviously stronger when, although the dog is unleashed, the owner is nearby and attempting to assert control over the dog."  (*Id*.)

Against that analytical backdrop, not only was the danger to Officer Calhoun unexpected and imminent, but Plaintiffs' dogs were "running free, unleashed, uncontrolled, and unsupervised," thus tipping the balance in favor of the governmental interest.

These facts are less egregious than the ones presented in *Warboys v. Proulx*, (D. Conn. 2004) 303 F. Supp. 2d 111, (followed by *Birkes v. Tillamook County*, 2011 U.S. Dist. LEXIS 50248 and cited with approval in *People v. Lee* (2005) 131 Cal. App. 4th 1413)  in which the court found a dog fatality to be reasonable.  In *Warboys*, three officers and a trained police canine were in a parking lot allowing the police canine to identify a scent that might have been that of the fleeing car theft suspect they were tracking.  (*Id*. at 113.)  The officers saw a young male leaving an adjacent residence and advised him to return to the residence for safety reasons.  (*Id*. at 114.)  Blitz, the family pit bull, who weighed about ninety-five pounds, escaped through the open door and moved toward one officer and the police canine.  The young male attempt to

grab Blitz as he went by but missed and then yelled to the officers that Blitz wouldn't hurt them. As Blitz approached the officer, he unholstered his gun, and shot and killed the dog. Blitz was five to ten feet from the officer at the time he was shot. The whole event occurred in about five seconds. (*Id*.)

On summary judgment, the court accepted the following additional facts offered by the Plaintiff as true. Blitz was not barking or growling but rather emerged from the house in a friendly manner wagging his tail and was a gentle, loving pet that had never attacked an animal or human. (*Id*.) The court then held:

> Based on the undisputed facts recited above, when taken in the light most favorable to Warboys, Proulx acted reasonably in shooting Blitz. An officer who encounters a 90- to 100- pound Pit bull dog — a dog which is demonstrably not able to be restrained by its owner or guardian and which is approaching the officer at a rate of 6 feet per second and is at a distance of no more than ten feet does not act unreasonably in shooting the dog in order to protect himself and his canine companion. The court acknowledges that Blitz may indeed have approached the officer and his police canine merely to greet and sniff them or to receive a friendly pat on the head. At the same time, however, the court notes that had Proulx refrained from shooting the pit bull when he did and had Blitz's behavior turned out to have been hostile, it would have been too late for Proulx to use his firearm safely in order to defend himself and his police dog. Had Proulx refrained from shooting and instead had to defend himself from Blitz by other means in close range attack, the risk or serious injury or death to him and his canine would have been considerable. Based on these facts, this court concludes that the law did not require Proulx to wait until the approaching animal was within biting distance or was leaping at him before taking protective action. The fact that the approaching dog was a pit bull is another factor that supports the court's conclusion that it was objectively reasonable for Proulx to have responded to the situation as he did. The law simply does not require a reasonable officer in Proulx's circumstances to have used less force to protect himself, his police dog, and the officers standing nearby. (*Id*. at 117-19, citations and footnotes omitted.)

The *Warboys* court relied, at least in part, on the fact that Blitz was a pit bull, that pit bulls are a dangerous breed, and that their aggressiveness may be undetectable.

In the instant case, Officer Calhoun was faced with two large dogs moving toward him in a rapid manner which the dogs' guardians could not restrain. Under *Warboys* and *San Jose Charter*, these facts are enough to establish that Officer Calhoun acted reasonably. Moreover, the evidence also establishes Belle was agitated, that she "charged at" Officer Calhoun, and that even after Officer Calhoun's retreat, Belle continued to charge at him. Based on this scenario, Officer Calhoun reasonably believed he was in imminent danger of physical injury from Belle at the time he fired his weapon at the dog. Accordingly, Officer Calhoun's actions did not violate Plaintiffs' Fourth Amendment rights.

Under *San Jose Charter* and *Warboys*, these facts establish that Calhoun's seizure of Belle was not unreasonable.

## 2. OFFICER CALHOUN IS ENTITLED TO QUALIFIED IMMUNITY

Even if Plaintiffs could establish their civil rights were violated, Officer Calhoun is protected from liability by qualified immunity. Qualified immunity protects "officers from liability where their conduct does not violate clearly established law, regardless of whether the error is a mistake of law, fact or a combination of the two, and applies where a reasonable officer could have believed the conduct was justified, notwithstanding that reasonable officers could disagree." (*Pearson v. Callahan* (2009) 555 U.S. 223, 815; *Reynolds v. County of San Diego,* 84 F.3d 1162, 1170 (9th Cir. 1996)[2].) A court discerns whether "the [officer] acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable interpretation of the events can be constructed…after the fact." (*Hunter v. Bryant*, (1991) 502 U.S. 224, 228.) Qualified immunity "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." (*Id*. at 227.) "[O]fficers are entitled to qualified immunity even if they acted unconstitutionally, as long as a reasonable officer could have believed the conduct lawful." (*Alexander v. County of Los Angeles* (9th Cir. 1995) 64 F.3d 1315, 1322.[3]) The inquiry as to whether the law was clearly established "must be [determined] in light of the specific context of the case, not as a broad

---

[2] Overruled in part on other unrelated grounds, *Acri v. Varian Assoc.* (9th Cir. 1997) 114 F.3d 999.
[3] Overruled in part on other unrelated grounds, as stated in *Ashley v. Sutton* (Dist. Ore. 2007)492 F.Supp.2d 1230, 1252 27.

general proposition." (*Saucier v. Katz* (2001) 533 U.S. 194, 205.[4])  The violation "must have been 'clearly established' in a more particularized, and hence more relevant sense... [It must] be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." (*Id*. at 202; *Brousseau v. Haugen* (2004) 543 U.S. 194, 205.) Qualified immunity recognizes "that reasonable mistakes can be made as to the legal constraints on particular police conduct. ... If the officer's mistake as to what the law requires is reasonable, ... the officer is entitled to the immunity defense."   (*Brousseau, supra,* at 205.)  It is Plaintiffs' burden to prove that the law governing the officers' conduct was "clearly established."   (*Maraziti v. First Interstate Bank of Cal.* (9th Cir. 1992) 953 F.2d 520, 523.) It is not enough to "determine the broad question of whether the seizure...violated the Fourth Amendment's proscription against unreasonable seizures...To do so would merely state [the] right in the abstract, rather than ... under the particular circumstances of [the] case as the Supreme Court  has mandated." (*Maag v. Wessler* (9th Cir. 1992) 960 F.2d 773, 775.)  The Ninth Circuit, en banc, reiterated that general Fourth Amendment principles may only provide clearly established law in obvious cases and the Supreme Court "clarified that the bar for finding such obviousness is quite high....[T]he Court emphasized that it has 'repeatedly told courts not to define clearly established law at a high level of generality....[T]hat an unreasonable search or seizure violates the Fourth Amendment is of little help in determining  whether  the  violative  nature  of  particular  conduct  is  clearly established.'" (*Mattos  v. Agarano* (9th  Cir. 2011) 661 F.3d 433, 442; citing *Ashcroft v. al-Kidd* (2011) 131 S.Ct. 2074.)  The question is whether it is "'sufficiently clear' that every reasonable official would have understood that what he is doing violates that right." (*Id*. at 442)

Plaintiffs cannot meet their burden to prove that the law governing Officer Calhoun's conduct under the particular circumstances of this case was clearly established, specifically, his entry into Plaintiffs' residence and subsequent shooting of Plaintiffs' dog. To that end, Plaintiffs have provided no evidence that Officer Calhoun knowingly violated the Constitution; the question is whether, in light of precedent existing at the time, he was "plainly incompetent" in

---

[4] Overruled in part on the grounds that the *Saucier* qualified immunity analysis procedure is not mandatory, but is helpful and may be followed in the Court's discretion. (*Pearson*, 129 S.Ct. at 813, 818.)

entering Plaintiffs' front yard to approach the front door of Plaintiffs' front door as requested by Plaintiffs' phone call to VPD.  (*Al-Kidd, supra* at 2074.*)* What is clear is that every reasonable officer in similar circumstances would believe that Officer Calhoun's alleged conduct was lawful. Moreover, every reasonable officer, when confronted with a charging dog, who exhibited signs of aggression, would shoot at the dog in self-defense.  Thus, under the undisputed facts and controlling authority, Officer Calhoun is entitled to qualified immunity from Plaintiffs' § 1983 claims.

### 3.      PLAINTIFFS CONVERSION CLAIM IS MERITLESS

Plaintiffs cannot meet their burden on either a conversion.  It is well-settled that "[o]ne is privileged to commit an act which would otherwise be a trespass to or a conversion of a chattel in the possession of another, for the purpose of defending himself… under the same conditions which would afford a privilege to inflict a harmful or offensive contact upon the other for the same purpose."  (*Church of Scientology v. Armstrong* (1991) 232 Cal. App. 3d 1060, citing Rest.2d Torts, § 261.) Specifically, [f]or the purpose of defending his own person, an actor is privileged to make intentional invasions of another's interests or personality when the actor reasonably believes that such other person intends to cause a confinement or a harmful or offensive contact to the actor, of that such invasion of his interests is reasonably probable, and the actor reasonably believes that the apprehended harm can be safely prevented only by the infliction of such harm upon the other." (*Church, supra* at 1060.)

In an analogous case, *Perez v. City of Placerville* (2008) U.S. Dist. LEXIS 83172, Placerville police officers went to the home of Plaintiff intending to arrest a parolee who they believed lived at the home. "In the process of attempting to secure the location, Defendant Officer Beyer shot and killed Plaintiff's dog.  Officer Beyer maintained the killing was in defense of his fellow officer and police canine who were being attacked by the dog."  He was the only eye-witness to the event.  (*Perez, supra* at 6.)

*Perez* held that Beyer's conduct is privileged under state law, and thus, cannot give rise to a claim of conversion. (*Perez, supra* at 28-29, citing *Armstrong, supra,* at 1072 (holding that one is "'privileged to commit an act which would otherwise be a trespass to or a conversion of a

chattel in the possession of another, for the purpose of defending himself or a third person against the other, under the same conditions which would afford a privilege to inflict a harmful or offensive contact upon the other for the same purpose.'")

Likewise, Officer Calhoun shot Belle in self-defense. Accordingly, his conduct is privileged under state law, and thus cannot give rise to a claim of conversion.  Thus, Plaintiffs cannot succeed on these claims.

### 4. PLAINTIFFS INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM IS UNSUPPORTED BY THE EVIDENCE

The standards for intentional infliction of emotional distress are stringent:  "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual or proximate causation of the emotional distress by the defendant's outrageous conduct…."  (*Christensen v. Superior Court* (1991) 54 Cal.3d 868, 903, quoting *Davidson v. City of Westminster* (1982) 32 Cal.3d 197, 209, internal quotations omitted.)

Generally, "outrageous" has been defined as conduct "so extreme as to exceed all bounds of that usually tolerated in a civilized society" (*Davidson*, *supra*, at 209) and outrage "has been limited to 'the most extreme cases of violent attack where there is some special likelihood of fright or shock.'"  (*Christensen*, *supra*, at 905, quoting from *Ochoa v. Superior Court* (1985) 39 Cal.3d 159, 165, fn. 5.)  "While the outrageousness of a defendant's conduct normally presents an issue of fact to be determined by the trier of fact, the court may determine in the first instance whether the defendant's conduct may be reasonably regarded as so extreme and outrageous as to permit recovery."  (*Trerice v. Blue Cross of California* (1989) 209 Cal.App.3d 878, 883, internal citation omitted, emphasis added.)

"In evaluating whether the defendants' conduct was outrageous…[l]iability has been found only where the conduct has been so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  (*Cochran v. Cochran* (1998) 65 Cal.App.4th 488, 496, quoting from Restat. 2d Torts, §46.)

Thus, it is "the combination of statements and conduct (which) would under reasoned view tend to humiliate and degrade" the plaintiff which are necessary to support a cause of action for intentional infliction of emotional distress.  (*Rulon-Miller v. International Business Machines Corp.* (1984) 162 Cal.App.3d 241, 244.)

Plaintiffs are required to show, and have not, that the conduct was directed at them.  "The law limits claims of intentional infliction of emotional distress to egregious conduct toward the plaintiff proximately caused by defendant."  (*Miller v. National Broadcasting Co.* (1986) 187 Cal.App.3d 1463, 1489, emphasis original, quoted with approval in *Christianson*, *supra*, at 905.)

Here, Plaintiffs fail to establish either of these requisite elements.  For the reasons set forth in the above section, Plaintiffs cannot demonstrate "outrageous conduct" to support an IIED claim. While the death of Plaintiffs' beloved dog was a tragedy, the undisputed evidence is that Officer Calhoun killed Belle in self-defense. The facts do not support a constitutional claim under the Fourth Amendment, and they likewise do not establish outrageous conduct by Defendants.

Moreover, as Officer Calhoun killed Belle outside the presence of either Plaintiff, it is unreasonable to suggest that his behavior was intended to cause severe or emotional distress to Plaintiffs. There is no evidence in this case, and no suggestion, that any behavior "was intended to cause severe or extreme or emotional distress" (*Christianson*, *supra*, at 903) to Plaintiffs.

Consequently, Plaintiffs cannot succeed on this claim.

### 5. PLAINTIFFS CANNOT PREVAIL ON A CALIFORNIA CIVIL CODE § 52.1 BECAUSE THEY HAVE NOT PROVIDED ANY EVIDENCE OF THREATS, INTIMIDATION, OR COERCION

To prevail on a California Civil Code § 52.1 claim, also known as a Bane Act claim, Plaintiffs must show that the Officer Calhoun used "threats, intimidation, or coercion" to interfere with Plaintiffs' state or federal constitutional rights. (Cal. Civ. Code § 52.1(a), (b).) The elements necessary to establish liability under § 52.1 include the following: (1) Defendants interfered with Plaintiffs' constitutional rights by threatening or committing violent acts; (2) that Plaintiffs reasonably believed that if they exercised their constitutional rights, Defendants would commit violence against their property; (3) Plaintiffs were harmed; and (4) Defendants' conduct

was a substantial factor in causing Plaintiffs' harm. (*See Tolosko-Parker v. County of Sonoma,* (2009) U.S. Dist. Lexis 155 98; CACI No. 3025.)

Here, Plaintiffs do not allege any facts, let alone produce evidence, of any acts by Defendants that could be construed as "threats, violence or intimidation" that actually caused Plaintiffs a loss of their rights or that attempted to do so. Thus, because Plaintiffs cannot establish this essential element of a § 52.1 claim, they cannot prevail on the Bane Act.


DATED:  January 16, 2015                    Respectfully submitted,


                                             */s/ Furah Z. Faruqui*
                                            _____
                                            FURAH Z. FARUQUI
                                            Deputy City Attorney
                                            Attorney for Defendants,
                                            CITY OF VALLEJO and CHASE CALHOUN