Nick Casper (SBN 244637)
**CASPER, MEADOWS, SCHWARTZ & COOK**
A Professional Corporation
California Plaza
2121 North California Blvd., Suite 1020
Walnut Creek, California 94596
Telephone:   (925) 947-1147
Facsimile:    (925) 947-1131

Attorneys for Plaintiffs
ERIKA GREGORY and LOREN MOLLNER

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIKA GREGROY and LOREN MOLLNER, | Case No.  2:13-CV-00320-KJM-KJN |
| Plaintiffs, | **PLAINTIFFS' TRIAL BRIEF** |
| vs. | |
| CITY OF VALLEJO; former VPD Chief ROBERT NICHELINI, individually and in His official capacity; VPD Officer CHASE CALHOUN, individually; and DOES 1 Through 50, | **JUDGE:**    Hon. Kimberly J. Mueller<br>**CRTRM:**   3, 15th Floor<br>**TRIAL DATE:  January 26, 2015** |
| Defendants. | |

Plaintiffs Erika Gregory and Loren Mollner ("collectively, Plaintiffs") submit the following Trial Brief:

## **INTRODUCTION**

Plaintiffs bring a 42 U.S.C. § 1983 action for the fatal shooting of their eleven-year-old family dog, Belle, by Chase Calhoun ("Calhoun"), a former Vallejo Police Department ("VPD") officer.

*Gregory, et al. vs. City of Vallejo, et al.*     Case No. 2:13-CV-00320-KJM-KJN
PLAINTIFFS' TRIAL BRIEF

Plaintiffs allege that Calhoun's actions violated their rights under the U.S. Constitution because the shooting comprised a "seizure" under Fourth Amendment, and was objectively unreasonable under the totality of the circumstances. Plaintiffs also allege that he is not entitled to qualified immunity because he violated a clearly established right.

Plaintiffs also seek redress under California law for conversion, intentional infliction of emotional distress, and under the Bane Act.

## FACTUAL BACKGROUND

### I. PLAINTIFFS AND THEIR DOG, BELLE

Plaintiffs are a married couple with two children under the age of ten. Gregory operates her own consulting business in San Francisco with seven employees, and Mollner is employed by the U.S. Coast Guard under the U.S. Department of Homeland Security as a real property specialist. Plaintiffs own a home at 47 Kentucky Street in Vallejo, where they lived from 2002 until July 2012.

At the time of the incident, Plaintiffs owned three dogs: fourteen-year-old Flicka, eleven-year-old Belle, and Holly, a puppy. Plaintiffs had owned both Belle and Flicka since they were puppies, having gotten Belle when she was approximately nine weeks old. Belle was a Labrador-Catahoula-mix who weighed approximately 70 pounds, and Flicka was a blind and deaf Border Collie-mix who weighed approximately 40 pounds. During the more than ten years that Plaintiffs owned Belle, she had never bitten a person or been involved in any altercations with other dogs.

There are numerous witnesses who interacted with Belle in a variety of contexts besides Plaintiffs, including: Elizabeth Coudright, Plaintiffs' former tenant who lived in the unit below their home from July 15, 2009 until July 15, 2012; Jan Gregory, Erika Gregory's mother; Alexa Gregory, Erika Gregory's sister; Aidan Robson, Plaintiffs' former dog-walker; and Fiona Hovenden, Erika Gregory's business partner (some of these witnesses will also testify to Plaintiffs' damages).

### II. PLAINTIFFS DISCOVER MISSING FUNDS

CASPER, MEADOWS, SCHWARTZ & COOK
2121 N. California Blvd., Suite 1020
Walnut Creek, CA 94596
TEL: (925) 947-1147
FAX (925) 947-1131

On Thursday or Friday, May 10 or 11, 2012, Gregory was traveling for work and learned that her personal bank account had been overdrawn when there should have been sufficient funds. After looking at copies of deposited checks online, Gregory discovered that someone had stolen six or seven checks from her personal checkbook and fraudulently written and signed these checks in an amount totaling approximately $5,000. Gregory contacted her bank (Umpqua Bank) to report the theft, and an assigned bank investigator instructed her to file a report with VPD to increase the chances of bank reimbursement. On May 11, 2012, Gregory called VPD, but no one picked up the line, so she submitted an online report through VPD's website. Gregory never received a response from VPD to her online report, other than an electronic confirmation at the time of submission. Early the following week, Gregory again spoke with the bank investigator, who told Gregory that she had also called VPD, but had not received a response.

On Wednesday, May 16, 2012, Gregory was working from home and called the bank investigator, who told her she needed to call VPD again to initiate an investigation into the theft. At approximately 11:00 a.m., Gregory called the Investigations Unit at VPD to find out the status of her report, and a female VPD employee indicated that nothing had been done because VPD did not have enough detectives to investigate crimes other than murders. The VPD employee transferred Gregory to dispatch, and a dispatcher determined that Gregory needed to speak with Investigations, transferring her back to the first VPD employee with whom Gregory spoke. The Investigations Unit employee then told Gregory that she "can try and force a message through to dispatch, but I can't guarantee you anything" and said goodbye. Gregory did not know what "forcing a message through dispatch" meant.

### III. VPD OFFICER CALHOUN EVENTUALLY RESPONDS TO DISPATCH

Calhoun started his shift on May 16, 2012 at 7:00 a.m. The shift was not his regularly-assigned shift, and was an extra overtime shift for Calhoun. Calhoun was by himself and not working with a partner that shift.

At 10:59 a.m. on May 16, 2012, VPD Investigations Clerk/Secretary Stephanie Boursaw ("Boursaw") initiated a call for service out to 47 Kentucky Street, listing Erika

CASPER, MEADOWS, SCHWARTZ & COOK
2121 N. California Blvd., Suite 1020
Walnut Creek, CA 94596
TEL: (925) 947-1147
FAX: (925) 947-1131

*Gregory, et al. vs. City of Vallejo, et al.*   Case No. 2:13-CV-00320-KJM-KJN
PLAINTIFFS' TRIAL BRIEF

Gregory as the reporting party, and listing her phone number. The CAD entry lists as the patrol unit to respond as "PD/2P6," which was an identification referring to Calhoun's patrol unit. According to Calhoun, "2" represents the shift, "P" is for "patrol", and "6" was "the beat assignment, the area that [he] was assigned to work." Calhoun states that the calls for service would appear in the computer in the patrol cars. One minute later, at 11:00 a.m., Boursaw listed that the reporting party had filed a report, including a report number, and indicated that the reporting party [Gregory] "has suspect information provided to her by the bank" and "would like to speak to an officer to provide suspect information."

At 11:17 a.m., seventeen minutes after the initial call for service to "PD/2P6," dispatch recommended several other VPD patrol units to respond. At 12:05 p.m., the call for service "timed out." At 12:08 p.m., the call for service to 47 Kentucky Street was renewed, with "PD/2P6" and other units recommended, at which time Calhoun finally picked up the call for service. Calhoun does not recall if he ultimately asked to be sent to the call or was directly dispatched to the call, but "either way, it was in my area, so it was something I had to deal with." He recalls that he was in his car when he was dispatched to 47 Kentucky Street, but does not recall where in the city he was at the time.

Calhoun looked up the report number through the computer system in his patrol car and determined that a police officer had not made a report on the incident yet, but was aware that a prior report had been made by the reporting party, such as through VPD's online system. Calhoun had not had any involvement with Gregory's theft report prior to the call for service. Calhoun was aware that he was not responding to a crime in progress, and that he was following up on a prior report involving a theft from a bank account. He did not confirm that Gregory was expecting VPD to send an officer to her property to take a report, but states, "[u]sually when people call the police to report a crime, they expect us to respond."

### IV. CALHOUN ARRIVES AT THE PROPERTY AND ENTERS THE YARD, DESPITE HIS CONCERN ABOUT THE PRESENCE OF DOGS

Plaintiffs' home was situated on the corners of Kentucky and Trinity Streets, and was surrounded by a low white picket fence. The property had two entrances, with the front patio and yard accessed through a wooden gate on Kentucky Street. The gate led to a short cobbled

CASPER, MEADOWS,
SCHWARTZ & COOK
2121 N. California Blvd.,
Suite 1020
Walnut Creek, CA 94596
TEL: (925) 947-1147
FAX: (925) 947-1131

*Gregory, et al. vs. City of Vallejo, et al.*   Case No. 2:13-CV-00320-KJM-KJN
PLAINTIFFS' TRIAL BRIEF

path, opening up to the front patio. Continuing straight led to Plaintiffs' front yard and house, with the front door located on the wrap-around porch approximately twenty feet from the gate. At the time of the incident, there was a cowbell that hung from the gate that, when shaken, Gregory and others could hear from inside her home.

On May 16, 2012, there was objective indicia of the presence of dogs on the property: there were children's and dog toys in the front patio, and there was wire fencing extending along the wooden fence line to keep the puppy, Holly, from jumping out.

Calhoun parked his patrol car near Plaintiffs' property and approached the gate. When Calhoun saw Plaintiffs' property, his primary concern was the presence of dogs.

Calhoun walked up to the gate and peered inside the yard, observing children's toys, such as a wading pool; he does not recall seeing dog toys, but maintains that he was concerned about the presence of dogs. He did not call out his presence at the gate, nor did he call the reporting party despite having her phone number to inform Gregory of his arrival because "[w]e don't generally do that . . . we respond to calls all day long, and calls like this, we go up and knock on the door; that's kind of how it works. Calhoun did not observe a cattle bell attached to the gate.

Calhoun states that he shook the gate and tapped the gate with his flashlight, per his habit when entering properties where dogs might be startled. Calhoun was ultimately "confident" that there were no dogs on the premises partly because there was a small picket fence and "I didn't see wiring." He then entered Plaintiffs' property. Calhoun did not take any further measures to determine whether there were dogs on the property after entering through the gate.

At the time Calhoun entered the yard, Gregory was working at her computer in her home office, waiting for the nanny to drop off five-year-old L.G. from preschool. Belle and Flicka were outside, and the puppy was inside the home with Gregory. Gregory was sitting at her desk, with her back to the window that faced the wraparound porch and front yard. Gregory typically heard when people walked through the gate when she was in her office. When Gregory was home during the day, she would typically leave the dogs in the fenced-in

CASPER, MEADOWS, SCHWARTZ & COOK
2121 N. California Blvd., Suite 1020
Walnut Creek, CA 94596
TEL: (925) 947-1147
FAX (925) 947-1131

*Gregory, et al. vs. City of Vallejo, et al.*   Case No. 2:13-CV-00320-KJM-KJN
PLAINTIFFS' TRIAL BRIEF

1  yard because they liked to lie in the sun, and they alerted Gregory to when people were at the
2  gate by barking.
3  Gregory never heard any sounds from the direction of the gate when Calhoun arrived;
4  the first thing alerting Gregory to Calhoun's presence on her property was the sound of
5  gunshots.

## V. CALHOUN SHOOTS AND KILLS BELLE

According to Calhoun, when he was approximately halfway toward the house, he saw two dogs charging at him at a full sprint from the left side of the house. Belle, the black-and-tan one, was slightly ahead of Flicka. Calhoun states that the dogs were barking as they approached.

Within "a second or two," Calhoun states the following occurred: he recognized that the dogs "didn't appear to be friendly"; he noticed the dogs snarling; he observed that the hairs on their backs were raised and that their tails were straight; determined that the dogs "were going to attack me"; retreated five or six feet toward the gate; and fired two shots, killing the lead dog, Belle. Calhoun did not recognize either dog as being a pit bull. Calhoun states he did not have time to retreat through the gate or otherwise from the yard, but he was "surprised that I was able to . . . get my firearm out of the holster fast enough and fire those rounds . . ." The holster he was using on that date was a "Level 3" holster, which requires the release of two snaps and rocking the gun forward to release it – the "triple threat" holster." The other dog, Flicka, ran away after he shot Belle.

He says that he shot Belle at "point-blank range" because it was "getting ready to" leap up and bite him. He does not recall if the dog had "jumped or . . . was starting to jump." Calhoun fired two shots, striking her in the snout, and through the mouth and throat. Calhoun believes he was further than the kiddie pool in the yard when he started retreating back toward the gate, shooting Belle at approximately at her final point of rest. He was not concerned about the presence of children because he was firing his gun toward the ground. Gregory heard the shots from nearby in the home office and "hit the floor" because she thought "somebody was trying to shoot me."

CASPER, MEADOWS,
SCHWARTZ & COOK
2121 N. California Blvd.,
Suite 1020
Walnut Creek, CA 94596
TEL: (925) 947-1147
FAX: (925) 947-1131

*Gregory, et al. vs. City of Vallejo, et al.*     Case No. 2:13-CV-00320-KJM-KJN
PLAINTIFFS' TRIAL BRIEF

Calhoun was not bitten by either dog. Calhoun was the only eye witness to the shooting.

In the wake of the incident, Plaintiffs have experienced severe emotional distress. After approximately eight years of living at 47 Kentucky Street, Plaintiffs and their two children moved out of their home and out of Vallejo in July 2012 as a result of the trauma from the incident.

## VI. CALHOUN'S TERMINATION

On December 2, 2013, Chase Calhoun was terminated from VPD. The termination was the result of an Internal Affairs Investigation ("IA"), conducted by Lieutenant Sid Dejesus ("Lt. DeJesus") into Calhoun's misconduct ranging from March 2012 until August 2013, during which time Calhoun was having sexual contacts with a woman, "Jane Roe," while Calhoun was on his patrol shifts, in remote locations, and frequently in his patrol vehicle. Jane Roe ended the relationship and notified VPD of Calhoun's wrongdoing in August 2013. The IA charged Calhoun with seven violations of department policy; all seven charges were sustained by three superior officers, including Chief Kreins.

Chief Kreins, in his Notice of Discipline, states, "The nature and extent of you (sic) misconduct is shocking, which misconduct clearly was unbecoming and brought into disrepute the Department and its other personnel. Your actions demonstrate serious, repeated and perplexing failures in judgment that make you unfit to be a police officer."

The IA report reveals two issues of particular relevance to this case:

### A. Factual Issues Related to Calhoun's Credibility

Lt. DeJesus interviewed Calhoun, and Calhoun confirmed he began a sexual relationship with Jane Roe in March 2012. Lt. DeJesus remarked in the IA Report that "Officer Calhoun appeared to me to have selective memory loss in relation to the frequency of his sexual contacts with [Jane Roe], and specific dates related to the same." Lt. DeJesus stated that "Officer Calhoun would attempt to minimize the time that it would take for him to complete these sexual acts by describing the duration of time as lasting only 10 to 15 minutes at a time." Calhoun did confirm that he would take Jane Roe to Mare Island for these

CASPER, MEADOWS, SCHWARTZ & COOK
2121 N. California Blvd., Suite 1020
Walnut Creek, CA 94596
TEL: (925) 947-1147
FAX (925) 947-1131

*Gregory, et al. vs. City of Vallejo, et al.*     Case No. 2:13-CV-00320-KJM-KJN
PLAINTIFFS' TRIAL BRIEF

encounters. Lt. DeJesus states that Calhoun appeared "to minimize the amount of times he and [Jane Roe] would actually have sexual intercourse while in a police car on Mare Island . . ."

Calhoun only admitted to taking Jane Roe to the Mare Island Training Facility ("MITC") after Lt. DeJesus confronted him with a photograph of the location. When asked about having sex with Jane Roe at another remote location (VPD Traffic Office), Calhoun responded, "I've got to be honest, I can't recall having sex there." Calhoun denied missing calls for service, despite the statement of Sergeant B. Clark ("Sgt. Clark") that he was "routinely" missing calls for service.

### B. Factual Issues Related to Calhoun' Habit of Not Responding to Calls for Service

From April 2012 through February 2013, Jane Roe lived at 1225 Santa Clara Street. From March 2, 2012 through January 9, 2013, Calhoun worked frequently as a solo beat officer assigned to "Beat 6," which Lt. DeJesus found of significance because Beat 6 is in close proximity to Jane Roe's house on Santa Clara Street. Calhoun was working as a solo beat officer assigned to "Beat 6" on May 16, 2012 when he shot and killed Belle.

During the time Jane Roe lived on Santa Clara Street, she and Calhoun had sexual intercourse while he was on duty once or twice a week. During this timeframe, the IA revealed that Calhoun took Jane Roe to remote locations to have sex while on his shift, including to a recycling center on Mare Island and to MITC.

Lt. DeJesus interviewed Sgt. Clark as part of the IA. The IA states, "Sergeant Clark spoke of Officer Calhoun having 'routinely' missed 'Calls for Service,' and how dispatch would need to 'advise a second time,' at which point Officer Calhoun would then answer for his designated CFS."

In Lt. DeJesus's findings of a violation of Availability of Duty (VPD General Order B-1, III, B1.4), he states:

> During the course of the investigation, I was able to confirm the actual locations where Officer Calhoun would drive [Jane Roe] for the purpose of having sexual intercourse. These locations were established to be in remote areas concealed from the general public where Officer Calhoun could assure himself of the privacy he would need to complete these sexual encounters. The location on Mare Island near Alco Recycling, which is located on the furthest North-West

CASPER, MEADOWS,
SCHWARTZ & COOK
2121 N. California Blvd.,
Suite 1020
Walnut Creek, CA  94596
TEL: (925) 947-1147
FAX (925) 947-1131

*Gregory, et al. vs. City of Vallejo, et al.*     Case No. 2:13-CV-00320-KJM-KJN
PLAINTIFFS' TRIAL BRIEF

corner of the Island, the PG&E substation in Glen Clove, and Gilcrest, would necessarily take Officer Calhoun out of service for extended periods and very likely resulted in missed or delayed responses to Calls for Service as confirmed by Sergeant B. Clark.

Officer Calhoun would not advise Communications of his duty status changes which occurred each time he allowed [Jane Roe] into his police care which also took him out of service by his own action.

In Lt. DeJesus's findings of a violation of Duty Responsibilities (VPD General Order B-1, III, B1.14), he states:

> By virtue of Officer Calhoun taking himself out of service without lawful and/or reasonable justification, he was not in a position to respond expeditiously to calls for service either directed to him by Communications, or calls from other uniformed officers who may have needed assistance or backup, or from citizens of this City. By virtue of him having an unauthorized civilian inside his police car, he was no longer in a position to respond and/or perform his duties in a prompt or safe manner.

## LEGAL ARGUMENT

### I. CALHOUN VIOLATED PLAINTIFFS' FOURTH AMENDMENT RIGHTS AND IS NOT PROTECTED BY QUALIFIED IMMUNITY.

Defendants will assert they are protected by qualified immunity. The issue of qualified immunity involves analysis of whether the plaintiff has shown a deprivation of a clearly established constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201, 205 (2001), *abrogated by Pearson v. Callahan* (2009) 555 U.S. 236 (providing courts with discretion to address either prong in determining the immunity issue). As stated in *Drummond ex rel. Drummond v. City of Anaheim* (9th Cir. 2003) 343 F.3d 1052, 1056:

> In order to decide whether state officers are entitled to qualified immunity, *Saucier* . . . instructs that we must first determine whether, "[t]aken in the light most favorable to the party asserting the injury ... the facts alleged show [that] the officer's conduct violated a constitutional right.' '[I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established ... in light of the specific context of the case' such that 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'

When assessing qualified immunity, courts must presume facts in favor of the plaintiff. *Kosakoff v. City of San Diego* (9th Cir. 2011) 460 Fed.Appx. 652, 654-55.

As explained below, Calhoun violated clearly established constitutional rights.

#### A. Legal Standard for an Excessive Force Claim Under § 1983.

CASPER, MEADOWS, SCHWARTZ & COOK
2121 N. California Blvd., Suite 1020
Walnut Creek, CA 94596
TEL: (925) 947-1147
FAX: (925) 947-1131

*Gregory, et al. vs. City of Vallejo, et al.*   Case No. 2:13-CV-00320-KJM-KJN
PLAINTIFFS' TRIAL BRIEF

"Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor* (1989) 490 U.S. 386, 396. "Reasonableness is the touchstone of any seizure under the Fourth Amendment . . . We look to the totality of the circumstances to determine whether the destruction of property was reasonably necessary to effectuate the performance of the law enforcement officer's duties." *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose* (9th Cir. 2005) 402 F.3d 962, 975.

"[T]he destruction of property by state officials poses as much of a threat, if not more, to people's right to be 'secure . . . in their effects' as does the physical taking of them." *Fuller v. Vines* (9th Cir. 1994) 36 F.3d 65, 68, *overruled on other grounds, Robinson v. Solano County* (9th Cir. 2002) F.3d 1007. "The killing of [a] dog is a destruction recognized as a seizure under the Fourth Amendment." *Id.* The killing of a citizen's dog while in the performance of a law enforcement officer's duty amounts to a "severe" intrusion. *San Jose Charter of Hells Angels Motorcycle Club, supra,* 402 F.3d at 975; *See also Brown v. Muhlenberg Twp.* (3d Cir. 2001) 269 F.3d 205, 210-211, calling the destruction of a pet an "extreme intrusion."

The balancing required by *Graham* "nearly always requires a jury to sift through disputed factual contentions," to draw inferences, and to make credibility assessments such that summary judgment should be granted "sparingly." *Santos v. Gates* (9th Cir. 2002) 287 F.3d 846, 853; *accord, Nelson v. City of Davis* (9th Cir.2009) 571 F.3d 924, 927; *Drummond, supra,* 343 F.3d at 1056; *Smith v. City of Hemet* (9th Cir. 2005) 394 F.3d 689, 701. Moreover, "[t]o the extent that there is a difference between the parties, [courts are to] look to the version most favorable to the plaintiff." *Smith, supra,* 394 F.3d at 693; *Sneade v. Rojas* (D. Mass., Mar. 10, 2014) 2014 WL 949635 at * 5 ["[G]iven that there is a chance, however slight, that a jury could find that under these circumstances Officer Rojas's shooting of [plaintiffs' dog] was unlawful, I am denying summary judgment with respect to Plaintiffs' Section 1983 claim against him."]

**B.     Plaintiffs Will Show by a Preponderance of Evidence that Calhoun Violated Plaintiffs' Fourth Amendment Rights.**

CASPER, MEADOWS, SCHWARTZ & COOK
2121 N. California Blvd., Suite 1020
Walnut Creek, CA 94596
TEL: (925) 947-1147
FAX: (925) 947-1131

*Gregory, et al. vs. City of Vallejo, et al.*     Case No. 2:13-CV-00320-KJM-KJN
PLAINTIFFS' TRIAL BRIEF

The crux of this inquiry is whether Calhoun had an objectively reasonable belief that he was required to shoot and kill Belle in the interests of officer safety, which has been recognized in certain circumstances to justify such an extraordinary use of force. *See Warboys v. Proulx* (D. Conn. 2004) 303 F.Supp.2d 211 [officers were justified in killing 90- to 100-pound Pit Bull].

### 1. Calhoun's Credibility is Paramount, and Seriously in Question.

Calhoun was the sole eyewitness to the shooting and to the events preceding it. In order for Defendants to prevail, Calhoun's account that he feared that he was "going to be attacked" must be credible.

Here, there is no independent evidence that Belle was about to attack Calhoun: Calhoun was not bitten or otherwise touched by the dogs, and Belle had no history of aggression. The reasonableness of Calhoun's decision to kill Belle turns in large part on the credibility of his story. His account that, within "one or two seconds," he recognized the intent of the dogs to attack – including noticing the raised hair on their backs – retreated five or six feet, unholstered a Level-3 holster, and fired two shots into Belle right before she was going to leap, is a debatable sequence of events that must be evaluated by a jury.

Furthermore, Calhoun's credibility is seriously in question in light of his enduring course of misconduct while a VPD Officer. First, Calhoun's misdeeds which resulted in seven sustained findings of department policy violations and his ultimate termination – having sexual intercourse at remote locations distant from his patrol beat, while on duty, in uniform and in his patrol car – in and of themselves bear on his credibility. Calhoun's decision to have sexual encounters while on duty instead of fulfilling his duties as a police officer necessarily involved acts of dishonesty, as Calhoun concealed his activities and whereabouts from dispatch, his fellow officers, and from his supervisors. The only reason his misconduct came to light was Jane Roe's notification to VPD; officers interviewed in the IA purportedly had no idea of Calhoun's clandestine activities. In other words, from at least March 2012 until August 2013, he routinely held himself out to be doing what he was obligated to do (patrol his beat), when in fact, he was not.

CASPER, MEADOWS,
SCHWARTZ & COOK
2121 N. California Blvd.,
Suite 1020
Walnut Creek, CA  94596
TEL: (925) 947-1147
FAX (925) 947-1131

*Gregory, et al. vs. City of Vallejo, et al.*     Case No. 2:13-CV-00320-KJM-KJN
PLAINTIFFS' TRIAL BRIEF

Second, there is ample evidence that Calhoun was dishonest during the IA, even in the face of overwhelming evidence of his wrongdoing. In his interview of Calhoun, Lt. DeJesus found him "to have selective memory loss" related to pivotal pieces of information of his contacts with Jane Roe. He also found that Calhoun "would attempt to minimize" the length of time of his contacts with Jane Roe to an unbelievable degree. He admitted to taking Jane Roe to locations only after being confronted with photographs. He responded he couldn't "recall having sex" at other locations – once again, a difficult assertion to believe. Calhoun denied missing Calls for Service, despite Sgt. Clark's statement that it was an ongoing problem for Calhoun.

In short, Calhoun was a VPD Officer for a mere two years, and was terminated based on conduct that was, in the words of former Chief Kreins, "shocking" and demonstrated "serious, repeated and perplexing failures in judgment."

### 2. There Exists Independent Evidence that Also Casts Doubt on Calhoun's Account of the Shooting.

Aside from Calhoun's disputed credibility as the sole witness to Belle's shooting, there exists other evidence that calls into question his version of events.

First, there is abundant evidence of Belle's temperament for peacefulness, and courts have found such evidence in police dog shooting cases relevant to the inquiry of reasonableness of the use of force. As stated in *Thurston v. City of North Las Vegas Police Dept.* (9th Cir. 2014) 552 Fed.Appx. 640, 642:

> [T]here is a genuine issue of fact as to whether the dogs attacked. The district court relied on the lack of evidence directly contradicting the officers' testimony that the dogs attacked. But this ignores the summary judgment standard that requires the court to view the evidence in the light most favorable to Thurston and draw all reasonable inferences in her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Here, although Thurston did not witness the alleged attack herself, she did testify that her dogs were not aggressive and that she had observed her dogs sitting by the back patio door looking happy and "wiggling their tails" just prior to her being escorted out of the house. Viewing the evidence in Thurston's favor, a jury could infer that if her dogs were "wiggling their tails" non-aggressively right before the alleged attack, then perhaps they did not attack at all.

*See also Kay v. County of Cook, Illinois* (N.D. Ill., Aug. 29, 2006) 2006 WL 2509721 at *3, finding summary judgment inappropriate ["Kay further presented evidence that his brown dog

CASPER, MEADOWS,
SCHWARTZ & COOK
2121 N. California Blvd.,
Suite 1020
Walnut Creek, CA 94596
TEL: (925) 947-1147
FAX: (925) 947-1131

*Gregory, et al. vs. City of Vallejo, et al.*   Case No. 2:13-CV-00320-KJM-KJN
PLAINTIFFS' TRIAL BRIEF

attended obedience training, that there is no history that his dogs have bitten anyone, and that there were no complaints from neighbors or animal control about his dogs."]; *Taylor v. City of Chicago* (N.D. Ill., Nov. 23, 2010) 2010 WL 4877797 at * 3, denying summary judgment ["[P]laintiffs have pled facts that would overcome an argument that Brick posed an imminent danger. They have alleged that Brick had no biting history, is a social dog, and had completed advanced and intermediate professional obedience classes."]

Here, Gregory states that Belle had never bitten any person or dog. Coudright, who lived on the premises for three years until July 2012, will state that, although Belle would sometimes bark and run toward visitors (as many dogs do), Belle had never shown signs of aggression, including toward the numerous visitors and people making deliveries to the property. Jan Gregory knew Belle since she was a puppy (over eleven years), and also will state that during her countless encounters with Belle, she was a playful, peaceful dog that never exhibited aggressive signs toward people, including toward UPS drivers who entered Plaintiffs' property.

Other relevant evidence to the reasonableness of Calhoun's actions is the advanced age of Belle (eleven years). *Wood v. Kitsap County* (W.D. Wash., May 3, 2007) 2007 WL 1306548 at * 9 [citing the fact the dog was eleven years old and in poor health as a relevant factor for weighing the officers' claims of aggression]. Belle's age also lends credence to the evidence of her temperament, as there was a long period in which she exhibited a lack of aggression, in contrast to a young dog with a small sample size of behaviors. Belle was also not a Pit Bull, a breed that is typically flagged as an aggressive breed, and a fact which Calhoun recognized during his brief encounter. *Warboys, supra,* 303 F.Supp at n. 13 [relying, in part, on the dog's Pit Bull breed in determining the reasonableness of the shooting].

### 3. Calhoun's Pre-Entry Actions Are in Dispute.

Calhoun's purported actions in entering the property are also disputed, which may have contributed to the ultimate unconstitutional shooting. Formulating a plan to enter property when law enforcement is aware of the presence of dogs is a factor cited by courts in

CASPER, MEADOWS, SCHWARTZ & COOK
2121 N. California Blvd., Suite 1020
Walnut Creek, CA 94596
TEL: (925) 947-1147
FAX: (925) 947-1131

*Gregory, et al. vs. City of Vallejo, et al.*    Case No. 2:13-CV-00320-KJM-KJN
PLAINTIFFS' TRIAL BRIEF

determining the reasonableness of a dog shooting case. *San Jose Charter of Hells Angels Motorcycle Club, supra,* 402 F.3d 962 at 976.

While the facts here are distinct from those in *San Jose Charter of Hells Angels Motorcycle Club*, in which the entry team had a week of planning prior to entry, Calhoun concedes that when viewing Plaintiffs' property with its fenced-in yard, his primary concern was the presence of dogs. Calhoun then came up with a plan: he shook the gate and knocked it with his flashlight prior to entering the premises.

There are factual disputes as to this account. Calhoun states he never saw wiring on the fence, which contributed to his confidence that there were no dogs, yet there was wiring on the picket fence at the time. Calhoun states that he did not see a bell on the gate, but there is evidence that there was, in fact, a bell on the gate to alert Plaintiffs to visitors. Gregory did not hear Calhoun at the gate, despite working nearby in her home office.

In addition to whether Calhoun actually took those precautions prior to entering, there are disputes as to the reasonableness of his entry plan. Calhoun concedes that he did not announce his presence at the gate or call the reporting party simply because officers "don't generally do that." The reasonableness of this practice is questionable under the circumstances, particularly since Calhoun was concerned about the presence of dogs, had difficulty seeing into the property due to foliage, and knew he was there to take a report and not to address a crime-in-progress.

### 4. Calhoun's Whereabouts Leading Up to the Incident, and His State of Mind, Are in Dispute.

As set previously forth, May 16, 2012 was approximately two months after Calhoun began taking Jane Roe to remote locations for sexual intercourse while on duty. Three of the sustained findings in the IA was for Calhoun's violations of "Availability for Duty," "Duty Responsibilities" and "Idling on Duty" based on Calhoun taking Jane Roe to remote areas of Mare Island during his shifts, thus being unavailable for calls for service. Calhoun's habit of dilatory responses to calls for service was corroborated by Sgt. Clark.

Here, there is evidence that Calhoun was unavailable for the original call for service by Gregory. The initial dispatch at 10:59 a.m. was directed to "PD/2P6," which was an

CASPER, MEADOWS,
SCHWARTZ & COOK
2121 N. California Blvd.,
Suite 1020
Walnut Creek, CA 94596
TEL: (925) 947-1147
FAX: (925) 947-1131

*Gregory, et al. vs. City of Vallejo, et al.*   Case No. 2:13-CV-00320-KJM-KJN
PLAINTIFFS' TRIAL BRIEF

identification referring to Calhoun's patrol unit. The CAD log reflects this fact, and Calhoun corroborates this by stating, "either way, it was in my area, so it was something I had to deal with." The CAD log also reflects that Calhoun responded to dispatch at 12:08 p.m. – a lapse of an hour and nine minutes from the original call for service in his beat.

Calhoun's whereabouts for this period of time are relevant to his state of mind during the incident, and may shed light on his response to unfolding circumstances. For example, if Calhoun was somewhere where he was not supposed to be – a possibility in light of the date of the incident relative to Calhoun's wrongdoing, the fact he was working the same Beat 6 where Jane Roe lived, and the apparent lag in response – there is a plausible inference that he may have been rushing to the call in a hurried, frantic state. There is also an inference that his mind was focused on avoiding detection from dispatch, other officers, or supervisors, and not on confronting the call for service with a calm and collected demeanor. Such evidence would explain his response to what otherwise may have been mundane circumstances – an eleven-year-old family dog running toward him – which ultimately bears on the reasonableness of the use of force.

### C. The Constitutional Right Was Clearly Established at the Time of the Shooting.

Assuming Plaintiffs prove a violation of their Fourth Amendment rights, the next step under the qualified immunity inquiry under the framework of *Saucier, supra,* 533 U.S. at 201 is determining whether the right is clearly established.

Here, on May 16, 2012, it was well-settled that an officer could not kill a citizen's dog, on his or her property, if it is not reasonable under the totality of the circumstances. *San Jose Charter of Hells Angels Motorcycle Club, supra,* 402 F.3d at 977-978 ["These cases should have alerted any reasonable officer that the Fourth Amendment forbids the killing of a person's dog, or the destruction of a person's property, when that destruction is unnecessary . . ."]; *Viilo v. Eyre* (7th Cir. 2008) 547 F.3d 707, 710 ["[I]n a case decided after the events at issue here, the Ninth Circuit held that it was clearly established *in 1998* that an officer cannot kill a person's pet unnecessarily." (emphasis in original)]; *Criscuolo, supra,* 540 Fed.Appx. at 564.

CASPER, MEADOWS, SCHWARTZ & COOK
2121 N. California Blvd., Suite 1020
Walnut Creek, CA 94596
TEL: (925) 947-1147
FAX: (925) 947-1131

*Gregory, et al. vs. City of Vallejo, et al.*     Case No. 2:13-CV-00320-KJM-KJN
PLAINTIFFS' TRIAL BRIEF

Since Calhoun's actions were objectively unreasonable under the totality of the circumstances, and the right of Plaintiffs to be free from the unreasonable killing of their dog on their property was clearly established at the time of the incident, Calhoun is not entitled to qualified immunity.

## II.    PLAINTIFFS' STATE LAW CLAIMS

### A.    Conversion

Plaintiffs claim that Chase Calhoun wrongfully exercised control over their personal property. To prevail on this claim, Plaintiffs must prove that they owned their dog, Belle; that Calhoun intentionally and substantially interfered with plaintiffs' property by destroying the property by killing Belle; that plaintiffs did not consent; that plaintiffs were harmed; and that Calhoun's conduct was a substantial factor in causing plaintiffs' harm.

Plaintiffs will meet these elements of conversion by a preponderance of evidence.

### B.    Intentional Infliction of Emotional Distress

Plaintiffs allege that Calhoun's conduct caused them to suffer severe emotional distress. To prevail on this claim, Plaintiffs must prove that Calhoun's conduct was outrageous; that Calhoun acted with reckless disregard of the probability that Plaintiffs would suffer emotional distress, knowing that Plaintiffs were present when the conduct occurred; that plaintiffs suffered severe emotional distress; and that Calhoun's conduct was a substantial factor in causing Plaintiffs' severe emotional distress.

Here, the Plaintiffs will be able to meet their burden that Calhoun acted with a deliberate disregard of the probability that his actions would cause emotional distress: he arrived late to the call for service for unknown reasons; he entered the property without taking adequate precautions despite his concern about the presence of dogs; and he shot and killed Plaintiffs' family dog that had been a loving and peaceful dog in the preceding eleven years of its life.

### C.    CAL. CIV. CODE § 52.1

Plaintiffs allege that Calhoun's conduct violated the Bane Act under Cal. Civ. Code § 52.1 because he intentionally interfered with their civil rights by threats, intimidation, or

CASPER, MEADOWS,
SCHWARTZ & COOK
2121 N. California Blvd.,
Suite 1020
Walnut Creek, CA  94596
TEL: (925) 947-1147
FAX (925) 947-1131

*Gregory, et al. vs. City of Vallejo, et al.*    Case No. 2:13-CV-00320-KJM-KJN
PLAINTIFFS' TRIAL BRIEF

coercion. To prevail on this claim, Plaintiffs must prove that Calhoun acted violently against Plaintiffs' property; that plaintiffs were harmed; and that Calhoun's conduct was a substantial factor in causing plaintiffs' harm.

### III.   PUNITIVE DAMAGES

Plaintiffs seek an award of punitive damages against Calhoun. To prevail on this item of damages, Plaintiffs must prove that Calhoun's actions were malicious, oppressive or in reckless disregard of Plaintiffs' rights. Conduct is in reckless disregard of Plaintiffs' rights if, under the circumstances, it reflects complete indifference to Plaintiffs' safety or rights, or if Calhoun acted in the face of a perceived risk that his actions would violate Plaintiffs' rights under federal law.

Plaintiffs will be entitled to a punitive damages award based on the outrageous nature of Calhoun's conduct in shooting their family dog unnecessarily.

### CONCLUSION

Plaintiffs anticipate that they will meet their burden on all of their claims. Calhoun's actions in killing their eleven-year-old dog was unreasonable, and Plaintiffs will seek to recover compensation under federal and state law, including an award for punitive damages.

Dated: January 19, 2015

　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　*/s/* - "Nick Casper"
Nick Casper
**CASPER, MEADOWS, SCHWARTZ & COOK**
Attorneys for Plaintiffs ERIKA GREGORY and LOREN MOLLNER

CASPER, MEADOWS, SCHWARTZ & COOK
2121 N. California Blvd., Suite 1020
Walnut Creek, CA 94596
TEL: (925) 947-1147
FAX (925) 947-1131

*Gregory, et al. vs. City of Vallejo, et al.*   Case No. 2:13-CV-00320-KJM-KJN
PLAINTIFFS' TRIAL BRIEF