IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

---oOo---

BEFORE THE HONORABLE KIMBERLY J. MUELLER, JUDGE

---oOo---


ERIKA GREGORY and LOREN
MOLLNER,

          Plaintiffs,      No. 2:13-cv-0320

vs.

CITY OF VALLEJO; former
VPD Chief ROBERT
NICHELINI, individually
and in his official
capacity; VPD Officer
CHASE CALHOUN,
individually; and DOES 1
through 50,

          Defendants.

_____/


---oOo---

REPORTER'S PARTIAL TRANSCRIPT

CONTINUED TRIAL TESTIMONY

CHASE CALHOUN

TUESDAY, JANUARY 27, 2015

---oOo---


Reported by: DIANE J. SHEPARD, CSR 6331, RPR

1                            APPEARANCES

2

3

4          For the Plaintiffs:

5
                    CASPER, MEADOWS, SCHWARTZ & COOK
6                   BY:  NICK CASPER
                    2121 North California Boulevard, Suite 1020
7                   Walnut Creek, California 94596

8
           For the Defendant:
9
                    CITY OF VALLEJO
10                  OFFICE OF CITY ATTORNEY
                    BY:  FURAH Z. FARUQUI
11                       Deputy City Attorney
                    555 Santa Clara Street
12                  P.O. Box 3068
                    Vallejo, California 94590
13

14

15

16

17

18

19

20

21

22

23

24

25

1                        I N D E X

2     PLAINTIFF WITNESSES:                              PAGE:

3     **CHASE CALHOUN**
      DIRECT EXAMINATION BY MR. CASPER (cont'd)        4
4     CROSS-EXAMINATION BY MS. FARUQUI                 36
      REDIRECT EXAMINATION BY MR. CASPER               68
5     RECROSS-EXAMINATION BY MS. FARUQUI               71
      FURTHER REDIRECT EXAMINATION BY MR. CASPER       72
6     FURTHER RECROSS-EXAMINATION BY MS. FARUQUI       73

7

8

            PLAINTIFF EXHIBITS RECEIVED IN EVIDENCE
9      No.                Description                   Page

10      35     CAD Log                                  6
        29     Photograph                               26
11      32     Photograph                               30

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         SACRAMENTO, CALIFORNIA

2                       TUESDAY, JANUARY 27, 2015

3                              ---oOo---

4                            CHASE CALHOUN,

5       a witness called by the Plaintiffs, having been previously

6       sworn by the Clerk to tell the truth, the whole truth, and

7       nothing but the truth, testified as follows:

8                      DIRECT EXAMINATION (cont'd)

9       BY MR. CASPER:

10      Q.      Good morning, Mr. Calhoun.

11      A.      Good morning.

12      Q.      I believe we left yesterday discussing the computer

13      system in your patrol car on May 16th, 2012, does that sound

14      familiar?

15      A.      Yes.

16      Q.      And you were describing that you had a system in your

17      patrol vehicle that told you -- or informed you of calls for

18      service, is that correct?

19      A.      Yes.

20      Q.      And at some point did you learn about a call for

21      service at 47 Kentucky Street?

22      A.      Yes.

23      Q.      How did that display in your vehicle?

24      A.      I mean, I don't recall exactly.  It's a been a long

25      time.  But from what I can remember, again, pulled up pending

1    calls for service and saw that that call was in my assigned

2    area, and I clicked on the call, which read, I guess, a more

3    detailed description -- I think some of it was covered

4    yesterday -- about the call for service, and I think at that

5    point I actually went onto a -- we have, I guess, a separate

6    computerized system for report writing and searched the case

7    number that was referenced to the original online report and

8    saw that it was just an online report.  There wasn't an actual

9    crime report by a police officer.

10          So basically what that told me is that it was kind of

11   -- it was going to have to be handled from start to finish.  It

12   wasn't just follow-up.  It was going to be a whole crime

13   report.

14   Q.      So the initial online report isn't considered a

15   police report, correct?

16   A.      It is.  And, again, it's been a long time since, not

17   only this happened, but since even I've been working there.  I

18   can't remember exactly the ins and outs of that, but I think,

19   at the time, the online reporting system was brought on by the

20   lack of staffing with the police department.

21          There is some, I guess, not necessarily minor crimes,

22   but I think what they call crimes without suspect information,

23   or there wasn't any leads to follow up on.  And this gave the

24   citizens the ability to file their own police report either

25   online or at the police department lobby.

1     Q.        Isn't it true, Mr. Calhoun, that you testified that

2     at the time there were horrible staffing levels at VPD?

3     A.        Yes.  There were.

4     Q.        And some minor theft crimes, there just wasn't

5     follow-up due to the lack of resources, is that correct?

6     A.        Not necessarily.  I mean, it depends on follow-up by

7     who.  Parole officers were able to, if they had the time, and

8     allowed to follow up on crimes, even minor if they had the time

9     or felt it was necessary.  But more than likely there usually

10    wasn't follow-up by detectives at the time.

11    Q.        Mr. Calhoun, what time do you recall getting the call

12    for service?

13    A.        I don't recall the times, but if you have the CAD

14    notes, I could tell you exactly.

15    Q.        I do, and I would like to direct your attention to

16    it.  Plaintiff will be moving into evidence stipulated

17    Exhibit 35.

18              THE COURT:  That's in a binder behind you.

19              MR. CASPER:  I'm also going to publish it on the

20    screen.  It might be easier for you to review what's in the

21    binder.  It's in Exhibit 35.

22              THE COURT:  Exhibit 35 is coming in and may be

23    published.

24              (Plaintiffs' Exhibit 35 admitted into evidence.)

25    Q.        BY MR. CASPER:  Is this the CAD log that you were

1      referencing Mr. Calhoun?

2      A.       Yes.

3      Q.       And what is a CAD log, briefly?

4      A.       Again, I'm not -- this is kind of more of a dispatch

5      thing.  I'm not an expert in this, but we dealt with them

6      occasionally.  From the best of my understanding, the best that

7      I can remember, this isn't necessarily -- or this isn't what we

8      saw in our computer system, but it's a -- I think it's the way

9      it's generated on the dispatch's computer systems.  They're

10     linked up, but they're different, the way they're viewed.

11     Because the dispatchers have more ability to, I guess,

12     manipulate or enter data and stuff, and this is, like, the

13     printout of it, the call for service after the fact.

14     Q.       And based on this CAD log, what time did you respond

15     to the call for service?

16     A.       Answered up, or dispatched, or what time I actually

17     arrived?

18     Q.       Answered to dispatch first?

19     A.       That would be is 12:08.

20     Q.       And which line --

21              Where does it read that that occurred at 12:08?

22     A.       If you look, I guess, the far left, it shows the

23     date, going all the way down, and then the next I guess it

24     would be column shows the times.

25              And so you have a bunch of times there.  It looks

1    like 11:00 is when dispatch entered the call for service or

2    formed the call for service in the computer system.

3    Q.        Well, I want to stop you there, Mr. Calhoun.  The

4    line above it, I see 10:59 at the very top, and then it lists

5    my client, Erika Gregory, and her address and phone number, is

6    that correct?

7    A.        Oh, at the very top?

8    Q.        Yes.

9    A.        Yeah.

10   Q.        Does that indicate that that's when the call for

11   service is initiated?

12   A.        I'm not -- I'm not an expert in the dispatch, the way

13   it works.  I don't know.  It may have been when they entered

14   it, and then maybe they post at 11:00, but, yeah, 10:59, 11:00

15   sounds --

16   Q.        And returning to when you first picked up the call

17   for service, where was that again?  I'm looking at the date

18   column and then at 12:08 in the next column.

19   A.        Yes.

20   Q.        And what does it state on that line that indicates

21   that you picked up that call for service, that you indicated to

22   dispatch that you would be responding to that call?

23            MS. FARUQUI:  Objection.  Assumes facts not in

24   evidence.  Officer Calhoun has not testified that he responded

25   to dispatch and picked up the call.

1                    THE COURT:  Overruled.  You may answer to the extent

2        you're able.

3                    THE WITNESS:  Again, I'm not an expert in the

4        dispatch system, or CAD reports, or anything.  But the best I

5        can remember from having to look at these, but it says 12:08,

6        STAT.  I don't know what STAT means.  But it says PD/2Paul6,

7        which is who I was that day.  That was my call sign.  And then

8        next to that it says DI, and from what I remember DI stands for

9        dispatched.

10       Q.       BY MR. CASPER:  Does that arrow indicate the line

11       that you're referring to right above that?

12       A.       Yes.

13       Q.       Do you remember what P-unit refers to?

14       A.       The P stands for patrol.

15       Q.       Patrol.  And this call came in your beat, is that

16       correct?

17       A.       Yes.

18       Q.       Do you recall how many officers were working that

19       beat on that shift?

20       A.       It was just me.

21       Q.       Do you know where you were when you first received

22       this call for service?

23       A.       No, I don't.

24       Q.       Do you know why it took an hour and nine minutes for

25       you to respond to this call for service?

1    A.       It didn't take an hour and nine minutes.  It took

2    three minutes.

3    Q.       Didn't we establish that the initial call for service

4    came in at 10:59 a.m.?

5    A.       Yeah.  But as we just talked about, I wasn't -- I

6    didn't respond or dispatched to the call.  I wasn't dispatched

7    to the call until 12:08.

8            In fact, I don't think I was dispatched.  I think I

9    was proactive and took it upon myself to answer up for the call

10   because it was pending in my beat.

11   Q.       So you saw it in your computer, and you took it upon

12   yourself to respond?

13   A.       Yeah.

14   Q.       And that process took an hour and nine minutes, is

15   that correct?

16   A.       No.  I guess going into the fact that there's low

17   staffing levels with the Vallejo Police Department, we had, at

18   the time, I believe, eight beats, eight areas, and I'm not

19   sure, but most of the time we weren't able to fill even all

20   those beats.

21           And because a lot of times there was, you know, calls

22   that require two officers, and if you're only working

23   one-officer cars, you have to have somebody to cover another

24   officer if there's higher priority crimes or calls for service.

25           So even though I was assigned to work, like, the

1    downtown area, we would routinely go all around town to handle

2    different calls for service, sometimes ourselves, even if it

3    wasn't our area, and then also to cover other officers and

4    calls.

5    Q.        Mr. Calhoun, you don't recall where you were before

6    this call, is that correct?

7    A.        No.  But I do recall seeing a CAD printout -- I don't

8    know if you have it -- of all the calls for service I handled

9    that day, and I do recall seeing on that that I responded to

10   multiple calls that day before this one.

11   Q.        Did that refresh your recollection as to what calls

12   you had responded to?

13   A.        No.  But it might if you have it and I can look at

14   it.

15   Q.        So you reviewed a document that told you that you had

16   responded to calls.  You still don't know where you were before

17   this call, is that correct?

18   A.        Exactly?  I mean, the calls -- the specific calls?

19            I mean, I vaguely remember one of the calls I went to

20   earlier that day.  And when I looked at that document -- I

21   don't remember when it was -- I remember seeing that I

22   responded to multiple calls that day, but I don't remember

23   which ones, no, other than that one that I vaguely remember.

24   Q.        When you saw this on your computer system in the

25   vehicle and decided that you were going to pick it up, did you

1     understand the general nature of the call for service?

2     A.        I believe so, yes.

3     Q.        Did you understand that it was concerning a theft

4     crime?

5     A.        Yes.

6     Q.        Did you understand that this was a completed theft

7     crime meaning it wasn't a crime in progress?

8     A.        I guess you'd have to define crime in progress.  It

9     kind of sounded that there was a continuing check fraud, but it

10    was something that we would refer to as a cold call.  There

11    wasn't a, you know, something -- somebody breaking into a house

12    or something.  It was a --

13    Q.        In terms of the response level hierarchy, was it

14    fairly low on that hierarchy?

15    A.        Yes, it was.

16    Q.        It wasn't what you would call a hot pursuit or a hot

17    call -- I'm not sure exactly the verbiage -- but something

18    where a suspect was on the scene?

19    A.        Correct.

20    Q.        Did you in fact drive to 47 Kentucky Street?

21    A.        Yes, I did.

22    Q.        Do you recall where you parked?

23    A.        I don't recall exactly.  I remember pulling up in

24    front of the house.  I can't remember if it was on the side of

25    the street of the house or across the street.

```
 1                    Generally, if you're responding to a -- like an
 2       in-progress or a hot call, it's normal to park, like, down the
 3       street.  But because this wasn't, I just pulled up and parked
 4       right in front of the house.
 5       Q.        Do you recall what equipment you were carrying that
 6       day?  You were carrying a baton, is that right?
 7       A.        I believe so, yes.
 8       Q.        And a firearm, is that correct?
 9       A.        Yes.
10       Q.        And OC pepper spray, is that correct?
11       A.        Yes.
12       Q.        And a taser?
13       A.        Yes.
14       Q.        What other equipment were you carrying?
15       A.        On my duty belt specifically?
16       Q.        Sure.
17       A.        There is a radio.  Generally, I carried like a clip
18       for my keys and keys, a magazine pouch with firearm magazines,
19       and, I guess, extra ammunition.  That's basically it, I think.
20       That I can remember at least.
21       Q.        Where was the radio attached?
22       A.        The radio itself is attached to the belt, so the
23       radio is lower, but then there is a lapel -- it's called a
24       lapel mic, so it's like a cord with a mic that either comes up
25       this way -- I think I used to wear mine around my back and
```

1    clipped up here on my shoulder.

2    Q.       Were you carrying any other equipment that day

3    outside of your belt?

4    A.       I don't know what you're referring to, I guess.  Not

5    that I --

6    Q.       You were wearing a uniform, correct?

7    A.       Yes.

8    Q.       Were you wearing a hat?

9    A.       I don't know.  I don't remember.  I don't think so.

10   Q.       You responded to the property, and what did you

11   observe?

12   A.       Just as far as the house or --

13   Q.       Yeah.  What did the property look like?

14   A.       When I pulled up in front, I noticed -- and I think

15   there was some pictures shown yesterday -- like a short, white

16   picket fence and a gate, and then the yard had a lot of foliage

17   growing up past the gate.

18   Q.       And was it difficult to look into the property?

19   A.       Yes, it was.

20   Q.       Was that because of the foliage?

21   A.       Yes.

22   Q.       I'm going to refer you to what's already been

23   admitted, Exhibit 11.

24           Mr. Calhoun, does that generally appear to be the

25   property as it appeared on March -- excuse me -- May 16, 2012?

1      A.         Yes.

2      Q.         Is that the foliage that you're referring to in part

3      that made it difficult to look into the property?

4      A.         Yes.  You're showing all the pictures.

5      Q.         Sorry.  Thank you.

6                 Mr. Calhoun, you've testified that prior to entering,

7      your primary concern was the presence of dogs, is that correct?

8      A.         Yes.

9      Q.         So you, in approaching the property and viewing the

10     property, you knew that one of the top officer safety issues

11     confronting you was the presence of dogs, correct?

12     A.         Yes.

13     Q.         And that was because of what?

14     A.         I guess something from maybe training and also

15     personal experience.  It's just something whenever I approached

16     a house, or I was going to a house that had even a small gate,

17     sometimes there was dogs in the front yard.  So whenever I saw

18     a gate like that, it kind of -- it wasn't like this huge

19     officer safety concern, but it was something in the back of my

20     mind that I was always trying to be aware of was the fact that

21     there may be dogs in the front yard.

22     Q.         You took some precautions prior to entering, correct?

23     A.         Yes.

24     Q.         You looked into the property, correct?

25     A.         Yes.

1      Q.        You noticed some children's toys including a kiddie

2      pool, is that right?

3      A.        Yes.

4      Q.        But you did not notice any dog toys, correct?

5      A.        No, I didn't.

6      Q.        Did you notice any chicken wire that was attached to

7      the picket fence?

8      A.        No, I didn't.

9      Q.        Did you announce your presence at the gate?

10     A.        Verbally?

11     Q.        Yes.

12     A.        No.

13     Q.        Isn't that because you generally don't do that as a

14     practice?

15     A.        No.

16     Q.        That's not why?

17     A.        Or, no, that's not something that I generally did.

18     Q.        And it's true that you state that you shook the gate?

19     A.        Yes.

20     Q.        And you tapped it with your flashlight?

21     A.        Yes.

22     Q.        What was that flashlight, what did it look like?

23     A.        Do you want, like, the type of flashlight or what it

24     kind of looked like?

25     Q.        Yeah.

1     A.          I believe it was a Streamlight.  SL20 was the model.

2     Q.          Approximately how large was it?

3     A.          About maybe 10 inches.

4     Q.          Do you recall about five minutes ago going through

5     what equipment you were carrying that day?

6     A.          Yes.

7     Q.          And why didn't you mention that you were carrying a

8     10-inch flashlight?

9     A.          I forgot.  It's been a long time.  The flashlight was

10    something I always carried.  Not necessarily on my belt.

11    Sometimes in my pocket.

12    Q.          Isn't it true at your deposition you didn't mention

13    carrying a flashlight?

14    A.          Like I said, it's something that I didn't even think

15    of.

16    Q.          Isn't it true, Mr. Calhoun that there were

17    essentially two pieces of equipment you used that day according

18    to you, the flashlight and your gun?

19    A.          Yes.

20    Q.          And one of those you forgot as to what you were

21    carrying?

22    A.          I mean, I'm looking back at a uniform that I haven't

23    worn in over a year or longer and stuff like that.  I guess, if

24    I really sit here and think about it, there may be a couple

25    other things that I was carrying that I forgot to mention as

1    well.

2    Q.      But one of those was something that was one of two

3    pieces of equipment that you used that day, correct?

4    A.      Yes.

5    Q.      Mr. Calhoun, did you ever receive training in writing

6    police reports?

7    A.      Yes.

8    Q.      Was that part of what's called POST training?

9    A.      Yes.

10   Q.      What does POST stand for?

11   A.      I believe it's Peace Officers Standards and Training.

12   Q.      And that's a standardized course that practically

13   every law enforcement officer takes in the United States, is

14   that correct?

15   A.      I believe so.

16   Q.      And what did it cover in terms of report writing, did

17   it cover the need to be accurate?

18   A.      I think the biggest thing with police reports is it

19   covered the need to write a police report with enough

20   information to document the nature of the incident, and so that

21   the officer could recall what had happened during the incident

22   so he could testify in court.

23   Q.      So to be comprehensive is not one of the requirements

24   of police report writing?

25   A.      I guess there is a fine line.  I mean, you have to

1    balance being comprehensive with being, I guess, time

2    efficient.  You can't spend, you know, hours and hours and

3    hours going over the top, documenting something, that's just

4    not -- that's not the reason for it.  The reasons is to

5    document the amount of information you need so that you can

6    recall enough to testify on the incident.

7    Q.        Isn't it true, Mr. Calhoun, that --

8              Well, let me say, did you write a report in this

9    incident?

10   A.        It wasn't a police report or a crime report.  It was

11   an information-only report.

12   Q.        Did you write an information-only report?

13   A.        Yes.

14   Q.        And in that information-only report, was there a

15   report narrative?

16   A.        Yes.

17   Q.        And in that narrative did you have an opportunity to

18   describe what happened on this incident?

19   A.        Yes.

20   Q.        And in that narrative, did you ever state that you

21   tapped the fence with a flashlight or shook the gate prior to

22   entering the property?

23   A.        I don't recall.  I would have to read it.

24             MR. CASPER:  If I may approach, I would like to

25   refreshes the witness' recollection?

DIANE J. SHEPARD, OFFICIAL COURT REPORTER, USDC -- (916) 554-7460

1                    THE COURT:  All right.  Does Ms. Faruqui know what

2        you're going to show him?

3                    MR. CASPER:  It's the police report.  That is exhibit

4        -- Defense Exhibit Number --

5                    MS. FARUQUI:  Exhibit A.

6                    MR. CASPER:  Exhibit A.

7                    THE COURT:  All right.  You may approach.

8        Q.        BY MR. CASPER:  And just let me know when you've had

9        an opportunity to read your narrative, Officer Calhoun --

10       excuse me -- Mr. Calhoun.

11       A.        (Witness reviewing document.)  Okay.

12       Q.        Did you see anywhere in that narrative where you

13       mention that you took the precautions that you claim you took,

14       that you tapped the gate with your flashlight or you shook the

15       gate prior to entering the property?

16       A.        No.

17       Q.        Isn't it true that you state that you looked at the

18       yard to see if there were any dogs, and you didn't see any

19       dogs, so you entered?

20       A.        Yes.

21       Q.        Wouldn't that have been important to include that

22       information?

23       A.        At the time, I didn't feel so.  It's just -- this is

24       just an information report just to document a general

25       understanding of what happened.  It's not -- it's not a

1       four-hour deposition or an in-depth testimony.  It's just

2       something to document the basis for what happened that day,

3       generally, so that if I need to look back, it could help

4       refresh.

5                   I mean, the police report, as you know, isn't

6       something that's evidence.  It's something that we use to

7       prepare cases, and so I can remember and testify as to what

8       happened.

9       Q.      And this was to refresh your recollection for later

10      on an incident in which you shot and killed two Vallejo

11      citizens' dog, is that correct?

12      A.      A dog, yes.

13      Q.      And you didn't feel that it was necessary to perhaps

14      establish the precautionary measures you took prior to entering

15      that yard and before killing their dog?

16                  MS. FARUQUI:  Objection.  Argumentative.

17                  THE COURT:  Overruled.  You may answer.

18                  THE WITNESS:  Can you repeat that question?

19      Q.      BY MR. CASPER:  You didn't feel that it was important

20      to include those precautionary measures in this incident?

21      A.      At the time, I included the amount of information

22      that I thought was necessary.

23      Q.      At some point you entered the yard, is that correct?

24      A.      Yes.

25      Q.      Isn't it true that approximately halfway toward the

```
 1    house you noticed two dogs?

 2    A.        Yes.

 3    Q.        And isn't it true that they were located on the left

 4    corner of the house?

 5    A.        Yes.

 6    Q.        Isn't it true, Mr. Calhoun, that that was

 7    approximately between 20 and 30 feet away?

 8    A.        I don't recall.  I was only there briefly.  So for me

 9    to give exact or even good estimates of the exact distances is

10    hard.  I think I brought that up at the deposition.  I was only

11    there for a little bit, and judging off pictures it's hard to

12    tell exactly how many feet it is.

13    Q.        I want to draw your attention to Exhibit 24 in

14    evidence.

15              Mr. Calhoun, does that depict, generally, the area

16    where you first saw the dogs?

17    A.        Yes.

18    Q.        And where on Exhibit 24 did you see the dogs?

19    A.        They were -- as I was walking up, I heard something

20    first.  And as I heard something, I looked up, and I saw them

21    running in a full sprint around the corner of the house.  So if

22    you're looking at this picture, it's the left corner of the

23    house, up on the deck.

24    Q.        Isn't it true that you observed that these dogs were

25    charging at you at a full sprint?
```

1    A.        Yes.

2    Q.        And that you observed that the dogs were snarling?

3    A.        Yeah.  My main attention was towards the dog that was

4    in front.  It was a little bit in front of the other.

5    Q.        And that dog was a larger dog, is that correct?

6    Larger of the two?

7    A.        I believe so, yes.

8    Q.        And on that lead dog, was it -- how close was the

9    other dog to the lead dog?

10   A.        I don't recall.  I'd say they were fairly close, but

11   I don't know exactly.

12   Q.        And you noticed on this lead dog that she was

13   snarling?

14   A.        Yes.

15   Q.        And that she was barking?

16   A.        Yes.

17   Q.        And that the hairs on the back of her neck were on

18   end?

19   A.        I would say like raised or -- yeah.

20   Q.        And you testified that her tail was straight, is that

21   correct?

22   A.        Yes.

23   Q.        And all of these signs indicated to you that this dog

24   was going to attack, is that right?

25   A.        Yes.

1      Q.        And you ended up withdrawing your firearm and

2      shooting this dog twice at point blank range, right as it was

3      about to leap, is that correct?

4      A.        I couldn't tell you if it was about to leap, or it

5      had already started to leap or not, but, yes, point blank range

6      probably.

7      Q.        Isn't it true that only one to two seconds elapsed

8      between the time you first saw the dogs and the time that you

9      shot the dog?

10     A.        Yeah.

11     Q.        So all of these things that you have just testified

12     to, the observations, the removal of your firearm, the shooting

13     that dog, that happened within two seconds?

14     A.        Yes.

15     Q.        What kind of holster were you carrying that day?

16     A.        It's been a long time.  I couldn't give you the make

17     or model anymore.

18     Q.        How many levels of protection did it have?

19     A.        I think it was referred to as a triple-threat

20     holster.

21     Q.        And what were the three things that needed to be done

22     to release that firearm?

23     A.        There was two snaps, and a rocking motion, and it's

24     kind of hard to explain, I guess.  But the best way I could

25     describe it, and I almost kind of have to show you with my

DIANE J. SHEPARD, OFFICIAL COURT REPORTER, USDC -- (916) 554-7460

1      hand --

2                  THE COURT:  Again, there is something on the screen.

3                  MR. CASPER:  I keep forgetting.  Apologize.

4                  THE COURT:  Go ahead.

5                  THE WITNESS:  As you reach down, there's a snap that

6      you hit with your thumb, and there's another snap that you hit

7      with your middle finger.  So as you, I guess, grab your

8      firearm, you hit both snaps and rock the firearm back at the

9      same time and then pull the firearm out.

10     Q.      BY MR. CASPER:  I want you to refer to Exhibit 29 in

11     your exhibit binder, in Plaintiffs' exhibit binder.

12                  Mr. Calhoun, does that depict the lead dog that you

13     shot that day?

14     A.      Yes.

15     Q.      And does that depict her positioning after she was

16     shot?

17     A.      Yes.

18     Q.      Did you move her body in any way?

19     A.      No.

20                  MR. CASPER:  Plaintiff moves into evidence

21     Exhibit 29.

22                  THE COURT:  Ms. Faruqui?

23                  MS. FARUQUI:  Objection.

24                  THE COURT:  That objection is overruled.  29 is

25     admitted.

1                    (Plaintiffs' Exhibit 29 admitted into evidence.)

2       Q.          BY MR. CASPER:  Mr. Calhoun, it's your testimony that

3       the dog was ready to leap, is that correct?

4       A.          Again, I mean, you brought it up yourself and kind of

5       harping on the same thing is you got to realize, I mean, this

6       is literally one to two seconds.

7                    And I think, you know, you're talking about how I was

8       able to even, you know, kind of to recognize all these things

9       and draw the firearm in that splint second.  And this is

10      something that I guess I have had discussed or gone over in

11      training, but this is the only time I've ever, I guess,

12      experienced this in my personal life.

13                   I mean, I've spent hours and hours doing firearms

14      training and shooting.  And I think it's considered like an

15      adrenaline dump or adrenaline rush that kind of slows

16      everything down, and even to the point, like, when you fire

17      that -- when you fire the firearm, it wasn't -- it muffles your

18      hearing and stuff.  It's like a tapping sound.  It doesn't even

19      sound like a loud bang or anything going off because -- because

20      of that adrenaline and everything kind of slows down a little

21      bit.

22                   Looking back at it, I'm surprised that not only does

23      it still kind of stand out in my mind so vividly, and that I

24      was able to, I guess, see that dog and realize, you know, all

25      the stuff going on with it that made me know that it was going

1    to attack me and then be able to pull the firearm that fast and

2    fire two rounds.  But, you know, I couldn't tell you if it was

3    jumping, or on its hind legs, or exactly what as far as whether

4    it was leaping or getting ready to leap or not.

5    Q.        Do you believe the dog was in mid air when you shot

6    the dog?

7    A.        I don't know.  This happened too fast.

8    Q.        Did the dog ever make contact with you?

9    A.        I don't believe so.

10            Something I can say, though, and just looking back at

11   it, I trained a lot with firearms, but I was by no means an

12   expert marksman or, like, an amazing shot.

13            Something that we always trained in with firearms is

14   you try to train small as possible, even at close distances.  I

15   mean, it can be hard to hit a smaller target sometimes.

16   Because when you're faced with a situation like this, and you

17   have this crazy adrenaline dump, and in this split second you

18   have to make this decision whether or not -- you know, first of

19   all, there's this threat where you're going to be seriously

20   injured.

21   Q.        Thank you, Mr. Calhoun.  I don't believe this is

22   responsive to my question.  I'd like to refer your attention to

23   Exhibit 28 that's already in evidence.

24            Mr. Calhoun, once again, does that depict the same

25   position of Belle as you saw her that day?

```
 1    A.         Yes.

 2    Q.         And do you believe you were further --

 3               Where were you located when you first saw the dogs

 4    approaching?  Was it in front or behind of Belle in this

 5    photograph?

 6    A.         I remember.  And this stands out very vividly in my

 7    mind, and it was one of those things where I'm not even sure

 8    why I did this.  But as I was walking up, you can see the

 9    little kiddie swimming pool there.  It's kind of out in the

10    path.

11               So I was walking literally next to the swimming pool.

12    And just as I was passing the left of the swimming pool, I

13    remember looking down for some reason into the swimming pool,

14    or at it, and that's when I heard the noise, and looked up, and

15    saw the dogs charging from the corner of the house.

16    Q.         So you were somewhere in that general area when you

17    first saw the dogs?

18    A.         Yeah.  It could have been a little bit farther even.

19    Q.         Further towards the house?

20    A.         I'm not sure exactly, but close enough that I -- as I

21    was walking up, I looked down at the swimming pool that was

22    sitting on the ground there.

23    Q.         And so the less than two seconds includes the time

24    that it took you to retreat the five or six feet to where Belle

25    ended up lying?
```

1       A.        Yeah.

2       Q.        Do you know where you shot the dog?

3       A.        The placement?

4       Q.        Yes.

5       A.        From what I could tell, it looked like the back of

6       the throat and then right in the, like, the side of the snout.

7       Q.        And I'd like you to refer to Exhibit 32 in the

8       binder.  Does that appear to be one of the --

9                 Are any of the locations of the bullet wounds evident

10      on Exhibit 32?

11      A.        Yes.  One of them is.

12      Q.        And which shot was that?

13      A.        The one on the snout.

14      Q.        And does that seem consistent as to what you recall

15      as to where you shot the dog?

16      A.        Yes.

17      Q.        Is there anything about that bullet hole that makes

18      you further understand where the dog was in relation to you?

19      A.        No.  Other than what I was trying to explain a minute

20      ago when you cut me off is that, you know, the two shots being

21      that close, I mean one in the back of its throat and one just,

22      I mean, maybe a couple inches away on the snout would make me

23      think that it had to be point blank range.

24                I mean, to be moving backwards and making that

25      decision in a split second, trying to pull the gun out of the

1    holster, and firing two rounds, you know, without aiming and

2    down, for them to be that -- for them to be that close

3    together, there was no other explanation than it was probably

4    point blank range.

5              MR. CASPER:  Plaintiff moves into evidence

6    Exhibit 32, Your Honor.

7              THE COURT:  Ms. Faruqui.

8              MS. FARUQUI:  Objection.  403.

9              THE COURT:  That objection is overruled.  32 is

10   admitted.

11             (Plaintiffs' Exhibit 32 admitted into evidence.)

12   Q.        BY MR. CASPER:  Mr. Calhoun, do you believe that you

13   fired both shots within rapid succession?

14   A.        Yes.

15   Q.        And at some point you recall there being a resident

16   in the house, is that correct?

17   A.        Yes.

18   Q.        And that resident at some point attempted to go out

19   the front door to find out what was going on?

20   A.        Yes.

21   Q.        And do you recall ordering that person back in the

22   house?

23   A.        Yes.

24   Q.        And isn't it true, Mr. Calhoun, that at the time you

25   ordered her back in the house because you thought these two

1    dogs may have been loose, wild dogs in the yard?

2    A.          Yeah, I mean, I just, you know, was almost attacked

3    by two vicious dogs and had to shoot one of them.  Obviously, I

4    was scared at the time that I just had experienced that.

5           And as I backed out of the fence and closed the gate,

6    I heard someone coming outside, and, obviously, at that time I

7    didn't know that they were their dogs or whose dogs they were.

8    Alls I know is they were vicious and just tried to attack me,

9    so, yeah, at the time I ordered her to go back inside the house

10   because I didn't want her to be attacked by the dog as well,

11   the other dog that was still out.

12   Q.          So the fact that you had entered this closed yard,

13   with foliage, and shot one of dogs on this property, it didn't

14   indicate to you that these were her pets?

15   A.          You're talking in a matter of just, I mean, a couple

16   split seconds that I had to -- I got attacked or almost

17   attacked by these dogs and had to make this decision to shoot

18   one of them to protect myself, and then a couple seconds later

19   as I'm trying to get out of the gate to protect myself and lock

20   the gate, that, you know, I didn't know at that time that they

21   were her dogs or not.

22   Q.          And it's true that at the time, in that moment, that

23   your concern was that there were two loose vicious dogs on the

24   property, is that correct?

25   A.          My concern at the time that there was two vicious

```
 1        dogs on the property --

 2        Q.        How about loose?

 3        A.        -- just tried to attack me.

 4                  I didn't know whose dogs they were, or if they were

 5        loose, or what was going on.  From the best I could tell when I

 6        entered the yard, that there was a front yard and a backyard,

 7        and I didn't think there was any dogs in the front yard.  I

 8        didn't realize that it was a big wrap-around property.  I

 9        didn't know where the dogs came from.  I didn't think there was

10        any dogs in the yard at all, so I didn't know.

11        Q.        Isn't it true that part of your decision to enter the

12        property as did you was because it was a front yard and not a

13        backyard?

14        A.        Yes.

15        Q.        And in your experience dogs are typically in

16        backyards versus front yards?

17        A.        Yes.

18        Q.        Mr. Calhoun, isn't it true that the presence of

19        children was not a concern to you when you shot the gun?

20        A.        The presence of children in the direction I was

21        firing my gun?

22        Q.        Sure.

23        A.        Yeah.  I was firing my gun at a downward direction at

24        the dog.  There was no children laying on the cement underneath

25        the dog.
```

1    Q.        And that was the material that was generally under

2    the dog, cement?

3    A.        It was the walkway.  I think you've seen the

4    pictures.  I don't know what you classify that as.  If it's

5    pavers or -- I'm not sure what it was.  But it was like either

6    a stone, or cement, or something.

7    Q.        Mr. Calhoun, at some point are you aware of who is

8    now Lieutenant Sid DeJesus is?

9    A.        Yes.

10   Q.        Was he a sergeant in 2012?

11   A.        I don't recall.

12   Q.        Do you recall at some point being interviewed by

13   Lieutenant DeJesus in 2013?

14             MS. FARUQUI:  Objection.  Vague as to time.

15             MR. CASPER:  At some point --

16             THE COURT:  Overruled.  There is the year.  You can

17   answer "yes" or "no" to the extent you're able.

18             THE WITNESS:  My interview in regard to this

19   situation?

20   Q.        BY MR. CASPER:  No.  Regarding to some misconduct

21   that you had done?

22   A.        So whether or not I had been interviewed to something

23   that doesn't relate to this?

24             MR. CASPER:  I move to strike, Your Honor.

25             THE COURT:  Well, the question -- it's the Court that

```
 1        makes legal determinations.

 2                 Can you repeat the initial question or do you want

 3        the court reporter --

 4                 MR. CASPER:  I'll rephrase, Your Honor.

 5        Q.       BY MR. CASPER:  At some point were you investigated

 6        for misconduct in 2013?

 7        A.       Yes.

 8        Q.       And did that misconduct span in time from March 2012

 9        to August 2013?

10        A.       I don't know if those dates are correct, but,

11        generally, yes.

12        Q.       And in that process of being investigated, were you

13        interviewed by Lieutenant DeJesus?

14        A.       Yes.

15        Q.       And isn't it true, Mr. Calhoun, that during that

16        investigation you were dishonest with Lieutenant DeJesus?

17        A.       No, I wasn't.

18        Q.       Would the Internal Affairs investigation report dated

19        August 20th, 2013 refresh your recollection?

20        A.       I was never charged with dishonesty or found to be

21        dishonest in anything.

22        Q.       It's your testimony that you were forthcoming with

23        Mr. DeJesus in the interview?

24        A.       Yes.

25        Q.       Did you ever experience any selective memory loss
```

```
1         during this interview?

2    A.          No.

3    Q.          Do you know what selective memory loss refers to?

4    A.          No.  Not really.  I mean, if you want to define your

5         definition.  I have my definition of what I would define it as,

6         but that wasn't the case.

7    Q.          Isn't it true, Mr. Calhoun, that as a result of that

8         investigation, you were terminated from Vallejo PD?

9    A.          Yes.

10              MR. CASPER:  I have nothing further, Your Honor.

11              THE COURT:  All right.  Ms. Faruqui.

12              At this point, are the parties agreeing that

13        Ms. Faruqui may also conduct her direct exam?

14              MR. CASPER:  Yeah, if that could be explained a bit

15        to the jury.

16              THE COURT:  All right.

17              MR. CASPER:  Thank you.

18              THE COURT:  Ladies and gentlemen of the jury,

19        typically at this point during the Plaintiffs' case you would

20        be only hearing the Plaintiffs' case.  But because the defense

21        also would call Mr. Calhoun, the parties have agreed that

22        Ms. Faruqui can ask questions not only within the scope defined

23        by Mr. Casper's questions, but she can also ask the questions

24        that she would ask in her case-in-chief, in her defense case.

25        So the ground rules are being modified to achieve some
```

1    efficiencies, and the parties have worked together on that.

2          Ms. Faruqui, you may proceed, and you may ask both

3    the questions that you would ask in response to Mr. Casper's

4    questioning and those that you would ask in your case.

5          MS. FARUQUI:  Thank you, Your Honor.

6                        CROSS-EXAMINATION

7    BY MS. FARUQUI:

8    Q.     Good morning, Officer Calhoun.

9    A.     Not officer.  Just Chase Calhoun.  But good morning.

10   Q.     Good morning.

11          You testified, when Mr. Casper asked you questions,

12   about your present occupation.  I want to go to where you

13   worked before you were self-employed selling insurance.

14          Can you tell me where you worked?

15   A.     Yeah.  I worked for the Vallejo Police Department.

16   Q.     And what was your rank at the time?

17   A.     Just officer.

18   Q.     What were your duties and responsibilities at the

19   Vallejo Police Department?

20   A.     I was assigned to the patrol division, so I was part

21   of the patrol.  There, it was kind of all encompassing.  We

22   worked generally in cars.  We were assigned areas.  We

23   patrolled the city in both -- you know, we performed proactive,

24   I guess, police work, actually going out and looking for

25   criminal activity and trying to, you know, make arrests, or do

1    things to stop criminal activity, and then we also responded to

2    calls for service, so, like, 911 calls for service, mostly

3    involving crimes.

4    Q.        And prior to being a sworn officer at the Vallejo

5    Police Department, were you also a cadet for the Vallejo Police

6    Department?

7    A.        Yes.

8    Q.        And what does that mean?

9    A.        So this was a couple years before I was a police

10   officer.  As a police cadet, it's a non-sworn position.  It's

11   something I was hired, I guess, during and as part of the

12   requirements of the job you're attending college full time.

13            You perform, I guess, minimal, like, non-sworn law

14   enforcement duties.  Part of that was, like, patrolling, like,

15   an area called Mare Island, or working with the traffic

16   division helping to investigate small traffic accidents and

17   things like that, and then we also -- we did training kind of

18   like academy or college-style classroom instruction, physical

19   training twice a month.

20   Q.        And prior to being -- prior to working at Vallejo,

21   did you ever work in any prior law enforcement?

22   A.        Yes.

23   Q.        And where was that?

24   A.        The Alameda County Sheriff's Department.

25   Q.        Can you describe what your duties were at the

1    sheriff's department?

2    A.        Yeah.  My main duty or job assignment was at the

3    Glenn Dyer Jail in Oakland.  I worked as, I guess, a housing

4    unit deputy in charge of security of inmates housed in the

5    facility.

6    Q.        And in order to become a police officer, did you have

7    to attend an academy?

8    A.        Yes.

9    Q.        Is that a requirement for any police officer?

10   A.        Yes.

11   Q.        Was that the POST academy?

12   A.        Yes.

13   Q.        Where did you attend?  Which academy did you attend?

14   A.        The Alameda County Sheriff's Academy.

15   Q.        And do you recall when you attended the academy?

16   A.        It's been a long time, so it would be hard for me to

17   give you exact dates, but, looking back, I believe it was,

18   like, the end of 2009 into 2010.

19   Q.        Do you recall what the general nature of training at

20   the academy was?

21   A.        Yeah.  The academy, it's law-enforcement based

22   training.  They break it down by I guess what they call

23   learning domains.  They're kind of like small textbooks.  There

24   is a lot of them.  They each cover different topics.  So you

25   cover a wide range of topics that prepare you for a career in

1    law enforcement.

2    Q.        And at the academy did you have any use-of-force

3    training?

4    A.        Yes.

5    Q.        And do you recall what type of training that was?

6    A.        Not exactly.  I mean, again, it's been a while.

7    There is a set, I guess, standard of hours that you would spend

8    just on use of force.

9             But going through that academy, you not only are

10   exposed to and spend time training use of force while going

11   through that, but also other aspects like the firearm's

12   training touches on use of force, and the defensive tactics

13   part of the training also touches back on use of force.

14   Q.        Did any of the training that you had at the academy

15   encompass timing issues such as reaction times?

16   A.        Yes.  In the academy.  It's hard, you know.  I guess

17   I'll say this, that when I look back, it's hard sometimes for

18   me to remember exactly what I learned in the academy opposed to

19   what I learned in other law enforcement training, or, you know,

20   training throughout my career.

21   Q.        All right.  So let me ask you this, at the some point

22   in your training or some point in your career did you

23   experience training related to reaction time?

24   A.        Yes.

25   Q.        And do you remember what type of training that was?

1    A.        I think the one that always -- I had maybe had heard

2    a few times, or the one that kind of stands out the most to me

3    is kind of like with distance training.  The amount of time it

4    takes for, you know, I guess, a person -- how quickly even a

5    person can close the distance on somebody if they're in a full

6    sprint.

7    Q.        Based on your training, did you at some point learn

8    what reasonable force is?

9    A.        Yes.

10   Q.        And can you tell the jury what that is?

11   A.        Well, I guess the reasonable force for an officer

12   it's considered like a standard.

13             It would be the amount of force that's necessary to

14   overcome or defend yourself from resistance or a threat that

15   any other officer in a similar situation with similar training

16   would do.  So something that a similar officer with similar

17   training would do in the same situation.

18   Q.        And you also mentioned that you had some self-defense

19   training?

20   A.        They called it defensive tactics training.

21   Q.        And can you describe to the jury what defensive

22   tactics training is, please?

23   A.        I don't know the best way to describe it.  I guess it

24   would be more along the lines -- it was kind of all

25   encompassing.  It would go from anything as small as, you know,

1    handcuffing someone to what they call control holds, or, you

2    know, the wrist locks and twist locks, and those type of things

3    to, I guess, more, you know, striking, and wrestling, and gun

4    retention, and that type of thing.

5    Q.       And then specifically when you were at the Vallejo

6    Police Department did you receive some training on use of

7    force?

8    A.       Yes.

9    Q.       And did you receive some training on firearms?

10   A.       Yes.

11   Q.       What type of firearms training was that?

12   A.       Specifically at the Vallejo Police Department?

13   Q.       Yes.

14   A.       I don't recall exactly or how to explain it exactly,

15   but I guess the best way would be was when I went back there

16   from the sheriff's department, I went through I believe it was

17   a two-week orientation -- they called it orientation -- before

18   I started the actual patrol or patrol training.  And during

19   that, I guess, two-week time, I spent some time at the range

20   doing firearm's training.

21   Q.       When you were employed by the Vallejo Police

22   Department, were you familiar with the policies and procedures?

23   A.       Yes.

24   Q.       And are you familiar with the use of force policy at

25   the Vallejo Police Department?

1      A.        I am.  Although it's a little bit more vague now.

2      When I was working in the Vallejo Police Department, and force

3      was something that was, you know, I may have had to use at any

4      given time.  It was a lot fresher in my mind as towards the

5      exact policy.

6      Q.        Do you have a basic understanding of what that policy

7      is?

8      A.        Yes.

9      Q.        Can you describe to the jury what that is?

10     A.        The whole, I guess, use of force policy?

11     Q.        Yes.

12     A.        The Vallejo Police Department, at least as far as I

13     can remember, had their basic policy was that you were allowed

14     to use reasonable force to, you know, to effect arrest, to

15     overcome somebody's resistance, or to defend yourself or

16     somebody else.

17     Q.        And was there anything in the policy -- strike that.

18               At some point in your career did you receive training

19     on how to encounter a dangerous dog?

20     A.        Yes.

21     Q.        And what type of training did you receive with

22     respect to that?

23     A.        I would say that, you know, dangerous animals or dogs

24     was something that had probably been touched on on just more

25     than one occasion throughout my law enforcement career, but I

1    do remember one time specifically when I was working with the

2    Alameda County Sheriff's Department where they did an actual --

3    it might have been shorter -- but an actual training block on

4    how to deal with dangerous animals -- dangerous or injured

5    animals, I believe.

6    Q.        And did you at any point learn what the signs were

7    when you encounter a dangerous dog?

8    A.        Yes.

9    Q.        Can you tell us what those signs are?

10   A.        Again, just to kind of preface it, remembering back,

11   you know, I've spent some time in law enforcement, and I

12   couldn't tell you exactly -- and from also my personal life, I

13   guess, being around or dealing with dogs -- exactly if I

14   learned these ones at the sheriff's department.

15              But I believe that the gist of what they covered and

16   my understanding of a dangerous dog is things like, you know,

17   growling, barking or snarling, kind of like the noises or

18   sounds, a dog showing their teeth, the hair raised on the back

19   of their back or their neck, and then a straight tail as

20   opposed to like a wagging tail.

21   Q.        Why is the straight tail significant to you?

22   A.        To me -- and I don't know if that's necessarily my

23   training or my own experience.  I've been around a lot of dogs,

24   and I've owned dogs, and, you know, all dogs, I guess, bark and

25   can even growl and stuff.

1          But something I noticed and I had been told in

2     training, or in personal experience, is that a dog, even if

3     it's barking, if the tail is, you know, wagging back and forth,

4     that doesn't necessarily mean the dog's aggressive just because

5     it's barking.  But when the dog has that tail kind of locked or

6     straight, that's different.  The dog is being aggressive, and

7     it's not being friendly.

8     Q.       So is it your testimony that these signs combined are

9     what the signs would be of a dangerous dog as opposed to one of

10    the signs by itself?

11    A.       I think any of the signs by itself could, you know,

12    be alerted to a dangerous dog, or it's a possibility it could

13    be a dangerous dog, but, yeah, I think all the signs together

14    are, you know, definitely, to me, a dangerous dog.

15    Q.       And would you describe that as a dog that's about to

16    attack?

17    A.       Yes.

18    Q.       At some point in your training did you learn about

19    the force continuum?

20    A.       Yes.

21    Q.       And can you describe to us what that is?

22    A.       Yeah, I mean the -- I don't know.  Some of the

23    stuff's a little foggy because it's been a long time since I

24    worked in law enforcement.  When I was doing it every day, it

25    was a lot fresher in my mind.

1          But the gist of the force continuum, or the way they

2     use that is you have all these options of using force available

3     to you.  Anything as far as just like, you know, as small as

4     telling somebody to do something, or, you know, those control

5     holds, or handcuffing, or -- and you start getting into the

6     different weapons, the pepper spray and the tasers, all the way

7     up to the firearm.

8          And the way it's kind of explained is, if possible,

9     if you're able to, you kind of start at that lowest level of

10    force you can, and then work your way up, if possible.  So if

11    alls you need to do is tell somebody to sit down or to put

12    their hands behind their back, and that works, that's fine.

13         But at the same time you're not expected that if

14    you're met with a severe or a higher threat, to start at the

15    bottom.  You start where you need to to deal with the threat.

16    Q.        So you use the level of force that would be required

17    to neutralize the threat, is that correct?

18    A.        Correct.

19    Q.        I'm going to go back to your employment at VPD.  Did

20    you get any type of commendations or service awards there?

21    A.        Yes.

22    Q.        Can you describe those generally?

23    A.        I mean, generally, they're for, I guess, actions or

24    things you were involved in that were, I guess, above and

25    beyond what you normally do, and you're being recognized by a

1    supervisor or by somebody for those actions.

2    Q.      Do you remember in what types of activities you got

3    those awards?

4    A.      I mean, generally, it would be hard without having

5    them in front of me.  If I had them in front of me, I could

6    kind of go over them.  But I guess a wide range of things.  I

7    had a couple as a police cadet before I was an officer, and as

8    an officer I had more.

9            They were for things like, you know, I guess,

10   spending the time and investigating crimes maybe further than

11   normally or than other officers may have in order to make, you

12   know, a good arrest or a big arrest.  You know, maybe dealing

13   in dangerous situations where you're dealing with somebody

14   that's armed or in a dangerous situation.  You're being

15   recognized for that.  Those type of things.

16   Q.      And I didn't ask you this, but did you attend

17   college?

18   A.      Yes, I did.

19   Q.      Where did you go?

20   A.      I first attended Diablo Valley College in Pleasant

21   Hill, and then I later attended Cal State East Bay or Cal State

22   Hayward.

23   Q.      Did you attain a degree from Cal State East Bay?

24   A.      Yes.

25   Q.      What's that degree?

1    A.        Bachelors of Science in criminal justice.

2    Q.        Do you recall what year that was?

3    A.        I don't, but I believe it was 2009.  Just prior to

4    attending the academy.

5    Q.        All right.  At this point, I want to get to the day

6    of the incident, and I know some of that has been covered by

7    Mr. Casper, but I'm going to go ahead and ask you some of these

8    questions in my direct.

9              What was your assignment at the time of the incident,

10   which was, as we have said multiple times, May 16th, 2012?

11   A.        As far as patrol or the exact assignment?

12   Q.        No.  Patrol?

13   A.        I was working patrol.

14   Q.        And we got to this a little bit in Mr. Casper's

15   cross, but can you explain a little bit more about the general

16   practice of receiving a call for service, how that works?

17   A.        I think I kind of touched on it a little bit.

18   There's kind of two ways that you can receive a call for

19   service.  One is that you're available, so you're not doing

20   anything else at the time, and the dispatch can dispatch you a

21   call as in they kind of -- they tell you that you have to go to

22   this call and who you're going with, or, you can look at the

23   calls that are pending, which was common practice there, and

24   you answer.  We called it answering out for the call yourself.

25              So you see that there's something in your area or

1     even another area that needs to be handled, and you take it

2     upon yourself to, I guess, dispatch or tell dispatch you're

3     going to handle that call.

4     Q.      So what's the difference between being dispatched to

5     a call and going through the call log?

6             MR. CASPER:  Objection.  Asked and answered.

7             THE COURT:  Overruled.

8             THE WITNESS:  Kind of -- I know it's kind of

9     confusing.  Even looking back it's kind of hard.

10            But I guess the biggest one is being dispatched.  You

11    have someone basically telling you you have to do it, and then

12    going through the call log and doing it yourself.  You're

13    trying to be, I guess, proactive, or you're trying to keep up

14    on the workload so you're doing it yourself.

15            So something -- I guess an example would be is there

16    it was a very busy city.  There is a lot of calls for service

17    and a lot of calls pending.  And so something that I would

18    commonly try to do is if I had calls in my area, especially if

19    they were lower priority calls, I would try to answer up for

20    those calls when I was free and try to deal with those calls.

21            That way if a few minutes later something big

22    happened, I don't have to do this -- handle this big,

23    time-consuming call and then still have to go back and do these

24    little calls, or even worse do this big call and be tied up on

25    that, and have somebody else from another area have to come and

1    handle my work because I'm unable to do those.

2          So if I wasn't busy doing something else.  And before

3    I would be proactive and go out and, like, make car stops or

4    try to find somebody to arrest or whatever, I would make sure

5    that I didn't have any calls pending in my area first.

6    Q.      So can you describe to me what the priority of calls

7    would be that you would respond to?

8    A.      Again, it's a little vague because it's been a long

9    time, but are you talking about how they exactly rank them or

10   just in general?

11   Q.      In general.  What types of calls would require

12   immediate attention versus other types?

13   A.      Okay.  Sorry.  They have, I guess, higher priority

14   calls would be something that's commonly referred to as like a

15   hot call, would be like an emergency situation, or something

16   where you have a crime in progress.  Maybe there's, you know,

17   sometimes a violent crime, or something where there's crime in

18   the still, whoever the suspect in the crime is is still there,

19   and so that requires, like, an immediate response.

20          And even sometimes, depending on the severity of it,

21   they call it a code three response with lights and sirens.  You

22   have to get there, like, right now.

23          And then kind of there was a couple lower levels of

24   calls where maybe it was something like a more severe call, but

25   the person may not still be there, but maybe it just happened,

1    and they just left a few minutes ago, and so it's important

2    that you try to get there and deal with it right now.

3              And then they have, I guess, kind of the lower level

4    calls, which are -- they call them cold calls.  There may be

5    suspect information.  There may not be.  But it's a been a long

6    time, or you're pretty sure there's not somebody still there.

7    You're not going to catch them right this second.  So that's, I

8    guess, a less of a response.

9              THE COURT:  Ms. Faruqui, we are getting some quite

10   narrative answers at this point.  Can you provide short answers

11   to questions.

12             THE WITNESS:  Sorry.  I'm just trying to explain.

13             THE COURT:  I understand that.  Short answers and

14   wait for the next question.

15             MS. FARUQUI:  Thank you Your Honor.

16   Q.        BY MS. FARUQUI:  With respect to the call at 47

17   Kentucky Street, can you describe --

18             Let me ask it this way.  Were you dispatched to that

19   call?

20   A.        I believe I answered up for the call.  So I was

21   dispatched, but I think I asked for dispatch to send me the

22   call.

23   Q.        Okay.  So just to be clear, dispatch did not say you

24   need to go to this call right now?

25   A.        No.  If I recall correctly, I asked them to send it

1          to me.

2          Q.          And you testified to this already, but you were

3          dispatched at 12:08 p.m., is that correct?

4          A.          I believe so, yes.

5          Q.          And then you arrived at the property at 12:11 p.m.?

6          A.          Yes.

7          Q.          So it only took you three minutes to arrive to the

8          property?

9          A.          Yes.

10         Q.          When you arrived to the property, you testified that

11         you parked your car in front of the house and that you got up

12         and walked to the property, is that correct?

13         A.          Yes.

14                     MS. FARUQUI:  I want to, at this time, show you a

15         demonstrative, which is an enlarged version of Exhibit 11 that

16         plaintiffs have already produced.

17                     THE COURT:  Have you shown it to Mr. Casper, the

18         enlarged version?

19                     MR. CASPER:  Exhibit 11?

20                     MS. FARUQUI:  Yes.

21                     MR. CASPER:  No objection.

22                     THE COURT:  All right.

23                     MS. FARUQUI:  I'll continue with the questions while

24         my assistant sets up.

25                     THE COURT:  All right.

1          Q.        BY MS. FARUQUI:  You talked about what you were

2     wearing that day earlier, and you mentioned --

3               THE COURT:  Hold on one second.  So it's clear,

4     Mr. Casper, you may reposition yourself so that you can see the

5     exhibit, and perhaps the assistant can try to set the exhibit

6     up so both Mr. Casper and the Court can see it.  You can move

7     to the end.

8               MR. CASPER:  Thank you.

9               THE COURT:  If you move it back a little bit, the

10    Court can also see it without blocking Ms. Faruqui's view.

11              Well, the Court can't see it, but the Court assumes

12    it's a large version of 11.  If there are any disputes --

13              MS. FARUQUI:  Would you like us to show you?

14              THE COURT:  You may proceed.

15              MS. FARUQUI:  I'm going to stand in front of the

16    demonstrative.

17              THE COURT:  I think perhaps you can move it back so

18    that you can still be at the podium with the mic, and have it

19    even with the edge of the podium furthest from the jury.  Can

20    the jury see the exhibit?  Let's try that.

21         Q.        BY MS. FARUQUI:  Mr. Calhoun, can you see the

22    exhibit?

23         A.        Yes.  It's the same as 11?

24         Q.        Yes.

25         A.        Okay.

1    Q.      So before my assistant set it up, I was asking you

2    what you were wearing that day.

3            Is the flashlight something that typically would be

4    in your utility belt?

5    A.      It depends.  Like I said, I mean, I'm looking back.

6    This was a long time ago.  And I actually used to carry two

7    flashlights.  I think I failed to mention both of them.  I

8    carried one, like a really small one that I didn't use, just as

9    a backup on my belt, and then a little holster thing, and then

10   another one, that bigger flashlight which I would generally

11   carry or put in my pocket a lot of times.

12   Q.      But it was something that you carried every time you

13   were on patrol, is that correct?

14   A.      Yes.

15           MR. CASPER:  Objection.  Leading, Your Honor.

16           THE COURT:  Sustained.  The jury shall disregard that

17   answer.

18   Q.      BY MS. FARUQUI:  Is this something that --

19           Is the flashlight something that you carried when you

20   were working patrol?

21   A.      Yes.

22   Q.      And was that customary for you?

23   A.      Yes.

24   Q.      All right.  So now I want to turn to what is Defense

25   Exhibit B, which is an enlarged version of Exhibit 11.

1          And you testified that when you parked and arrived at

2     the property, that you walked up to this gate, is that correct?

3     A.     Yes.

4     Q.     And at that time, what did you notice about the gate?

5     A.     I mean, just that it was a, like, a white picket

6     fence with a gate and foliage surrounding it.

7     Q.     Did you have any officer safety concerns when you

8     looked at this gate?

9     A.     Just like I said, it wasn't, you know, necessarily a

10    huge concern, but because of the fence and the front yard I was

11    always, I guess, aware of the fact that there may be dogs.

12          But, generally, if there was dogs in the front yard,

13    usually if you pulled up in front of the house, they were

14    already out and visible.

15    Q.     And you testified that you peeked over the gate to

16    look inside the property, is that correct?

17    A.     Yes.

18    Q.     What did you notice when you peeked over the gate?

19    A.     Just that it was a lot of foliage around the whole

20    yard.  It was kind of overgrown.  I guess that's it.

21    Q.     Were you able to see any dogs on the property at that

22    time?

23    A.     No.  I didn't see any dogs.

24    Q.     And you testified that you shook the gate, is that

25    accurate?

1    A.        Yes.

2    Q.        Can you describe what the purpose of shaking the gate

3    is?

4    A.        In my experience, and even sometimes, like, in law

5    enforcement, you have to go into backyards and stuff.  And a

6    lot of times if there's dogs in a yard, their hearing is very

7    good, and, like I said, usually if there's dogs in the front

8    yard, just pulling up in the car the dogs would have been

9    alerted to your presence.

10           But I try to make it a common practice whenever I

11   went through a gate to try to make at least a little bit of

12   noise to see if there was dogs.  Usually if there was dogs in

13   the yard and you shook a gate or a fence, they would come

14   running up and were alerted to your presence.

15   Q.        So on the day in question when you shook the gate,

16   did any dogs respond?

17   A.        No.

18   Q.        And you testified then that you hit the gate with

19   your flashlight, is that correct?

20   A.        Yeah.  I mean, not really hard.  I mean, you have to

21   be cognizant in law enforcement not to strike people's property

22   so hard that you're going to damage it with a flashlight, but I

23   would say more tapped it, loud enough that I thought that if

24   there was dogs in the yard, they would have been alerted to my

25   presence and came running, but I didn't want to hit it hit it

1     and dent it or break it.

2     Q.       Did you at that point observe any dogs responding to

3     the action of hitting the flashlight on the fence?

4     A.       No.

5     Q.       And in the past, had you ever --

6              If you'd ever taken any of those actions which, you

7     know, shaking the gate or hitting the gate with a flashlight,

8     did you experience response from dogs in prior situations?

9     A.       Yes.

10    Q.       And how quickly would you receive a response, from

11    your experience?

12    A.       Usually immediately.  I mean, usually with dogs just

13    walking up they knew you were there and alerted to your

14    presence, but usually, if not, you shook a gate, they were

15    usually right there.

16    Q.       And when you hit the flashlight, did any dogs

17    respond?

18    A.       No.

19    Q.       What else did you -- strike that.

20             Was there an intercom at the gate?

21    A.       No.

22    Q.       What about a doorbell?

23    A.       No.

24    Q.       So what would you have to do in order to get to the

25    front door?

1     A.        Enter the gate.

2     Q.        After you took these safety precautions, what did you

3     do next?

4     A.        Entered the gate and started walking towards the

5     front door.

6     Q.        And can you tell us what happened next?

7     A.        I talked about it a little bit earlier.  As I was

8     walking towards the front door, I remember looking down at the

9     little swimming pool.  For whatever reason, it just drew my

10    attention looking at it, and that's when I heard a noise and

11    looked up kind of to the left and saw the two dogs charging me.

12    Q.        So I want to take you in that instance.

13              You walked, you testified, through the gate, halfway

14    to the front door, and you observed two large dogs?

15    A.        Yes.

16    Q.        And they were running --

17              How did you observe them?

18    A.        I guess, you know, the best way I could describe it

19    is in a full sprint.  I mean, they were running.  They weren't,

20    you know, walking or trotting.  They were running.

21              And, as I testified, they -- my attention was alerted

22    more to the dog that was a little bit in front.  And, you know,

23    again, all this is happening in just like a split second, but I

24    could see that the dog wasn't -- or to me didn't appear to be

25    friendly.  I mean, it was charging me.  It was making this,

1    like, growling, snarling, barking type sound.

2            It's -- I don't know how to describe it, but its,

3    like, lips were kind of up, showing its teeth, kind of that

4    same, I guess, snarling or growling I think is how it's

5    described, and it had the hair kind of on its back or the back

6    of its neck was up, and its tail was straight, and, again, it

7    was sprinting.  It was running.  It wasn't trotting or walking.

8    Q.       Based on your training that you described earlier for

9    signs of an aggressive dog, did you see all the signs that you

10   described earlier that day?

11   A.       Yes.

12   Q.       How did that impact you?  What did you think the dogs

13   were about to do?

14   A.       There was no doubt in my mind in that second that

15   those dogs were going to attack me.

16   Q.       So what did you do next?

17   A.       Again, I mean, this is all happening so fast.  It's

18   literally, like, you know, a second or two.  And some of it, I

19   guess, I didn't realize until after the fact when I looked at

20   where the dog was and kind of where I knew I was.

21            But, you know, unbeknownst to me at the time, I was

22   backing up.  I didn't realize at that time I was even backing

23   up.  And, I mean, just that split second where I looked and

24   realized that these dogs were going to attack me, I mean I

25   barely had enough time to draw my firearm and fire the two

1    rounds to stop the first dog.

2              And the second dog was running, I guess, right, you

3    know, behind it, or right close to it.  I was also scared that

4    that one was going to attack me as well, but when I shot the

5    two rounds and hit the first dog, as I scanned over, the second

6    dog turned around and ran away.  At that point, I was able to

7    finish backing up out of the yard and close the gate.

8    Q.       What was the significance of you noticing that you

9    had retreated five to six feet in that instance?

10   A.       Again, I mean, I didn't realize it until after the

11   fact.  I didn't even realize that -- you know, I didn't even

12   realize I was backing up.  It just happened so fast.  I mean, I

13   remember walking up, and I, you know, kind of looked down or

14   glanced down at the swimming pool, and then this happens in

15   basically like a split second.

16             And then where the dog had fallen, I realized that I

17   was probably at least five or six feet back.  So I was just

18   surprised that I was even able to back up that much in that

19   amount of time.

20   Q.       At that point, can you describe for the jury how you

21   felt threatened when you saw the two dogs running at you in a

22   full sprint?

23             MR. CASPER:  Objection.  Asked and answered.

24             THE COURT:  Sustained.

25             THE WITNESS:  Absolutely, I mean --

1          THE COURT:  I sustained the objection.

2          THE WITNESS:  Sorry.

3          THE COURT:  Next question.

4     Q.        BY MS. FARUQUI:  What was the impact of two large

5     dogs running at you versus just one?

6     A.        I mean, one dog that's going to attack you,

7     obviously, I mean, that's still, I mean, bad or dangerous.  You

8     could still be severely injured by one dog.  But the fact that

9     there's two of them, it multiplies it, I guess.  I mean, being

10    attacked by two dogs, you could be seriously injured or even

11    killed.  I mean, one's going to be bad, but two is even worse.

12    Q.        After you shot the lead dog, what happened next?

13    A.        I finished backing out, got out of the yard and

14    closed the gate.

15    Q.        And then what happened?

16    A.        At some point, the resident started to come out of

17    the house, and then, again, this is all happening real fast,

18    and I didn't know, you know, whose dogs these were or what.

19    Alls I know is I was just, you know, almost attacked by these

20    two dogs that appeared to me to be vicious, and so I told her

21    to go back inside the house because I was scared that she was

22    going to be attacked by the remaining dog.

23    Q.        At some point, Mr. Casper asked you this, but the

24    plaintiff, Erika Gregory, came out of her home, is that

25    accurate?

1      A.          Yeah.  And I think it was a short time later she came

2      out and realized that it was her dog that I had shot.

3      Q.          What did you say to her at that time?

4      A.          She was obviously very upset, and I can remember

5      telling her that, you know, I was sorry that I had to shoot her

6      dog, but her dog was going to attack me.  I had no choice at

7      the time other than to shoot it to protect myself.

8      Q.          Did you tell her at that time that you were a dog

9      lover and an animal lover?

10     A.          Yeah, absolutely.  She was very upset.  I mean,

11     that's the only way I can describe it.  And, I mean, you know,

12     rightfully so.  I mean, I would be upset if the same thing

13     happened to my dog.

14                 MR. CASPER:  Object.

15                 THE WITNESS:  I told her --

16                 MR. CASPER:  Object as leading, Your Honor.

17                 THE COURT:  Sustained at this point.  Just wait now

18     for the next question.

19     Q.          BY MS. FARUQUI:  Mr. Calhoun, you were just saying

20     that you would be upset if this had happened to your dog.

21     Could you go into that a little bit?

22     A.          I mean, absolutely.  I totally understand how a dog

23     is like a part of the family and can be -- it would be very

24     upsetting to lose an animal.

25     Q.          In this situation did you -- strike that.

1          Let me go back just a little bit before the incident

2     happened.  Did you see any signs posted on the gate?

3     A.     No.

4     Q.     So was there a sign that said do not enter?

5     A.     No.

6     Q.     Was there a sign that said beware of dog?

7     A.     No.

8     Q.     Was there a no trespassing sign?

9     A.     No.

10    Q.     Did anyone else witness this incident?

11    A.     No.

12    Q.     So you're the only eyewitness, is that correct?

13    A.     Yes.

14    Q.     Was there an Internal Affairs investigation after

15    this incident?

16    A.     Yes.

17    Q.     And what were the results of that IA investigation

18    into this incident?

19    A.     I don't know what the word is that they used, but it

20    was found to be justified.

21    Q.     So is it accurate to say that your actions on the day

22    in question were found to be justified?

23    A.     Yes.

24    Q.     What was the basis for your decision to use a gun?

25    A.     Just, I mean, timing had a lot to do with it.  I

1    mean, you're faced with this situation where you have this

2    threat, and it's an immediate threat.  You're being charged by

3    one -- not one but two dogs, and there was just no time to use

4    any other type of force other than the firearm.

5    Q.       During your tenure at the Vallejo Police Department,

6    did you ever receive any complaints about your use of force?

7    A.       No.

8    Q.       Did you receive any complaints about violence?

9    A.       No.

10   Q.       Did you receive any complaints either internal or

11   from citizens about discourtesy?

12   A.       No.

13   Q.       So at any time there was not a force complaint

14   against you, is that correct?

15   A.       That's correct.

16            THE COURT:  How much longer do you need?

17            MS. FARUQUI:  Just a couple minutes.

18            THE COURT:  All right.  Why don't you finish up and

19   then we'll take a midmorning break.

20   Q.       BY MR. CASPER:  Mr. Casper testified -- or strike

21   that -- asked you about an investigation that happened in 2013?

22   A.       Yes.

23   Q.       And when you were terminated from the Vallejo Police

24   Department, were any of the allegations sustained that you were

25   untruthful?

1    A.        No.

2    Q.        Did those allegations have anything to do with

3    dishonesty?

4    A.        No.

5              MS. FARUQUI:  No further questions, Your Honor.

6              THE COURT:  All right.  That does bring us to a good

7    point for a midmorning break.  Let's take a 15-minute break.

8              During that break, please remember all of my

9    admonitions.  Do not discuss the case with anyone.  Don't do

10   any research of any kind.  If anyone does attempt to contact

11   you during the break, please let me know immediately.  If you

12   become aware of anyone discussing the case, let me know.

13             Thank you for your service so far today.  We'll see

14   you in 15 minutes.

15             (Jury out.)

16             (Break taken.)

17             THE COURT:  Just briefly, how much more time do you

18   need with Mr. Calhoun?

19             MR. CASPER:  Well, it kind of depends on what I'm

20   about to bring up, Your Honor.

21             THE COURT:  You may be seated.  The rest of you.

22             MR. CASPER:  I intend to cross-examine Mr. Calhoun on

23   the specific incidents of his misconduct that were -- that came

24   up in the Internal Affairs report.

25             This is based on defense counsel opening the door to

1    his competency as a police officer and his character.  She

2    mentioned his commendations and service awards.  She also

3    brought up the lack of --

4            THE COURT:  Were those removed?  Was he stripped of

5    those?

6            MR. CASPER:  Not as far as I know.

7            MS. FARUQUI:  No.

8            THE COURT:  I just wanted to clarify that.

9            MR. CASPER:  She also brought up the lack of

10   complaints of excessive force, discourtesy, but, more

11   importantly, the commendations and service awards, and there

12   was some testimony that was established through that.

13           THE COURT:  What's your best case for going into

14   specific acts?

15           MR. CASPER:  Well, it would be based on defense

16   counsel opening the door on this issue.  I don't have the case

17   law in front of me, Your Honor.  I would need a brief amount of

18   time.  But I believe that it opens the door to testimony

19   regarding his competency or his quality of being a police

20   officer.

21           THE COURT:  All right.  Well, let me think about

22   that.  I'm looking at my order where I specifically addressed

23   Rule 608 and specific bad acts.  I did note that the door might

24   be opened.  Let me consider that, and I'll let you know when

25   you come back.

1          MR. CASPER:  Thank you.

2          THE COURT:  Give me the two ranges.  If I do allow

3      that question?

4          MR. CASPER:  First of all, if you do allow it, I

5      don't want to get into a mini trial on the specifics of that

6      internal affairs, but I do intend, generally, to get into him

7      being routinely late for calls for service, perhaps some of the

8      general allegations involved in the Internal Affairs report.

9          THE COURT:  Aren't there select questions you can ask

10     drawing out information from that report without getting into

11     the litany of specific acts?

12         MR. CASPER:  I mean, specific in the sense that he

13     was being -- I can stay away from the sexual misconduct.

14         THE COURT:  Do you want to elicit the nature of the

15     misconduct?

16         MR. CASPER:  No.  I just want to establish that he

17     was routinely late for service and that was unavailable for

18     calls.

19         THE COURT:  I think there is some impeachment

20     material in the report that can be used in that way.  So what's

21     your estimate of the range of time you need?

22         MR. CASPER:  With it, probably 20 minutes.  Without

23     it, 5 to 10.

24         THE COURT:  All right.  And then you'd be prepared to

25     call Ms. Elmossalamy?

1          MR. CASPER:  Elmossalamy.  And I would have to check

2     the hallway.  I assume she's here.

3          MS. FARUQUI:  Your Honor, if I may respond to opening

4     the door.  There was nothing opened in terms of -- I believe

5     your order said that any questions about truthfulness in

6     employment.

7          Mr. Calhoun did not deny that he was terminated, and

8     on direct -- or cross that Mr. Casper did, he did not ask him

9     any of those questions.

10          And so, to me, I'm not sure what type of impeachment

11     would really be asked.  And then further in terms of the

12     lateness of calls, he testified that he arrived at the call

13     three minutes later.  I don't think that enough has been made

14     in this case for lateness.  As well as you had said that habit

15     was not going to be considered in terms of general lateness.

16          THE COURT:  I don't hear any request to establish

17     habit.  No habit evidence.

18          MR. CASPER:  That's correct.  I intend to introduce

19     evidence that goes to his quality as a police officer.

20          As it stands now, the jury has heard testimony that

21     Mr. Calhoun was a good police officer, and that he received

22     commendations and service awards.

23          THE COURT:  I think there's some standard impeachment

24     that can rely on the investigatory report based on what

25     Mr. Casper has said.  There's some select questions to draw out

1    some of the findings that DeJesus made in reaching his

2    conclusions.  So some cross-examination will be allowed along

3    those lines.

4              MR. CASPER:  Thank you.

5              (Break taken.)

6              THE COURT:  Back on the record with counsel and the

7    parties.  I've looked at the investigative report so I'm

8    familiar with it.  I've reviewed it again, and I do believe

9    there is impeachment material there.  So unless you've met and

10   conferred, I'm prepared to allow impeachment by cross and rule

11   on objections as they come.

12             MR. CASPER:  Okay.  Thank you, Your Honor.

13             THE COURT:  All right.  Let's bring the jury in.

14             (Jury in.)

15             THE COURT:  Welcome back, ladies and gentlemen of the

16   jury.  You may all be seated.

17             And at this point, Mr. Casper will return with

18   recross.

19             MR. CASPER:  Thank you, Your Honor.

20                      REDIRECT EXAMINATION

21   BY MR. CASPER:

22   Q.        Mr. Calhoun, I want to turn your attention to

23   Exhibit 2 in evidence.

24             Mr. Calhoun, do those depict the two animals that

25   were charging you on May 16, 2012?

1    A.       Yes.

2    Q.       Which of those animals was the one that you shot and

3    killed?

4    A.       The one on the left.

5    Q.       And was the one on the right the animal that was

6    still loose on the property after you shot and killed the

7    other?

8    A.       I believe so, yes.

9    Q.       Was this was the animal that you were concerned and

10   ordered Ms. Gregory back in the house?

11   A.       Yes.

12   Q.       Did you ever learn that this dog was a 14-year-old

13   blind and deaf Border Collie mix?

14   A.       Not until after.

15   Q.       Mr. Calhoun, did you ever attempt to call the

16   reporting party prior to entering the yard?

17   A.       No.

18   Q.       Did you have that reporting party's phone number at

19   the time?

20   A.       I believe so.  It was in the call.

21   Q.       And isn't it true that you didn't call prior to

22   entering the property because, generally, that's not what

23   officers do?

24   A.       Yes.

25   Q.       And that is despite the fact that you were concerned

1        about dogs on the property, correct?

2        A.        Yes.

3        Q.        Mr. Calhoun, isn't it true that you were investigated

4        for taking yourself out of availability for calls for service

5        from March 2012 to August 2013?

6                  MS. FARUQUI:  Objection.  Misstates --

7                  THE COURT:  Overruled.  You may answer.

8                  THE WITNESS:  Can you repeat the question?

9        Q.        BY MR. CASPER:  Isn't it true from March 2012 to

10       August 2013 one of the allegations in the Internal Affairs

11       investigation of you was that you were making yourself

12       unavailable for calls for service?

13       A.        Yes.

14       Q.        And isn't that because you were going to remote

15       locations of the county on Mare Island?

16       A.        Within the City of Vallejo, yes.

17       Q.        And those areas were remote to your beat, isn't that

18       correct?

19       A.        I don't recall.

20       Q.        Isn't it true that some of the locations was a Alco

21       Recycling Center on Mare Island?

22                 MS. FARUQUI:  Objection.  Relevance.

23                 THE COURT:  Overruled.

24                 THE WITNESS:  Yes.

25       Q.        BY MR. CASPER:  And a PG&E substation?

1      A.        Yes.

2      Q.        As well as an area referred to as Gilcrest?

3      A.        I believe so, yes.

4      Q.        Isn't it true that one of the sustained findings

5      against you was that you were unavailable -- excuse me -- that

6      you were in violation of idling on duty?

7      A.        Yes.

8      Q.        As well as availability for duty?

9      A.        Yes.

10     Q.        As well as duty responsibilities?

11     A.        Yes.

12     Q.        And conduct unbecoming of an officer?

13     A.        Yes.

14     Q.        Isn't it true that when Lieutenant DeJesus asked you

15     if you were available for calls for service, that you denied

16     that you were ever late for calls for service as a result of

17     the misconduct?

18     A.        Yes.

19               MR. CASPER:  I have nothing further.  Thank you.

20               THE COURT:  All right.  Any further questions from

21     you, Ms. Faruqui?

22               MS. FARUQUI:  Yes.

23                         RECROSS-EXAMINATION

24     BY MS. FARUQUI:

25     Q.        Mr. Calhoun, when there was the internal affairs

1    investigation that was conducted in 2013, was that related to

2    this incident, the May 16th, 2012 incident?

3    A.      No.

4    Q.      Was that related to untruthfulness or dishonesty?

5    A.      No.

6    Q.      And how can you explain what was referred to as

7    responding late to calls?

8    A.      I don't believe that was ever the case.  I think that

9    may have been a misunderstanding from the person who had said

10   that.

11   Q.      And was part of this investigation an investigation

12   into your use of force at any time?

13   A.      No.

14           MS. FARUQUI:  Thank you.

15           THE COURT:  All right.  Any further questions,

16   Mr. Casper?

17           MR. CASPER:  Real briefly, Your Honor.

18                    FURTHER REDIRECT EXAMINATION

19   BY MR. CASPER:

20   Q.      Is it your testimony, Mr. Calhoun, that you would be

21   at these locations that I had mentioned on Mare Island and that

22   you still could get to your calls for service on time?

23   A.      Can you repeat the question?

24   Q.      Is it your testimony that you were placing yourself

25   in these remote areas of Mare Island - the PG&E substation, the

1    Alco recycling plant, Gilcrest - and still be able to respond

2    in a timely manner to your calls for service?

3    A.        I guess I believe that's open for interpretation.

4    Q.        Isn't it true that Sergeant Clark at the time was one

5    of your supervising officers?

6    A.        Yes.

7    Q.        Isn't it true that he found that you were routinely

8    late for calls for service?

9    A.        I don't believe that was the case.

10   Q.        Would you like your recollection refreshed with the

11   Internal Affairs investigation?

12   A.        I can remember the exact incident he was referring

13   to, if you want me to explain that.

14   Q.        Was that the one incident that he's referring to as

15   "routinely"?

16              MS. FARUQUI:  Objection.  Vague.

17              THE COURT:  Overruled.  You may answer if you're

18   able.

19              THE WITNESS:  What was the question?

20              MR. CASPER:  I have nothing further.

21              THE COURT:  All right.  Ms. Faruqui.

22              MS. FARUQUI:  I have one.

23                          FURTHER RECROSS-EXAMINATION

24   BY MS. FARUQUI:

25   Q.        Mr. Calhoun, you testified earlier that with respect

1    to this call at 47 Kentucky Street, you were dispatched at

2    12:08 p.m. and you arrived at the residence at 12:11 p.m., is

3    that correct?

4    A.        Yes.

5    Q.        In your mind, would that make you late for service?

6    A.        No.

7              MS. FARUQUI:  No further questions.

8              MR. CASPER:  I have nothing further, Your Honor.

9              THE COURT:  All right.  Is this witness excused from

10   testifying?

11             MR. CASPER:  Yes, Your Honor.

12             THE COURT:  Do you agree, Ms. Faruqui?

13             MS. FARUQUI:  Subject to recall in terms of --

14             THE COURT:  In case there is any rebuttal case.

15             MR. CASPER:  Right.

16             THE COURT:  You may step down now, sir.  You are

17   subject to recall.

18             (End of partial transcript.)

19                         CERTIFICATION

20        I, Diane J. Shepard, certify that the foregoing is a

21   correct transcript from the record of proceedings in the

22   above-entitled matter.

23                         /s/ DIANE J. SHEPARD
                           DIANE J. SHEPARD, CSR #6331, RPR
24                         Official Court Reporter
                           United States District Court

25